UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BRADFORD C. BLEIDT and<br>ALLOCATION PLUS ASSET MANAGEMENT<br>COMPANY, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. CA-04-12415-NG

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION, ORDER FREEZING ASSETS AND ORDER FOR OTHER EQUITABLE RELIEF

### PROCEDURAL BACKGROUND

On Friday, November 12, 2004, Plaintiff Securities and Exchange Commission ("Commission") filed this emergency enforcement action against Defendants Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc. ("Allocation"). Bleidt is the president of Allocation, a Boston-based investment adviser registered with the Commission. Among other things, the Commission's Complaint alleged that Bleidt had confessed – in a tape recording sent to the Commission's Boston District Office – to diverting millions of dollars of investor funds over the past 20 years. On the same day, November 12, the Court – acting through emergency Judge Richard G. Stearns – granted the Commission all of the relief it sought in its proposed Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief ("TRO").

On November 17, 2004, the Court, acting through Judge Nancy Gertner, granted the Motion of Plaintiff Securities and Exchange Commission to Extend Temporary Restraining

Order – to December 2, 2004. Also on November 17, the Court, acting through Judge Gertner, granted the Motion of Plaintiff Securities and Exchange Commission Requesting That Bleidt Be Ordered to Surrender His Passport.

On November 18, 2004, the Court, acting through Judge Gertner, granted the Securities and Exchange Commission's Motion for Appointment of a Receiver ("Motion Appointing Receiver") and appointed David A. Vicinanzo, Esquire, of Nixon Peabody LLP as the receiver in this matter. On November 22, 2004, the Court, acting through emergency Judge Stearns, granted the Motion of Plaintiff Securities and Exchange Commission to Clarify Scope of Order Appointing Receiver and entered a revised order which incorporated certain technical amendments to the order appointing the receiver in this matter.

The Commission now files this Supplemental Memorandum in support of its motion for a preliminary injunction. As further discussed below, the Commission has properly served defendants with copies of all papers filed, and orders issued, in this case. In addition, as further detailed below, the Commission has thus far compiled an overwhelming amount of evidence that defendants have violated the federal securities laws and that the asset freeze and other equitable relief first ordered by the Court on November 12 should remain in place.

The Commission staff also anticipates that Mr. Vicinanzo, the receiver appointed in this matter, or counsel for him, will want to address the Court during the preliminary injunction hearing scheduled for December 2, 2004, so that he may, among other things, update the Court on his efforts to identify and maximize any of Defendants' remaining assets.

Defendant Bleidt has been charged on related federal criminal charges by the U.S. Attorney's Office for the District of Massachusetts. He is currently being detained at the

2

Plymouth County House of Corrections, pending transport to Ft. Devens for a competency evaluation. Based on communications the Commission staff has had with the U.S. Marshall's Service, the Court would probably need to issue an order to ensure Defendant Bleidt's appearance at any hearing in this matter. The Commission staff sent a letter to Defendant Bleidt yesterday, via overnight and regular U.S. mail, at the Plymouth County House of Corrections informing him of the hearing currently scheduled for tomorrow, December 2.

## SERVICE OF PAPERS AND ORDERS UPON DEFENDANTS

The Commission has properly served all of the papers filed, and orders which have thus far been issued, upon defendants. On November 12, the day the Commission filed the Complaint, the Commission sent, via FedEx and regular U.S. mail, copies of the TRO to Bleidt at his residence. Also, on November 12, the Commission faxed the TRO to Allocation's office. On November 15, the Commission also sent, via fax and regular U.S. mail, copies of the Commission's motion to extend the TRO to Bleidt and Allocation. On November 16, a process server also left copies of all papers which had until then been filed at Bleidt's residence. This was effective service pursuant to Federal Rule of Civil Procedure 4(e)(1) (i.e., Massachusetts law). On November 17, the Commission sent, via fax and regular U.S. mail, copies of the motions for the appointment of a receiver and for Bleidt to surrender his passport, to Bleidt and Allocation. Also, on November 17, the Commission sent, via fax, a copy of the docket to Bleidt and Allocation; the docket noted that the Commission's motions for the appointment of a receiver and for Bleidt to surrender his passport had been granted. Also, on November 17, all of the papers filed, and all orders then entered, were served by process server on CT Corporation System, Allocation's registered agent in Providence, Rhode Island. On November 22, the

3

Commission sent, via fax and regular U.S. mail, the Commission's motion to clarify the scope of the order appointing the receiver, and the amended order itself, to Bleidt and Allocation. Also, on November 22, the Commission sent, via fax and regular U.S. mail, copies of the Commission's motion for clarification of the order appointing the receiver to Bleidt and Allocation. Also, on November 22, the Commission sent, via fax, a copy of the amended order appointing a receiver to Bleidt and Allocation. Also, on November 22, per arrangement with the Plymouth County House of Correction – where he is being temporarily held on related federal criminal charges – Bleidt was served with all of the papers filed, and all orders then entered. On November 29, the Commission also sent a courtesy copy of all papers filed, and all orders then entered, via Federal Express, to Edward J. Lee, Bleidt's attorney in the related federal criminal matter.

## EVIDENCE OF DEFENDANTS' FRAUD

As further discussed below, the Commission has thus far been able to compile an overwhelming amount of evidence, most of it summarized in the attached Declaration of Mark A. Gera ("Gera Declaration") and Declaration of Anthony C. Jordan ("Jordan Declaration"), that defendants have violated the federal securities laws. As such, the Commission's request for a preliminary injunction should be granted.

