UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BRADFORD C. BLEIDT and ) <br> ALLOCATION PLUS ASSET MANAGEMENT ) <br> COMPANY, INC. ) <br> ) <br> Defendants. ) | Civil Action No. 04-12415-NG |

## INITIAL REPORT OF RECEIVER

In accordance with this Court's Order dated November 22, 2004 (the "Appointment Order"), David A. Vicinanzo, the Court-appointed receiver (the "Receiver"), of defendants Bradford C. Bleidt ("Bleidt") and Allocation Plus Asset Management Company, Inc. ("APAM") and his counsel, Nixon Peabody LLP ("Nixon Peabody") hereby submit their Initial Report.

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Receivership Entities.

1.       APAM was an investment advisory and asset management firm.  Prior to the commencement of the above-captioned civil action, APAM had approximately $85 million under management and, according to its form ADV, was registered with the Securities and Exchange Commission (the "Commission").  Financial Planning Perspectives Services, Inc. ("FPPS") was also an investment advisory firm specializing in financial planning.  According to its form ADV, it too was registered as an investment advisor with the Commission.  FP Insurance Agency and Financial Perspectives Management Company are affiliates of APAM and FPPS.

2.      From approximately February 2004 through November 2004, APAM and FPPS provided investment advisory and asset management services through individual registered representatives and investment advisor representatives registered with Winslow, Evans and Crocker ("WEC"), a broker-dealer registered with the Commission.  Prior to that period, APAM and FPPS's representatives were registered with Detwiler, Mitchell, Fenton & Graves, Inc. ("Detwiler") from October 2001 to February 2004 and Commonwealth Financial Network ("Commonwealth") from January 1991 to October 2001.  All three brokerage firms are Commission registered brokers-dealers and members of the National Association of Securities Dealers, Inc. ("NASD").  Finally, National Financial Services LLC ("NFS"), a broker-dealer that provides clearance and custodial services for WEC, Detwiler and Commonwealth, presently serves as the custodial broker for the former APAM and FPPS customers' accounts that have not transferred to new brokerage firms.

3.      Since 1993, Bleidt was APAM's Director, President, Treasurer and sole shareholder.  Bleidt was also the Director, Chief Executive Officer and majority shareholder of FPPS.  Lastly, Bleidt also was a registered investment advisor representative with both APAM and FPPS and registered at various times with each of the three broker dealers.

**B.      Bleidt's Pre-Receivership Acquisition and Operation of WBIX.**

4.      WBIX Corp. (formerly known as Langer Broadcasting Corp.) operates an AM radio broadcasting business servicing the Boston, Massachusetts metropolitan area under the call letters of WBIX 1060 AM (the "Station").  On or about July 16, 2002, Bleidt entered into a stock Purchase and Sale Agreement with Alexander Langer ("Langer") to acquire all of the stock of WBIX Corp., for a purchase price of approximately $10,000,000.  Simultaneously, as part of that transaction, WBIX and Shared Visions, Inc. ("SVI"), a corporation wholly owned by Bleidt,

entered into a Time Brokerage Agreement whereby SVI undertook to manage the Station in

anticipation of the eventual closing of the sale of the WBIX Corp. stock to Bleidt or his nominee.

5.      Subsequently, Bleidt formed Perspectives Broadcasting, Inc. ("PBI"; together

with APAM, FPPS, FP Insurance Agency, Financial Perspectives Management Company and

SVI, the "Receivership Entities"), for the express purpose of acquiring WBIX Corp.'s stock and

the Station's  FCC license for the broadcasting business.  On or about January 13, 2004, PBI, a

corporation wholly owned by Bleidt, acquired all of the stock of WBIX Corp. from Langer.

Bleidt and PBI, however, only paid Langer cash in the amount of $3,050,000 at the closing and

the balance of the purchase price for the station was satisfied by a promissory note in favor of

Langer in the principal amount of $7,318,000.

