UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>vs. )<br><br>BRADFORD C. BLEIDT and )<br>ALLOCATION PLUS ASSET MANAGEMENT )<br>COMPANY, INC., )<br><br>Defendants. ) | Civil Action No. 04-12415-NG |

**RECEIVER'S MOTION FOR AN ORDER: (A) APPROVING THE WBIX RESCISSION
AGREEMENT AND THE RETRANSFER OF ALL OF THE STOCK IN WBIX CORP.
TO ALEXANDER G. LANGER FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, AND (B) GRANTING RELATED RELIEF**

**PRELIMINARY STATEMENT**

Pursuant to 28 U.S.C. § 1651(a), David A. Vicinanzo, the Court-appointed receiver in the

above-captioned civil action, (the "Receiver") respectfully requests that the Court enter an order

substantially in the form attached hereto as Exhibit A: (a) approving the rescission of the sale of

all of the issued and outstanding capital stock of WBIX Corp. from Alexander G. Langer

("Langer") to Perspectives Broadcasting Inc. ("PBI") in accordance with the terms and

conditions of the WBIX Rescission Agreement (the "Agreement") attached hereto as Exhibit B;

(b) approving the retransfer of the stock to Langer free and clear of all rights of any other alleged

equity holders or creditors with all such rights attaching to the proceeds of the proposed

rescission transaction; (c) permanently enjoining all persons with claims against defendants

Bradford C. Bleidt ("Bleidt") and Allocation Plus Asset Management Company, Inc. ("APAM")

or any entity controlled or operated by Bleidt or APAM from taking any action to enforce such claims against Langer or WBIX Corp. or their respective property following the closing of the rescission transaction contemplated by the Agreement and requiring that such claims be satisfied exclusively from the proceeds of that transaction; and (d) determining that, upon closing, WBIX Corp. shall hold title to its assets free and clear of all liens, claims, encumbrances and interests, with all such liens, claims, encumbrances and interests to attach to the proceeds of the proposed rescission transaction.

As previously reported to the Court and parties of interest in this case, the principal asset to be administered in this receivership proceeding is Bleidt's interest in WBIX Corp. WBIX Corp. operates an AM radio broadcasting business under the call letters of WBIX 1060 AM (the "Station"), and which services the Boston, Massachusetts metropolitan market. As detailed below, after aggressively marketing the Station for more than 10 months, the Receiver believes that the total consideration to be realized by the proposed transaction is fair and reasonable and a rescission of PBI's purchase of the WBIX stock is the only feasible way to monetize Bleidt's interest in the Station in the near future.

## BACKGROUND

**A.    Appointment of the Receiver and Recent Confirmation of the Scope of Bleidt's Fraud.**

1.    APAM was an investment advisory and asset management firm. Prior to the commencement of the above-captioned civil action, APAM had approximately $85 million under management. Since 1993, Bleidt was president and treasurer of APAM and was the firm's sole shareholder and director.

2.    As detailed more fully in the Receiver's First and Second Reports to the Court, on or about November 11, 2004, Bleidt mailed a package enclosing a tape recorder and a tape to the

Securities and Exchange Commission's (the "Commission") Boston District Office. On the tape recording, Bleidt confessed that he had defrauded his clients out of tens of millions of dollars and converted funds entrusted to him for his personal use.

3.       In response, on November 12, 2004, the Commission commenced the above-captioned civil action. By orders dated November 18, 2004 and November 22, 2004 the Court appointed the Receiver.

4.       Shortly after the commencement of the above-captioned action, the United States commenced a criminal action against Bleidt styled <u>United States of America v. Bleidt</u>, Docket No. 05-10144-WGY. (the "Criminal Action").

5.       In its Information filed in connection with the Criminal Action, the United States alleged that Bleidt defrauded approximately 125 investors of more than $27 million and charged Bleidt with 115 counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

6.       On July 26, 2005, Bleidt agreed to plead guilty to all of the counts in the Information in exchange for a sentence of imprisonment of 135 months. A sentencing hearing has been scheduled for October 25, 2005 in the Criminal Action to consider Bleidt's plea agreement.

**B.       Bleidt's Pre-Receivership Operation and Acquisition of the Station.**

7.       On or about July 16, 2002, Bleidt entered into a Stock Purchase and Sale Agreement with Langer to acquire all of the stock of Langer Broadcasting Corp. (whose name was changed after the closing under the Stock Purchase and Sale Agreement to WBIX Corp. (hereinafter "WBIX Corp.")) for a purchase price of approximately $10,000,000.

- 4 -

Simultaneously, as part of that transaction, WBIX Corp. and Shared Visions, Inc. ("SVI"), a corporation wholly owned by Bleidt, entered into a Time Brokerage Agreement whereby SVI undertook to manage the Station in anticipation of the eventual closing of the sale the WBIX Corp. stock to Bleidt or his nominee.

8.    Subsequently, Bleidt formed PBI for the express purpose of acquiring WBIX Corp.'s stock and the Station's FCC license.  On or about January 13, 2004, PBI, a corporation wholly owned by Bleidt, acquired all of the issued and outstanding shares of stock of WBIX Corp. from Langer.

9.    At the closing of the transaction, Bleidt tendered $1,300,000 in cash. The remaining portion of the purchase price for the WBIX stock was satisfied by:

- Credits of $750,000 and $1,000,000, respectively for Bleidt's pre-closing deposits and for monies expended by Bleidt for capital improvements and operating deficits at the Station; and

- A note in the favor of Langer in the principal amount of $7,318,000 (the "Langer Note").

10.    Transaction documents also recite that PBI's obligations under the Langer Note were secured by a pledge of 100% of the issued and outstanding shares of the stock in both WBIX Corp. and PBI, a security interest in all of PBI's and WBIX Corp.'s assets and a guaranty from Bleidt in favor of Langer.

11.    Shortly thereafter, in or about the spring of 2004, Bleidt, PBI and SVI entered into an Asset Purchase Agreement (the "APA") for WBIX Corp. and the Station with Egan Communications, LLC. Although in January 2004, Bleidt exchanged consideration with a recited aggregate value of $10,368,000, for the stock in WBIX Corp., just months later, pursuant to the APA, Bleidt, PBI and SVI agreed to sell all their interest in the Station and WBIX Corp. for an aggregate purchase price of only $7,000,000.

12.     As part of that transaction, Bleidt, PBI and SVI entered in a local marketing agreement ("LMA") with Egan that allowed Egan to program all of the airtime at the Station for the term of the LMA and to retain a percentage of the revenues derived from that airtime.  In exchange, Egan agreed to reimburse WBIX Corp., PBI and SVI (or pay directly) the costs of personnel, tower and antenna rental expenses and other operating costs incurred in the operation of the Station.

**C.     The Receiver's Operation and Marketing of the Station.**

13.     Immediately following the commencement of this receivership proceeding, Egan publicly notified the Station's employees, advertisers, and antenna and tower lessors of his intent to terminate both the APA and the LMA and to stop funding the Station's personnel and other operating costs.  Compounding matters in the wake of Bleidt's public confession of fraud, neither WBIX Corp., SVI nor PBI had sufficient cash flow to replace Egan and to fund operations at the Station.

14.     In response, the Receiver initiated discussions with Egan and was able to successfully negotiate an agreement whereby Egan agreed to fund the Station's operations through November 30, 2004. Simultaneously, the Receiver had discussions with Langer to step in as the manager of the Station.  These discussions culminated in an arrangement with Langer to manage the Station on behalf of the Receiver on an interim basis and to assist the Receiver in the marketing of the Station.  Since December 1, 2004, in accordance with the terms of that agreement, Langer has managed operations of the Station and has funded the Station's operating expenses. Although, the Station incurred substantial operating deficits while operated by Bleidt, the Receiver, with Langer's financial and operational assistance, has been able to operate the

- 6 -

Station on a break-even basis since December 1, 2004, without being required to draw on any estate funds to finance the Station's operation.

15.    Immediately upon his appointment, the Receiver also began to aggressively market the Station. Specifically, the Receiver engaged RL Sharpe Associates, a business broker specializing in the sale of radio stations and other media businesses, to sell the Station on a commission basis. At the same time, the Receiver and Nixon Peabody, with the assistance of Langer, also directly marketed the Station to various private equity funds and other interested parties, and pursued numerous expressions of interest received from potential buyers since entry of the Appointment Order. To date, however, none of these efforts have produced cash offers in excess of Langer's asserted lien on the Station. One informal proposal was made jointly to the Receiver and to Langer by a private equity firm, which proposed that the Station be sold to its nominee at a steeply discounted price (and less than Langer's asserted lien on the Station) and that Langer convert his debt claims against WBIX Corp. to an equity interest in the purchaser and thereafter manage the Station for the purchaser, all for an undetermined amount of cash to come to the Receiver and these estates. That proposal was never formalized and was, on information and belief, not of interest to Langer.

**D.    The WBIX Rescission Agreement.**

16.    Faced with absence of a cash buyer for the Station, the Receiver began exploring alternatives to a sale that would maximize recoveries to these estates and, distributions to defrauded investors and other estate creditors. Those efforts culminated in the WBIX Rescission Agreement. In essence, the proposed Agreement contemplates that PBI's purchase of the WBIX Corp. stock be rescinded and that such stock be retransferred to Langer. In exchange, as detailed in §4 of the Agreement, Langer will:

- Make cash payments to these estates totaling $1,500,000. The first payment in the amount of $1,100,000 is due at the closing of the rescission transaction. The remaining payments of $400,000 be will evidenced by a Promissory Note of Langer and will be made in four separate installments of $100,000 each and are due 90 days from the closing date, and on the first, second and third anniversaries of the closing date. In addition, Langer's obligations to make post-closing payments will be secured by a pledge of WBIX stock, first priority security interest in all of the tangible and intangible personal property of WBIX Corp. (excluding the license), and Langer's personal obligation to pay such installments under his Promissory Note;

- Cancel the Note from PBI in favor of Langer and release Langer's liens on the WBIX Corp. stock and assets;

- Assume Station liabilities of $433,000; and

- Pay the Receiver 25% of the net proceeds of the sale of the Station in excess of $10,000,000 made within 36 months of the closing of the rescission transaction.

**E.     Langer's Good Faith.**

17.     Langer has at all times acted in good faith in his dealings with the Receiver. He fully cooperated with the Receiver in marketing the Station. It was only after it became apparent that no offers would be made that would both satisfy Langer's secured claims and provide the estate with a meaningful recovery that the Receiver entered into discussions with Langer that led to the Rescission Agreement.

## RELIEF REQUESTED

18.     By this Motion, the Receiver seeks entry of an order, substantially in the form attached hereto as Exhibit A (the "Free and Clear Order"): (a) approving the rescission of the sale of all of the issued and outstanding capital stock of WBIX Corp. from Langer to PBI in accordance with the terms and conditions of the Rescission Agreement attached hereto as Exhibit B; (b) approving the retransfer of the WBIX stock to Langer free and clear of all rights of any alleged equity holder or creditor with all such rights attaching to the proceeds of the rescission transaction; (c) permanently enjoining persons with claims against defendants Bleidt and APAM

or any entity owned or operated by Bleidt and APAM from taking any action to enforce such

claims against Langer or WBIX Corp. or their respective property following the closing of the

rescission transaction contemplated by the Agreement and requiring that such claims be satisfied

exclusively from the proceeds of the transaction; and (d) determining that upon closing WBIX

Corp. shall hold title to its assets free and clear of all liens, claims, encumbrances and interests

with all such liens, claims, encumbrances and interests attaching to the proceeds of the proposed

rescission transaction.

19.    The Receiver respectfully submits that the requested relief is the only way to

obtain a reasonable return for the Station from Langer or any other arms-length buyer and is fully

consistent with orders regularly and routinely entered by other federal courts sitting in

bankruptcy or supervising securities fund receivership proceedings. Upon his appointment in this

case, the Receiver "stepped into the shoes" of an admitted thief.  Furthermore, the Receiver has

no first-hand knowledge concerning Bleidt's pre-receivership transactions with respect to the

Station and, accordingly, is in no position to offer traditional seller's warranties to Langer or any

other buyer that, for example, prior to the commencement of this receivership proceeding to

incur liabilities that are not reflected the corporate records of WBIX Corp. which are in the

Receiver's custody.

