UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>BRADFORD C. BLEIDT and )<br>ALLOCATION PLUS ASSET MANAGEMENT )<br>COMPANY, INC., )<br>)<br>Defendants. )<br>) | Civil Action No. 04-12415-NG |

THE RECEIVER'S REPLY TO DEFENDANT BRADFORD C. BLEIDT'S OPPOSITION TO HIS MOTION FOR AN ORDER: (A) APPROVING THE WBIX RESCISSION AGREEMENT AND THE RETRANSFER OF ALL OF THE STOCK IN WBIX CORP. TO ALEXANDER G. LANGER FREE AND CLEAR OF LIEANS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (B) GRANTING RELATED RELIEF.

David A. Vicinanzo, the Court-appointed receiver in the above-captioned civil action (the "Receiver") hereby replies to Bradford C. Bleidt's ("Bleidt") Opposition to his Motion for an Order: (a) Approving the WBIX Rescission Agreement and the Retransfer of All of the Stock in WBIX Corp. to Alexander G. Langer Free and Clear of Liens, Claims, Encumbrances and Interests, and (b) Granting Relief (the "Rescission Motion" or the "Motion").

**PRELIMINARY STATEMENT**

After losing millions and millions of stolen investor dollars acquiring and operating the Station, the gist of Bleidt's objection is that the Court should not approve the proposed rescission transaction because the Receiver can somehow magically bifurcate Langer's claim against the Station into secured and unsecured components and thereby conjure up greater equity in the Station for this estate. Bleidt's advice on this proposition is of a quality similar to that he

peddled to investors. Bleidt fundamentally misunderstands bankruptcy law and his opposition has no merit whatsoever.

Generally speaking, as applied in reorganization cases, bankruptcy law differs dramatically from nonbankruptcy law in that the former provides a statutory mechanism for a debtor to avoid foreclosure and retain a secured creditor's collateral. The pragmatic purpose of bifurcation of a secured creditor's claim into secured and unsecured components, under § 506(a) of the Bankruptcy Code is to fix "the value of a secured creditor's legal entitlements associated with its security interest" when the debtor is allowed to retain and use collateral. 4 Collier on Bankruptcy § 506.03[4][a] (15th ed. 2005). For instance, both a secured creditor's rights to adequate protection in a bankruptcy case prior to confirmation of a plan of reorganization and the payments to be made to creditors holding collateral under a plan of reorganization are largely, if not exclusively, determined by fixing the value of the creditor's collateral under § 506(a) of the Bankruptcy Code

Bifurcation of a secured claim under § 506(a), however, has no application outside of bankruptcy. This is especially so in a case like this where (a) the debtor is liquidating rather than reorganizing, and (b) as a matter of law, has no legal or equitable entitlement to retain collateral absent payment of the entire face amount of the lien holder's debt. More importantly, notwithstanding Bleidt's advice, bifurcation of a claim whether inside or outside of bankruptcy simply does <u>not</u> alchemically create equity for creditors without liens in the collateral being sold or otherwise liquidated. The simple fact is that whether the Station is sold in or out of bankruptcy, and whether Langer's secured claim is bifurcated or not, the face amount of Langer's approximately $9 million lien (and potentially significant additional claims) must be paid in full before there is any equity in the Station for this estate. The reality in this case is that

the Station in the current circumstances has a market value far less than $9 million and, accordingly, put bluntly, every dollar realized by the Receiver from this asset is a premium recovery. In further support of his response the Receiver respectfully states as follows:

## BACKGROUND

1.	Through the Rescission Motion, the Receiver seeks to liquidate the principal asset in this receivership proceeding: Bleidt's indirect interest in WBIX Corp. WBIX Corp. operates an AM radio broadcasting business under the letters of WBIX 1060 AM which services the Boston, Massachusetts metropolitan market.