### November 12 Receipt of Bleidt's Taped Confession

1.    On Friday, November 12, 2004, the Commission's Boston District Office ("BDO") received, via DHL, a tape recording from Bleidt. See Gera Declaration ¶2 and Exhibit A thereto. (The voice on all of the tape recordings discussed herein have been authenticated as that of Bleidt by either Bonnie Bleidt, his wife, or Nancy Foss, an Allocation employee and

4

former assistant of Bleidt. Please see Exhibits A & B hereto for relevant pages of the testimonies of Ms. Bleit and Ms. Foss).

2.      In the tape recording received by the SEC staff on November 12, Bleidt states, in part: "I am the owner of ... Financial Perspectives [FPPS] and Allocation ... . I am reporting a serious, serious breach of professional conduct and just criminal behavior. I'm reporting myself. Over the last twenty years almost, I've stolen tens and millions of dollars from clients through Allocation Plus Asset Management Corp. You all have audited us in the past and for the most part, it's a clean operation. The only violations were conducted by me, by Brad Bleidt. .... I would prepare monthly statements to send to clients and we're talking about close to one hundred clients at least. So this is a major, major, major situation and it's tragic and I'm so sorry and guilty and obviously, I'm not there. ... What I basically did is that when I would get a new client, I would roll – I would take their money, have it payable to Allocation Plus Asset Management Corporation and deposit it in a Sovereign Bank account of which I would set up payments for the first and the fifteenth of the month or any time the client would call and request money. I always had enough cash flow that I was able to cover those demands. And it's today, this Thursday [November 11] is the day of reckoning because there is a, a client that needs a million-and-a-half dollars wired into their account that's supposed to be there this morning, and obviously it's not going to be there this morning because the money's gone. I stole it. I used it to buy a radio station, believe it or not, which is stupid. I mean, I'm sick, I'm just, I'm, I'm literally a psychopath. I must be to do to the magnitude, and to whom I did it. The innocent victims, are just, it's, it, I'm a monster. I'm an absolute monster." See Gera Declaration ¶ 3 and Exhibit A thereto.

5

3.      According to a number of record, including Commission filings, Bleidt has been Allocation's Director, President, Treasurer and sole shareholder since 1993. Bleidt was, until recently, Financial Perspectives Planning Services, Inc.'s ("FPPS") CEO and a member of its board of directors. He is also FPPS' majority shareholder. FPPS, like Allocation, is a Boston-based investment advisor registered with the Commission. See Gera Declaration ¶ 4.

**On-Site Examinations**

4.      Commencing on Friday, November 12, the day the SEC staff received Bleidt's taped confession, the SEC staff has been conducting an on-site examination of Defendant Allocation and of non-defendant FPPS at 205 Portland Street, Boston. Since November 12, the SEC staff has also been conducting an on-site examination of Winslow, Evans & Crocker ("WE&C"), a Commission registered broker-dealer. Since approximately January 2004, FPPS's financial planners have been registered representatives of WE&C, with WE&C maintaining the customer accounts of FPPS and Allocation through National Financial Services LLC ("National"). The SEC staff has also been conducting on-site examinations of Detwiler, Mitchell, Fenton & Graves, Inc. ("Detwiler") and Commonwealth Financial Network ("Commonwealth"), broker-dealers with which FPPS and Allocation were associated in the past. See Gera Declaration ¶ 5.

5.      The SEC staff has thus far obtained and reviewed a significant amount of documents pursuant to its on-going examinations of FPPS, Allocation, WE&C, Detwiler and Commonwealth. See Gera Declaration ¶ 6.

**November 12 Discoveries**

6.     On Friday, November 12, during the SEC staff's on-site examinations, the SEC staff discovered, at 205 Portland Street, that Bleidt had left behind for the SEC staff written instructions concerning how the SEC staff might be able to determine the nature and extent of his fraud.  See Gera Declaration ¶ 7 and Exhibit B thereto.

7.     The SEC staff also learned, while on-site at 205 Portland Street on November 12, that Bleidt had left behind two additional tape recorded messages for the staff.  See Gera Declaration ¶ 8 and Exhibit C thereto.

8.     In one of the tapes left behind for the SEC staff at 205 Portland Street, Bleidt stated: "I was pretty sneaky and this was very devious ... [w]e created or I created a Ponzi scheme here where over about a 20 year period I would take in money invested – deposited into a corporate account the people thought they were investing at the Asset Management Company so they wrote the checks to the asset management company. ... [T]he big cover was that we ran a clean operation here other than me[.] ... [J]ust by being able to have a legitimate operation stand in front of my crimes so my you know my embezzlements, I was able to shield from purview anything that I did.  Pretty you know it is something to consider when client lists were requested you know obviously the clients that I have embezzled from are never on the client list. ... [T]he client files are there, they're it's a fairly good accounting of what's there all the clients that have been abused are listed their approximate asset base that includes growth from hypothetical portfolio management because obviously the monies don't exist in some cases there's some small brokerage accounts that are reflected but for the most part what you see is what you got there.  It's pure fraud ... ."  See Gera Declaration ¶ 9 and Exhibit C thereto.

9.      On the second tape left for the SEC staff at 205 Portland Street, Bleidt directed the staff to two sets of fraudulent Allocation account statements which he mailed out to his clients. On the tape, he states, in part: "There's three rolling file cabinets, and two of them are for monthly statements, where clients got statements monthly, and the other one where clients got statements quarterly. They're usually quarterlies are for – you know clients I've had for a long time. ... A lot of these – there are a number of payments that get made on the first of the month and the on fifteenth of the month that were coming out of my Sovereign account, the APAM [Allocation] account that I had, obviously that's going to stop because there's not going to be any money in there. ... Those lists that are with the cabinets should be fairly accurate, and the statements that are in there are accurate but they also represent the principal that was stolen but also fictitious histories of trades and investments, and allocations, and you know that, you know, performance is pretty good, theoretically I guess but they obviously, it's fictitious, you know so I really don't know how that gets valued but the addition of the sum of all those statements I haven't even had the guts to even look at that. It's got to be well over 20 million – cumulative. This was done over a two decade period so it's just built on itself, and it's just horrible, I mean the carnage and the individual suffering that's going to come off, the knowledge of these people not having any monies ... ." See Gera Declaration ¶ 10 and Exhibit C thereto.