**C.      Bleidt's Pre-Receivership Asset Purchase Agreement and Local Marketing
         Agreement for the Station with Egan.**

6.      Shortly thereafter, in or about the Spring of 2004 Bleidt, PBI and SVI entered into

an Asset Purchase Agreement ("APA") for WBIX Corp. and the Station with Egan

Communications, LLC ("Egan").  Pursuant to the APA with Egan, Bleidt, PBI and SVI agreed to

sell all their interest in the Station and WBIX Corp. for an aggregate purchase price of

$7,000,000.  As part of that transaction, Bleidt, PBI and SVI entered into a Local Marketing

Agreement ("LMA") with Egan that allowed Egan to program all airtime at the Station for the

term of the LMA and to retain a percentage of the revenues obtained from that airtime.  In

exchange, Egan agreed to reimburse WBIX Corp., PBI and SVI for the personnel, tower and

antenna rental and other operating costs incurred in the operation of the Station.

**D.      Commencement of the Commission's Enforcement Action.**

7.      On or about November 11, 2004, Bleidt mailed to the Commission's Boston

District Office a package enclosing a tape recorder and an audio tape.  In the tape recording,

which the Commission staff has transcribed, Bleidt confessed that he has defrauded his clients

out of tens of millions of dollars and that he diverted investor funds into a personal account at

Sovereign Bank ("Sovereign").

       8.      Specifically, in the tape, Bleidt admits:

> I'm reporting a serious serious breach of professional conduct and just criminal behavior,
> I'm reporting myself.  **Over the last twenty years almost, I've stolen tens and millions
> of dollars from clients through Allocation Plus Asset Management Corp.**

(emphasis supplied)

       9.      In response, on November 12, 2004, the Commission commenced the above-

captioned civil action.  On the same day the Court, acting through emergency Judge Richard G.

Stearns, entered a Temporary Restraining Order Freezing Assets and Order for Other Equitable

Relief (the "TRO") which, among other things, enjoined banks, brokerages, financial institutions

and other persons from transferring or dissipating funds or other assets held in the name of Bleidt

and/or APAM.  Subsequently, on November 17, 2004, the Court extended the TRO to December

2, 2004 and on December 2, 2004, the Court entered a Preliminary Injunction Order Freezing

Assets and Order for Other Equitable Relief (the "Preliminary Injunction").  The Preliminary

Injunction, among other things, expanded the scope of the asset freeze implemented by the TRO

and enjoined third parties from transferring funds or dissipating other assets held in the name of

Bleidt, APAM and each of the other Receivership Entities.

      10.      Shortly after commencement of the above-captioned action on November 19,

2004, the United States commenced a criminal action against Bleidt styled USA v. Bleidt,

Criminal Action No. 04-00277-JLA-ALL (the "Criminal Action").  On the same day, Bleidt was

arrested and continues to be held in federal custody.  On November 24, 2004, Judge Joyce

London Alexander ordered Bleidt to be examined pursuant to 18 U.S.C. § 4241 to determine

whether he was mentally competent to stand trial.  Subsequently, on February 2, 2005, the Court

(Alexander, J.) held a hearing to determine Bleidt's competency and has found Bleidt competent to stand trial.

11.    Although Bleidt has retained counsel in the Criminal Action and has appeared in person at the hearing to consider the Preliminary Injunction and the status conferences before this Court on January 18, 2005 and February 17, 2005, Bleidt, after more than 90 days since the commencement of this action, has not answered to the Commission's Complaint. Most recently, at the February 17, 2005 status conference, Bleidt reported that he had retained Attorney Gregory Oberhauser of Lowell, Massachusetts to defend him in this civil action. Mr. Oberhauser, however, did not appear at the status conference. The Court, accordingly, scheduled a further status conference for May 5, 2005 at 2:30 p.m. for Bleidt to report on the status of his efforts to obtain counsel and to set a discovery schedule if necessary.