20.    The requested relief is calculated to address, among other things: (i) the

Receiver's inability to warrant that he can transfer 100 percent of all the issued and outstanding

stock of WBIX Corp.; (ii) the uncertainty that WBIX Corp. holds good title to its assets; and

(iii) the practical, commercial reality that any arms-length buyer will require a substantial

discount (if it is willing to proceed with the transaction at all) if the title for the purchased assets

is obtained amid such uncertainty. In essence, the Receiver is seeking an order authorizing the

retransfer of the WBIX stock to Langer free and clear of all rights of any alleged equity holder of

WBIX Corp. or creditor of the Station, with all such rights, if any, attaching to the proceeds of

the rescission transaction.  No adjudication from the Court of the validity of such rights is sought

at this time.  Instead, the proposed Free and Clear Order channels the enforcement of such rights

to the proceeds of the rescission transaction with the same validity, force and effect, if any, as

they now have in or against WBIX Corp. or its assets and requires that any such claims be

satisfied exclusively from the proceeds of the rescission transaction.

     21.     Such injunctive relief is a common feature of orders authorizing sales from

liquidating estates in federal bankruptcy and receivership proceedings and, as developed below,

well within this Court's equitable jurisdiction.  Recognizing the practical problems with selling

property from liquidating estates, Congress has codified bankruptcy courts' powers to sell

property free and clear by enacting 11 U.S.C. § 363(f).  Bankruptcy and receivership courts also

have the inherent power as courts of equity to sell property free and clear.  In re Searles Castle

Enters., Inc., 12 B.R. 127 (Bankr. D. Mass. 1981), aff'd 17 B.R. 440 (1st Cir. BAP 1982); David

L. Abney, "Selling Equity Receivership Property Free and Clear of all Liens and Encumbrances"

16 Real Est. L. J. 364 (1988).  And federal courts supervising modern receivership proceedings,

relying on their inherent equitable powers rather than § 363(f) of the Bankruptcy Code, regularly

enter free and clear orders channeling claims against property sold to sale proceeds.  See, e.g.

SEC v. Health Maint. Centers, Inc., et al., Case No. 02-0153P, (W. D. Wash. 2002); SEC v.

Lancer, et al., Case No. 03-80612, (S. D. Fla. 2003).

## GROUNDS FOR RELIEF

**A.      This Court has jurisdiction to enter the requested Free and Clear Order.**

22.      A "[d]istrict court has broad powers and wide discretion to determine appropriate relief in an equity receivership." And the power to order the sale or transfer of property is well within this broad jurisdiction:

> [A] court of equity having custody and control of property has power to order a sale of same in its discretion. The power of sale necessarily follows the power to take possession and control of and to preserve property, resting in the sovereignty and exercised through courts of chancery, or courts having statutory power to make the sale.

SEC v. Am. Capital Invs., Inc., 98 F.3d 1133, 1144 (9th Cir. 1996), abrogated on other grounds by Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) quoting 2 Clark on Receivers § 482 (3d ed. 1992).

23.      Furthermore, the power of federal receivership courts, under appropriate circumstances, to order the sale of property free and clear of liens and encumbrances has long been recognized.  See, e.g. Miners Bank of Wilkes-Barre v. Acker, 66 F.2d 850, 853 (3d Cir. 1933) ("A court of equity under proper circumstances has power to order a receiver to sell property free and clear of all incumbrances (sic)…"); Seaboard Nat. Bank v. Rogers Milk Prods. Co., 21 F.2d 414, 416 (2d Cir. 1927) ("There is no doubt of the power of a court of equity under proper circumstances to sell property free of liens, transferring the lien to the proceeds"); see generally, 2 Clark on Receivers § 500 (3d ed. 1959); Abney, 16 Real Est. L. J. 364.

24.      More recently, the Ninth Circuit confirmed the power of a federal district court to enter an order transferring interests and claims of defrauded investors in property sold by a receiver to the proceeds of the sale and to enjoin the defrauded investors "from filing claims to vindicate their interests, except against the receivership estate." Am. Capital Invs., Inc., 98 F.3d at 1138, 1146; see also 2 Clark on Receiverships § 487 (when a court of equity orders property

in its custody to be sold, the court itself as vendor confirms the title in the purchaser and protects

that title from interference by injunction).  The Ninth Circuit also emphatically rejected the claim

that such an order deprived nonparties of property of due process of law and upheld the

constitutional validity of such orders: "[F]or the claims of nonparties to property claimed by

receivers, summary proceedings satisfy due process so long as there is adequate notice and

opportunity to be heard." Id. at 1146; see also Abney, 16 Real Est. L.J. at 369 ("If nonparty

claimants are served by mail, the sale order is duly published, and all parties are served with a

proper legal notice, a court should be able to make the sale with some assurance it has met the

constitutional notice requirements").

25.    Finally, the "All Writs Act," 28 U.S.C. § 1651(a), further confirms this Court's

authority to enter the proposed Free and Clear Order. Section 1651 provides:

> The Supreme Court and all courts established by Act of Congress may issue all
> writs necessary or appropriate in and of their respective jurisdictions and
> agreeable to the usages and principles of law.

26.    The Supreme Court has declared that this provision provides a district court with a

"legislatively approved source of procedural instruments designed to achieve the rational ends of

the law." U.S. v. N.Y. Tel. Co., 434 U.S. 159, 172 (1977).  Pursuant to § 1651(a), therefore, a

district court "may avail itself of all auxiliary writs as aids in the performance of its duties, when

the use of such historic aids is calculated in its sound judgment to achieve the ends of justice

entrusted to it." Id. at 173 quoting Adams v. U.S., ex rel McCann, 317 U.S. 269, 273 (1942).

**B.    The proposed rescission transaction is in the best interest of defrauded
investors and other creditors of these estates.**

27.    Under the circumstances of this case, the Receiver believes that the total

consideration to be realized by these estates under the Agreement is fair and reasonable and a

rescission of PBI's purchase of WBIX stock is the only feasible way to monetize Bleidt's interest

in the Station in the near future. After more than ten months of marketing efforts, the Receiver

has been unable to find a buyer willing to purchase the Station for more than the asserted liens

encumbering it or on terms otherwise providing a recovery to these estates. The proposed

rescission agreement allows the estate to realize $1.5 million in "equity" in the Station and share

in the net proceeds of any sale of the Station during the next three years at a price above

$10,000,000. In addition, the proposed rescission will relieve the estate of claims of not less than

$7,751,000 and thereby avoid any dilution of defrauded investors' claims arising from these

liabilities. Finally, the value of the consideration to be realized in the proposed rescission is

substantially more than the price Bleidt obtained for the Station in the Egan APA and its

consistent with the fair value ascribed to the Station.

      28.    The Receiver also believes that further marketing of the Station is not likely to

generate value in excess of the proposed rescission transaction. Moreover, Langer will not

operate the Station indefinitely and operating the Station without his assistance may consume all

of the funds collected to date from the wind-up of Bleidt's other business. Similarly, continuing

operations at the Station risks the estate incurring significant administrative liabilities without any

means to satisfy them.

      **C.    Ample notice of the proposed rescission transaction will be given to
defrauded investors, creditors and other parties-in-interest.**

      29.    The Receiver will employ various methods of notification to ensure that all

interested parties will be informed of the terms and conditions of the Rescission Agreement and

the relief sought in this motion. Simultaneously with filing of this motion, the Receiver served

each of the 140 defrauded investors identified to date and all known creditors of PBI, SVI and

WBIX Corp., by first-class mail, with a copy of the Motion, the proposed Free and Clear Order,

and the Rescission Agreement. In addition, a copy of this motion, the proposed Free and Clear

Order and the Rescission Agreement was simultaneously published on the Receiver's webpage: http://extranet30.nixonpeabody.com. The Receiver will publish a notice concerning the hearing on this motion, the relief sought in the motion and the transactions contemplated by the Rescission Agreement in the following newspapers and trade journals: (a) the Boston Globe; (b) the Boston Herald; (c) Radio and Records; and (d) Inside Radio.

30.    The Receiver believes that the foregoing notice is good and sufficient under the circumstances and reasonably calculated to provide timely and adequate notice to the major constituencies in this case and these persons most interested in the rescission transaction and the relief sought in this motion.

**WHEREFORE**, the Receiver respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit A: (a) approving the rescission of the sale of all of the issued and outstanding capital stock of WBIX Corp. from Langer to PBI in accordance with the terms and conditions of the WBIX Rescission Agreement attached hereto as Exhibit B; (b) approving the retransfer of the stock to Langer free and clear of all rights of any other alleged equity holders or creditors with all such rights attaching to the proceeds of the proposed rescission transaction; (c) permanently enjoining persons with claims against defendants Bleidt and APAM or any entity controlled or operated by Bleidt or APAM from taking any action to enforce such claims against Langer or WBIX Corp. or their respective property following the closing of the rescission transaction contemplated by the Agreement and requiring that such claims be satisfied exclusively from the proceeds of that transaction; and (d) determining that upon closing WBIX Corp. shall hold title to its assets free and clear of all liens, claims, encumbrances and interests with all such liens, claims, encumbrances and interests attaching to the proceeds of the proposed rescission transaction.

September 27, 2005                    Respectfully submitted,

                                     DAVID A. VICINANZO, RECEIVER

                                     /s/ Francis C. Morrissey
                                     _____
                                     Kevin M. Fitzgerald (admitted pro hac vice)
                                     Francis C. Morrissey (BBO #567589)
                                     Nixon Peabody LLP
                                     100 Summer Street
                                     Boston, MA  02110
                                     (617) 345-1000

# EXHIBIT A

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| Plaintiff, | ) ) ) | Case No. CA-04-12415-NG |
| vs. | ) ) ) | |
| BRADFORD C. BLEIDT and ALLOCATION PLUS ASSET MANAGEMENT COMPANY, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] ORDER AUTHORIZING AND APPROVING WBIX RESCISSION AGREEMENT AND FOR RELATED RELIEF

Upon the Motion of David A. Vicinanzo (the "Receiver"), Receiver for Bradford C. Bleidt ("Bleidt"), Allocation Plus Asset Management Company, Inc. ("APAM"), Financial Perspectives Planning Services, Inc. ("FPPS"), Perspectives Broadcasting, Inc. ("PBI"), WBIX Corp., formerly known as Langer Broadcasting Corp. ("WBIX Corp."), Shared Visions, Inc. ("SVI") and FPPS Management, Inc., dated September __, 2005 (the "Rescission Motion" or "Motion"), for an Order Authorizing and Approving the WBIX Rescission Agreement and for Related Relief.  Among other things, the Rescission Motion seeks approval of that certain WBIX Rescission Agreement (the "Rescission Agreement" or the "Agreement") by and between the Receiver and Alexander G. Langer, ("Langer") pursuant to which, the Receiver has agreed to rescind the sale of Langer's stock in WBIX Corp. to PBI.  The Rescission Motion also seeks a declaration from this Court that following the closing of the rescission transaction contemplated

- 2 -

by the Agreement, (a) WBIX Corp. shall hold the license to broadcast the radio station WBIX;

and (b) WBIX Corp. shall hold the other assets it presently owns as of the date of this Order free

and clear of all liens, claims and encumbrances, excluding Assumed Obligations (as defined in

the Rescission Agreement); and (c) the Receiver owns and has the power to re-convey 100

percent of the issued and outstanding shares of stock of WBIX Corp. Capitalized terms used but

not defined in this Order shall have the meanings ascribed to them in the Rescission Agreement.

NOW, THEREFORE, based upon all of the evidence provided to the Court at the hearing

held on [_____] (the "Hearing"), the Affidavit of David A. Vicinanzo (the

"Vicinanzo Affidavit"), the Affidavit of Alexander G. Langer (the "Langer Affidavit"), the

Certificates of Service for the Motion; and upon the entire record of the Hearing; and after due

deliberation thereon; and good cause appearing therefore;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court has jurisdiction to hear and determine the Motion and approve the

Rescission Agreement.

B.    On October ____, 2005, the Receiver served a copy of the Rescission Motion and

the Agreement on all of the parties identified in Schedule G of the Agreement by hand or by first

class mail.

C.    In addition, on October ____, 2005 and again on October ___, 2005, the Receiver

published a notice concerning the hearing on the Rescission Motion, the relief sought in the

Rescission Motion and the transactions contemplated by the Rescission Agreement in the

following newspapers and periodicals: (1) *The Boston Globe*; (2) *The Boston Herald*; (3) *Radio

and Records*; (4) *Radio Business Report* and (5) *Inside Radio*.

D.    The Receiver also published the Rescission Motion, the Agreement and a Notice

concerning the Rescission Motion on his webpage at http://extranet30.nixonpeabody.com.

E.    Notice of the Motion, the Rescission Agreement, the hearing thereon and the

transactions contemplated therein was proper, timely, adequate and sufficient under the

circumstances.