2.	As detailed in the Motion, on or about July 16, 2002, Bleidt entered into a Stock Purchase and Sale Agreement with Langer to acquire all of the stock of Langer Broadcasting Corp. (whose name was changed after the closing of the Stock Purchase and Sale Agreement to WBIX Corp. (hereinafter "WBIX Corp.")) for a purchase price of approximately $10,000,000. Simultaneously, as part of that transaction, WBIX Corp. and Shared Visions, Inc. ("SVI"), a corporation wholly owned by Bleidt, entered into a Time Brokerage Agreement whereby SVI undertook to manage the Station in anticipation of the eventual closing of the sale the WBIX Corp. stock to Bleidt or his nominee.[1]

3.	Subsequently, Bleidt formed Perspectives Broadcasting, Inc. ("PBI") for the express purpose of acquiring WBIX Corp.'s stock and the Station's FCC license. On or about January 13, 2004, PBI, also a corporation wholly owned by Bleidt, acquired all of the issued and outstanding shares of stock of WBIX Corp. from Langer.

---

[1] Prior to the transaction, beginning in 2000, however, SVI also operated the Station through other temporary arrangements with Langer.

4. At the closing of the transaction, Bleidt tendered $1,300,000 in cash. The remaining portion of the purchase price for the WBIX stock was satisfied by:

- Credits of $750,000 and $1,000,000, respectively for Bleidt's pre-closing deposits and for monies expended by Bleidt for capital improvements and operating deficits Bleidt incurred at the Station; and

- A promissory note in the favor of Langer in the principal amount of $7,318,000 (the "Langer Note").

5. As of October 13, 2005, PBI's obligations under the Langer Note for unpaid principal and interest were not less than **$8,863,000**. This amount is exclusive of costs of collection and other charges also collectible by Langer under the terms of the note.

6. Transaction documents also recite that PBI's obligations under the Langer Note are secured by a pledge of 100% of the issued and outstanding shares of the stock in both WBIX Corp. and PBI, a security interest in all of PBI's and WBIX Corp.'s assets and a guaranty from Bleidt in favor of Langer.

7. Shortly thereafter, in or about the Spring of 2004, Bleidt, PBI and SVI entered into an Asset Purchase Agreement (the "APA") for WBIX Corp. and the Station with Egan Communications, LLC. ("Egan"). Although in January 2004, Bleidt exchanged consideration with a recited aggregate value of $10,368,000, for the stock in WBIX Corp., just months later, pursuant to the APA, Bleidt, PBI and SVI agreed to sell all their interest in the Station and WBIX Corp. to Egan for an aggregate purchase price of only $7,000,000.

8. To state the obvious, this purchase price coming just weeks after the acquisition from Langer is approximately $3,500,000 <u>less</u> than the consideration secured by the Receiver as described in the pending Motion and reflects that Bleidt was never able to operate the Station on anything even remotely approaching a break-even basis. To the contrary, from December 31,

2001 to November 12, 2004, the period it was operated by Bleidt, the Station hemorrhaged operational losses of not less than **$7,152,816.00**, virtually all of it defrauded investor money.

9.  Furthermore, immediately following Bleidt's very public confession of fraud at the commencement of this case, Egan terminated the APA. In short, Egan was not willing to purchase the Station even for the deeply discounted $7 million purchase price or frankly for any other amount.

### THE RECEIVER'S RESPONSE TO BLEIDT'S OBJECTION TO HIS RESCISSION MOTION

10. In his objection to the Rescission Motion, Bleidt does not contend that he and PBI owe Langer less than $8,863,000, or that those obligations are not secured by a lien on WBIX Corp's and PBI's stock and the Station's assets. Nor does Bleidt challenge the perfection and priority of Langer's lien. Similarly, Bleidt does not dispute that just months after purchasing the Station from Langer for approximately $10,000,000 he tried to sell it to Egan for $7,000,000 and that deeply discounted deal imploded when he publicly disclosed that he defrauded investors of tens of millions of dollars; nor does Bleidt claim that the Station has a value in excess of Langer's lien. He could not, in fact, credibly make such a claim.

11. Instead, Bleidt suggests that this Court should not approve the proposed rescission agreement (and thereby risk losing it altogether) because in his view, the Receiver can better help those he defrauded by somehow bifurcating Langer's claim against the Station into secured and unsecured components and thereby conjure up equity in the Station for this estate. Bleidt's bizarre claim is contrary to both law and common sense and may be summarily rejected by this Court.