10.     The SEC staff was able to recover the fraudulent Allocation monthly and quarterly account statements referred to by Bleidt on the second tape left for the staff at 205 Portland Street. The account statements indicated that Bleidt was sending fraudulent monthly Allocation account statements to approximately 100 clients and fraudulent quarterly Allocation account statements to approximately 40 clients. The account statements falsely indicated that the

8

defrauded investors had a total of approximately $45 million invested with Bleidt. The last set of these account statements were dated September 2004. See Gera Declaration ¶ 11 and Exhibit D thereto.

11.    The SEC staff was also able to recover on-site Sovereign bank documents left behind by Bleidt indicating which of his clients received payments on the first and fifteenth of the month, respectively, during approximately the past six (6) months. The documents indicate that approximately 15 clients received monthly payments on the first of the month and that approximately 10 clients received monthly payments on the fifteenth. The documents also indicate that these monthly payments made by Bleidt averaged out to approximately $40,0000 for the clients who received payments on the first of the month and to approximately $23,000 for the clients who received payments on the fifteenth of the month. See Gera Declaration ¶ 12 and Exhibit E thereto.

12.    The approximately 140 clients reflected on the fraudulent account statements left behind by Bleidt are currently believed by the SEC staff to constitute most, if not all, of Bleidt's "Ponzi scheme" victims. Though the fraudulent account statements indicate that these clients had approximately $45 million under management with Bleidt, the SEC staff is still attempting to determine the true nature and extent of the harm caused these clients. The $45 million figure used by Bleidt is not reliable given Bleidt's taped acknowledgment that the "performance" reflected in the statements is "theoretical[]" or "fictitious." See Gera Declaration ¶ 13.

**Additional Taped Confessions**

13.    Also on Friday, November 12, employees of FPPS and/or Allocation discovered on-site at 205 Portland Street five (5) additional tape recordings left for the following specific

individuals at FPPS and/or Allocation:  Keith Harris, Chief Financial Officer of Financial Perspectives Management Company, the entity which provided management services to, among others, FPPS and Allocation (Tape #1); Nancy Foss, Bleidt's assistant (Tape #2); James McCarty, President, board member and minority shareholder of FPPS (Tape #3); Bonnie Bleidt, Bleidt's wife and an FPPS employee (Tape #6); Joseph DeLuca, another FPPS employee (Tape #5).  In addition, the SEC staff has recovered a tape which Bleidt sent, on or about November 11, to Robert Maloney at WE&C (Tape #7).  In all of these additional tape recorded messages, Bleidt confesses to his fraud, in similar language and tone.  See Gera Declaration ¶ 14 and Exhibit F thereto.

### Bleidt's Misappropriation of Church Funds

14.     Bleidt left a handwritten note for the SEC staff that stated "This is what triggered the exposure[.]"  Attached to the note was a file for the Greek Orthodox Church of Weston ("the Church") containing, among other things, copies of fictitious account statements and correspondence with the Church.  See Gera Declaration ¶ 15 and Exhibit G thereto.

15.     Additional tape recordings left behind by Bleidt confirm that the Church is the client referred to by Bleidt in the tape received by the SEC staff on Friday, November 12 – the client which caused his "day of reckoning" because it needed "a million-and-a-half dollars wired into [its] account" on Thursday, November 11.  In that original tape, Bleidt also noted that he had used that client's funds "to buy a radio station."  See Gera Declaration ¶ 16 and Exhibit A thereto.

16.     Similarly, on the tape which he left at 205 Portland Street for Keith Harris, Bleidt states, in part: "And you know that Greek Church situation where they want their million-and-a-

half. It's supposed to be at the lawyer's office via wire this morning and the money doesn't exist. I actually gave it to Alex Langer at the first of the year to buy the station [WBIX]." Additionally, on the tape which he left at 205 Portland Street for Nancy Foss, Bleidt states, in part: "[T]he Greek Church, which is expecting a million-and-a-half wire today, and it's not going to happen, because the money doesn't exist." On the tape which he left at 205 Portland Street for Bonnie Bleidt, his wife, Bleidt similarly states, in part: "And today a wire for the Greek Church is supposed to hit for 1.5 million which does not exist because I've stolen it." And on the tape which he sent to Bob Maloney of WE&C Bleidt states, in part: "There is a one million five-hundred thousand dollar wire that is supposed to be delivered to the Greek Orthodox Church in Weston, Massachusetts, that is not going to happen, because those monies do not exist. They were given to Alex Langer at the beginning of the year, probably January 13th, to buy a radio station." See Gera Declaration ¶ 17 and Exhibit F thereto.

17.    Bleidt further elaborated on his relationship with the Church in the second tape left for the SEC staff at 205 Portland Street. On that tape, Bleidt states, in part: "Dealing with the church first off, those monies were brought in [to Allocation] ... right before we moved ... from Fechtor Detwiler [FPPS's and Allocation's broker-dealer before WE&C, now known as Detwiler, Mitchell, Fenton & Graves, Inc.] ... . I basically had told them that we were moving to Winslow, Evans and Crocker and move the monies out of the National [Financial] [custodial] account into the church's Sovereign account and then have them write a check back to APAM [Allocation] – for, you know to set up a new account which I told them was at Winslow, Evans and Crocker and obviously it didn't exist. That was at a time when Alex [Langer] was really pushing to close [on the deal to purchase radio station WBIX] right around ... the 13th of January

[2004]. And I did this to settle that 'cause I thought I could get some money back 'cause there was other things out there that I could replace it, and, obviously that didn't happen. ... ." <u>See</u> Gera Declaration ¶ 18 and Exhibit C thereto.