## THE RECEIVER'S ACTIVITIES

### A.    Overview of the Receiver's Activities.

12.    The Appointment Order charged the Receiver with responsibility for:

- Taking and retaining immediate possession, custody and control of the funds, assets and property of Bleidt, APAM and the other Receivership Entities;

- Taking control of all books, records, papers and other documents, including complete files of Bleidt, APAM and the other Receivership Entities;

- Taking all steps the Receiver deems necessary to secure and protect the assets and property of Bleidt, APAM, and the other Receivership Entities;

- Taking all steps the Receiver deems necessary to conduct an inventory of the assets and liabilities of Bleidt, APAM and the other Receivership Entities;

- Taking all steps the Receiver deems necessary to reconstruct the histories of APAM's client accounts to determine whether and how client funds have been dissipated; and

- Promptly providing written notice of the Appointment Order to all current and former APAM clients.

13.     Based on the information developed to date, it appears that Bleidt has misappropriated and embezzled more than $25,000,000 in investor funds and that substantially all of those misappropriated funds were used to make illiquid investments in a radio station, fund operating deficits of APAM and FPPS, and support Bleidt's lifestyle.  Moreover, upon his appointment in November 2004, the Receiver succeeded to just $196,828.21 (almost all of which was subject to setoff claims asserted by the banks where APAM and FPPS maintained those funds) in cash and responsibility to either operate or promptly wind-up five distinct businesses burdened by Bleidt's public admission of massive and long-standing securities fraud.

14.     During the first 90 days of this case, the Receiver's efforts have focused on protecting investors from further fraud and identifying and preserving assets for eventual liquidation and distribution to defrauded investors and other creditors.  Immediately upon his appointment, the Receiver secured all of Bleidt's, APAM's and FPPS's paper and electronic records and began working with the Commission staff to analyze the scope of Bleidt's fraud, determine whether that fraud was ongoing and whether anyone else was working in concert with Bleidt to defraud investors.  Simultaneously, the Receiver worked to mitigate unintended effects of the asset freeze imposed by the Preliminary Injunction and Appointment Order on investors and to take steps to ensure that those orders did not expose investors to unnecessary market risk or deprive them of funds necessary for immediate living expenses.

15.     In addition, the Receiver, without any significant liquid assets, has been able to maintain the Station as a going concern and prevent the Station from going dark in the wake of Bleidt's public confession of fraud and embezzlement.  Bleidt's fraud, however, irreparably damaged APAM's and FPPS's investment businesses and rendered them virtually valueless. Even though these businesses had de minimis value, the Receiver was required to wind them up.

This process was time consuming and labor intensive and encompassed termination of all of APAM's advisory agreements, transfer of all APAM and FPPS advisory clients to WEC, making sure these accounts were covered by appropriate investment representatives and preparing final portfolio statements for each APAM account. In addition, the Receiver was required to address an array of employee issues, negotiate the termination and surrender of the businesses' five leased facilities and find a home for APAM and FPPS's business records and miscellaneous tangible assets. While none of these efforts resulted in recoveries to this estate, all were necessary to protect investors, mitigate damages incurred by employees, creditors and other parties-in-interest, and properly close the businesses.

16.     Finally, the next 90 days of this receivership will focus on liquidating the estate's two principal assets: (a) the Station and its license; and (b) causes of actions against culpable third parties. As detailed below, these efforts are already well underway. The Receiver has already begun marketing the Station to potential buyers and recruiting appropriate brokers and/or investment bankers to assist in that effort. In addition, since his appointment, the Receiver has identified potential causes of action that can be pursued by the estate and/or individual investors, spent considerable time developing the law and facts which support such claims, and had extensive conferences with the Commission staff, defrauded investors and likely defendants about a potential global settlement of the Receiver's and defrauded investors' claims.

**B. Preservation of WBIX Corp. as Going Concern and Prevention of the Station from "Going Dark."**

17.     The substantial majority of the funds Bleidt misappropriated from investors identified to date are directly traceable to his acquisition and operation of the Station. Furthermore, based on the information developed to date, the Station is the principal asset of this estate and likely to be a principal source of distributions to defrauded investors and other

creditors.  The value of the Station, in turn, depends largely, if not entirely, on its staying on the air and being sold as a going concern.