F.    All interested persons and entities, including, without limitation: (i) Bradford C.

Bleidt; (ii) Gregory D. Oberhauser; (iii) Chris Egan; (iv) Egan Communications LLC; (v) Bruce

Mittman; (vi) Mittcom Consulting Group; (vii) Jeffrey D. Ganz; (viii) NStar; (ix) Boston Harbor

Hotel; (x) Regan Communications; (xi) Greater Boston Chamber of Commerce; (xii) Robert

Glovsky (the individuals and entities identified in subsections (i) through (xii) being the

"Identified Claimants"); (xiii) the Defrauded Investors identified in Schedule __ of the

Rescission Agreement; (xiv) the creditors of WBIX Corp. identified in Schedule ____ of the

Rescission Agreement; (xv) all persons or entities who claim or may claim or have threatened to

claim or who have asserted any interest in or lien upon the WBIX Stock or WBIX's assets or

right to the issuance of WBIX stock; (xvi) all parties who have entered an appearance in the

above-captioned case, (xvii) all current and former employees of WBIX Corp. and PBI;

(xviii) the Securities and Exchange Commission; (xix) the Federal Communication Commission;

(xx) the Office of the Secretary of State of the Commonwealth of Massachusetts; (xxi) the

Federal Bureau of Investigation; (xxii) the Massachusetts Attorney General's Office; and

(xxiii) the Attorney General of the United States; have been afforded a reasonable opportunity to

object or to be heard regarding the relief requested in the Motion.

G.    The Receiver has full power and authority to execute, deliver and perform the

WBIX Rescission Agreement and all other documents contemplated thereby on behalf of Bleidt

- 4 -

and the Additional Bleidt Entities and the rescission of the sale of the WBIX Stock to PBI has

been duly and validly authorized by all corporate and other authority necessary to consummate

the transactions contemplated by the Rescission Agreement. No consents or approvals, other

than as expressly provided for in the Agreement, are required by the Receiver to consummate

such transactions.

      H.     The Rescission Agreement was negotiated, proposed, and entered into by the

parties without collusion, in good faith, and from arm's length bargaining positions.

      I.     The Receiver has advanced sound business reasons for seeking to enter into the

Rescission Agreement, as more fully set forth in the Motion and the Vicinanzo Affidavit, and as

demonstrated at the Hearing, and it is a reasonable exercise of the Receiver's business judgment

and a proper exercise of his fiduciary duties to rescind the sale of the WBIX Stock to PBI and to

execute and deliver the Rescission Agreement to Langer.

      J.     The terms and conditions of the Rescission Agreement, including the total

consideration to be realized by the Receiver, are fair and reasonable, and the transactions

contemplated by the Rescission Agreement are fair and reasonable and are in the best interest of

Bleidt's and the Additional Bleidt Entities' estates, the Defrauded Investors and the other

creditors of those estates.

      K.     The Rescission Agreement will provide a greater recovery for Bleidt's and the

Additional Bleidt Entities' estates than would be provided by any other practical alternative.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED

THAT:

      1.     The Motion is granted in its entirety.

- 5 -

2.    The WBIX Rescission Agreement and the transactions contemplated thereby are approved and the Receiver is hereby authorized, empowered, and directed to enter into the Rescission Agreement on behalf of Bleidt and the Additional Bleidt Entities and to execute and perform such other agreements or documents, and take such actions, as are necessary or desirable to effectuate the terms of the Rescission Agreement.

3.    All objections to the relief requested in the Motion that have not been withdrawn, waived, mooted or settled, and all reservations of rights included therein are hereby overruled on the merits.

4.    The rescission of the sale of the WBIX Stock to PBI and the term, agreements, conditions and transactions contemplated by the Rescission Agreement are hereby approved in all respects.

5.    The Receiver is hereby authorized, directed, and empowered on the Closing Date to fully assume, perform under, consummate, and implement the Rescission Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Rescission Agreement, and the transactions contemplated thereby.

6.    This Order is and shall be effective as a determination that upon Closing of the rescission transaction, and except as expressly provided for in the Rescission Agreement, WBIX Corp. shall be vested with good title to all assets it holds as of the date of this Order, free and clear of any and all liens, claims, encumbrances, liabilities, obligations, pledges, security interests, charges, and interests of any kind including, without limitation, competing claims to title of those assets held or asserted by any Defrauded Investors (individually, "Claim" or collectively, "Claims"), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or

- 6 -

noncontingent, liquidated or unliquidated, mature or unmatured, disputed or undisputed or

known or unknown, whether arising prior to or subsequent to the Appointment Order, whether

imposed by agreement, understanding, law, equity or otherwise. All such Claims on WBIX

Corp.'s assets shall attach to the proceeds of the Rescission Agreement, with the same force,

validity, and effect, if any, as they now may have.

7.    Upon Closing, Langer shall acquire from the Receiver one hundred (100%)

percent of all of the issued and outstanding capital stock of LBC free and clear of all rights of

any other alleged stockholders or warrants, subscriptions, calls or other rights or commitments to

issue or acquire any capital stock or other securities of LBC or rights or obligations of any kind

convertible into securities of any kind or class with all such rights to attach only to the proceeds

of the rescission transaction with the same validity, force and effect, if any, as they now have in

or against WBIX Corp., subject to all Claims and defenses the Receiver may possess with

respect hereto.

8.    Except as expressly provided in this Order and in the Rescission Agreement,

Langer is not assuming, nor shall he in any way whatsoever be liable, as successor to PBI or

otherwise, for any debts, liabilities, obligations, commitments, fines, penalties, recoupments,

audits, repayments, chargebacks or other assessment of any form or nature, which arose prior to

the date of the entry of this Order or any debts, liabilities, obligations, or commitments, in any

way whatsoever relating to or arising from the Station, WBIX Corp. or WBIX Corp.'s assets, or

Bleidt's and/or PBI's operation or use or ownership of the Station, or WBIX Corp.'s assets prior

to consummation of the transactions contemplated by the Rescission Agreement.

9.    Any and all persons are hereby barred, estopped, and forever enjoined from taking

any action of any kind against Langer, WBIX Corp., or any of their respective property on

- 7 -

account of any Claim against Bleidt or any of the Additional Bleidt Entities or against WBIX

Corp., or any of its assets existing as of the date of this Order.  All such Claims shall attach to the

proceeds of the Rescission Agreement, with the same force, validity, and effect, of any, as they

now may have.

10.     All persons or entities who presently, or on the Closing Date, are in possession of

some or all of WBIX Corp.'s assets are hereby directed to surrender possession of such assets to

Langer on the Closing Date or at such time thereafter as Langer may request.

11.     The payment referred to in paragraph 4 of the Rescission Agreement, together

with other consideration provided for in the Rescission Agreement, shall constitute reasonably

equivalent value and fair consideration for the transaction within the meaning of the United

States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") and all applicable

law.

12.     The Rescission Agreement and any related agreements may be waived, modified,

amended or supplemented by agreement of the Receiver and Langer without further action of the

Court; provided, however, that such waiver, modification, amendment or supplement is not

material and substantially conforms to and effectuates the Rescission Agreement.

13.     The failure to specifically include any particular provision of the Rescission

Agreement or any related agreements in this Order shall not diminish or impair the effectiveness

of such provision, it being the intent of the Court, the Receiver, and Langer that the Rescission

Agreement or any related agreement, are authorized and approved in their entirety with such

amendments thereto, as may be made in accordance with this Order prior to Closing.

14.     The terms and provisions of this Order shall be binding in all respects on the

Receiver, Bleidt, the Additional Bleidt Entities, their estates and creditors, the Identified

- 8 -

Claimants, the Defrauded Investors, Langer and his respective affiliates, successors, and assigns, and any affected third parties, and all persons asserting or who may assert a Claim against or interest in Bleidt's or the Additional Bleidt Entities' estates, the Station, WBIX Corp., WBIX's other assets, or the stock of WBIX Corp. existing as of the date of this Order, whether known or unknown. The Rescission Agreement and the transactions contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to, rejection or avoidance by, Bleidt and the Additional Bleidt Entities in any case commenced by Bleidt or the Additional Bleidt Entities under the Bankruptcy Code, or any Chapter 7 or Chapter 11 trustee of Bleidt or the Additional Bleidt Entities appointed in such a case and their respective bankruptcy estates.

15.    This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the Rescission Agreement and to resolve any dispute concerning this Order, the Rescission Agreement, or the rights and duties hereunder or thereunder, or any issues relating to the Rescission Agreement and this Order, including, but not limited to, the resolution of any claims asserted by third parties that give rise to the indemnification provisions of the Rescission Agreement, the implementation of the procedures set forth in Section 16 of the Rescission Agreement, the interpretation of the terms, conditions, and provisions hereof and of the Rescission Agreement, and all issues and disputes arising in connection with the relief authorized herein.

- 9 -

16.    To the extent any provisions of this Order conflict with the terms and conditions of the Rescission Agreement, this Order shall govern.


October __, 2005                                    _____
                                                   Honorable Nancy Gertner
                                                   United States District Court Judge

# EXHIBIT B

## WBIX
## RESCISSION AGREEMENT

This Rescission Agreement ("Agreement") is made as of
_____ __, 2005, among (i) Alexander G. Langer with a
principal place of business at 94 St. Rose Street, Jamaica Plain,
Massachusetts 02130 ("Langer"), (ii) David A. Vicinanzo as court
appointed receiver ("Receiver") for Bradford C. Bleidt
("Bleidt"), WBIX Corp. (formerly known as Langer Broadcasting
Corp. ("LBC")), a Florida corporation, with a principal place of
business at 100 Mt. Wayte Avenue, Framingham, Massachusetts
01702, and Perspectives Broadcasting, Inc. ("PBI"), a
Massachusetts corporation formerly with a principal place of
business at 164 Canal Street and 205 Portland Street, Boston,
Massachusetts 02114 (the Receiver and collectively with WBIX
Corp., Bleidt and PBI, the "Licensee"), and (iii) David A.
Vicinanzo as Receiver for Shared Visions, Inc., Financial
Perspectives Planning Services, Inc., FPPS Management, Inc., and
Allocation Plus Asset Management Company, Inc. each being
Massachusetts corporations and each formerly with a principal
place of business at 164 Canal Street and 205 Portland Street,
Boston, Massachusetts 02114 (collectively, the "Additional Bleidt
Entities.")

### RECITALS

WHEREAS, LBC (now WBIX Corp.) was and is engaged in the
operation of an AM radio broadcasting business ("Business") under
the call letters WBIX 1060 AM (the "Station") broadcasting from
separate tower sites located in Ashland, Massachusetts and in
Framingham, Massachusetts; and

WHEREAS, on or about July 16, 2002, Bleidt entered into a
Stock Purchase and Sale Agreement with LBC ("Langer") and its
then sole shareholder, Langer, in connection with the sale of all
of the issued and outstanding shares of stock in LBC (the
"Stock") to Bleidt or his nominee for a purchase price of Ten
Million ($10,000,000) Dollars (the "PBI Purchase Price"); and

WHEREAS, on or about July 16, 2002, LBC and Shared Visions,
Inc. ("SVI"), a Massachusetts corporation wholly owned by Bleidt,
entered into a Time Brokerage Agreement whereby SVI undertook to
manage the Station in anticipation of the eventual closing on the
sale of the LBC Stock to Bleidt or his nominee; and

WHEREAS, Bleidt formed PBI for the express purpose of
acquiring the LBC Stock and the FCC Station license (the
"License") for the Business; and

WHEREAS, Bleidt was sole owner of all of the issued and
outstanding shares of stock of PBI; and

WHEREAS, on or about January 13, 2004 (the "Langer-PBI Closing Date"), PBI acquired from Langer all of the LBC Stock and subsequently changed the corporate name of LBC to WBIX Corp.; and

WHEREAS, in connection with the acquisition of the purchase of the LBC Stock, Bleidt or his affiliates tendered aggregate deposits to Langer prior to the Langer-PBI Closing Date in the amount of $750,000 and expended monies prior to the Langer-PBI Closing Date to cover operating deficits for the Station's operation as well as capital improvements for expanding the Station's broadcast signal, for which Langer credited Bleidt or his nominee with a $1,000,000 offset and reduction against the PBI Purchase Price; and

WHEREAS, on or shortly after the Langer-PBI Closing Date, Bleidt or his nominee tendered to Langer $1,300,000 as an additional cash payment against the PBI Purchase Price and PBI and/or Bleidt entered into an interest bearing Promissory Note and a First Amendment thereto in favor of Langer reflecting a remaining purchase price for the purchase of the LBC Stock and the License in the amount of $7,318,000 plus accrued interest (the "Langer Note") along with a Loan Agreement; and