12. Bleidt's opposition is premised on a fundamentally flawed understanding of the effect of "bifurcating" or "stripping" a "secured claim" in bankruptcy. Outside of bankruptcy, a

debt is usually referred to as "secured" if the creditor has a lien against collateral, even though the collateral would not be sufficient to satisfy the debt. Under the Bankruptcy Code, a claim is considered "secured" only to the extent of the value of the collateral. 11 U.S.C. § 506(a). If the collateral is worth less than the amount of the debt, the creditor will have a secured claim for an amount equal to the value of the collateral and an unsecured claim for the remainder that is owing. Id. Using Bleidt's example, if a creditor is owed $10,000 but its collateral is worth only $4,000 at the commencement of a bankruptcy case, pursuant to § 506(a) of the Bankruptcy Code, the creditor's claim against the debtor is bifurcated into a secured component of $4,000 and an unsecured component of $6,000.

13. Bifurcation of claims into secured and unsecured components in bankruptcy, however, simply does not create, as Bleidt contends, any equity for other creditors. Both within and outside of bankruptcy, the proceeds of the sale of collateral continue to be subject to the secured creditor's lien. Again using Bleidt's example, if collateral subject to a $10,000 lien is sold for $4,000 in bankruptcy the lien continues to encumber the entire $4,000 in proceeds and no "equity" for other unsecured creditors is magically created. Instead, in bankruptcy, the proceeds of the collateral (or their monetary equivalent) are tendered to the secured creditor and the creditor's unsecured claim is satisfied pro rata from other unencumbered estate assets (if any).

14. Nor may Bleidt in particular credibly contend that in the wake of the havoc he created, the value of the Station now exceeds the amount of Langer's lien on its assets and the WBIX Corp. stock. Bleidt does not dispute, nor could he, (a) that the Station incurred losses of not less than $7,152,816 during his stewardship; (b) that just weeks after he acquired the Station in 2004 for the largely unpaid purchase price of $10,368,000, he tried to sell the Station to Egan

for $7,000,000 (approximately $2,000,000 less than what is currently owed to Langer); and (c) that in the wake of the damage to the Station's good will and marketability caused by Bleidt's public confession of fraud, Egan was unwilling to purchase the Station on any terms.  Nor may Bleidt dispute that during the last eleven months the Receiver has not received a single offer for the Station.  The Receiver's judgment is that the only conclusion to be drawn from this uncontested record is that the Station has a market value far less than Langer's lien, and that the proposed rescission transaction, as a practical matter, is the only opportunity this estate will have to realize any value whatsoever from the Station.

15.     In short, if a secured creditor is undersecured (i.e., the value of its collateral is worth less than the face amount of its lien), as Langer surely is, by definition, there is no equity for other creditors whether inside or outside of bankruptcy.  Bleidt's legal advice to the court overlooks this fundamental concept.  By contrast, under the proposed rescission transaction, this estate will realize, in addition to relief from significant debts, cash consideration of not less than $1.5 million above and beyond Langer's nearly $9,000,000 lien on the Station; this is the functional equivalent of at least a $10,500.00 price for the Station.  Bifurcating Langer's lien will not change a thing about the core economics of the proposed transaction, and Bleidt's invocation of § 506(a) to suggest otherwise is plainly wrong.  Quite the contrary, were the Court to follow Bleidt's advice, his victims would once again be left at significant risk of recovering nothing.

WHEREFORE, the Receiver respectfully requests that the Court issue an Order:

A.   Overruling Bleidt's opposition to the Rescission Motion, in its entirety;

B.   Granting the Receiver's pending Motion and;

C.   Granting such other and further relief as is deemed appropriate and just.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | DAVID A. VICINANZO, RECEIVER |
|  | By his attorneys, |
| Dated:  October 21, 2001 | /s/ Kevin M. Fitzgerald |
|  | Kevin M. Fitzgerald (admitted pro hac vice) |
|  | Francis C. Morrissey (BBO #567589) |
|  | Jeffrey P. Gilbreth (BBO #661496) |
|  | Nixon Peabody LLP |
|  | 100 Summer Street |
|  | Boston, MA  02110 |
|  | (617) 345-1000 |