18.    Bleidt also elaborated, on the second tape left for the SEC staff at 205 Portland Street, on why he believed the Church wanted or needed its money on Thursday, November 11. On that tape, Bleidt states, in part: "But anyway, what's happened is that the church has an IRS settlement so they need the money back immediately, and they are expecting a wire this morning, Thursday. And obviously it's not going to happen – and so it's going to hit the fan." <u>See</u> Gera Declaration ¶ 19 and Exhibit C thereto.

19.    Documents reviewed by the SEC staff indicate that, in or about January 2004, Bleidt misappropriated approximately $2.2 million from the Church. On or about January 9, 2004, the Church liquidated its funds at Detwiler and transferred approximately $2.2 million to Allocation – via two checks drawn from the Church's Sovereign account. Allocation's Sovereign account statements indicate that it received the Church's $2.2 million on or about January 13-15, 2004. On or about January 14, 2004, $1.3 million was transferred from Allocation's Sovereign account to an account in the name of Perspectives Broadcasting, Inc. ("Perspectives"). On or about January 14, 2004, Perspectives' Sovereign account received the $1.3 million. On or about January 14, 2004, the $1.3 million was transferred from Perspectives' Sovereign account to a National account in the name of Alex Langer. <u>See</u> Exhibit K (copy of wire transfer agreement for Perspectives). In addition to Bleidt's own taped admissions, the SEC staff has obtained other information that Alex Langer was the owner of radio station WBIX

before selling it to Bleidt and/or to Bleidt-related entities in or about January 2004. <u>See</u> Gera Declaration ¶ 20 and Exhibits H, I, J and K thereto.

## Allocation Sovereign Account

20.    As further detailed below, Bleidt not only used the Allocation Sovereign account to make periodic payments to clients, but also to make Allocation-related expenses and personal expenses (both directly through the account as well as via the transfer of monies to a personal account at Fleet (account number 0077052881)) ("Fleet personal account"). <u>See</u> Jordan Declaration, ¶ 2.

21.    On September 10, 2004, Bleidt wrote a check (#3398) out of the Allocation Sovereign account for $18,655 to Cushing Academy. The SEC staff has obtained other information that one of Bleidt's sons attends Cushing Academy. This check cleared the Allocation Sovereign account on October 1, 2004. <u>See</u> Jordan Declaration, ¶ 3 and Exhibits A and B thereto.

22.    On September 27, 2004, Bleidt wrote a check (#3399) out of the Allocation Sovereign account for $4,199.60 to Anita Brewer, purportedly for "various expenses." The SEC staff has obtained other information that, on or about the time that this check was written, Bleidt was renting a residence from Ms. Brewer. This check cleared the Allocation Sovereign account on October 1, 2004. <u>See</u> Jordan Declaration, ¶ 4 and Exhibits A & B thereto.

23.    On October 6, 2004, Bleidt wrote a check (#3429) out of the Allocation Sovereign account to Sam Abbott for $4,000. The check itself indicates that it is for "Oct Rent." The SEC staff has obtained other information that, on or about the time that this check was written, Bleidt

was renting a house from Mr. Abbott. This check cleared the Allocation Sovereign account on October 13, 2004. See Jordan Declaration, ¶ 5 and Exhibits B & C thereto.

24.    On October 8, 2004, Bleidt sent a wire transfer, in the amount of $10,000, out of the Allocation Sovereign account and into the Fleet personal account. See Jordan Declaration, ¶ 6 and Exhibits B and D thereto.

25.    On October 14, 2004, Bleidt used the Fleet personal account – which had recently received the funds described above, in paragraph 6 – to make, among others, the following on-line payments: (a) Citicorp Diners Club ($1,597.45); (b) Porsche Payment Center ($1,018.24); (c) Chase Auto Finance ($391.91); and (d) Cushing Academy ($388.74). See Jordan Declaration, ¶ 7 and Exhibit E thereto.

26.    On October 14, 2004, Bleidt had a negative balance of $19,207.38 in the Allocation Sovereign account. See Jordan Declaration, ¶ 8 and Exhibit B thereto.

27.    On October 15, 2004, Bleidt received $150,000 in client funds, via wire transfer, into the Allocation Sovereign account. Also, on October 15, Bleidt deposited an additional $67,420.62 in client funds into the Allocation Sovereign account. The funds had been sent to him via two checks made out to "APAM" (Allocation), both dated October 14, 2004. One check (#4301), made out to "APAM" from a Cambridge Trust Company account, was in the amount of $28,990.32. The second check (#1318), made out to "APAM" from a Citizens Bank account, was in the amount of $38,430.30. See Jordan Declaration, ¶ 9 and Exhibits B and G thereto.

28.    On October 15, 2004, the same day that he received the client funds described above, in paragraph 7, Bleidt made seven (7) wire transfers out of the Allocation Sovereign account – for a total of $60,500. At least five (5) of these wire transfers were for the benefit of

Bleidt's clients: one for $5,000, a second one for $6,000, a third one for $10,000, a fourth one for $13,000, and a fifth one for $15,000. In addition, one of the seven (7) wire transfers, for $10,000, was sent to the Fleet personal account. See Jordan Declaration, ¶ 10 and Exhibits B and H thereto.

29.     On October 26, 2004, Bleidt sent a wire transfer, in the amount of $10,000, out of the Allocation Sovereign account into the Fleet personal account. See Jordan Declaration, ¶ 11 and Exhibits B, E and I thereto.