18.     Bleidt's widely publicized admission of fraud and the commencement of this enforcement action, however, immediately put the Station at risk of "going dark."  Almost simultaneously with the entry of the Appointment Order, Egan publicly notified the Station's employees, advertisers and antenna and tower lessors of its intent to terminate both the APA and the LMA and that it would no longer fund payroll for the Station's personnel and other operating costs.  Moreover, neither WBIX Corp., SVI or PBI had sufficient cash flow to replace Egan and fund operations at the Station.  In short, from the very inception of this case, the Station faced an exodus of its on-air talent and other employees and across-the-board abandonment by its customers and vendors.

19.     Immediately following his appointment, the Receiver initiated discussions with Egan and was able to successfully negotiate an agreement whereby Egan agreed to fund the Station's operations, on an interim basis, through November 30, 2004.  Simultaneously, the Receiver had discussions with Langer to step in as the manager of the Station until an appropriate buyer is located.  These discussions  resulted in an agreement with Langer to secure his ongoing management services and his assistance in the marketing of the station.  In accordance with the terms of that agreement, Langer has assumed responsibility management of the Station's operating expenses going forward and has successfully operated the Station without any additional draw on receivership assets since December 1, 2004.  The Receiver has further maintained the value of the Station for defrauded investors and other creditors by making necessary filings with the Federal Communications Commission to obtain administrative authority for the Receiver's possession and operation of the Station.  All of these efforts were

indispensable to continuing the broadcast of the Station's signal and preserving the value of the Station and its license for subsequent sale to a third party.

**C.    Review and Analysis of APAM and FPPS Accounts and the Nature and Scope of Bleidt's Fraud.**

20.    Immediately following his appointment, the Receiver and his counsel, working closely with the Commission's forensic accountants and other professionals, also commenced a comprehensive review of APAM and FPPS accounts to determine whether and how clients' funds had been misappropriated. This investigation encompassed, among other things: (a) a close review of the tape recordings Bleidt provided to the Commission staff and various APAM and FPPS employees; (b) reconciliation of the fraudulent APAM account statements and Sovereign statements for the account Bleidt used in his scheme with APAM, FPPS, NFS and WEC's business records; (c) analysis of the flow of funds into and out from APAM customer accounts; and (d) extensive interviews with APAM and FPPS employees and clients.

21.    Based on the information developed to date, it appears that Bleidt embezzled and misappropriated more than $25,000,000 from approximately 140 investors. It further appears that Bleidt obtained these funds and camouflaged his fraud by, among other things, requesting that customers make investments through checks payable to APAM, personally depositing those checks (and commingling the proceeds) into accounts he personally maintained and controlled in the name of "Allocation Plus Asset Management Company, Inc.", first at Fleet National Bank ("Fleet") and later at Sovereign (the "Phony APAM Accounts"), sending customers fictitious APAM account statements, and making periodic distributions (upon request) to such investors from funds obtained from other investors. None of the funds deposited in the Phony APAM Accounts were reflected on APAM's, WEC's or NFS's books or ever used to make bona fide investments on behalf of customers. Instead, those funds were misappropriated by Bleidt and

improperly used for various personal and business expenses, including acquisition and operation of the Station.

22.     Based on the information developed to date, the Receiver has preliminarily determined that Bleidt operated this fraudulent scheme alone and for his own benefit.  While the other registered representatives at APAM and FPPS apparently did not knowingly assist Bleidt, the facts and circumstances of this case indicate that certain APAM and/or FPPS representatives knew or were reckless in not knowing that Bleidt's dealings with clients were highly irregular and contrary to APAM's and FPPS's written policies and usual practices, the policies and procedures of APAM's and FPPS's broker-dealers, and the usual and customary operations of registered investment advisors generally.  In addition, the general securities principal responsible for compliance at APAM and FPPS failed to implement even the most rudimentary broker-dealer supervisory procedures and, thereby, allowed Bleidt's fraud to continue undiscovered for at least a decade or more.  Finally, the Commission staff's and the Receiver's investigation into the scope of Bleidt's fraud, what devices Bleidt used to fraudulently obtain investor funds, and who may have assisted him is ongoing.  The conclusions set forth above, accordingly, are all preliminary and subject to further confirmation as additional information concerning Bleidt's activities and the flow of funds to and from APAM and FPPS customers is developed.