WHEREAS, in connection with securing repayment of the Langer Note, PBI and/or Bleidt executed and delivered to Langer a Pledge Agreement of the LBC Stock and a Pledge Agreement of the PBI stock, each in favor of Langer, and separate Security Agreements, each in favor of Langer, covering all of the assets of LBC and PBI, along with a Guaranty and First Amendment thereto of Bleidt in favor of Langer (collectively the "Security Agreements"); and

WHEREAS, Bleidt or one of the Bleidt and Affiliates entered into an Asset Purchase Agreement (the "Egan Purchase Agreement") in 2004 with Egan Communications, LLC, a Massachusetts limited liability company ("ECLLC") in connection with a proposed purchase of the assets of the Station including its FCC License, and at or about the same time ECLLC or its affiliate entered into an LMA to manage and operate the Station; and

WHEREAS, on or about November 18, 2004, counsel for ECLLC and its sole member-manager, Chris Egan, notified Bleidt and Affiliates of his clients' intention to terminate the Egan Purchase Agreement; and

WHEREAS, Langer has failed to receive payments from Bleidt, PBI or LBC due under the Langer Note; and

WHEREAS, the Receiver was appointed as such for Bleidt and Affiliates by Order of the U.S. District Court, District of Massachusetts, Case No. 04CV12415, on November 18, 2004, as such Order was modified on November 22, 2004 to include WBIX Corp. and the Additional Bleidt Entities, a copy of such Order, as so modified, being attached hereto as Exhibit A-1 and Exhibit A-2 and made a part hereof; and

- 2 -

WHEREAS, the Receiver and Langer recognized the importance of continuing the broadcast of the Station's signal in order to preserve the value of the Station and the License for a subsequent sale to a third party purchaser; and

WHEREAS, the Receiver and Langer's wholly-owned affiliate, 1060 Communications Corp., a Massachusetts corporation (the "Langer Affiliate") informally entered into a Local Management Agreement in connection with the management of the Station by the Langer Affiliate and the LBC assets pending disposition of the Station; and

WHEREAS, the Receiver and Langer have each solicited prospective third party purchasers for the Station, the License and the LBC assets with the intention of applying any sales proceeds therefrom to: (i) repay Langer, in whole or in part, (ii) pay fees and expenses of the Receiver and his counsel and (iii) return to investors in one or more Additional Bleidt Entities allegedly defrauded by Bleidt ("Defrauded Investors") some portion of monies of the Defrauded Investors diverted by Bleidt for purposes other than investments on their behalf; and

WHEREAS, despite good faith efforts by the Receiver and Langer over the last number of months, a third party purchaser who was ready, willing and able to purchase the Station and its License has failed to materialize; and

WHEREAS, Langer, as the former owner of LBC and the Station holding a secured interest in the assets of PBI, LBC and the Station, is willing to enter into this Agreement, the purpose of which is cause a rescission of the original sale of the Stock in LBC to PBI and to return such LBC Stock to Langer; and

WHEREAS, the Receiver deems it to be in the best interest of the Defrauded Investors and other creditors of Bleidt and Affiliates to enter into this Agreement with Langer so that, pending Court approval, the Receiver will cause a retitling of all of the LBC stock to Langer or his nominee and Langer will pay the Receiver, in consideration therefor, the amounts set forth in Section 4 hereof; and

WHEREAS, the parties hereto believe it to be in their mutual best interests to enter into this Agreement to rescind the original sale of the Stock of LBC, subject to Final Court Approval, and the transfer of the License, subject to FCC approval.

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants, representations, warranties and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement each agree as follows:

- 3 -

1.    Capitalized terms used in this Agreement shall have the respective meanings set forth below.

"Additional Bleidt Entities" means Shared Visions, Inc., Financial Perspectives Planning Services, Inc., FPPS Management, Inc. and Allocation Plus Asset Management Company, Inc.

"Agreement" means this Rescission Agreement entered into by and among: (i) Langer, (ii) the Receiver on behalf of Bleidt, LBC and PBI, and (iii) the Receiver on behalf of the Additional Bleidt Entities.

"Appointment Order" means the appointment of the Receiver over the assets of Bleidt And Affiliates (as defined below) by order of the United States District Court for the District of Massachusetts dated November 18, 2004 and modified on November 22, 2004.

"Assumed Obligations" means the liabilities of LBC or PBI assumed by Langer as identified in Sections 4C(i) and 4C(ii) hereof.

"Bleidt" means Bradford C. Bleidt.

"Bleidt And Affiliates" means Bleidt, PBI, LBC and the Additional Bleidt Entities, as the context and facts may determine.

"Business" means the operation and management of the Station.

"Cash Rescission Payment" means the amount of $1,100,000 as set forth in Sections 4A(i) hereof to be paid by Langer to the Receiver on the Closing Date.

"Closing Date" means the latest date on which all the closing conditions set forth in Sections 9 and 10 hereof are satisfied or waived, the Initial Rescission Payment is paid and the LBC Stock is retitled to Langer.

"Company" means PBI and/or LBC, as the context and facts may determine.

"Contingent Payment" means the amount as determined under Section 4D hereof.

"Court" means the U.S. District Court, District of Massachusetts, which has jurisdiction over the Receiver, or such other court as may succeed to such jurisdiction.

"Defrauded Investors" mean those individuals or entities who tendered cash, securities and/or liquid assets to Bleidt And Affiliates for investment purposes and whose assets were

- 4 -

improperly expended, in whole or in part, by Bleidt for personal and/or non-investment purposes.

"ECLLC" means Egan Communications, LLC.

"Final FCC Approval" means the approval by the Federal Communications Commission of the transfer or assignment of the License (defined below), in accordance with the terms of this Agreement following the expiration of the appeals period with respect to such approval.

"FCC" means the Federal Communication Commission, an agency of the United States, regulating the issuance of radio station licenses, among other matters.

"Final Court Approval" means the approval of the Court in the form attached hereto as Exhibit A-3 of the Order Authorizing And Approving WBIX Rescission Agreement And For Related Relief with such changes thereto as shall be mutually agreed by the parties hereto after notification to known creditors of Bleidt and Affiliates, after publication of notice of the Court hearing related thereto and after all necessary consents have been obtained from third parties subject to the jurisdiction of the Court relative to the Bleidt and Affiliates receivership and the appeals period has expired with respect to the transaction contemplated under this Agreement which is the subject of such Final Court Approval.

"Governmental Entities" means the FCC, the Office of the Secretary of State of The Commonwealth of Massachusetts, the Securities and Exchange Commission, the Federal Bureau of Investigation, the Massachusetts Attorney General's Office, the Attorney General of the United States and any other state or federal governmental agency, entity, or court which has asserted jurisdiction over or expressed an interest in Bleidt and Affiliates in connection with the License or the Defrauded Investors.

"LBC" means Langer Broadcasting Corp., whose name was changed to WBIX Corp., as holder of the License.

"LMA" means the separate Local Management Agreement or Time Brokerage Agreement as the case may be, entered into by ECLLC or an Affiliate thereof and by Shared Visions, Inc. in connection with the management and operation of the Station.

"Langer" means Alexander G. Langer.

"Langer Affiliate" means 1060 Communications Corp.

"Langer Note" means the interest-bearing Promissory Note from PBI, as Borrower, in favor of Langer, as Lender, dated January 13, 2004 in the original principal amount of $6,618,000, as modified by a First Amendment thereto dated January 13, 2004

pursuant to which the principal amount of the Langer Note was increased to $7,318,000 and the payment terms were modified.

"Langer-PBI Closing Date" means the date on which the sale of the LBC Stock was effectively transferred to PBI, the FCC approval for the transfer of the License was approved, the Langer Note was entered into by PBI in favor of Langer and the Loan Agreement and Security Agreements were entered into by PBI and Bleidt, as applicable in favor of Langer.

"License" means the FCC License granted to LBC to broadcast on the Station.

"Loan Agreement" means the Loan Agreement, as amended by a First Amendment thereto, each dated January 13, 2004, between Langer, as Lender, PBI, as Borrower, and Bleidt, as Guarantor, in connection with the sale by Langer of the LBC Stock to PBI.

"PBI" means Perspectives Broadcasting, Inc.

"PBI Purchase Price" means the amount of $10,000,000 which was to have been paid to Langer by Bleidt or his nominee in connection with his sale of the LBC Stock.

"Receiver" means David A. Vicinanzo, or his successor, as court appointed Receiver for Bleidt, LBC, PBI and the Additional Bleidt Entities by Order of the U.S. District Court, District of Massachusetts, Case No. 04CV12415, on November 18, 2004, as modified on November 22, 2004 to include WBIX Corp. and the Additional Bleidt Entities.

"Rescission Payment" means the amount of $1,500,000 to be paid by Langer to the Receiver as set forth in Section 4A hereof.

"SVI" means Shared Visions, Inc.

"Security Agreements" means the Guaranty Agreement as amended by a First Amendment thereto, each dated January 13, 2004, entered into by Bleidt in favor of Langer, guaranteeing the PBI Purchase Price, the Pledge Agreement of all of the issued and outstanding shares of stock of PBI in favor of Langer, the Pledge Agreement of all of the issued and outstanding shares of the LBC Stock in favor of Langer, each dated January 13, 2004, the Security Agreement of PBI of all of the PBI assets and the Security Agreement of LBC of all of the LBC assets, each in favor of Langer and each effective January 13, 2004.

"Station" means the radio Station WBIX (AM), assigned to Natick, Massachusetts (1060 AM).

"Stock" means all of the issued and outstanding shares of stock in LBC.

- 6 -

"Tower Sites" means the sites in Ashland and Framingham, Massachusetts from which LBC leases space on the radio towers situated thereon.

2.    Rescission of Sale of Stock.    Pending Final Court Approval of this Agreement and satisfaction of the closing conditions set forth in Sections 9 and 10 hereof, the Receiver and Langer agree to rescind the sale of the LBC Stock to PBI and to treat such sale for legal purposes as well as for state and federal income tax treatment purposes as having been rescinded and cancelled ab initio, as if such sale had not been consummated. As a part of the consideration therefor, Langer agrees to release his lien on the assets of LBC and PBI and the pledge of the Stock of LBC by PBI and the pledge of the stock of PBI by Bleidt, in each case in favor of Langer.

3.    Closing.    The closing on the rescission of the Stock ("Closing") shall occur within thirty (30) days following receipt of both Final Court Approval and Final FCC Approval of the transaction contemplated hereunder and satisfaction of all of the closing conditions set forth in Sections 9 and 10 hereof; provided, however, in no event shall this Closing occur later than November 30, 2005; and provided, further, however, either party may elect to notify the other party of its intention to extend the Closing under this Agreement for a period not to exceed an additional thirty (30) days (i.e., from November 30, 2005 through December 30, 2005), in order to provide either party with a period of time to undertake due diligence, seek third party consents or approval to take into account regulatory filings and approvals by the FCC for the transfer of the License for the Station.  As used herein, Closing shall mean the date the Cash Rescission Payment is paid and the LBC Stock is retransferred to Langer.    At the Closing, the Receiver shall retransfer to Langer and Langer shall reacquire, accept and acquire from Receiver, for the Cash Rescission Payment, an aggregate of one thousand (1,000) shares of no par value common stock of LBC, which shall constitute one hundred (100%) percent of all of the issued and outstanding capital stock of LBC.    The certificate representing the LBC Stock so delivered shall be duly endorsed by the Receiver in blank for transfer, or accompanied by a stock power duly executed in blank by the Receiver, reassigning the Stock held by the Receiver to Langer.  The Closing shall take place at the offices of the Receiver, at 10:00 A.M. local time, on November 30, 2005, provided that Langer and the Receiver may agree to close at an earlier date. The Closing may also take place at such other location, date and/or time on which the parties hereto shall mutually agree.  The date upon which the Closing is to take place is defined as the "Closing Date". If the parties mutually agree in writing to extend the Closing Date, the parties hereto shall continue, as set forth in this Agreement, to cause the Closing to occur as soon thereafter as practicable.

The Closing shall be subject to the satisfaction of the conditions set forth in Sections 9 and 10 hereof, the delivery by

the Receiver of the documents to be delivered pursuant to Section 5, the delivery by Langer of the Cash Rescission Payment and the documents to be delivered pursuant to Section 7, and the delivery of any other documents provided for hereunder including those under Section 6 hereof.    The Closing of any and all of the transactions hereby shall be deemed not to have occurred unless and until all conditions to the Closing shall have been satisfied or unless a party waives in writing any condition to the Closing and all such transactions shall be deemed to have taken place simultaneously.

    4.   <u>Payment By Langer</u>.