30.     On October 28, 2004, Bleidt used the Fleet personal account – which had recently received the funds described above, in paragraph 11 – to make, among others, the following on-line payments: (a) Citicorp Diners Club ($4,273.03); (b) Discover Card ($2,904.45); (c) Porsche Payment Center ($2,051.48); and (d) Chase Auto Finance ($391.91). See Jordan Declaration, ¶ 12 and Exhibit E thereto.

31.     On October 28, 2004, Bleidt wrote a check (#3444) out of the Allocation Sovereign account for $15,000 to Regan Communication. The "For" line on the check states: "Split between WBIX, Financial Perspectives." This check cleared the Allocation Sovereign account on November 1, 2004. See Jordan Declaration, ¶ 13 and Exhibits J & K thereto.

32.     On October 28, 2004, Bleidt wrote a check (#3440) out of the Allocation Sovereign account for $200 to purchase Celtics tickets. This check cleared the Allocation Sovereign account on November 1, 2004. See Jordan Declaration, ¶ 14 and Exhibits J & K thereto.

33.     On October 31, 2004, Bleidt wrote a check (#3447) out of the Allocation Sovereign account for $4,880 to Manhattan National Life. The "For" line on the check states:

"Policy # 04-CM 966011." Other information obtained by the SEC staff is that Bleidt has a term life insurance policy with Manhattan National Life. This check cleared the Allocation Sovereign account on November 10, 2004. See Jordan Declaration, ¶ 15 and Exhibits L and K thereto.

34.    On November 1, 2004, Bleidt sent a wire transfer, in the amount of $4,704.10, out of the Allocation Sovereign account, to a Sovereign account in the name of Denise Bleidt. Other information obtained by the SEC staff is that Denise Bleidt is Bleidt's ex-wife. See Jordan Declaration, ¶ 16 and Exhibit M thereto.

35.    On November 1, 2004, Bleidt sent a wire transfer, in the amount of $1,500, out of the Allocation Sovereign account, to Bleidt's daughter. See Jordan Declaration, ¶ 17 and Exhibit N thereto.

36.    On November 1, 2004, Bleidt wrote a check (#3461) out of the Allocation Sovereign account for $149.25 to Eagle Leasing. The "For" line on the check states: "Perspectives Broadcasting." Other information obtained by the SEC staff is that Perspectives Broadcasting may have been affiliated in the operation of radio station WBIX. This check cleared the Allocation Sovereign account on November 5, 2004. See Jordan Declaration, ¶ 18 and Exhibits O & K thereto.

37.    On November 1, 2004, Bleidt wrote a check (#3465) out of the Allocation Sovereign account for $8,950.50 to St. Bonaventure University. The SEC staff has obtained other information that one of Bleidt's sons attends St. Bonaventure University. This check cleared the Allocation Sovereign account on November 8, 2004. See Jordan Declaration, ¶ 19 and Exhibits P and K thereto.

38.     On November 2, 2004, Bleidt deposited $80,000 in client funds into the Allocation Sovereign account. <u>See</u> Jordan Declaration, ¶ 20 and Exhibits K & Q thereto.

39.     On November 3, 2004, the day after receiving the client funds described above, in paragraph 17, Bleidt sent a wire transfer, in the amount of $20,000, out of the Allocation Sovereign account, to a Shared Visions account at Sovereign. Other information obtained by the SEC staff is that Shared Visions was affiliated in the operation of radio station WBIX. <u>See</u> Jordan Declaration, ¶ 21 and Exhibit R thereto.

40.     On November 5, 2004, Bleidt deposited $125,000 in client funds into the Allocation Sovereign account. <u>See</u> Jordan Declaration, ¶ 22 and Exhibits S & K thereto.

41.     On November 9, 2004, a few days after receiving the client funds described above, in paragraph 22, Bleidt sent a wire transfer, in the amount of $83,000, out of the Allocation Sovereign account, to the Shared Visions account at Sovereign. <u>See</u> Jordan Declaration, ¶ 23 and Exhibit T thereto.

42.     On November 9, 2004, Bleidt sent a second wire transfer, in the amount of $24,500, out of the Allocation Sovereign account, to a Financial Perspectives Planning Services, Inc. ("FPPS") account at Sovereign. At the time, Bleidt was the CEO of FPPS, a separate Boston-based investment adviser registered with the Commission. <u>See</u> Jordan Declaration, ¶ 24 and Exhibit T thereto.

43.     On November 9, 2004, Bleidt sent a third wire transfer, in the amount of $3,000, out of the Allocation Sovereign account, to the Shared Visions account at Sovereign. <u>See</u> Jordan Declaration, ¶ 25 and Exhibit T thereto.

44.     On November 10, 2004, Bleidt sent a wire transfer, in the amount of $16,035.19, out of the Allocation Sovereign account, to Cushing Academy.  As previously noted above, one of Bleidt's sons attends Cushing Academy.  See Jordan Declaration, ¶ 26 and Exhibit U thereto.

45.     On November 10, 2004, Bleit sent a second wire transfer, in the amount of $10,000, out of the Allocation Sovereign account, to the Fleet personal account.  See Jordan Declaration, ¶ 27 and Exhibits U & V thereto.

46.     On November 10, 2004, Bleidt sent a third wire transfer, in the amount of $10,000, out of the Allocation Sovereign account, to a Sovereign account in the name of Denise Bleidt, Bleidt's ex-wife.  See Jordan Declaration, ¶ 28 and Exhibit U thereto.

47.     On November 10, 2004, Bleidt sent a fourth wire transfer, in the amount of $9,000, out of the Allocation Sovereign account, to a Sovereign account in the name of Denise Bleidt, Bleidt's ex-wife.  See Jordan Declaration, ¶ 29 and Exhibit U thereto.

48.     On November 10, 2004, Bleidt sent a fifth wire transfer, in the amount of $3,000, out of the Allocation Sovereign account, to his daughter.  See Jordan Declaration, ¶ 30 and Exhibit U thereto.