**D.     The Receiver's Efforts to Mitigate the Financial Impact of the TRO and the Preliminary Injunction on Bona Fide APAM and FPPS Customers.**

23.     Entry of the TRO and the Preliminary Injunction "froze" approximately 1,822 APAM and FPPS accounts at WEC that were previously managed by approximately 26 registered representatives.  It also necessarily deprived certain APAM and FPPS customers of funds needed for living expenses and prevented each of APAM and FPPS's customers (whether

or not Bleidt was the registered representative on the account) from managing their own money to avoid market risk and maximize returns. Upon his appointment, the Receiver immediately took steps to mitigate the financial hardship and market risk imposed by the TRO and Preliminary Injunction on FPPS and APAM customers.

24.     First, he negotiated modifications to the Preliminary Injunction with WEC that: (a) allowed trading in the APAM and FPPS accounts at WEC at the customer's direction; and (b) permitted WEC to make required distributions from qualified individual retirement accounts for tax purposes and periodic distributions based on standing instructions by the customer issued prior to the commencement of this enforcement action. These modifications were approved by the Court on December 2, 2004.

25.     Next, the Receiver developed a procedure with WEC and the Commission staff that allowed for the turnover of investor funds back to customers upon confirmation that the funds held in APAM and FPPS accounts at WEC were not traceable to the APAM Phony Account, Bleidt or any person or entity controlled or related to Bleidt. Generally speaking, under this procedure, both the customer and WEC are required to certify that Bleidt did not directly or indirectly control the funds in the account(s) at issue and that none of the funds in the account(s) come from Bleidt or a person or entity controlled by Bleidt. All such certifications are then forwarded to the Commission for review, and finally the Receiver, in close consultation with the Commission staff, determines whether or not the funds in the WEC account(s) should be released. As of the date of this Report, certifications for 430 WEC accounts have been forwarded to the Commission staff and the funds in 371 accounts have been released in accordance with these procedures.

E.    **Asset Recovery and Analysis.**

26.    Upon entry of the Appointment Order, the Receiver succeeded to all of Bleidt's

property including his interests in five distinct businesses operated through the Receivership

Entities.  In accordance with that order, the Receiver has taken physical custody of substantially

all of Bleidt's and the Receivership Entities' tangible personal property and begun efforts to

liquidate both that property and this estate's far more valuable intangible property.  The

following discussion summarizes the status of the principal assets the Receiver has identified to

date:

- The Station and its License.  Based on the information developed to date, the
  substantial majority of the funds Bleidt misappropriated from APAM investors are
  traceable to his acquisition and operation of the Station.  Since entry of the
  Appointment Order, the Receiver and his professionals: (a) have reviewed
  appraisals previously obtained for the Station; (b) analyzed the validity and
  enforceability of liens purporting to encumber WBIX Corp.'s assets and Bleidt's
  shares in WBIX Corp.; and (c) begun efforts to market the Station.  In addition,
  because WBIX Corp. is a corporation organized under the laws of Florida, to
  protect this Court's in rem jurisdiction over the Station, the Receiver filed copies
  of the Commission's Complaint in this civil action and the Appointment Order in
  the United States District Courts for the Southern, Middle and Northern District of
  Florida pursuant to 28 U.S.C. § 754.