      A.      Subject to the satisfaction of the Closing conditions set forth in Sections 9 and 10 hereof, Langer agrees to pay in exchange for the receipt by way of rescission of all of the LBC Stock, One Million Five Hundred Thousand ($1,500,000) Dollars (the "Rescission Payment") to the Receiver as follows:

      (i)  One Million One Hundred Thousand ($1,100,000) Dollars (the "Cash Rescission Payment") shall be payable at the Closing by certified, bank or cashiers check or by wire transfer;

      (ii) One Hundred Thousand ($100,000) Dollars shall be payable ninety (90) days from the Closing Date;

      (iii)    One Hundred Thousand ($100,000) Dollars shall be payable on the twelve (12) month anniversary of the Closing Date;

      (iv) One Hundred Thousand ($100,000) Dollars shall be payable on the 2nd anniversary of the Closing Date; and

      (v) One Hundred Thousand ($100,000) Dollars shall be payable on the 3rd anniversary of the Closing Date.

      All deferred payments identified in Section 4A(ii), (iii), (iv) and (v) above shall be evidenced by a Promissory Note of WBIX Corp. in the form of Exhibit B attached hereto (the "WBIX Note"), shall be made by certified, cashiers or bank check or by wire transfer into the account of the Receiver, shall be non-interest bearing, and may be prepaid in whole or in part at any time and from time to time in the sole discretion of Langer.    If a Notice of Claim has been provided by Langer, as such term is defined in Section 16 hereof, then such amount of any deferred payments due on and after the Receiver's receipt of the Notice of Claim as would be sufficient to satisfy such claim, shall be paid into and held by the U.S. District Court, District of Massachusetts until resolution of such claim, pursuant to the provisions of Section 16 hereof.

      B.  As security for the payment under the WBIX Note, Langer shall deliver to the Receiver at the Closing: (i) a Security Agreement in the form of Exhibit C attached hereto

providing a first priority security interest in all of the
tangible and intangible personal property of LBC (excluding the
License), whether now or hereafter acquired by LBC, or in which
LBC now has or hereafter acquires an interest, including, without
limitation, all licenses, permits, construction permits and
contracts used by LBC in connection with the operation of the
Station, which security interest shall be subject to no prior
liens, except as provided hereunder, excepting only licenses
issued by the FCC to the extent that transfer or assignment
thereof or a lien thereon would cause or permit the imposition of
a sanction by the FCC including loss or revocation thereof, but
including, to the maximum extent permitted by law, all rights,
incidents or appurtenant to such FCC license, including without
limitation, any renewal expectation and further including,
without limitation, the right to receive all proceeds derived
from or arising from or in connection with sale, assignment,
transfer or other disposition of such license, authorizations and
permits, which Security Agreement shall provide for a required
subordination of the Receiver's security interest in the assets
of LBC to an institutional lender to LBC to provide working
capital for the Station, (iii) a Pledge Agreement executed and
delivered by Langer in favor of Receiver for all of the issued
and outstanding shares of stock of LBC to be acquired by Langer,
and (vii) such other security agreements, assignments, financing
statements and other documents reasonably required by the
Receiver to create a perfected lien and security interest in and
to the collateral pledged under the Security Agreement and the
Pledge Agreement.

    C.   In addition to the Rescission Payment set forth in
Section 4A above, Langer agrees to pay the following amounts due
from Bleidt and Affiliates (the "Assumed Obligations"):

    (i)  to Warmus and Associates, Inc., for
engineering services to the Station, the approximate amount of
$363,000, more or less, or such other amount as may be
negotiated by and agreed to between Langer and Warmus and
Associates, Inc.; and

    (ii)  to Towers Sites, Ltd., for unpaid rent for
the tower site leased by LBC located in Ashland, Massachusetts,
the approximate amount of $70,000, more or less, or such other
amount as may be negotiated by and agreed to between Langer and
Tower Sites, Ltd.;

    provided, however, in each case, that at the Closing
Receiver shall receive an Indemnity from Langer in the form of
Exhibit E attached hereto, benefiting Receiver and the
appropriate Bleidt entity and relating to such Assumed
Obligations.

    D. In the event the Station is sold to an unrelated
third party buyer within thirty-six (36) months from the Closing
Date, Langer shall pay the Receiver twenty-five (25%) percent of

- 9 -

the amount in excess of Ten Million ($10,000,000) Dollars of the net sales proceeds from the sale of the Station, after taking into account all expenses of sale, including Langer's legal fees and expenses relating to the negotiation and consummation of the sale and any brokerage commission paid by Langer in connection with such sale (the "Contingent Payment").    Such Contingent Payment shall be paid to the Receiver at the time of receipt from such third party buyer of one or more payments of cash or equivalent.  This provision shall survive the Closing Date.

   5.   Deliveries by the Receiver.  It shall be Langer's Conditions of Closing that the Receiver shall deliver the following at the Closing, all of which shall be satisfactory in form and substance to Langer (all documents shall be dated the Closing Date unless otherwise specified):

       (a) Duly executed Stock Assignment in the form attached as Exhibit E to this Agreement, together with original Stock Certificate of LBC held by PBI evidencing the Stock.

       (b) Opinion of Nixon, Peabody, LLP, counsel for the Receiver, dated as of the Closing Date and addressed to Langer as to (i) the authority of the Receiver and the due authorization of the Receiver for himself and on behalf of LBC and PBI to enter into this Agreement, and of all such transfers and other actions taken and documents executed by such parties, and (ii) the binding nature of the Court Order upon interested third parties including the Defrauded Investors and any other creditors of Bleidt and Affiliates, who have actual notice of the Court hearing with respect to the proposed issuance of the Final Court Approval.  In rendering such opinion, counsel may rely on such certificates or orders as appropriate under the circumstances.

       (c) Certificate signed by the Receiver updating the Disclosure Schedule delivered pursuant to Section 11 hereof and confirming the accuracy of all representations and warranties as of the Closing Date.

       (d) List of creditors of Bleidt and Affiliates and their representatives, including possible creditors identified to the Receiver by Langer, who are given actual notice by the Receiver of the Court hearing with respect to the issuance of the Final Court Approval.

       (e) A Final Court Order from the Court, in the form of Exhibit A-3 attached hereto and made a part hereof with any changes thereto to be agreed in writing by all parties to this Agreement, binding on all governmental entities having an interest in Bleidt and Affiliates and the Defrauded Investors, as well as being binding on the Defrauded Investors and potential creditors of Bleidt and Affiliates, and being binding on individuals and/or entities as having claims of being shareholders of LBC or having claims to rights to Stock or equity in LBC, which Final Court Order shall be satisfactory in all

- 10 -

respects to Langer and providing Langer with good clear record title to all assets of WBIX free of all liens, claims and encumbrances (excluding claims of the two creditors identified in Section 4C hereof) and insulating WBIX and its assets from all claims of any third party (excluding claims of the two creditors identified in Section 4C hereof), whether such claims are grounded in contract, tort or fraud.

(f) Consents to the transactions contemplated hereby of the parties to all material contracts, agreements, commitments and understandings to which LBC or PBI is a party or to which they or their assets are subject, to the extent reasonably required to consummate the retitling of the LBC Stock to Langer.

(g) A Certificate of the Receiver and the Company certifying that to the best of Receiver's knowledge, after a review of records in his possession or control and inquiry of Langer, there are no liabilities attributable to the Business as of the Closing Date other than in the ordinary course of business and other than contracts and other obligations set forth in the Disclosure Schedule attached hereto as amended through the Closing Date.

(h) Minute book of LBC and copies of all financial records, invoices, receipts and the like since the date the Shared Visions, Inc. Time Brokerage Agreement with Langer was entered into.

(i) Execution and delivery, followed by termination, of the Local Management Agreement between 1060 Communications Corp. and the Receiver, in form and substance satisfactory to the parties thereto.

(j) Such other documents, certificates and opinions as Langer may reasonably request for the purpose of enabling his counsel to provide opinions under this Agreement and in order to evidence the accuracy and completeness of any of the representations, warranties or statements of either Company or the Receiver.

6. <u>Third Party Deliveries</u>. It shall be a condition of Closing that satisfactory agreements be entered into with Warmus and Associates, Inc. and Towers Sites, Ltd. relative to agreed payments due to such parties and terms of such payments and of satisfactory lease arrangements being entered into between LBC and Towers Sites, Ltd. and between LBC and Clear Channel Communications relative to lease arrangements for the respective Tower Sites.

7. <u>Deliveries by Langer</u>. Langer hereby covenants and agrees to deliver or cause to be delivered the following at the Closing, all of which shall be satisfactory in form and substance to the Receiver (all documents shall be dated the Closing Date,

unless otherwise specified) subject to all the terms and conditions of this Agreement:

(a) Promissory Note of Langer, representing the deferred portion of the Rescission Payment, in the form of Exhibit B attached hereto.

(b) Security Agreement of WBIX Corp., in the form of Exhibit C attached hereto.

(c) Pledge Agreement of Langer of the stock of LBC, in the form of Exhibit D attached hereto.

(d) Indemnity of Langer from claims of the two creditors identified in Section 4C hereof in the form of Exhibit E attached hereto.

(e) Unaudited accounting of the operations of the Station from November 30, 2004 through the last day of the month preceding the Closing Date.

(f) A certificate dated the Closing Date and executed by Langer certifying that: (i) the representations and warranties of Langer contained in this Agreement or in any Exhibit, Schedule, certificate or other document delivered by Langer pursuant to this Agreement are true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date or, if not, in what respects they are not, and (ii) each and all of the agreements and covenants of Langer to be performed on or before the Closing Date pursuant to the terms of this Agreement have been duly performed or, if not, in what respects they have not; provided, however, notification of any such changes shall not constitute Receiver's acceptance thereof, unless Receiver confirms his acceptance of such changes by written notice to Langer.

(g) Opinion of Greif & Litwak, P.C., counsel for Langer, as to the due validity and enforceability of all actions taken and all documents executed by Langer and Langer's due authority and capacity in connection with the foregoing. In rendering such opinion, counsel may rely on such certificates as appropriate under the circumstances.

(h) Execution and delivery, followed by termination, of the Local Management Agreement between 1060 Communications Corp. and the Receiver in form and substance satisfactory to the parties thereto.

(i) Cancellation of the Langer Note and the Bleidt Guaranty and the Security Agreements in favor of Langer.

(j) Evidence of FCC approval for transfer of the LBC Stock to Langer and of the Station License.

- 12 -

(k) A cashiers, certified or bank check payable to the Receiver or wire transfer to the account of the Receiver in the amount of the Cash Rescission Payment.

(l) Such other documents, certificates and opinions as the Receiver may reasonably request for the purpose of enabling its counsel to provide opinions under this Agreement and in order to evidence the accuracy and completeness of any of the representations, warranties or statements of Langer.

8. <u>Filings</u>. Simultaneously with, or prior to, the delivery of the items set forth in Sections 5, 6 and 7 hereof by the parties thereto, the filing for approval by the FCC of the transfer of the Station's License and any other required filings shall be made with regulatory authorities.

9. <u>Langer's Conditions of Closing</u>. Consummation by Langer of the Closing is subject to the fulfillment prior to or at the Closing Date of each of the following conditions, any one or more of which may be waived by Langer in whole or in part:

(a) The representations and warranties of the Receiver contained in this Agreement or in any certificate, Schedule, Exhibit or other agreement delivered pursuant to the provisions of this Agreement shall be true in all material respects as of the date when made, shall be deemed to be made again at and as of the Closing Date and shall be true in all material respects at and as of the Closing Date.

(b) The Receiver, LBC and PBI, in all material respects, shall have performed and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by each of them prior to or at the Closing Date.

(c) LBC and PBI, in all material respects, shall each be in full compliance with all the required terms and conditions of all agreements material to the Business of the Station.

(d) No material adverse change shall have taken place in the business or financial condition of LBC between the date hereof and the Closing Date, other than changes in the ordinary course of business or occurring with the prior written consent of Langer.

(e) All required consents of governmental authorities including the Final Court Approval and the Final FCC Approval and contracting or other third parties (including without limitation transfers of all licenses, leases and other contracting parties) to the transactions contemplated by this Agreement shall have been properly obtained and evidence thereof provided to Langer insofar as is material to consummation of the retitling of the Stock.

- 13 -

(f)  There shall be no judgment, decree, injunction, ruling, order or notice of any court or governmental authority outstanding against LBC, PBI, Bleidt or any of the Additional Bleidt Entities, the Receiver or Langer, or any claim or proceeding or threat of any such action ("a Litigation Problem") which prohibits, restricts or delays, or could, in the reasonable opinion of counsel for Langer, prohibit, restrict or delay the consummation of any of the transactions contemplated by the Agreement; provided, however, that Langer may, in its sole discretion, waive in writing prior to the Closing all or any part of this condition as to any particular Litigation Problem.