49.     On November 12, 2004, Bleidt made a number of on-line payments from the Fleet personal account.  As noted above, in paragraph 26, on November 10, Bleidt had wired funds into this account from the Allocation Sovereign account.  Among the payments made by Bleidt from the Fleet personal account on November 12 are: (a) Discover Card ($2,904.45); (b) Porsche Payment Center ($2,000); (c) MBNA ($1,000); (d) American Express ($760.52); (e) Bank One ($500); and (f) Chase Auto Finance ($400).  See Jordan Declaration, ¶ 31 and Exhibit U thereto.

50.     Also written on the Fleet personal account was a check (#1535) dated November 12, 2004, in the amount of $4,000, to Sam Abbott. The "For" line on the check states: "Dec Rent in Advance." At the time, Bleidt was renting his residence from Mr. Abbott. This check cleared the Fleet personal account on November 16, 2004. See Jordan Declaration, ¶ 32 and Exhibits W & V thereto.

## ARGUMENT

### I.     The Standard for Granting a Preliminary Injunction

Section 20(b) of the Securities Act of 1933 [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act of 1934 [15 U.S.C. §78u(d)(1)] provide that a court shall enter a temporary restraining order or preliminary injunction in a Commission enforcement action "upon a proper showing" of federal securities law violations. Unlike private litigants seeking similar relief, the Commission need not show irreparable injury or a lack of adequate remedies at law. SEC v. Cavanagh, 155 F.3d 129, 132 (2nd Cir. 1998). The reason is that the Commission appears before the Court not as an ordinary litigant, but as a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws." SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2nd Cir. 1975).

To satisfy the "proper showing" requirement, the Commission must make "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." SEC v. Cavanagh, 155 F.3d at 132. The showing should be based on "reasonable inquiry and other credible information." SEC v. International Loan Network, Inc., 770 F.Supp. 678, 688 (D.D.C. 1991), aff'd, 968 F.2d 1304 (D.C. Cir. 1992).

The need for a preliminary injunction is particularly acute in a case like this, where the risk of further investor losses from continuing securities law violations is substantial. When presented with such exigent circumstances, courts in this Circuit and elsewhere have readily granted the Commission's requests for a preliminary injunction. *See, e.g.*, <u>SEC v. Cavanagh</u>, 155 F.3d at 135-36; <u>SEC v. Levine</u>, 881 F.2d 1165 (2nd Cir. 1989); <u>SEC v. Milan Capital Group, Inc.</u>, 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000); <u>SEC v. SG Limited</u>, slip op., Civil No. 00-11141-JLT (D.Mass. June 9, 2000); <u>SEC v. Cheal</u>, slip op., Civil No. 00-10182-EFH (D.Mass. Feb. 1, 2000); <u>SEC v. Princeton Economic Int'l, Inc.</u>, 1999 WL 997149 (S.D.N.Y. Nov. 3, 1999); <u>SEC v. Paro</u>, 468 F.Supp. 635 (S.D.N.Y. 1979).

When deciding whether the Commission has shown a likelihood of success on the merits and a likelihood of future violations, the Court has broad discretion to consider evidence by affidavit rather than live testimony. *See, e.g.*, <u>SEC v. Frank</u>, 388 F.2d 486, 490 (2nd 1968); <u>SEC v. Musella</u>, 578 F.Supp. at 427, <u>SEC v. Vesco</u>, 358 F.Supp. 1186, 1188 (S.D.N.Y. 1973). The Commission believes that the evidence submitted through the Gera Declaration and other exhibits attached hereto provides a sound basis for entering a preliminary injunction.

Indeed, the need for a preliminary injunction in this case is very compelling. As detailed above, Defendant Bleidt has repeatedly admitted – on tape – to having stolen "tens of millions" of investment advisory client funds over a twenty year period. In addition, as the bank transactions summarized in the Jordan Declaration make clear, Bleidt has repeatedly used investor funds to cover, among others, both Allocation-related expenses and personal expenses. A preliminary injunction – along with all of the attendant equitable relief (including the asset freeze) – is necessary to preserve the status quo so that the Commission – along with the

Receiver – can attempt to determine the extent of Bleidt's scheme and to recover any and all of Defendants' assets for the benefit of harmed investors.

## CONCLUSION

For the reasons set forth above and in the other pleadings it has submitted, the Commission requests that the Court enter a Preliminary Injunction, Order Freezing Assets and Order for Other Equitable Relief in the form submitted herewith.

Respectfully submitted,


Walter G. Ricciardi
District Administrator

Silvestre A. Fontes
Senior Trial Counsel
(BBO # 627971)

Michele T. Perillo
Staff Attorney
(BBO #629343)

December 1, 2004

21

1

Volume I
Pages 1 to 225
Exhibits 1 - 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :

SECURITIES AND EXCHANGE      :
COMMISSION,                  :
            Plaintiff,     :
                         :   Case No.
                         :   CA-04-12414-NG
        vs.               :
                         :
                         :

BRADFORD C. BLEIDT and      :
ALLOCATION ASSET MANAGEMENT :
COMPANY, INC.,          :
            Defendants.

- - - - - - - - - - - - - - - -x

        DEPOSITION OF BONNIE S. BLEIDT, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of the Securities and
Exchange Commission, 73 Tremont Street, Boston,
Massachusetts, on Friday, November 19, 2004,
commencing at 10:24 a.m.

PRESENT:

    Securities and Exchange Commission
        (by Silvestre Fontes, Esq., and
        Michele T. Perillo, Esq.)
        73 Tremont Street, Boston, MA 02108,
        for the Plaintiff.

    Rose & Associates
        (by Alan D. Rose (morning only) and
        Alan D. Rose, Jr.)
        29 Commonwealth Avenue, Boston, MA 02116,
        for the Deponent.