- Causes of Action Against Third Parties.  The Receiver believes that the
  prosecution of litigation against third parties, including insiders of the
  Receivership Entities, APAM's and FPPS's general securities principal,
  transferees of funds from the Phony APAM Accounts; APAM's and FPPS's
  former broker-dealers, Fleet, Sovereign, and their respective insurance carriers
  may result in substantial recoveries to fund distributions to defrauded investors
  and other creditors of this estate.  The Receiver's efforts during this first 90 days
  have focused on identifying potential causes of action and developing the facts
  and law that support those claims.  Since his appointment, accordingly, the
  Receiver and his professionals have:  (a) extensively interviewed APAM's and
  FPPS's former employees, broker-dealers and clients; (b) researched the
  Receiver's standing to pursue such litigation as successor to Bleidt's interests in
  the Receivership Entities and on behalf of defrauded investors; (c) analyzed the
  supervisory systems used by APAM's and FPPS's broker-dealers and reviewed
  their written compliance procedures; and (d) reviewed many of the insurance
  policies and/or fidelity bonds which may fund recoveries from such litigation.
  The Receiver has also had extensive discussions with the Commission staff and

counsel to the largest victims of Bleidt's fraud concerning litigation and settlement strategies and coordinating efforts to maximize recoveries on behalf of defrauded investors.

- <u>Cash</u>.  As of the commencement of this case, Bleidt and the Receivership Entities had monies in the aggregate amount of $196,828.24 in various accounts at Fleet and Sovereign.  The substantial majority of those sums, however, were "frozen" by the banks and subject to rights of setoff asserted by each of Sovereign and Fleet.  Moreover, Fleet filed a motion with this Court for relief from the Preliminary Injunction and the Appointment Order to exercise its asserted setoff rights against funds held in the name of APAM and FPPS.  The Receiver vigorously disputed the banks' right of setoff and he and his counsel were able to negotiate a turnover of all the funds held by Sovereign and Fleet without having to litigate the banks' respective rights of setoff.  The Receiver's agreement with Fleet concerning the turnover of APAM and FPPS funds was memorialized in a Stipulation filed with the Court and approved as an order of the Court on December 23, 2004.

- <u>Tangible Personal Property</u>.  Since his appointment in November, the Receiver and his counsel have physically taken custody of substantially all Bleidt's and the Receivership Entities' tangible personal property. That property was scattered at nine locations throughout the state and includes, among other things:  fine art, automobiles, office furniture, computer equipment, household furnishings, a piano and jewelry.  The Receiver is in the process of preparing a detailed inventory of the property and has had discussions with appraisers and auctioneers about how to most cost-effectively liquidate this property and maximize recoveries to the estate from this property.  The Receiver has also confirmed that substantially all of APAM's and FPPS's equipment and other tangible personal property is subject to a security interest in favor of Fleet.

**F.**   **<u>Wind-Up of APAM's and FPPS' Businesses.</u>**

27.   Before Bleidt's confession of investor fraud and embezzlement on November 12,

2004, APAM and FPPS employed approximately 35 persons and operated their asset

management and financial planning businesses from 5 leased facilities in Boston, Braintree,

Beverly and Peabody, Massachusetts.  Commencement of this enforcement action and entry of

the Preliminary Injunction, however, irreparably harmed APAM's and FPPS' investment

advisory and other businesses and required the Receiver and his professionals to wind those

businesses up almost immediately following entry of the Appointment Order.

28.     Once the Receiver assessed the permanent injury inflicted by Bleidt's fraud on APAM's and FPPS's good will with their customers, creditors and employees, the Receiver promptly terminated all of APAM's advisory agreements with its customers effective November 12, 2004.  To insure that client accounts were protected, the Receiver also arranged for WEC to either hire the former APAM/FPPS representatives assigned to those accounts or assign a WEC representative to those accounts.  The Receiver also prepared final fourth quarter portfolio statements for each APAM client.  In addition, the Receiver collected all outstanding management fees due from WEC and negotiated an agreement with WEC, subject to regulatory approval, to purchase APAM's accounts in exchange for a purchase price based on the number of accounts WEC retains during the following two years.  Finally, the Receiver also wound down FPPS's insurance agency subsidiary – including collecting all outstanding commissions due and de-registering the subsidiary as the insurance agency.