(g)  All consents, authorizations, orders and approvals of, and filings and registrations with any governmental authority which are required for, or in connection with the execution and delivery of this Agreement and the consummation by each party hereto of the transactions contemplated hereby shall have been obtained or made.

(h)  The execution of this Agreement and the retitling of the Stock shall have received Final Court Approval.

(i)  The respective Landlords of LBC's leased Tower Sites shall have either consented to an assignment of the existing lease Agreements with the Company or shall have entered into new Lease Agreements with the Company, all as determined by Langer in his sole discretion.

(j)  Amounts owed by ECLLC or its member(s) to all third parties in connection with its LMA for the Station shall have been paid in full, with satisfactory evidence of same furnished to Langer.

(k)  Allan G. Moskowitz, Esq. shall have delivered to Langer an opinion of Kaye Scholer LLP, et. al. relative to FCC approval of the transfer of LBC's operating license.

(l)  The Receiver shall have entered into an LMA for the management of the station covering the period November 30, 2004 through the Closing Date with 1060 Communications Corp., a Massachusetts corporation wholly owned by Langer.

10.  Receiver's Conditions of Closing.  Consummation by Langer and the Receiver of the Closing transactions is subject to the fulfillment prior to or at the Closing Date of each of the following conditions, any one or more of which may be waived by the Receiver in whole or in part:

(a)  The representations and warranties of Langer contained in this Agreement or in any certificate, Schedule, Exhibit or other agreement delivered pursuant to one or more of the provisions of this Agreement, shall be true in all material respects as of the date when made, shall be deemed to be made

- 14 -

again at and as of the Closing Date and shall be true in all material respects at and as of the Closing Date.

(b) Langer shall have complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing Date, including the payment of the Cash Rescission Payment and delivery of the Promissory Note of Langer representing the deferred portion of the Rescission Payment.

(c) All consents, authorizations, orders and approvals of, and filings and registrations with any governmental authority including the FCC and the Court relative to the Final Court Order and the Final FCC Approval which are required for, or in connection with, the execution and delivery of this Agreement and the consummation by each party hereto of the transactions contemplated hereby shall have been obtained or made.

(d) Required consents, permissions and approvals with respect to the assignment or transfer of any leases, contracts or agreements from Receiver and/or LBC or PBI, as the case may be, to any other person shall have been received.

11. <u>Receiver's Representations And Warranties</u>. To its actual knowledge, after due inquiry, and except as otherwise provided herein, the Receiver represents and warrants to Langer as of the date hereof and as of the Closing Date, as follows, EXCEPT AS SET FORTH IN THE DISCLOSURE SCHEDULE ATTACHED HERETO AS <u>SCHEDULE G</u>, AS UPDATED BY ANY CHANGE IN SUCH KNOWLEDGE AS OF THE CLOSING DATE:

11.1. <u>Status of LBC and PBI</u>.

(a) <u>Organization</u>. Based solely on Certificates of Legal Existence and Good Standing issued by the Massachusetts Secretary of State and the Florida Secretary of State, each of LBC and PBI is a corporation duly organized and validly existing in good standing under the laws of Florida and Massachusetts, respectively, have full corporate power to own or lease its properties and conduct its business as now being conducted. True and accurate copies of (a) the Articles of Incorporation, as amended to date, (b) short form Certificates of Good Standing and Legal Existence (listing all amendments, restatements, any articles of merger or similar action affecting the Articles of Incorporation) from the office of the Florida Secretary of State and the Massachusetts Secretary of State and dated not more than thirty (30) days prior to the date of the Closing, have been furnished to Langer.

(b) <u>Capitalization; Ownership Interests</u>. All outstanding shares of capital stock of LBC which are owned or otherwise controlled by the Receiver will be retitled in the name of Langer and any other outstanding shares of capital stock of

LBC and it is intended that any warrants, subscriptions, calls or other rights or commitments to issue or acquire any capital stock or other securities of LBC or rights or obligations of any kind convertible into securities of any kind or class and any agreements or understandings of any kind to which PBI or LBC is a party relating to the issuance, voting, purchase, repurchase, redemption or transfer of stock or other equity interest of LBC shall be effectively cancelled with respect to any such person who has actual notice of the Final Court Approval, as a result of the entry of the Final Court Approval.

(c) <u>Authorization</u>. The execution and delivery of this Agreement and the due consummation by the Receiver of the transactions contemplated by this Agreement shall have been duly authorized by the United States District Court, District of Massachusetts pursuant to a Court Order under case No. CA-04-12415-NG, which is to be incorporated herein by reference, with notice to all known creditors having first been given by the Receiver relative to such proposed Court Order, and this Agreement constitutes the valid and binding agreement of the Receiver, enforceable against it in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar laws in effect on the Closing Date and to general principles of equity. The Receiver is duly authorized to execute this Agreement and all other agreements or documents attached as Exhibits or referred to therein and to bind PBI and LBC thereto and to engage in and consummate all the transactions and other acts contemplated thereby. Except as described in the Disclosure Schedule as amended to the Closing Date, the Receiver knows of no claim, law or regulatory or contract provision that would prevent or impede the due execution and delivery of all such documents by the Receiver and the completion of all such transactions and acts.

11.2 <u>Tax Returns; Taxes</u>. The Receiver shall turn over to Langer all financial records of the Station's operations and LBC in his control or possession so as to allow Langer to complete or amend any necessary tax returns for LBC from the date Bleidt took control over LBC via the LMA between Shared Visions, Inc. and LBC. No tax returns of LBC or PBI have been audited by any federal, state or local tax authority. Receiver has neither made, filed, nor knows of, without independent investigation, any outstanding agreements or waivers extending the statutory period of limitation applicable to any federal, state or local tax return for any period with respect to LBC or PBI.

11.3 <u>Real and Personal Property</u>.

(a) <u>Ownership</u>. Title to all real and personal property, all contracts, rights of action and all books and records of PBI and LBC is held by Receiver by virtue of Paragraph 4 of the Appointment Order. Receiver has taken no action since the date of the Appointment Order to place or allow the placement of any liens (except the lien created by the Appointment Order or

any subsequent order of the Court) on the assets of PBI or LBC.

(b) Leases; Subleases. The Disclosure Schedule sets forth each lease or sublease pursuant to which LBC leases or subleases any real or personal property, either as lessor or lessee. The Receiver has delivered to Langer true and correct copies of all leases and subleases in his possession or control required to be set forth in the Disclosure Schedule. Receiver has not received notice of any default in connection with any lease or sublease to which LBC is a party or by which it is bound, except for the Tower Sites, Ltd. Lease, nor, except as hereinbefore provided, so far as the Receiver knows is there any basis for any claim or default in any respect under any such lease.

11.4  Contracts; Powers of Attorney.

(a) Contracts. Each written contract or agreement to which LBC is a party or to which any of its properties is subject which is known to Receiver, without independent investigation, and is material to the operation of the Business, is listed in the Disclosure Schedule. All such contracts and agreements are referred to herein as "Contracts". Receiver is aware of no outstanding written notice of default, of cancellation or termination in connection with any of the Contracts, except as otherwise set forth in the Disclosure schedule.

(b) Power of Attorney. Except as set forth in the Disclosure Schedule, there are no persons holding powers of attorney or similar rights from the Receiver which relate to LBC or the LBC Business.

11.5  Intentionally Omitted.

11.6  Transactions with Affiliates. Except as set forth in the Disclosure Schedule there is no lease, sublease, contract, agreement, commitment, understanding, or other arrangement of any kind whatsoever entered into by the Receiver with any affiliated firm, person or corporation which would affect the transactions contemplated hereunder.

11.7  No Misleading Statements or Omissions. No representation or warranty by the Receiver in this Section 11 or in any Certificate or other document required to be signed and furnished  by  the  Receiver  pursuant  to  this  Agreement intentionally contains or will contain any untrue statement of a material fact, or intentionally omits or will omit to state a material fact necessary to make the statements herein or therein not misleading.

11.8  Litigation; Compliance with Law.

Except for the matters disclosed herein pertaining to the Receiver and the Court, Receiver has no reason to believe LBC

- 17 -

has failed to comply in any material respect with any federal, State or other statute, law, judgment, order, decree, regulation or rule of any court or governmental authority applicable to it, including all communications laws, and all rules and regulations promulgated under such laws since November 18, 2004.

11.9 <u>Absence of Restrictions and Conflicts</u>. Except for the Security Agreements in favor of Langer, the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and conditions of this Agreement do not and will not, with the passing of time or the giving of notice or both (a) constitute a violation of, conflict with, constitute a breach of or default under or result in the creation or imposition of any security interest, lien or other encumbrance, upon any of the assets of LBC under (i) any judgment, decree or order of any court or governmental authority or agency; or (ii) any statute, law, regulation or rule. Subject to the foregoing and Final FCC Approval and Final Court Approval, the Receiver has the right and authority to retitle the LBC Stock, free of any claims, liens, restrictions or encumbrances.

12. <u>Langer's Representations And Warranties</u>. Langer hereby represents and warrants to the Receiver as of the date of this Agreement and as of the Closing Date, as follows:

12.1 <u>Authorizations</u>. Langer has full power and authority to enter into this Agreement, and to enter into the other transactions provided for herein, and the execution and delivery of this Agreement and the consummation by Langer of the transactions provided for herein by Langer have been duly and validly authorized. This Agreement constitutes the valid and binding agreement of Langer, enforceable against him in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar laws from time to time in effect and to general principles of equity.

12.2 <u>No Misleading Statements or Omissions</u>. No representation or warranty by Langer in this Section 12 or in any written exhibit, statement, certificate or agreement required to be furnished by Langer pursuant to this Agreement intentionally contains or will contain any untrue statement of a material fact, or intentionally omits or will omit to state a material fact necessary to make the statements herein or therein not misleading.

12.3 <u>Litigation Claims</u>. Except for the matters disclosed in <u>Schedule 12.3</u> Langer is not engaged in or a party to, or to the best of his knowledge, threatened with any claim, controversy, legal action, or other proceeding whether or not before any court or administrative agency and whether by a private or public party, questioning the validity of the transactions contemplated herein or seeking to enjoin or otherwise prohibit the transactions from occurring.

12.4 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated herein based upon arrangements made by or on behalf of Langer. Notwithstanding the foregoing, subject, however, to the provisions of Section 14.5 hereof, any claim made for such brokerage, finder's or other fee or commission shall be the responsibility of Langer.

12.5 <u>Investment Representation</u>. The Stock being transferred pursuant to this Agreement is being acquired by Langer for investment only and not with a view to any public distribution thereof, and Langer will not offer to sell or otherwise dispose of the Stock so acquired by him except in compliance with the registration requirements of the Securities Act of 1933.

13. <u>Survival; Indemnification</u>.

13.1 <u>Survival</u>. All representations and warranties made by Langer or the Receiver in this Agreement or required by this Agreement to be made in any exhibit, schedule, certificate, instrument or agreement delivered pursuant to this Agreement, shall be made at and as of the date of this Agreement and at and as of the Closing Date hereunder and shall survive for a period of three (3) years following the Closing Date.

14. <u>Other Agreements</u>

14.1 <u>Continuing Operation of Business</u>. The Receiver agrees that after execution of this Agreement and prior to the Closing (except upon the prior written consent of Langer which will not be unreasonably withheld or delayed) the Receiver will cause LBC to do the following:

(a) Carry on its business diligently and in the ordinary course through the informal LMA with the Langer Affiliate.

(b) Allow for continued operating control of the Business of LBC by the Langer Affiliate, 1060 Communications Corp., pursuant to the informal Local Management Agreement between the parties.

(c) Not incur any additional liabilities or obligations in connection with the operation of the Business, except such liabilities or obligations as the Receiver or the Langer Affiliate considers to be reasonable and necessary for the operation of the Business.

(d) Not license, assign, sell, transfer or encumber any of the property, assets or Stock of or Stock rights to LBC.

(e) Not do any act, or omit to do any act, or permit any act or omission to act, any of which will cause a breach of

- 19 -

any contract, agreement, commitment or understanding to which LBC is a party or by which it is bound that is likely to materially and adversely affect its Business or financial condition; and

(f) Assist Langer in the preparation of all required returns for LBC taxes, and other tax reports, filings and amendments thereof, required to be filed, and to provide Langer with all financial information relating to LBC in the possession of or under the control of the Receiver.