RECEIVED
NOV 2 2 2004

2

PRESENT (continued):

Also present:  Madeline Normile, Paralegal
               (morning only)

206

1    the backup.

2         Q.    When you say employment agreement with

3    FPPS, is that your employment agreement?

4         A.    It is for all the planners.  It is still

5    being worked on, so I don't believe any of the

6    planners have yet signed it.  And this category is

7    all of my APAM client last quarter statements.

8         Q.    Your own specific clients?

9         A.    My specific clients.

10        Q.    And that's roughly 50 percent of your

11   clientele; is that correct?

12        A.    I am slowly but surely just going into

13   money management.  So this is my main focus as far

14   as my client base goes.

15        Q.    Roughly 50 percent of your clients are APAM

16   clients, correct?

17        A.    Correct.

18        Q.    Why don't we now -- let's play the tape,

19   and we will have you identify the voice on it,

20   hopefully, and also I will have a couple of

21   follow-up questions on it.

22             MR. FONTES:  I am going to mark the tape

23   itself as an exhibit.  It will be Exhibit 6.

24

207

1          (Cassette tape marked as SEC

2          Exhibit 6 for identification)

3          MR. FONTES:  So the record is clear, this

4   is a copy of tape recording received by the staff

5   during the conduct of its investigation and/or this

6   litigation.

7          ALAN ROSE, JR.:  Is he going to transcribe

8   what is on the tape?

9          MR. FONTES:  No, I don't think he needs to

10  transcribe it because other transcriptions of it

11  have been made, and I don't think we need two sets

12  of --

13         ALAN ROSE, JR.:  I am just going to renew

14  my request on the record that I receive a copy of

15  the tape.

16         (Whereupon, the tape was played)

17     BY MR. FONTES:

18     Q.   A couple of follow-up questions on the tape

19  you just listened to, the tape that's been marked as

20  Exhibit 6.  First, have you -- before today, had you

21  listened to this tape before?

22     A.   I listened to it Thursday morning.

23     Q.   Where was the tape when you first obtained

24  it?

208

1    A.   I was in my office, and it was delivered by

2  the receptionist.

3    Q.   Your office is FPPS?

4    A.   Yes.

5    Q.   And it was delivered by a receptionist?

6    A.   Yes.

7    Q.   A receptionist that works at FPPS?

8    A.   Yes.

9    Q.   Was it in a package --

10    A.   Yes.

11    Q.   -- the original?

12    A.   It was in an envelope.

13    Q.   Was it a small envelope or large envelope?

14    A.   A large protective plastic envelope.

15    Q.   Was that an envelope that appeared to have

16  been sent through the mail?

17    A.   No.

18    Q.   It was an internal envelope?

19    A.   Yes.

20    Q.   At approximately what time did you receive

21  it from the receptionist Thursday morning?

22    A.   A little after 9:00.

23    Q.   Did you immediately open the package?

24    A.   No.  She said I was supposed to wait three

209

 1    minutes.

 2        Q.    The receptionist said that?

 3        A.    Yes.

 4        Q.    Did you ask as to why you had to wait three

 5    minutes?

 6        A.    I think I probably just looked at her

 7    incredulously and -- I didn't think much of it.

 8        Q.    Did you wait three minutes before opening

 9    it, or did you just go ahead and open it?

10        A.    I had to go tell my assistant something, so

11    I went to talk to him, and then I came back and

12    opened it.

13        Q.    Did the outside of the envelope indicate

14    who the package was from?

15        A.    I believe so.  It was my husband's writing

16    on the label.

17        Q.    What did the label say?

18        A.    I don't remember, but I have it at my

19    office.

20        Q.    Can you identify the voice on the tape that

21    we just played for you?

22        A.    It's Brad's.

23        Q.    Is the tape that we just played, just

24    finished playing, Exhibit 6, as far as you can tell,

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. CA-04-12415-NG

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
SECURITIES AND EXCHANGE COMMISSION,   \*
     Plaintiff,   \*
        \*
v.   \*
        \*
BRADFORD C. BLEIDT and ALLOCATION   \*
PLUS ASSET MANAGEMENT COMPANY, INC.,   \*
     Defendants.   \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

              DEPOSITION OF NANCY ANN FOSS, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Michelle Kaczynski, a
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of the United States Securities and Exchange
Commission, 73 Tremont Street, Suite 600, Boston,
Massachusetts, on Tuesday, November 23, 2004, at 2:01
p.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS  02116**
**(617) 426-6060**

SECURITIES AND EXCHANGE COMMISSION
BOSTON DISTRICT OFFICE

NOV 2 6 2004

RECEIVED

1      **APPEARANCES:**

2      ON BEHALF OF THE PLAINTIFF:

3      MICHELE T. PERILLO, ESQ.
      United States Securities and Exchange Commission

4      Boston District Office
      73 Tremont Street, Suite 600

5      Boston, MA  02108
      (617) 573-5916

6

      ON BEHALF OF THE DEPONENT:

7

      JAMES P. HALL, ESQ.

8      Qua, Hall, Harvey & Walsh
      25 Fletcher Street

9      Chelmsford, MA  01824
      (978) 250-4255

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    I was very careful to put only those numbers and then

2    put a description there, so again, that was my first

3    three days of, you know, with the clients, but it made

4    me at least -- there's no right in any of this, but at

5    least made me that I could do something, that I could

6    be, you know, a nice person on the other end, that I

7    could at least talk to them.

8         Q.    And before you listened to that tape on

9    November 11th, is it the case that you had no idea what

10   Brad had done?

11        A.    I had no idea.  It was total, we were in

12   total shock.

13             MS. PERILLO:  Why don't we go off the

14   record at this point.

15                  (Discussion off the record).