29.     The wind-up of APAM's and FPPS's business also required terminating the employment of substantially all of the companies' employees.  The Receiver has made every effort to implement this unavoidable lay off as humanely and orderly as possible.  Specifically, the Receiver sought and successfully obtained permission from the Court to pay substantially all accrued employee wages, salaries and commissions, the payment of which had been enjoined by the Preliminary Injunction.  Similarly, the Receiver and his professionals arranged for the continuation of employees' health insurance during the receivership.  This involved negotiation with APAM's and FPPS's insurer over payment procedures for past due premiums.  Following termination of an individual's employment, the Receiver also advised the employee of his or her temporary insurance continuation rights under COBRA and worked with APAM and FPPS's

insurer to arrange for employees who had not obtained alternative coverage to purchase individual conversion policies from the insurer.

30.     In addition, in connection with the wind-up of APAM and FPPS, staff retained by Receiver have processed employees' unemployment benefit claims. This has involved providing verification information to the Massachusetts Division of Employment for over 40 employees. During January of this year, the Receiver also worked with an outside payroll service to arrange for timely distribution of Form W-2's to employees to allow these employees to prepare their individual tax returns. Finally, the Receiver and his professionals have responded and continue to respond to numerous inquiries from former employees concerning specific wage, benefit and taxation issues.

31.     The wind-up of APAM and FPPS businesses has also involved the termination and/or assignment of the companies' various real property leases and the evacuation and turnover of leased premises. To date, the Receiver and his professionals have negotiated and documented lease termination and turnover agreements for premises located at:

- 100 Cummings Center, Suite 235C
  Beverly, MA 01915; and

- 3 Centennial Drive
  Peabody, MA 01960

32.     The Receiver has also vacated and is in the process of finalizing lease termination agreements with landlords for the following premises:

- 639 Granite Street, Suite 28
  Braintree, MA 02184;

- 205 Portland Street
  Boston, MA 02114; and

- 164 Canal Street
  Boston, MA 02114

33.    In addition, much of the furniture and equipment at APAM and FPPS's offices was rented and/or subject to security interests in favor of vendors and third-party lenders. Where appropriate, the Receiver and his professionals have negotiated consensual turnover arrangements of such furniture and equipment with APAM' and FPPS's lessors and other lenders. Finally, as part of the wind-up of APAM and FPPS, the Receiver has transferred delivery of all of FPPS and APAM's mail to his offices and arranged for the transportation, storage and inventory of APAM's and FPPS's business records and assets.

**G.    Investor Communications.**

34.    Shortly after entry of the Appointment Order, the Receiver's counsel served a copy of the Appointment Order, the TRO and the Preliminary Injunction on: (a) all current and former APAM and FPPS customers; and (b) all defrauded investors identified to date. The Receiver also supplemented this notice with written correspondences to those investors on December 17, 2004 and December 23, 2004, which, among other things, advised investors to review their accounts for fraud and provided investors with contact information for the Receiver, the Receiver's counsel and WEC. In addition, the Receiver and his counsel have had, and continue to have, regular communications with individual investors, various investor groups and their counsel. Such communications frequently occur on a daily basis and primarily involve questions concerning the release of frozen accounts and the progress of the receivership. The Receiver and his counsel have also met personally with many defrauded investors, including multiple meetings with defrauded investors at the multi-agency victims' assistance program carried out by the Department of Justice, the FBI, the Commission, the IRS and the Postal Service during the week of January 3, 2005. Finally, to streamline and facilitate communications with defrauded investors and other parties of interest the Receiver expects to launch a web page

in the near future that will, among other things, summarize the status of the receivership's effort to collect and liquidate Bleidt's assets; explain the procedures employed to release frozen FPPS, APAM, and WEC accounts; and, when appropriate, set forth the deadlines and procedures for asserting claims against this estate. The Receiver also anticipates his website will contain links to this status report and other important pleadings and documents filed in this case.