14.2 Inspection. The Receiver shall allow Langer and his authorized representatives full access during normal business hours and prior to the Closing Date to all of the properties and records of PBI and LBC and shall furnish to Langer and his representatives such information concerning PBI and LBC as Langer or his representatives may reasonably request. Langer and his representatives shall have the right to review and copy such records at Langer's expense as he may deem advisable, and shall advise the Receiver of those items of which copies are made. The Receiver and its representatives, and if the transactions contemplated herein are not consummated, Langer and his representatives, shall treat all information obtained from the others, and not otherwise known to such party or already in the public domain, as confidential, and if the transactions contemplated herein are not consummated, each party shall return to each other party all materials and copies made of materials belonging to the other party.

14.3 No Negotiations. From the date hereof until the Closing or until this Agreement is terminated as provided in Section 15, the Receiver shall not, and will direct the representatives, and counsel of the Receiver not to solicit or enter into any discussions or negotiations with, or furnish or cause to be furnished any information concerning, LBC to any person or entity (other than Langer and his representatives) in connection with any acquisition of all or any interest in LBC, whether by merger, sale or purchase of equity interests, sale of all or substantially all of the assets or other takeover or business combination involving LBC; provided, however, nothing herein shall require the Receiver to do or fail to do any act that would be inconsistent with its fiduciary duties and obligations as Receiver.

14.4 Good Faith Efforts; Further Assurances; Cooperation. The parties hereto shall in good faith undertake to perform their respective obligations herein, to satisfy all conditions and to cause the transactions contemplated herein to be carried out promptly in accordance with the terms hereof. Upon the execution of this Agreement and thereafter, each party shall do such things as may be reasonably requested by the other parties hereto in order to more effectively consummate or document the transactions contemplated by this Agreement. The parties shall cooperate fully with each other and their respective officers, directors, employees, agents, counsel,

- 20 -

accountants and other designees in connection with any steps required to be taken as part of their respective obligations under this Agreement.

14.5 <u>Brokerage Commissions</u>. Each of the parties hereto hereby agrees for the benefit of the others that, other than as stated in the Disclosure Schedule, no person, firm, corporation or other entity is entitled to any brokerage commission or finder's fee in connection with any of the transactions contemplated by this Agreement, arising out of acts by him or it or his or its employees or agents. Langer agrees to indemnify and hold harmless the Receiver from and against any and all claims or demands for such commissions or fees based on any arrangement made by Langer, and the Receiver agrees to so indemnify and hold harmless Langer from and against any and all claims or demands for such commissions or fees based on any arrangement made by the Receiver.

14.6 <u>Public Announcements</u>. Prior to the Closing, other than announcements required by governmental agencies and other than required notification and approval of the Court and any Governmental Entities which are parties to the Receivership or as necessary to provide adequate notice to known and unknown Defrauded Investors, creditors and other claimants of WBIX Corp., neither Receiver nor Langer will make any press releases or other public announcements relative to the transactions contemplated by this Agreement without the prior written consent of other party. Following the Closing, Langer will furnish to the Receiver and Receiver will furnish to Langer any public announcement either party intends to make with respect to the transactions contemplated by this Agreement, prior to its release.

15. <u>Termination And Abandonment; Specific Performance</u>.

15.1 <u>Termination and Abandonment</u>. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual agreement of the Receiver and Langer.

(b) by Langer for cause if the conditions set forth in Sections 5, 6 and 9 shall have not been complied with or performed in any material respect and such non-compliance or non-performance shall not have been cured or eliminated (or by its nature cannot be cured or eliminated) on or before the Closing Date; <u>provided</u>, <u>however</u>, if such non-compliance or non-performance can be cured or eliminated, Langer shall not so terminate unless and until (i) he has given the Receiver written notice that non-compliance or non-performance has occurred, specifying the nature thereof and the action required to cure, and (ii) such non-compliance or non-performance shall not have been cured or eliminated within thirty (30) days of receipt of such notice;

(c) by the Receiver for cause if the conditions set

- 21 -

forth in Sections 7 and 10 shall have not been complied with or performed in any material respect and such non-compliance or non-performance shall not have been cured or eliminated (or by its nature cannot be cured or eliminated) on or before the required date for such condition or otherwise the Closing Date as applicable; provided, however, if such non-compliance or non-performance can be cured or eliminated, the Receiver shall not so terminate unless and until (i) it has given Langer written notice that non-compliance or non-performance has occurred, specifying the nature thereof and the action required to cure, and (ii) such non-compliance or non-performance shall not have been cured or eliminated within thirty (30) days of receipt of such notice;

(d) by Langer or the Receiver by written notice to the other, if any action or proceeding shall have been instituted before any court or other governmental body or by any public authority or any private person, firm, corporation or entity to restrain or prohibit or question the validity or legality of the transactions contemplated by this Agreement or to subject one or more of the parties to this Agreement to liability on the grounds that it or they have breached any law or regulation or otherwise acted improperly in connection with such transactions, other than an action, suit or proceeding instituted by a person other than a governmental authority which, in the written opinion of counsel to the party receiving notice of termination, does not have a substantial likelihood of success; or

(e) by Langer or the Receiver by written notice to the other if the Closing has not occurred on or before the required Closing Date or any agreed upon extension.

15.2 Effects of Termination

Upon termination for any reason:

(a) The current LMA arrangement between Receiver and the Langer Affiliate shall remain in full force and effect subject to the parties negotiating a more definitive arrangement within a reasonable time after such termination.

(b) The provisions of Sections 14.6, 15.4 and 17.18 shall survive termination.

15.3. Specific Performance and Other Remedies. The parties hereto each acknowledge that the rights of the others to consummate the transactions contemplated hereby are special, unique and of extraordinary character, and that, in the event that any party violates or fails and refuses to perform any covenant or agreement made by him or it herein, the non-breaching party may be without an adequate remedy at law. The parties each agree, therefore, that in the event that he or it violates or fails or refuses to perform any covenant or agreement made by him or it herein, the non-breaching party or parties may, in addition

- 22 -

to any remedies at law for damages or other relief, institute and prosecute an action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief.

15.4 <u>Rights and Obligations on Termination; Redelivery</u>. If this Agreement is terminated as provided herein, each party hereto will redeliver all documents, work papers and other materials and information, including all copies and summaries thereof of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same, and all information received by any party hereto with respect to the business of any other party shall not at any time be used for the advantage of, or disclosed to third parties, by such party to the detriment of the party furnishing such information; <u>provided</u>, <u>however</u>, that this paragraph shall not apply to any documents, work papers, materials, or information which are a matter of public knowledge other than on account of a breach of this Agreement or which have heretofore been or are hereafter published in any publication for public distribution or filed as public information with any governmental authority.

16. <u>Indemnification Provisions</u>.

16.1 <u>Obligations of the Receiver</u>. Subject to the limitations set forth in Section 16.5 hereof, the Receiver hereby agrees that he will, indemnify, hold harmless and defend Langer, his heirs, assigns and legal representative and LBC and its successors and assigns (all of the foregoing, collectively, the "Indemnified Parties" or, individually, an "Indemnified Party"), from and against any and all Liabilities (as hereinafter defined) that arise from or are in connection with:

(a) Any facts, circumstances or events, that first occurred or came into existence on or after June 1, 2002, the existence or happening of which constitutes a material breach of or inaccuracy in any of the representations or warranties of the Receiver contained in this Agreement or in any Disclosure Schedules or other documents contemplated hereby;

(b) Any breach or default by the Receiver of any covenants or agreements contained in Section 14 of this Agreement;

(c) Any claim, lawsuit, action or other proceeding that (i) is pending against Receiver or to which the Business is subject on the Closing Date seeking to enjoin the transactions contemplated herein or seeking monetary or other relief against the Receiver or the Business or based upon Receiver's noncompliance with Section 11.8 above, or (ii) is brought against Langer or to which the Business may become subject hereafter as a result of or arising from any acts or omissions of Bleidt and

- 23 -

Affiliates that may occur after the Closing Date, and whether or not the bringing or assertion of any such claim, lawsuit, action or other proceeding constitutes a breach of the Receiver's representations or warranties contained in this Agreement or is disclosed in the Disclosure Schedules;

(d) The failure to have paid or to pay, when due, any taxes that arose out of the operations of LBC or the consummation of the transactions contemplated by this Agreement or the failure to have filed, when due, any tax returns related to any such taxes for any period from June 1, 2002 up to the Closing Date, whether or not such failure constitutes a breach of the representations or warranties of the Receiver in Section 11 or is disclosed in this Agreement or the Disclosure Schedules.

(e) Any successful claim by any alleged stockholder of LBC, other than the Receiver, or any party successfully claiming to have any interest in a right to receive LBC stock which relates to the issuance, possession, ownership or claim to LBC stock or LBC stock rights.

Notwithstanding the foregoing, the parties agree that the only source available to Langer for such indemnification shall be that portion of the purchase price in the custody of the Court from time to time.

"Liabilities," as used in this Agreement, shall mean: (x) any judgment or settlement resulting from demands, claims, actions, suits, and any other legal or investigative proceedings brought against any or all of the Indemnified Parties, and (y) all liabilities, damages, losses, taxes, costs and expenses, including without limitation, reasonable attorneys' fees, incurred in or as a result of any of the foregoing.

16.2 <u>Limitations on Obligations of the Receiver</u>. In no event shall the Receiver have any obligation to indemnify the Indemnified Parties for or in respect of any of the Assumed Obligations identified in Schedule 4C, and Langer agrees to indemnify, hold harmless and defend the Receiver (in the same manner and on the same terms and conditions that are applicable to the Receiver's indemnification obligations under this Section 16), from any and all liabilities, damages, losses, costs and expenses, including, without limitation, reasonable attorney's fees, incurred by the Receiver as a result of any failure by Langer to pay or otherwise discharge and from any failure by Langer to comply with the provisions of any of the Assumed Obligations or the assumption of the leases for the Towers Sites after the Closing Date.

16.3 <u>Third Party Claims</u>. In the event of the assertion, in writing, of a third-party claim or dispute which, if adversely determined would entitle any of the Indemnified Parties to indemnification hereunder, Langer shall promptly notify the Receiver thereof in writing (the "Notice of Claim") which Notice

- 24 -

of Claim shall, with reasonable specificity identify the amount of the claim, the claimant and summarize the basis of the claim; provided, however, that any delay in providing or failure to provide such notification shall not affect the right of the Indemnified Parties to indemnification hereunder except to the extent the Receiver is materially prejudiced by the delay or failure.    Notwithstanding anything contained herein, within thirty (30) days of his receipt of the Notice of Claim, Receiver may elect, by written notice to Langer, to assume and direct the defense of any such claim, at Receiver's expense and using counsel of his choosing.    In the event Receiver does not so notify Langer, then Langer shall assume and direct said defense, at his expense and subject to the terms of this Section 16. Langer, at his expense (but subject to recoupment as herein provided) shall thereafter use timely and best efforts to transfer the jurisdiction under which the claim is made to the U.S. District Court, District of Massachusetts (the "Court") should the claim be brought in any other court, and shall file for a declaratory judgment and/or such other relief as is just and proper, citing the Final Court Approval and requesting a ruling from the Court to the effect that the claim has no validity as to Langer, WBIX Corp. and the Business, as applicable, and that it be dismissed by the Court with prejudice ("Langer Opposition") and Langer shall transfer to the Court any installment of the Purchase Price then due as well as any future installments of the Purchase Price when due if the claim remains outstanding as hereafter provided.    In the event of any such claim or assertion of liability against Langer or LBC, Langer shall petition the Court to hold that portion of one or more installment payments of the Purchase Price for use in satisfying Receiver's indemnification obligations set forth herein, and, unless previously dismissed by the Court or taken under the Court's jurisdiction for resolution pursuant to this Section 16.3, upon being presented with evidence of the fact that such claim has been decided adversely to Langer or LBC by a court of competent jurisdiction or settled by Langer with the consent of the Receiver, such consent not to be unreasonably withheld, delayed or hindered, shall pay over to Langer such portion of the Purchase Price held by the Court from time to time as will satisfy such indemnification claim hereunder as well as Langer's reasonable attorneys' fees incurred in connection with the foregoing.