16                  (Marked Exhibits 9 through 17;

17                  Audiotapes).

18        Q.    Ms. Foss, I have had marked by the court

19   reporter a number of tapes.  They have been marked

20   Exhibit 9 through Exhibit 17, and these are audiotapes.

21   I'm going to take it exhibit by exhibit, and really

22   what I just want you to do is see if you can tell me

23   who the voice is on the tape, and I'll only play the

24   first, you know, fifteen or twenty seconds so you can

1     get a good sense of the voice.

2          A.    Okay.

3          Q.    I may play the tape directed at you in full

4     in case I have any questions on that, but --

5          A.    Okay.

6          Q.    So I'm about to play Exhibit, and I should

7     say for the record that these tapes were all, you know,

8     produced to the SEC, given to the SEC in the course of

9     this litigation or in the conduct of our investigation,

10    so here goes Exhibit 9.

11                     (Playing audiotape).

12         A.    That's Brad.

13         Q.    You recognize that voice on Exhibit 9 as

14    being Brad Bleidt?

15         A.    Yes.

16         Q.    Okay.  Now I'm going to play Exhibit, the

17    tape marked Exhibit 10.

18                     (Playing audiotape).

19         Q.    Do you recognize the voice on Exhibit 10?

20         A.    That's Brad, that's Brad Bleidt.

21         Q.    Now I'm going play a tape that's been marked

22    SEC Exhibit 11.

23                     (Playing audiotape).

24         Q.    Do you recognize the voice on that tape?

```
1              A.   Yes, that's Brad.

2              Q.   Let me ask you a couple questions about that,

3         since that was the tape directed to you.  Is that the

4         tape you listened to on the morning of November 11th?

5              A.   Yes, correct.

6              Q.   And he mentions the, he mentioned the

7         GoldMine system on the tape, that you have some sort of

8         system of contacts.  Is that the same system that we

9         were discussing earlier today?

10             A.   Right, for the contact list to recreate those

11        letters.

12             Q.   And another thing that he mentioned, Mr.

13        Bleidt mentioned on this tape, Exhibit 11, is a life

14        insurance trust.  Do you have any knowledge of that

15        life insurance trust?

16             A.   The only knowledge is what is, what I heard

17        on the tape, and the only other knowledge I had is that

18        he was, only because he told me this, that he was going

19        to the doctors and get his life insurance, that's all I

20        knew.

21             Q.   That at some point in the past --

22             A.   Right --

23             Q.   -- he had gotten this life insurance?

24             A.   Yes, correct.
```

1    Q.   Do you know what company it's through, the

2    life insurance?

3    A.   I don't know that.

4    Q.   And what was, do you remember how long ago it

5    was that he mentioned he was getting life insurance?

6    A.   I would say it was probably, it was

7    definitely the summer months, I remember that, so I

8    would say, I don't know the actual month, so I don't

9    dare to tell you.  I know it was in the summertime,

10    that's all I remember.

11    Q.   Of 2004?

12    A.   Correct.

13    Q.   Now I will play what's been marked as

14    Exhibit 12.

15    MS. PERILLO:  For the record, I should

16    say, just to go back to the exhibits we've already gone

17    through, SEC Exhibit 9 is marked, tape of Bleidt's

18    phone call to his mom, SEC Exhibit 10 is marked, number

19    one, Keith, SEC Exhibit 11 is marked number two, Nancy,

20    and this exhibit I'm about to play, SEC 12, is marked

21    number three, Jim.

22    (Playing audiotape).

23    Q.   Do you recognize that voice?

24    A.   Yes, that's Brad's voice.

KACZYNSKI REPORTING

1      Q.    I'm now about to play the tape that's been

2  marked SEC Exhibit 13, and it's also marked number

3  four, SEC.

4                    (Playing audiotape).

5      Q.    Do you recognize the voice on Exhibit 13?

6      A.    Yes, that's Brad Bleidt.

7      Q.    Okay.  I'm about to play the tape that's

8  marked as SEC Exhibit 14, and this one says, number

9  five, Joe, and then in parens, two messages.

10                    (Playing audiotape).

11     Q.    Do you recognize the voice on Exhibit 14?

12     A.    Yes, that's Brad.

13     Q.    I'm about to play what's been marked as SEC

14  Exhibit 15.  It also says, number seven, Bob.

15                    (Playing audiotape).

16     Q.    Do you recognize that voice?

17     A.    I know it's Brad's, but it's just, obviously

18  it's off a different tape or something because that

19  doesn't, like I said, it doesn't sound like the other

20  ones.

21     Q.    So you recognize the voice to be Brad's, but

22  it sounds like a different soundtrack?

23     A.    Something, yes.

24     Q.    I'm about to play what's been marked as

KACZYNSKI REPORTING

1    Exhibit SEC 16.  It's also marked number eight,

2    regulators.

3                   (Playing audiotape).

4         Q.    Do you recognize the voice on Exhibit 16?

5         A.    That's Brad.

6         Q.    Let me just ask you one question about the

7    small portion of that tape we heard.  Brad says

8    something to the effect of, no one questioned my

9    authority here.  Is that a statement you would agree

10   with?

11        A.    Yes, he was a CEO, I mean, you know, we -- no

12   one did question his authority.

13        Q.    And the final tape is SEC Exhibit 17, it's

14   also marked number nine, more info on accounts, and

15   this one actually looks like I may have to rewind it

16   the whole way, so let me take a minute -- oh, no, I'm

17   wrong.  This is Exhibit 16.

18                   (Playing audiotape).

19        Q.    Do you recognize the voice on Exhibit 17?

20        A.    Yes, that's Brad's.

21             MS. PERILLO:  Well, I think those were

22   all of the questions that I have for today.  I want to

23   thank you again for coming in on such short notice, and

24   I just should say for the record that obviously right

KACZYNSKI REPORTING