       **H.**    **<u>Litigation</u>.**

     35.     To date, the Receiver has not become embroiled in any significant litigation and has managed to resolve all significant disputes that have arisen since his appointment without the need to seek judicial intervention. The only contested matter joined in this proceeding to date was Fleet's motion to assert its purported setoff rights against FPPS's and APAM's pre-receivership bank accounts. As detailed above, this matter was resolved consensually through a Court-approved stipulation.

     36.     In addition, only two proceedings – one private and one public – have been commenced against Bleidt and/or the Receivership Entities outside this forum. Specifically, on or about December 15, 2004, an investor allegedly defrauded by Bleidt filed a Statement of Claim in Arbitration against Bleidt, APAM and WEC with the NASD. By letter dated February 2, 2005, Bailey, at the Receiver's request, advised NASD that he would not proceed with his arbitration claim against Bleidt and APAM. On the public side, on or about January 2005, the Division of Insurance for the Commonwealth sought and obtained an order revoking all of Bleidt's Massachusetts insurance licenses. At the request of the Receiver, however, the Division dropped its request for a penalty, assessment and disgorgement order against Bleidt.

## ACCOUNTING OF FUNDS IN
## THE RECEIVER'S POSSESSION.

37.     To date, the Receiver has recovered cash in the amount of $392,034.95 and has

expended funds in the amount of $197,079.14 in connection with the wind-up of APAM's and

FPPS's businesses.  In accordance with paragraph 15 of the Appointment Order, a detailed

accounting of the funds in the Receiver's possession is attached hereto as Exhibit A.

## PROFESSIONAL FEES INCURRED BY THE RECEIVER.

38.     Due to the nature and exigencies of this case, the legal fees and expenses incurred

by the Receiver to date have been substantial.  The Receiver was required to employ counsel that

are experienced and familiar with litigation, securities, bankruptcy and insolvency,

communications, tax, and employment law and a host of other practice areas.  Collectively those

professionals have spent 1,719 hours providing legal services to this estate through the date of

this status report.  Copies of Nixon Peabody's invoices detailing all time and expenses claimed

for that work and the nature of the services performed are regularly provided to counsel for the

Commission.  There is, however, simply insufficient cash in this estate to pay these fees and

expenses at this time, and Receiver believes that the limited funds presently available to this

estate are better spent at this time on other wind-up expenses. The Receiver and Nixon Peabody,

accordingly, reserve their right to seek approval and payment of the full amount of their

reasonable fees and expenses at a more appropriate time in the future when funds are available

from this estate to pay them.

February 22, 2005                         Respectfully submitted,

                                          DAVID A. VICINANZO, RECEIVER


                                          /s/ Francis C. Morrissey
                                          Kevin M. Fitzgerald (admitted pro hac vice)
                                          Steven N. Fuller (BBO #550224)
                                          Francis C. Morrissey (BBO #567589)
                                          Nixon Peabody LLP
                                          100 Summer Street
                                          Boston, MA  02110
                                          (617) 345-1000

**EXHIBIT A**

**CASH COLLECTED ON A CONSOLIDATED BASIS FOR ALL RECEIVERSHIP
ENTITIES THROUGH FEBRUARY 22, 2005**

| | |
|---|---|
| Balance with Fleet and Sovereign as of the Commencement of Case: | $196,828.24 |
| APAM and FPPS Commissions and Fees: | $97,211.84 |
| Miscellaneous Collections: | $97,994.87 |
| **Total Cash Collected:** | **$392,034.95** |

**FUNDS DISBURSED AS OF FEBRUARY 22, 2005**

| | |
|---|---|
| Wages, Commissions, Benefits, Withholding Taxes and other Employee Related Payments: | $167,604.69 |
| Rent, Utilities and other Non-employee Operational Expenses: | $1,214.42 |
| Moving and Storage Expenses: | $2,223.75 |
| Miscellaneous Expenses: | $26,036.28 |
| **Total Funds Disbursed:** | **$197,079.14** |
| **Total Cash on Hand:** | **$194,955.81** |

BOS1467108.2