    16.4 Procedures Applicable to Indemnification Claims. To be effective, any claim for indemnification under this Section 16 by any of the Indemnified Parties must be made by a written notice (a "Notice of Claim") to Receiver, given in accordance with the provisions of Section 16.3 hereof. Upon receipt of a Notice of Claim, the Receiver shall have thirty (30) calendar days to contest its indemnification obligation with respect to such claim, or the amount thereof, by written notice to Langer (a "Contest Notice"). Such Contest Notice shall specify the reasons or bases for the objection of the Receiver to the indemnification claim, and if the objection relates to the amount of Liability

- 25 -

asserted, such Contest Notice shall also set forth the amount, if any, which Receiver believes is due the Indemnified Party or Parties. Receiver may, however, suspend the giving of the Contest Notice until such time as the Court provides a preliminary indication of the Court's position on the claim based upon the submission of the Langer Opposition. If the Court does not dismiss the claim with prejudice as a result of the filing of the Langer Opposition or otherwise, then if a Contest Notice is not given to Langer within such 30-day or other reasonable period, Langer shall have the right to petition the Court for payment of the claim outlined in the Notice of Claim along with reasonable attorneys' fees incurred by Langer as provided in Section 16.3 (collectively, the "Liability"), based upon the amount of Liability arising out of the matters set forth in the Notice of Claim. If, on the other hand, the Receiver contests a Notice of Claim within such 30-day or other reasonable period thereafter, Langer and the Receiver shall thereafter attempt in good faith to resolve their dispute by agreement. If they are unable to so resolve their dispute within the thirty (30) days or other reasonable period following the date the amount of Liability has been established, the Parties agree to jointly petition the Court to resolve the dispute.  If the Court decides the dispute in favor of Langer, any amounts due to Langer shall be released by the Court to Langer within ten (10) business days of such final determination of the amount of the Liability.

16.5 <u>Return of Deferred Payment(s)</u>. In the event of any determination of a right to indemnity against the Receiver pursuant to this Section 16, Langer's sole right hereunder against the Receiver shall be to seek a return from the Court of any and all future payments due from Langer to the Receiver and paid into the Court as a portion of the unpaid purchase price, including any Contingent Payment, up to an amount of such indemnification amount.

17. <u>Miscellaneous Provisions</u>.

17.1 <u>Notices</u>. All notices, communications and deliveries hereunder shall be made in writing signed by the party making the same, shall specify the Section hereunder pursuant to which it is given, and shall be deemed given on the date delivered if delivered in person or on the third business day after it is mailed if mailed certified first class mail return receipt requested (with postage and other fees prepaid) or by facsimile upon sender's receipt of an acknowledgement copy addressed as follows:

To the Receiver:          David A. Vicinanzo, Esq.
                          Nixon Peabody LLP
                          100 Summer Street
                          Boston, MA 02110

with a copy to:Kevin Fitzgerald, Esq.

- 26 -

```
                    James C. Hood, Esq.
                    Nixon Peabody LLP
                    889 Elm Street
                    Manchester, NH 03101
                    (603) 628-4000
                    (603) 628-4040 - Fax

To Langer:          Alexander G. Langer
                    94 Saint Rose Street
                    Boston, MA 02130

With a copy to:     Lawrence Litwak, Esq.
                    Greif & Litwak, P.C.
                    77 North Washington Street
                    Boston, MA 02114
                    (617) 723-9770
                    (617) 723-9490 - Fax
```

or to such other representative or at such other address as a party hereto may furnish to the other parties in writing. If notice is given of a permitted successor or assign of a party hereto, the notice shall be given as set forth above to such successor or assign of such party. A notice from an attorney acting or purporting to act on behalf of his client shall constitute notice from such attorney's client, provided such attorney is identified above or is authorized to act on behalf of his client.

17.2 <u>Exhibits and Schedules</u>. All enumerated Exhibits and Schedules to this Agreement, and any attachments thereto, are hereby incorporated into this Agreement and hereby are made a part hereof as if set out in full in the first place that reference is made thereto. All Exhibits, Schedules, certificates, information and lists to be disclosed in writing and delivered pursuant to this Agreement shall, if not attached to this Agreement, be delivered to the appropriate party at the address indicated above, shall indicate the section hereunder pursuant to which it was delivered or mailed, and shall be signed or initialed by the party or parties or an attorney-in-fact of the party or parties delivering the same.

17.3 <u>Time of the Essence; Computation of Time</u>. Time is of the essence of each and every provision of this Agreement which, by its terms, calls for performance by a specified date; <u>provided</u>, <u>however</u>, the foregoing undertaking is only to engage in reasonable efforts and does not represent, propose or otherwise guaranty any particular result. Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday or any public or legal holiday, whether state or federal, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding regular business day.

17.4 <u>Assignment; Successors in Interest</u>. No assignment or transfer by Langer or the Receiver of his or its rights and obligations hereunder prior to the Closing shall be made except with the prior written consent of the other party(ies); <u>provided, however</u>, that Langer may assign all its rights (subject to all his obligations) under this Agreement to an entity controlled by him. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, descendants and permitted successors and assigns, and any reference to a party hereto shall also be a reference to a permitted successor or assign.

17.5 <u>Number; Gender</u>. Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

17.6 <u>Captions; Certain Definitions</u>. The titles and captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of the provisions hereof. The parties agree to all definitions in the statement of parties hereto and in the other introductory language. Unless otherwise specified to the contrary, all references to Sections are references to Sections of this Agreement and all references to Exhibits and Schedules are references to Exhibits and Schedules to this Agreement.

17.7 <u>Controlling Law; Integration; Amendment; Waiver</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of The Commonwealth of Massachusetts. This Agreement and the other agreements contemplated hereby supersede all prior negotiations, agreements and understandings between the parties with respect to the subject matter hereof, constitute the entire agreement between the parties and may not be altered or amended except in a writing signed by Langer and the Receiver. The Receiver hereby consents to the Langer Affiliate's operation and management of the Station following the appointment of the Receiver up through the Closing Date and agrees that all of the revenue derived from the Station operations during such period, together with all expenses incurred by Langer or the Langer Affiliate during such period, shall belong to and be borne by the Langer Affiliate or Langer, as the case may be, for legal and tax reporting purposes. The failure of any party hereto at any time or times to require performance of any provisions hereof shall in no manner affect the right to enforce the same at a later point in time. No waiver by any party hereto of any condition, or of the breach of any term, provision, warranty, representation, agreement or covenant contained in this Agreement or the other agreements contemplated hereby, whether by conduct or otherwise, in any one or more instances shall be deemed or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, provision,

- 28 -

warranty, representation, agreement or covenant herein or therein contained.

17.8 <u>Expenses</u>. Each party hereto agrees to pay its own expenses of this Agreement and the transactions contemplated hereby.

17.9 <u>Intentionally Omitted.</u>

17.10<u>Counterparts</u>. This Agreement may be signed by each party upon a separate copy and in such case one counterpart of this Agreement shall reflect the signature of each party. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms hereof to produce or account for more than one of such counterparts. This Agreement shall become effective when one or more counterparts have been signed by each of the parties and delivered to each of the other parties.

17.11<u>Consent to Jurisdiction</u>. Each of the parties agrees that any suit, action or proceeding arising out of or relating to this Agreement shall be instituted in the Court and each of the parties waives any objection which it may now or hereafter have to the venue of any such suit, action or proceeding and irrevocably consents and submits to the jurisdiction of the Court in any such suit, action or proceeding.

17.12<u>Severability</u>. In the event that any court of competent jurisdiction shall determine that any provision of this Agreement is invalid, illegal or unenforceable such determination shall not affect the validity of any other provision of this Agreement, and this Agreement shall, to the fullest lawful extent, be reformed and construed as if said invalid, illegal or unenforceable provision had never been contained herein, and the remaining provisions of this Agreement shall remain in full force and effect and shall be construed to be valid under applicable law.

17.13<u>Binding Settlement</u>. The Receiver shall take such measures as are reasonably required to assure that this arrangement for rescission of the sale of the LBC Stock shall be a comprehensive and binding settlement of all claims against Langer, LBC and PBI and Bleidt and Affiliates, including claims of any federal or state governmental agencies which have asserted jurisdiction as a result of Bleidt's activities relating to the Defrauded Investors, claims of any Defrauded Investors and claims of any other actual or potential creditors of PBI, LBC or Bleidt and Affiliates. Moreover, the Receiver shall pursue all court approvals necessary to consummate the within arrangement including the Final Court Approval and shall permit Langer and his counsel to provide input on the wording of the proposed Final Court Approval before submission of same to the Court.

17.14<u>Due Inquiry</u>.    All parties to this Agreement warrant and represent to each other that each party has made such inquiries, conducted such investigations and reviewed such documents as each party has deemed appropriate with the assistance and advice of such attorneys, accountants and such other advisors as each such party has deemed appropriate; that each party to this Agreement has reviewed this Agreement with an attorney or attorney(s) of his or its own choice, has read this Agreement and understands the same and acknowledges the adequacy of the consideration of this Agreement and enters into this Agreement freely and voluntarily of his or its own volition.

17.15<u>No Admission Of Liability</u>.    Each party to this Agreement acknowledges and agrees that the fact of the existence of this Agreement and its terms or conditions shall not be deemed to be an admission of liability or wrongdoing whatsoever by any party hereto; the within Agreement being entered into by all parties hereto for the purpose of compromising and settling the potential claims existing among the parties.

17.16<u>Binding Effect</u>.    This Agreement shall be binding upon and in favor of the benefit of the parties hereto, including their heirs, administrators, executors, successors, and assigns.

17.17<u>Cooperation</u>.    Each party hereto agrees to execute and deliver all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

17.18<u>Confidentiality</u>.    As long as there exists no default in the respective obligations of the parties set forth herein, each of the parties hereto agree not to disclose the terms and provisions of this Agreement to third-parties except as may otherwise be required by law, including, but not limited to, disclosures on income tax returns, except as may be required in the ordinary course of business to obtain professional advice from attorneys or accountants and except as may be necessary to facilitate the subsequent sale of the Station and/or the

[CONTINUED ON PAGE 31]

From :                          PHONE No. : 6175224889              Sep.20 2005  6:21PM  P02

License to a third party. Any party who violates this provision, however, shall be liable for all damages occasioned thereby.

EXECUTED IN SEVERAL COUNTERPARTS, each of which shall be deemed to be an original hereof. This instrument known as the WBIX Rescission Agreement is intended to take effect as a sealed instrument.

**WBIX CORP.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

_____
Alexander G. Langer,
individually

**BRADFORD C. BLEIDT**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

**FINANCIAL PERSPECTIVES PLANNING SERVICES, INC.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

**PERSPECTIVES BROADCASTING, INC.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

**SHARED VISIONS, INC.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

**FPPS MANAGEMENT, INC.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

**ALLOCATION PLUS ASSET MANAGEMENT COMPANY, INC.**

By: _____ 9/21/05
David A. Vicinanzo, Receiver

For purposes of complying with the provisions of Section 7(h) hereof.
**1060 COMMUNICATIONS CORP.**

By: _____ , Pres
Alexander G. Langer, President

LL050678

- 31 -

**WBIX**

**RESCISSION AGREEMENT**

**LIST OF EXHIBITS AND SCHEDULES
AND ADDITIONAL DOCUMENTS**

**EXHIBITS**

| | |
|---|---|
| A-1 | Court Order dated November 18, 2004 |
| A-2 | Court order dated November 22, 2004 |
| A-3 | Final Court Order |
| B | WBIX Note of Langer for $400,000 |
| C | Security Agreement of Langer in Favor of Receiver |
| D | Pledge Agreement of LBC Stock in Favor of Receiver |
| E | Langer Indemnity |
| F | Stock Assignment |

**SCHEDULES**

G    Disclosure Schedule

**LIST OF ADDITIONAL DOCUMENTS**

1.   Final Court Order

2.   Final FCC Approval

3.   LBC Stock Certificate – Section 5(a)

4.   Opinion from Receiver's Counsel – Section 5B

5.   Certificate updating Disclosure Schedule – Section 5(c)

6.   Receiver's Bring Down Certificate – Section 5(f)

7.   LBC Minute Book, Financial Records – Section 11.2; Section 5(g)

8.   Agreement with Warmus and Associates Inc. as to payments due – Section 6

9.   Agreement with Towers Site, Ltd. as to payments due – Section 6

10.  Lease Arrangement with Towers Sites, Ltd. – Sections 6 & 9(i)

11.  Lease Arrangement with Clear Channel Communications – Sections 6 & 9(i)

12.  Accounting of Station Operations – Section 7(d)

- 32 -

13. Langer Bring Down Certificate – Section 7(e)

14. Opinion from Langer's Counsel – Section 7(g)

15. LMA between Receiver and 1060 Communication Corp. – Execution and Termination – Sections 5(h), 7(h) and 9(l)

16. Cancellation of Langer Note, Bleidt Guaranty and Security Agreements in favor of Langer – Section 7(i)

17. Evidence of FCC Approval for License Transfer – Section 7(j)

18. Cash Rescission Payment

19. Evidence of final Egan payments made – Section 7(j)

20. Opinion from Langer's FCC counsel – Section 7(k)

21. LBC Certificates of Legal Existence and Good Standing – Section 11.1(a)

22. PBI Certificates of Legal Existence and Good Standing – Section 11.1(a).

23. Retitled LBC Stock Certificate.

LL050678