# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
                                         )
SECURITIES AND EXCHANGE COMMISSION,      )
                                         )
            Plaintiff,                   )        Case No. CA-04-12415-NG
                                         )
    vs.                                  )
                                         )
BRADFORD C. BLEIDT and                   )
ALLOCATION PLUS ASSET MANAGEMENT         )
COMPANY, INC.                            )
                                         )
            Defendants.                  )
                                         )
```

## AFFIDAVIT OF ALEXANDER G. LANGER

I, Alexander G. Langer, being duly sworn according to law, hereby depose and state as follows:

1.     I am the former owner of 100 percent of the capital stock of Langer Broadcasting Corp. ("LBC"), a Florida corporation.

2.     On or about July 16, 2002, I entered into a Stock Purchase and Sale Agreement with Bradford C. Bleidt ("Bleidt"), pursuant to which I agreed to sell all of the stock ("Stock") in LBC to Bleidt or his nominee.  Bleidt nominated Perspectives Broadcasting, Inc. ("PBI"), a Massachusetts corporation formed by Bleidt to purchase the LBC Stock.

3.     On information and belief Bleidt owned 100% percent of the issued and outstanding stock of PBI.

4.     The closing on the sale of the LBC stock to PBI occurred on January 13, 2004.  Under the original terms of the sale, I was to finance $6,818,000 of the purchase price.  The agreement between Bleidt and me called for Bleidt to pay $2,000,000 in cash

at closing, but because Bleidt did not have sufficient funds to pay the cash required at closing, I agreed to reduce Bleidt's cash payment to $1,300,000 and to increase my financing of the purchase price to $7,318,000.

5.    In connection therewith, the following loan documents were executed, among others:

a.    Loan Agreement executed by PBI, Bleidt and me, pursuant to which I agreed to lend to PBI the sum of $6,618,000 in exchange for the promises made by PBI and Bleidt thereunder. A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

b.    First Amendment to Loan Agreement executed by PBI, Bleidt and me, pursuant to which the amount of the loan was increased to $7,318,000. A true and correct copy of the First Amendment to Loan Agreement is attached hereto as Exhibit B.

c.    Promissory Note of Perspectives Broadcasting, Inc., pursuant to which PBI agreed to pay me the sum of $6,618,000 plus interest at 7 percent per annum in accordance with the following schedule:

(1)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

(2)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

(3)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

(4)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

The Promissory Note contains a default rate of interest of 11 percent. A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

      d.    First Amendment to Promissory Note of Perspectives Broadcasting, Inc., pursuant to which the loan was increased by $700,000.00. The additional $700,000.00 was to be paid one month after closing, with the remaining schedule remaining unchanged. In sum pursuant to the terms of the Promissory Note, as amended, PBI agreed to pay me the sum of $7,318,000 plus interest at 7 percent per annum in accordance with the following schedule:

      (1)    $700,000.00 on or before February 13, 2004, together with accrued interest thereon.

      (2)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

      (3)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

      (4)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

      (5)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

A true and correct copy of the First Amendment to Promissory Note is attached hereto as Exhibit D.

      d.    Security Agreement executed by PBI, pursuant to which PBI granted to me a security interest in all of its assets to secure its obligations to me. A true and correct copy of the PBI Security Agreement is attached hereto as Exhibit E.

e.    Security Agreement executed by LBC, pursuant to which LBC granted to me a security interest in all of its assets to secure the obligations of PBI to me. A true and correct copy of the LBC Security Agreement is attached hereto as Exhibit F.

f.    Guaranty Agreement executed by Bleidt, pursuant to which he guaranteed the full and punctual payment of PBI to me.   A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

g.    First Amendment to Guaranty Agreement executed by Bleidt in conjunction with the amendments to the Loan Agreement and Promissory Note. A true and correct copy of the First Amendment to Guaranty Agreement is attached hereto as Exhibit H.

h.    Pledge Agreement With Respect to Stock of Langer Broadcasting Corp., pursuant to which PBI pledged to me the stock of LBC in order to secure PBI's indebtedness to me. A true and correct copy of the LBC Pledge Agreement is attached hereto as Exhibit I.

i.    Pledge Agreement With Respect to Stock of Perspectives Broadcasting, Inc., pursuant to which Bleidt pledged to me the stock of PBI in order to secure the obligations of PBI to me. A true and correct copy of the PBI Pledge Agreement is attached hereto as Exhibit J.

j.    In connection with the stock pledges, PBI and Bleidt executed Stock Assignments Separate from Certificate of LBC and PBI, respectively. True and correct copies of the Stock Assignments are attached hereto as Exhibits K and L, respectively.

6.    On January 20, 2004, UCC financing statements were filed with the Massachusetts Secretary of State evidencing and perfecting the security interests granted to me in the assets of LBC and PBI. True and correct copies of the LBC financing statement and the PBI financing statement are attached as Exhibits M and N, respectively.

7.    Neither PBI nor Bleidt ever made any payments under the Promissory Note or the Guaranty, as amended. As a result, I am currently owed the principal amount of $7,318,000, plus $1,545,000 interest, plus a 5% late charge thereon, plus counsel fees and costs of collection. This debt is secured by a valid and perfected security interest in all of the assets of PBI, LBC and all of the capital stock of each.

8.    LBC's business consisted of the operation of an AM radio station with the call letters WBIX. Approximately one month after the receiver was appointed, the receiver contacted me to discuss the operation of the WBIX radio station. As a result of our conversation, I agreed to operate the radio station for a period of time while the receiver searched out a buyer for it.

9.    Through a Massachusetts corporation, wholly owned by me, namely 1060 Communications Corp., I have managed the WBIX radio station for a period in excess of 10 months, namely, from December 1, 2004 to the present. In connection with the management of the WBIX Radio Station, the Receiver and 1060 Communications Corp. entered into a management agreement known as the Local Marketing Agreement, a true and correct copy of which is attached as Exhibit O. My agreement with the receiver was that I would fund the expenses of operating the station during this time period and would retain any profits derived therefrom. The station made a small profit of $61,932 during

this time period, exclusive of the salary of employees that I paid to assist in the management of the station and exclusive of repayment of my loans to fund deficits relating to the Station's operation in the amount of $42,000. In addition, I did not receive any compensation for my services, in what has amounted to a full-time job managing the station. A copy of a letter from my accountant, David L. Sutherland, CPA reflecting the monthly income and expenses and resulting monthly profits or loss of the Station from December 2004 through August 2005 is attached hereto as Exhibit P.

10.    It became clear early on that unless a purchaser was found for the WBIX radio station I would not get paid on my secured claim, but instead was facing the possibility that I would have to take back the radio station in order to recoup as much as possible of the money I had lent to PBI. It was, therefore, in my interest, as well as the receiver's, to try to find a buyer for the radio station.

11.    At the request of the receiver, I fielded requests for information from prospective buyers of the radio station. Some of the calls were from business brokers; others were directly from persons saying they were interested in obtaining information about the business for possible purchase. All reasonable requests for information were honored.

12.    No bona-fide offers were received for the business. As a result, the receiver and I entered into negotiations to return the radio station to me through a retransfer of the LBC stock to me.

13.    I have been informed and believe that I am entitled to all of the proceeds of the sale of the business up to the amount of my secured claim. In other words, unless the purchase price exceeds $8,863,000, plus a 5% late payment penalty, plus the counsel

fees and costs incurred by me in enforcing my rights under the loan documents, all of the proceeds of the sale should be paid to me. Under the terms of the Rescission Agreement, I will nevertheless pay to the receiver the sum of $1,500,000, and perhaps more, and will waive my claims against the receivership estate. Thus, approval of the Rescission Agreement will result in the receivership estate receiving at least $1,500,000 more than it has been able to obtain by selling the radio station to another party. Indeed, as previously stated, there have been no bona fide offers forthcoming for the sale of the radio station.

ALEXANDER G. LANGER

## COMMONWEALTH OF MASSACHUSETTS

Suffolk _____, ss.

On this 24th day of October, 2005, before me, the undersigned notary public, personally appeared Alexander G. Langer, proved to me through satisfactory evidence of identification, which was [X] photographic identification with signature issued by a federal or state governmental agency, [ ] oath or affirmation of a credible witness, [ ] personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached document(s), and acknowledged to me that he signed it voluntarily of its stated purpose.

Notary Public
Print Name: Dolores M Antonino
My Commission Expires: June 1, 2012

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| Plaintiff, ) | Case No. CA-04-12415-NG |
| vs. ) | |
| BRADFORD C. BLEIDT and ) ALLOCATION PLUS ASSET MANAGEMENT ) COMPANY, INC. ) | |
| Defendants. ) | |

## AFFIDAVIT OF ALEXANDER G. LANGER

I, Alexander G. Langer, being duly sworn according to law, hereby depose and state as follows:

1.    I am the former owner of 100 percent of the capital stock of Langer Broadcasting Corp. ("LBC"), a Florida corporation.

2.    On or about July 16, 2002, I entered into a Stock Purchase and Sale Agreement with Bradford C. Bleidt ("Bleidt"), pursuant to which I agreed to sell all of the stock ("Stock") in LBC to Bleidt or his nominee. Bleidt nominated Perspectives Broadcasting, Inc. ("PBI"), a Massachusetts corporation formed by Bleidt to purchase the LBC Stock.

3.    On information and belief Bleidt owned 100% percent of the issued and outstanding stock of PBI.

4.    The closing on the sale of the LBC stock to PBI occurred on January 13, 2004. Under the original terms of the sale, I was to finance $6,818,000 of the purchase price. The agreement between Bleidt and me called for Bleidt to pay $2,000,000 in cash

at closing, but because Bleidt did not have sufficient funds to pay the cash required at closing, I agreed to reduce Bleidt's cash payment to $1,300,000 and to increase my financing of the purchase price to $7,318,000.

     5.    In connection therewith, the following loan documents were executed, among others:

     a.    Loan Agreement executed by PBI, Bleidt and me, pursuant to which I agreed to lend to PBI the sum of $6,618,000 in exchange for the promises made by PBI and Bleidt thereunder.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

     b.    First Amendment to Loan Agreement executed by PBI, Bleidt and me, pursuant to which the amount of the loan was increased to $7,318,000.  A true and correct copy of the First Amendment to Loan Agreement is attached hereto as Exhibit B.

     c.    Promissory Note of Perspectives Broadcasting, Inc., pursuant to which PBI agreed to pay me the sum of $6,618,000 plus interest at 7 percent per annum in accordance with the following schedule:

     (1)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

     (2)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

     (3)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

     (4)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

The Promissory Note contains a default rate of interest of 11 percent. A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

      d.     First Amendment to Promissory Note of Perspectives Broadcasting, Inc., pursuant to which the loan was increased by $700,000.00. The additional $700,000.00 was to be paid one month after closing, with the remaining schedule remaining unchanged. In sum pursuant to the terms of the Promissory Note, as amended, PBI agreed to pay me the sum of $7,318,000 plus interest at 7 percent per annum in accordance with the following schedule:

        (1)    $700,000.00 on or before February 13, 2004, together with accrued interest thereon.

        (2)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

        (3)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

        (4)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

        (5)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

A true and correct copy of the First Amendment to Promissory Note is attached hereto as Exhibit D.

      d.     Security Agreement executed by PBI, pursuant to which PBI granted to me a security interest in all of its assets to secure its obligations to me. A true and correct copy of the PBI Security Agreement is attached hereto as Exhibit E.

e.    Security Agreement executed by LBC, pursuant to which LBC granted to me a security interest in all of its assets to secure the obligations of PBI to me. A true and correct copy of the LBC Security Agreement is attached hereto as Exhibit F.

f.    Guaranty Agreement executed by Bleidt, pursuant to which he guaranteed the full and punctual payment of PBI to me.   A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

g.    First Amendment to Guaranty Agreement executed by Bleidt in conjunction with the amendments to the Loan Agreement and Promissory Note. A true and correct copy of the First Amendment to Guaranty Agreement is attached hereto as Exhibit H.

h.    Pledge Agreement With Respect to Stock of Langer Broadcasting Corp., pursuant to which PBI pledged to me the stock of LBC in order to secure PBI's indebtedness to me. A true and correct copy of the LBC Pledge Agreement is attached hereto as Exhibit I.

i.    Pledge Agreement With Respect to Stock of Perspectives Broadcasting, Inc., pursuant to which Bleidt pledged to me the stock of PBI in order to secure the obligations of PBI to me. A true and correct copy of the PBI Pledge Agreement is attached hereto as Exhibit J.

j.    In connection with the stock pledges, PBI and Bleidt executed Stock Assignments Separate from Certificate of LBC and PBI, respectively. True and correct copies of the Stock Assignments are attached hereto as Exhibits K and L, respectively.

4

6.     On January 20, 2004, UCC financing statements were filed with the Massachusetts Secretary of State evidencing and perfecting the security interests granted to me in the assets of LBC and PBI.  True and correct copies of the LBC financing statement and the PBI financing statement are attached as Exhibits M and N, respectively.

7.     Neither PBI nor Bleidt ever made any payments under the Promissory Note or the Guaranty, as amended.  As a result, I am currently owed the principal amount of $7,318,000, plus $1,545,000 interest, plus a 5% late charge thereon, plus counsel fees and costs of collection.  This debt is secured by a valid and perfected security interest in all of the assets of PBI, LBC and all of the capital stock of each.

8.     LBC's business consisted of the operation of an AM radio station with the call letters WBIX.  Approximately one month after the receiver was appointed, the receiver contacted me to discuss the operation of the WBIX radio station.  As a result of our conversation, I agreed to operate the radio station for a period of time while the receiver searched out a buyer for it.

9.     Through a Massachusetts corporation, wholly owned by me, namely 1060 Communications Corp., I have managed the WBIX radio station for a period in excess of 10 months, namely, from December 1, 2004 to the present.  In connection with the management of the WBIX Radio Station, the Receiver and 1060 Communications Corp. entered into a management agreement known as the Local Marketing Agreement, a true and correct copy of which is attached as Exhibit O.  My agreement with the receiver was that I would fund the expenses of operating the station during this time period and would retain any profits derived therefrom.  The station made a small profit of $61,932 during

this time period, exclusive of the salary of employees that I paid to assist in the management of the station and exclusive of repayment of my loans to fund deficits relating to the Station's operation in the amount of $42,000.   In addition, I did not receive any compensation for my services, in what has amounted to a full-time job managing the station.  A copy of a letter from my accountant, David L. Sutherland, CPA reflecting the monthly income and expenses and resulting monthly profits or loss of the Station from December 2004 through August 2005 is attached hereto as Exhibit P.

10.    It became clear early on that unless a purchaser was found for the WBIX radio station I would not get paid on my secured claim, but instead was facing the possibility that I would have to take back the radio station in order to recoup as much as possible of the money I had lent to PBI.  It was, therefore, in my interest, as well as the receiver's, to try to find a buyer for the radio station.

11.    At the request of the receiver, I fielded requests for information from prospective buyers of the radio station.  Some of the calls were from business brokers; others were directly from persons saying they were interested in obtaining information about the business for possible purchase.  All reasonable requests for information were honored.

12.    No bona-fide offers were received for the business.  As a result, the receiver and I entered into negotiations to return the radio station to me through a retransfer of the LBC stock to me.

13.    I have been informed and believe that I am entitled to all of the proceeds of the sale of the business up to the amount of my secured claim.  In other words, unless the purchase price exceeds $8,863,000, plus a 5% late payment penalty, plus the counsel

fees and costs incurred by me in enforcing my rights under the loan documents, all of the proceeds of the sale should be paid to me.  Under the terms of the Rescission Agreement, I will nevertheless pay to the receiver the sum of $1,500,000, and perhaps more, and will waive my claims against the receivership estate.  Thus, approval of the Rescission Agreement will result in the receivership estate receiving at least $1,500,000 more than it has been able to obtain by selling the radio station to another party.  Indeed, as previously stated, there have been no bona fide offers forthcoming for the sale of the radio station.

_____
ALEXANDER G. LANGER

## COMMONWEALTH OF MASSACHUSETTS

Suffolk _____, ss.

On this 24th day of October 2005, before me, the undersigned notary public, personally appeared Alexander G. Langer, proved to me through satisfactory evidence of identification, which was [X] photographic identification with signature issued by a federal or state governmental agency, [ ] oath or affirmation of a credible witness, [ ] personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached document(s), and acknowledged to me that he signed it voluntarily of its stated purpose.

_____
Notary Public
Print Name: Dolores M Antonino
My Commission Expires: June 1, 2012

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | Case No. CA-04-12415-NG |
| ) | |
| vs. ) | |
| ) | |
| BRADFORD C. BLEIDT and ) | |
| ALLOCATION PLUS ASSET MANAGEMENT ) | |
| COMPANY, INC. ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF ALEXANDER G. LANGER

I, Alexander G. Langer, being duly sworn according to law, hereby depose and state as follows:

1.      I am the former owner of 100 percent of the capital stock of Langer Broadcasting Corp. ("LBC"), a Florida corporation.

2.      On or about July 16, 2002, I entered into a Stock Purchase and Sale Agreement with Bradford C. Bleidt ("Bleidt"), pursuant to which I agreed to sell all of the stock ("Stock") in LBC to Bleidt or his nominee.  Bleidt nominated Perspectives Broadcasting, Inc. ("PBI"), a Massachusetts corporation formed by Bleidt to purchase the LBC Stock.

3.      On information and belief Bleidt owned 100% percent of the issued and outstanding stock of PBI.

4.      The closing on the sale of the LBC stock to PBI occurred on January 13, 2004.  Under the original terms of the sale, I was to finance $6,818,000 of the purchase price.  The agreement between Bleidt and me called for Bleidt to pay $2,000,000 in cash

at closing, but because Bleidt did not have sufficient funds to pay the cash required at closing, I agreed to reduce Bleidt's cash payment to $1,300,000 and to increase my financing of the purchase price to $7,318,000.

     5.    In connection therewith, the following loan documents were executed, among others:

     a.    Loan Agreement executed by PBI, Bleidt and me, pursuant to which I agreed to lend to PBI the sum of $6,618,000 in exchange for the promises made by PBI and Bleidt thereunder. A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

     b.    First Amendment to Loan Agreement executed by PBI, Bleidt and me, pursuant to which the amount of the loan was increased to $7,318,000. A true and correct copy of the First Amendment to Loan Agreement is attached hereto as Exhibit B.

     c.    Promissory Note of Perspectives Broadcasting, Inc., pursuant to which PBI agreed to pay me the sum of $6,618,000 plus interest at 7 percent per annum in accordance with the following schedule:

     (1)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

     (2)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

     (3)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

     (4)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

2

The Promissory Note contains a default rate of interest of 11 percent. A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

      d.    First Amendment to Promissory Note of Perspectives Broadcasting, Inc., pursuant to which the loan was increased by $700,000.00. The additional $700,000.00 was to be paid one month after closing, with the remaining schedule remaining unchanged. In sum pursuant to the terms of the Promissory Note, as amended, PBI agreed to pay me the sum of $7,318,000 plus interest at 7 percent per annum in accordance with the following schedule:

      (1)    $700,000.00 on or before February 13, 2004, together with accrued interest thereon.

      (2)    $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

      (3)    $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

      (4)    $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

      (5)    $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

A true and correct copy of the First Amendment to Promissory Note is attached hereto as Exhibit D.

      d.    Security Agreement executed by PBI, pursuant to which PBI granted to me a security interest in all of its assets to secure its obligations to me. A true and correct copy of the PBI Security Agreement is attached hereto as Exhibit E.

e.    Security Agreement executed by LBC, pursuant to which LBC granted to me a security interest in all of its assets to secure the obligations of PBI to me. A true and correct copy of the LBC Security Agreement is attached hereto as Exhibit F.

f.    Guaranty Agreement executed by Bleidt, pursuant to which he guaranteed the full and punctual payment of PBI to me.    A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

g.    First Amendment to Guaranty Agreement executed by Bleidt in conjunction with the amendments to the Loan Agreement and Promissory Note. A true and correct copy of the First Amendment to Guaranty Agreement is attached hereto as Exhibit H.

h.    Pledge Agreement With Respect to Stock of Langer Broadcasting Corp., pursuant to which PBI pledged to me the stock of LBC in order to secure PBI's indebtedness to me. A true and correct copy of the LBC Pledge Agreement is attached hereto as Exhibit I.

i.    Pledge Agreement With Respect to Stock of Perspectives Broadcasting, Inc., pursuant to which Bleidt pledged to me the stock of PBI in order to secure the obligations of PBI to me. A true and correct copy of the PBI Pledge Agreement is attached hereto as Exhibit J.

j.    In connection with the stock pledges, PBI and Bleidt executed Stock Assignments Separate from Certificate of LBC and PBI, respectively. True and correct copies of the Stock Assignments are attached hereto as Exhibits K and L, respectively.

4

6.    On January 20, 2004, UCC financing statements were filed with the Massachusetts Secretary of State evidencing and perfecting the security interests granted to me in the assets of LBC and PBI. True and correct copies of the LBC financing statement and the PBI financing statement are attached as Exhibits M and N, respectively.

7.    Neither PBI nor Bleidt ever made any payments under the Promissory Note or the Guaranty, as amended. As a result, I am currently owed the principal amount of $7,318,000, plus $1,545,000 interest, plus a 5% late charge thereon, plus counsel fees and costs of collection. This debt is secured by a valid and perfected security interest in all of the assets of PBI, LBC and all of the capital stock of each.

8.    LBC's business consisted of the operation of an AM radio station with the call letters WBIX. Approximately one month after the receiver was appointed, the receiver contacted me to discuss the operation of the WBIX radio station. As a result of our conversation, I agreed to operate the radio station for a period of time while the receiver searched out a buyer for it.

9.    Through a Massachusetts corporation, wholly owned by me, namely 1060 Communications Corp., I have managed the WBIX radio station for a period in excess of 10 months, namely, from December 1, 2004 to the present. In connection with the management of the WBIX Radio Station, the Receiver and 1060 Communications Corp. entered into a management agreement known as the Local Marketing Agreement, a true and correct copy of which is attached as Exhibit O. My agreement with the receiver was that I would fund the expenses of operating the station during this time period and would retain any profits derived therefrom. The station made a small profit of $61,932 during

this time period, exclusive of the salary of employees that I paid to assist in the management of the station and exclusive of repayment of my loans to fund deficits relating to the Station's operation in the amount of $42,000. In addition, I did not receive any compensation for my services, in what has amounted to a full-time job managing the station. A copy of a letter from my accountant, David L. Sutherland, CPA reflecting the monthly income and expenses and resulting monthly profits or loss of the Station from December 2004 through August 2005 is attached hereto as Exhibit P.

10.    It became clear early on that unless a purchaser was found for the WBIX radio station I would not get paid on my secured claim, but instead was facing the possibility that I would have to take back the radio station in order to recoup as much as possible of the money I had lent to PBI. It was, therefore, in my interest, as well as the receiver's, to try to find a buyer for the radio station.

11.    At the request of the receiver, I fielded requests for information from prospective buyers of the radio station. Some of the calls were from business brokers; others were directly from persons saying they were interested in obtaining information about the business for possible purchase. All reasonable requests for information were honored.

12.    No bona-fide offers were received for the business. As a result, the receiver and I entered into negotiations to return the radio station to me through a retransfer of the LBC stock to me.

13.    I have been informed and believe that I am entitled to all of the proceeds of the sale of the business up to the amount of my secured claim. In other words, unless the purchase price exceeds $8,863,000, plus a 5% late payment penalty, plus the counsel

6

fees and costs incurred by me in enforcing my rights under the loan documents, all of the

proceeds of the sale should be paid to me.  Under the terms of the Rescission Agreement,

I will nevertheless pay to the receiver the sum of $1,500,000, and perhaps more, and will

waive my claims against the receivership estate.  Thus, approval of the Rescission

Agreement will result in the receivership estate receiving at least $1,500,000 more than it

has been able to obtain by selling the radio station to another party.  Indeed, as previously

stated, there have been no bona fide offers forthcoming for the sale of the radio station.


_____
ALEXANDER G. LANGER


## COMMONWEALTH OF MASSACHUSETTS

Suffolk_____, ss.

On this 24th day of October, 2005, before me, the undersigned notary public, personally appeared Alexander G. Langer, proved to me through satisfactory evidence of identification, which was [X] photographic identification with signature issued by a federal or state governmental agency, [ ] oath or affirmation of a credible witness, [ ] personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached document(s), and acknowledged to me that he signed it voluntarily of its stated purpose.

_____
Notary Public
Print Name: Dolores M Antonino
My Commission Expires: June 1, 2012

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | Case No. CA-04-12415-NG |
| ) | |
| vs. ) | |
| ) | |
| BRADFORD C. BLEIDT and ) | |
| ALLOCATION PLUS ASSET MANAGEMENT ) | |
| COMPANY, INC. ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF ALEXANDER G. LANGER

I, Alexander G. Langer, being duly sworn according to law, hereby depose and state as follows:

1.     I am the former owner of 100 percent of the capital stock of Langer Broadcasting Corp. ("LBC"), a Florida corporation.

2.     On or about July 16, 2002, I entered into a Stock Purchase and Sale Agreement with Bradford C. Bleidt ("Bleidt"), pursuant to which I agreed to sell all of the stock ("Stock") in LBC to Bleidt or his nominee.  Bleidt nominated Perspectives Broadcasting, Inc. ("PBI"), a Massachusetts corporation formed by Bleidt to purchase the LBC Stock.

3.     On information and belief Bleidt owned 100% percent of the issued and outstanding stock of PBI.

4.     The closing on the sale of the LBC stock to PBI occurred on January 13, 2004.  Under the original terms of the sale, I was to finance $6,818,000 of the purchase price.  The agreement between Bleidt and me called for Bleidt to pay $2,000,000 in cash

at closing, but because Bleidt did not have sufficient funds to pay the cash required at closing, I agreed to reduce Bleidt's cash payment to $1,300,000 and to increase my financing of the purchase price to $7,318,000.

5.      In connection therewith, the following loan documents were executed, among others:

a.      Loan Agreement executed by PBI, Bleidt and me, pursuant to which I agreed to lend to PBI the sum of $6,618,000 in exchange for the promises made by PBI and Bleidt thereunder.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

b.      First Amendment to Loan Agreement executed by PBI, Bleidt and me, pursuant to which the amount of the loan was increased to $7,318,000.  A true and correct copy of the First Amendment to Loan Agreement is attached hereto as Exhibit B.

c.      Promissory Note of Perspectives Broadcasting, Inc., pursuant to which PBI agreed to pay me the sum of $6,618,000 plus interest at 7 percent per annum in accordance with the following schedule:

(1)     $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

(2)     $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

(3)     $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

(4)     $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

The Promissory Note contains a default rate of interest of 11 percent. A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

      d.     First Amendment to Promissory Note of Perspectives Broadcasting, Inc., pursuant to which the loan was increased by $700,000.00. The additional $700,000.00 was to be paid one month after closing, with the remaining schedule remaining unchanged. In sum pursuant to the terms of the Promissory Note, as amended, PBI agreed to pay me the sum of $7,318,000 plus interest at 7 percent per annum in accordance with the following schedule:

      (1)     $700,000.00 on or before February 13, 2004, together with accrued interest thereon.

      (2)     $1,000,000 on or before April 1, 2004, together with accrued interest thereon.

      (3)     $1,000,000 on or before January 13, 2005, together with accrued interest thereon.

      (4)     $2,000,000 on or before January 13, 2006, together with accrued interest thereon.

      (5)     $2,618,000 on or before January 13, 2007, together with accrued interest thereon.

A true and correct copy of the First Amendment to Promissory Note is attached hereto as Exhibit D.

      d.     Security Agreement executed by PBI, pursuant to which PBI granted to me a security interest in all of its assets to secure its obligations to me. A true and correct copy of the PBI Security Agreement is attached hereto as Exhibit E.

e.    Security Agreement executed by LBC, pursuant to which LBC granted to me a security interest in all of its assets to secure the obligations of PBI to me. A true and correct copy of the LBC Security Agreement is attached hereto as Exhibit F.

f.    Guaranty Agreement executed by Bleidt, pursuant to which he guaranteed the full and punctual payment of PBI to me.    A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

g.    First Amendment to Guaranty Agreement executed by Bleidt in conjunction with the amendments to the Loan Agreement and Promissory Note. A true and correct copy of the First Amendment to Guaranty Agreement is attached hereto as Exhibit H.

h.    Pledge Agreement With Respect to Stock of Langer Broadcasting Corp., pursuant to which PBI pledged to me the stock of LBC in order to secure PBI's indebtedness to me. A true and correct copy of the LBC Pledge Agreement is attached hereto as Exhibit I.

i.    Pledge Agreement With Respect to Stock of Perspectives Broadcasting, Inc., pursuant to which Bleidt pledged to me the stock of PBI in order to secure the obligations of PBI to me. A true and correct copy of the PBI Pledge Agreement is attached hereto as Exhibit J.

j.    In connection with the stock pledges, PBI and Bleidt executed Stock Assignments Separate from Certificate of LBC and PBI, respectively. True and correct copies of the Stock Assignments are attached hereto as Exhibits K and L, respectively.

6. On January 20, 2004, UCC financing statements were filed with the Massachusetts Secretary of State evidencing and perfecting the security interests granted to me in the assets of LBC and PBI. True and correct copies of the LBC financing statement and the PBI financing statement are attached as Exhibits M and N, respectively.

7. Neither PBI nor Bleidt ever made any payments under the Promissory Note or the Guaranty, as amended. As a result, I am currently owed the principal amount of $7,318,000, plus $1,545,000 interest, plus a 5% late charge thereon, plus counsel fees and costs of collection. This debt is secured by a valid and perfected security interest in all of the assets of PBI, LBC and all of the capital stock of each.

8. LBC's business consisted of the operation of an AM radio station with the call letters WBIX. Approximately one month after the receiver was appointed, the receiver contacted me to discuss the operation of the WBIX radio station. As a result of our conversation, I agreed to operate the radio station for a period of time while the receiver searched out a buyer for it.

9. Through a Massachusetts corporation, wholly owned by me, namely 1060 Communications Corp., I have managed the WBIX radio station for a period in excess of 10 months, namely, from December 1, 2004 to the present. In connection with the management of the WBIX Radio Station, the Receiver and 1060 Communications Corp. entered into a management agreement known as the Local Marketing Agreement, a true and correct copy of which is attached as Exhibit O. My agreement with the receiver was that I would fund the expenses of operating the station during this time period and would retain any profits derived therefrom. The station made a small profit of $61,932 during

this time period, exclusive of the salary of employees that I paid to assist in the management of the station and exclusive of repayment of my loans to fund deficits relating to the Station's operation in the amount of $42,000. In addition, I did not receive any compensation for my services, in what has amounted to a full-time job managing the station. A copy of a letter from my accountant, David L. Sutherland, CPA reflecting the monthly income and expenses and resulting monthly profits or loss of the Station from December 2004 through August 2005 is attached hereto as Exhibit P.

10. It became clear early on that unless a purchaser was found for the WBIX radio station I would not get paid on my secured claim, but instead was facing the possibility that I would have to take back the radio station in order to recoup as much as possible of the money I had lent to PBI. It was, therefore, in my interest, as well as the receiver's, to try to find a buyer for the radio station.

11. At the request of the receiver, I fielded requests for information from prospective buyers of the radio station. Some of the calls were from business brokers; others were directly from persons saying they were interested in obtaining information about the business for possible purchase. All reasonable requests for information were honored.

12. No bona-fide offers were received for the business. As a result, the receiver and I entered into negotiations to return the radio station to me through a retransfer of the LBC stock to me.

13. I have been informed and believe that I am entitled to all of the proceeds of the sale of the business up to the amount of my secured claim. In other words, unless the purchase price exceeds $8,863,000, plus a 5% late payment penalty, plus the counsel

6

fees and costs incurred by me in enforcing my rights under the loan documents, all of the proceeds of the sale should be paid to me. Under the terms of the Rescission Agreement, I will nevertheless pay to the receiver the sum of $1,500,000, and perhaps more, and will waive my claims against the receivership estate. Thus, approval of the Rescission Agreement will result in the receivership estate receiving at least $1,500,000 more than it has been able to obtain by selling the radio station to another party. Indeed, as previously stated, there have been no bona fide offers forthcoming for the sale of the radio station.

_____
ALEXANDER G. LANGER

## COMMONWEALTH OF MASSACHUSETTS

Suffolk_____, ss.

On this 24th day of October, 2005, before me, the undersigned notary public, personally appeared Alexander G. Langer, proved to me through satisfactory evidence of identification, which was [X] photographic identification with signature issued by a federal or state governmental agency, [ ] oath or affirmation of a credible witness, [ ] personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached document(s), and acknowledged to me that he signed it voluntarily of its stated purpose.

_____
Notary Public
Print Name: Dolores M Antonino
My Commission Expires: June 1, 2012

# EXHIBIT A

**LOAN AGREEMENT**

THIS LOAN AGREEMENT (this "Agreement"), dated as of January 13, 2004, is entered into by and between **ALEXANDER G. LANGER** of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130, (the "Lender"), **PERSPECTIVES BROADCASTING, INC.**, a Massachusetts corporation, having an office at 164 Canal Street, Suite 400, Boston, Massachusetts 02114 ("Borrower"), and **BRADFORD C. BLEIDT** of 8 Norton's Point, Gloucester, Massachusetts 01944 (the "Guarantor"). Unless defined elsewhere in this Agreement, terms have the meanings ascribed in **Section 1** of this Agreement.

**PRELIMINARY STATEMENT**

Pursuant to the terms of Section 1.03 of the Stock Purchase and Sale Agreement dated July 16, 2002 (the "P & S Agreement"), under which the Lender has agreed to sell all of the issued and outstanding shares of stock of Langer Broadcasting Corp., a Florida corporation ("LBC"), to Borrower, as the nominee of Bradford C. Bleidt, designated as Purchaser under the P & S Agreement, the Lender agrees to make, and Borrower agrees to accept, a loan of Six Million Six Hundred Eighteen Thousand ($6,618,000) Dollars (the "Loan"), subject to satisfaction of the terms and conditions set forth in this Agreement and the other Loan Documents.

LBC owns the commercial broadcast radio station WBIX AM 1060 which is operated under a Local Management Agreement dated June 1, 2002 by Shared Visions, Inc., an affiliate of Borrower.

As an inducement to the Lender to make the Loan, the Guarantor intends to execute and deliver a Guaranty Agreement for repayment of the Loan in favor of Lender.

This Agreement sets forth certain representations and warranties by Borrower and Guarantor to and for the benefit of the Lender and certain covenants and agreements by and between the Lender, Borrower and Guarantor in connection with the Loan.

This Agreement consists of Sections 1 through 7 and the following Schedules, each of which is attached to and made a part of this Agreement:

<u>Schedule A</u> –    Guarantor's Financial Statement
<u>Schedule B</u> –    Lease & Tenancy At Will Arrangements

In consideration of the Loan, the Lender, Borrower and Guarantor hereby covenant and agree as follows:

**SECTION 1.   DEFINITIONS**

As used in this Agreement, the following terms have the meanings set forth below:

*Agreement* means this Loan Agreement, as the same may be amended from time to time by the parties hereto.

*Affiliate* means any Person which directly or indirectly Controls, or is Controlled by, or is under common Control with, Borrower as well as the spouse of any such Person and any member of the immediate family of such Person.

*Closing Date* means the date of execution of this Agreement unless otherwise provided in a writing signed by the parties hereto.

*Control* shall be deemed to exist if any Person shall have possession, directly or indirectly, of the power to direct the management or decision making policies, and shall be deemed to include any holder of 10% or more of any stock, partnership, membership or other interest, whether such holding is direct or indirect.

*Default Rate* means the default rate of interest set forth in the Note.

*Event of Default* has the meaning ascribed in Section 7.1 below or in the Note, as the case may be.

*FCC* means the Federal Communications Commission or any governmental authority succeeding to any of its functions.

*FCC License* means the license issued by the FCC to operate the Station.

Guarantor means Bradford C. Bleidt.

*Guaranty* means the Guaranty Agreement from Guarantor to and for the benefit of the Lender dated as of the date hereof.

*Governmental Authority* means the United States of America, The Commonwealth of Massachusetts, the Cities of Boston and Framingham and the Town of Ashland, Massachusetts, any political subdivision of any of them, and any court, agency, including the FCC, department, commission, board, bureau or instrumentality of any of them.

*Hazardous Substance* means asbestos or material containing asbestos, lead-based paint, urea formaldehyde, polychlorinated biphenyls, any oil, petroleum or chemical liquids, solids or liquid or gaseous products or any hazardous, toxic or radioactive waste, substance or material, as those terms are regulated, used and/or defined in any Law.

*Laws* or *Law* means any and all local, regional, municipal, county, state and federal statutes, regulations, ordinances, orders, judgments, codes or rules, approvals, permits and licenses, including, without limitation, health, safety, subdivision, employment, environmental and zoning laws and approvals, applicable to or affecting (i) the business of Borrower or LBC, or (ii) the ownership, development, operation or

-2-

use of any portion of the Property, or (iii) any right or remedy available to any party to this Agreement, now in effect or hereafter enacted.

*LBC* means Langer Broadcasting Corp., a Florida corporation, which is a wholly owned subsidiary of Borrower.

*Lease* means any and all oral or written leases, subleases, tenancy at will arrangements, licenses and occupancy agreements, as amended, now or hereafter granted in or to any portion of the Leased Property, including, without limitation, those set forth on **Schedule B** of this Agreement.

*Leased Property* means the towers sites leased or occupied as a tenant at will by LBC and identified in the P & S Agreement located in Ashland, Massachusetts and Framingham, Massachusetts as well as the broadcasting studio subleased by LBC and currently located at 164 Canal Street, Suite 400, Boston, Massachusetts, all necessary to operate the Station and as further disclosed in **SCHEDULE B** of this Agreement.

*Loan* means a loan by Lender to Borrower and guaranteed by Guarantor in the amount of $6,618,000.00, to be evidenced by the Note.

*Loan Documents* means the Note, the Guaranty, this Agreement, the Pledge Agreements, the Security Agreements, the UCC Financing Statements and every other document or instrument executed or to be executed in connection with security for repayment of the Loan or evidencing the Loan.

*Note* means the Promissory Note executed by Borrower and payable to the Lender or order, dated the date of the Closing and in the amount of the Loan, as the Note may be extended, renewed, modified or replaced from time to time.

*P & S Agreement* means the Stock Purchase and Sale Agreement dated July 16, 2002, as extended and/or amended, entered into among Bradford C. Bleidt, as nominee for Purchaser, Alexander G. Langer, as Seller, and LBC.

*Person* means an individual, partnership (general, limited or limited liability), corporation, limited liability company, trust, trustee, unincorporated association, syndicate, joint venture or organization or any government or agency or political subdivision thereof.

*Property* means the Leased Property, together with all easements, cross-easements and right of ways appurtenant thereto, and all buildings, improvements, furnishings, fixtures, equipment and other articles of personal property and fixtures leased or owned by the Borrower or LBC and now or subsequently used or useful in connection with the construction, operation, use or occupancy of the Station, along with the FCC License.

*Representative* means an officer, member, partner or manager of any Person that is not an individual who is authorized by the organizational documents of such Person to execute and deliver binding documents, certificates or reports on behalf of such Person.

*Station* means the radio broadcasting station currently having the call letters WBIX (AM 1060) which, together with the FCC License, is owned by LBC.

### SECTION 2.   THE LOAN AND COLLATERAL

**2.1   THE LOAN.**   Upon satisfaction of the conditions set forth in this Agreement, the Lender shall lend to Borrower, and Borrower shall borrow from the Lender, an amount equal to the Loan.   The Loan Proceeds shall be advanced in one installment on the Closing Date pursuant to the terms of this Agreement and repaid as provided in the Note and the other Loan Documents.

**2.2   THE NOTE.**   (a)   The Note will bear interest and be payable in the amounts and at the times specified in the Note.   The outstanding principal balance of the Loan, together with accrued, but unpaid interest thereon and other sums due under the Loan Documents, shall be due and payable on the maturity date (the "Maturity Date") which is the earlier to occur of (i) the third anniversary of the Closing Date, or (ii) the date upon which repayment of the Loan is accelerated by reason of occurrence of an Event of Default.

(b)      All payments made by the Borrower of principal of, and interest on, the Note, and other sums and charges payable thereunder, shall be made to the Lender in immediately available funds. The Borrower's obligation to make all payments provided either in this Agreement or in the Note shall be unconditional.   Each such payment shall be made without deduction for any claim, defense or offset of any type, including without limitation, any withholdings and other deductions on account of income or other taxes and regardless of whether any claims, defenses or offsets of any type exist.

**2.3   COLLATERAL.**      Repayment of the Loan and performance of Borrower's duties and obligations under the Loan Documents shall be secured by (i) separate Security Agreements providing a first priority perfected security interest in all of the tangible and intangible personal property of the Borrower and of LBC, whether now or hereafter acquired by the Borrower or LBC, or in which the Borrower or LBC now has or hereafter acquires an interest, including, without limitation, all licenses, permits, construction permits and contracts used by the Borrower in connection with the operation of the Station, which security interests shall be subject to no prior liens, except as provided hereunder, excepting only licenses issued by the FCC to the extent that transfer or assignment thereof or a lien thereon would cause or permit the imposition of a sanction by the FCC including loss or revocation thereof, but including, to the maximum extent permitted by law, all rights, incidents or appurtenant to such FCC license, including without limitation, any renewal expectation and further

including, without limitation, the right to receive all proceeds derived from or arising from or in connection with sale, assignment, transfer or other disposition of such licenses, authorizations and permits, (ii) a Pledge Agreement executed and delivered by Guarantor in favor of Lender for all of the issued and outstanding shares of stock of Borrower, (iii) a Pledge Agreement executed and delivered by Borrower in favor of Lender for all of the issued and outstanding shares of stock of LBC to be acquired by Borrower, (iv) the Guaranty, (v) Collateral Assignment of Life Insurance on the Guarantor in the amount of $6,600,000 (the "Life Insurance Assignment" in form and substance satisfactory to Lender and its counsel, (vi) Assignment of any interest of any affiliate of LBC or Borrower under leases and interests in any real estate to be hereafter acquired by any such Affiliate for purposes of leasing such acquired real estate to Borrower or LBC, as the case may be, to operate and/or broadcast the Station pursuant to a Conditional Assignment of Leases and Rents (the "Lease Assignment"), in form and substance satisfactory to the Lender and its counsel to be entered into at the time of acquisition of such real estate (whether such real estate be currently leased by LBC or otherwise), and (vii) such other security agreements, assignments, financing statements and other documents reasonably required by the Lender to create a perfected lien and security interest in and to the collateral pledged under the Loan Documents.

**2.4 JOINT AND SEVERAL LIABILITY.** This Agreement shall bind jointly and severally all Persons signing in their respective capacities and their respective heirs, successors and assigns.

## SECTION 3. REPRESENTATIONS AND WARRANTIES

Borrower and Guarantor (each as to himself, the Property and Borrower only) hereby represent and warrant (which representations and warranties shall survive the delivery of this Agreement) to and for the benefit of the Lender that:

**3.1 EXISTENCE AND POWER.** (a) Borrower: (i) is and will continue to be duly organized, validly existing and in good standing under the laws of The Commonwealth of Massachusetts; (ii) is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of its business conducted by it makes such qualification necessary, (iii) has the power to execute and deliver this Agreement, the Note, and the other Loan Documents; and (iv) has, (or through its wholly owned subsidiary, LBC, to be acquired has) all requisite permits, authorizations and licenses, without unusual restrictions or limitations, to own, lease and/or operate the Property and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b) Borrower shall cause LBC to remain in existence and in good standing under the laws of The Commonwealth of Massachusetts and the State of Florida, as applicable.

**3.2 AUTHORITY; CONSENTS.** (a) The execution, delivery and performance of this Agreement, the Note, and the other Loan Documents: (i) have been duly authorized by all necessary corporate action, (ii) are within Borrower's and Guarantor's powers, (iii) will not violate any provision of Law (including, without limitation, the rules, regulations, policies and orders of the FCC) or of Borrower's organizational documents, and (iv) will not result in or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of the Property or assets of Borrower, Guarantor or LBC (other than liens in favor of the Lender), whether pursuant to any mortgage, indenture or third party loan or credit agreement or other agreement or instrument to which Borrower, Guarantor or LBC is a party or otherwise.

(b) No approval, authorization, consent or other order of, or registration or filing with, any Governmental Authority is required in connection with the execution, delivery and performance of this Agreement, the Note, or the other Loan Documents.

(c) The Loan Documents constitute the legal, valid and binding obligation of the Borrower and Guarantor, and are enforceable in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors rights generally and, except as may be limited by exercise of judicial discretion in applying general principles of equity.

**3.3 VALIDITY.** This Agreement, the Note, and the other Loan Documents, upon execution and delivery, will be legal, valid, binding and enforceable obligations of Borrower and/or Guarantor, as applicable, in accordance with the terms of each.

**3.4 FULL DISCLOSURE.** Neither this Agreement nor any other document submitted to the Lender by or on behalf of Borrower or Guarantor in connection with the Loan contains an untrue statement of material fact, or, intentionally and/or negligently, omits a material fact necessary to make the statements contained herein or in such document true, accurate and complete.

**3.5 FINANCIAL CONDITION.** (a) The financial statement of Guarantor described in **Schedule A** is correct and complete and fairly and consistently present the financial condition of the Guarantor for the period and as of the date set forth therein. There has been no Material Adverse Change to the financial condition of Guarantor since the date of such financial statement.

(b) There are no direct or contingent liabilities of Borrower or Guarantor not disclosed in the financial statement described in **Schedule A** or in this Agreement. Other than in connection with the Loan, neither Borrower nor Guarantor has incurred any debt or pledged any of its assets as collateral or security, including its stock interest in LBC (to be acquired pursuant to the terms of the P & S Agreement), except as is specifically set forth in the financial

statement described in **Schedule A** or in this Agreement or in the P & S Agreement.

(c)  Borrower and Guarantor have filed all tax returns and reports required to be filed by Law with all Governmental Authorities and have paid in full or made adequate provision for the payment of all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

**3.6  COMPLIANCE.**  Borrower and the Property are in compliance with all Laws.  Borrower has obtained from each Governmental Authority and from any Lessor of the Leased Property relative to any restrictive covenant encumbering the Property, all licenses, permits, authorizations, consents and approvals necessary for the present use, and all such licenses, permits, authorizations, consents and approvals are and shall continue to be in full force and effect.

**3.7  LITIGATION.**  There are no proceedings pending by or before any Governmental Authority relating to Borrower, Guarantor or the Property and to the knowledge of Borrower and Guarantor, no such proceeding is threatened,  which, if adversely determined would be likely to have a material adverse effect on the business, operations, properties, assets or condition, financial or otherwise, of the Borrower or which questions the validity of the Loan Documents or any action taken or to be taken pursuant thereto.

**3.8  REQUIRED CONSENTS.**  Except as set forth on <u>Schedule 3.8</u> annexed hereto, the Borrower is not required to obtain any order, consent, approval or authorization of, or presently required to make any declaration or filing with, any governmental authority (including, without limitation, the FCC, or any state or subdivision thereof or any other Person) in connection with or as a condition to the execution, delivery and performance of any of the Loan Documents or the granting of the security interests in the Collateral.

**3.9  No ENCUMBRANCES OR DEFAULTS.**  The Borrower is not a party to any agreement or instrument or subject to any corporate, contractual or other restriction materially adversely affecting its business, properties, assets, operations or condition, financial or otherwise, except as disclosed in this Agreement and the schedules annexed hereto. The Borrower is not in violation of any provision of any material indenture, agreement or instrument (including any material License) to which it is a party, or by which it is bound, or any order, judgment or decree of any court or other agency or government (including, without limitation, the FCC).

**3.10  GOVERNMENTAL LICENSES; FCC COMPLIANCE; STATION UPGRADES.**  The Borrower or its wholly owned subsidiary, LBC, has validly obtained and duly holds all FCC Licenses, and all other commercial broadcast station licenses, permits and authorization of public or governmental bodies, including without limitation the FCC, which are required in connection with the Borrower's ownership and operation of the Station and in

- 7 -

connection with the conduct by the Borrower of its business as presently conducted, including but not limited to, such licenses, permits required by (i) the FCC; (ii) the Communications Act of 1934, as amended; (iii) 47 C.F.R. Part 73; (iv) any other governmental entity; or (v) any other law or regulation, for or in connection with the ownership and operations of the Station (all such FCC License and all such other governmental licenses, consents, permits, approvals and authorizations being sometimes hereinafter collectively referred to as the "Licenses").

The Borrower and its business (when acquired, will be, and when completed, all new construction or upgrades will be) in compliance with the Federal Communications Act and all applicable filing and operating requirements and other applicable Laws including, without limitation, all regulations, orders, directives and guidelines of the FCC and all other governmental agencies that possess regulatory authority with regard to the Borrower or its business.

**3.11  REAL ESTATE.**  The Borrower validly owns or leases, or holds valid easements with respect to, all real estate used in connection with the Station.  All such leases and easements are in full force and effect, and no default exists under any such lease or easement. Schedule B hereto accurately lists each such site utilized by Borrower or LBC, as the case may be, and designates whether each site is owned or leased.

**3.12  MATERIAL AGREEMENTS.**  The Borrower or its wholly owned subsidiary LBG, has entered into all material programming and other non-governmental agreements required for the operation of the Station. All material agreements are  in full force and effect.  To the Borrower's knowledge, neither the Borrower nor LBC nor any other party is in the material default under any of said agreements.

**3.13  TITLE TO PROPERTIES.**  The Borrower and LBC has good title to all of its respective properties and assets, free and clear of all mortgages, security interests, restrictions, liens and encumbrances of any kind, except for (i) Liens permitted by Section 6.2 hereof, and (ii) covenants, restrictions, rights, easements and minor irregularities in title to real property which do not and are not reasonably likely to interfere with the occupation, use and enjoyment by the Borrower of such properties and assets in the normal course of its business as presently conducted,  or materially impair the value of such properties and assets for the purpose of such business.

**3.14  TAXES AND TAX RETURNS.**  The Borrower has paid all taxes, assessments and other governmental charges levied upon its properties, assets, income and Licenses, other than those not yet delinquent. There are no unpaid assessments for additional taxes and no basis therefor.  The Borrower has filed, or duly obtained extensions for filing, all federal, state and local tax returns which the Borrower is required to file, and has paid or made adequate provision of the payment of all federal, state and local taxes, charges and assessments

assessed against the Borrower.  Borrower has not received any notice of deficiency with respect to any taxes and Borrower is not aware of any basis for the same.

**3.15  COMPLIANCE WITH LAWS.**  The Borrower and the Station are in compliance in all material respects with all laws, regulations and governmental orders applicable to it and the conduct of the business and operation of the Station including, without limitation, all FCC and Federal Aviation Administration ("FAA") rules and regulations with respect to the height, lighting, effective radiated power and signal of the towers, antennae and other equipment used by the Station.  The Borrower agrees to file or have LBC file with the FCC on a timely basis all required ownership reports and other reports required by law.

**3.16  INVESTMENTS.**  The Borrower has no Investments other than Investments permitted by Section 6.6 hereof.

**3.17  INDEBTEDNESS AND LIENS.**  The Borrower has no indebtedness except for the indebtedness permitted by Section 6.1 hereof, and there are no liens on any assets of the Borrower except liens permitted by Section 6. 2 hereof.

Schedule 6.1  attached hereto correctly describes as of the date or dates indicated herein: (a) all outstanding indebtedness of the Borrower including, without limitation, the amount of and holder of Stockholder indebtedness; (b) all existing Liens in respect of any property or assets of the Borrower; and (c) all outstanding investments, loans and advances of the Borrower.

**3.18  SOLVENCY OF THE BORROWER.**  Entering into this Agreement, making and delivering the Note and the borrowings under this Agreement and the Note do not and will not render the Borrower insolvent or unable to pay its debts as they become due.  The Borrower is not contemplating either the filing of a petition under any state or federal bankruptcy or insolvency law or the liquidation of any of its property, and the Borrower has no knowledge of any person contemplating the filing of any such petition.

**3.19  COMPLIANCE WITH ENVIRONMENTAL LAWS.**  Neither the Borrower nor to the Borrower's knowledge any other Person (including, without limitation, any previous owner, lessor or sublessor for the Borrower's Leased Property) has used, treated, stored or disposed of hazardous waste or toxic substances on any of the properties owned by an Affiliate of or by any other third party and/or leased to or by the Borrower in violation of any federal, state or local environmental protection, toxic substance, human health or similar statute, regulation or ordinance (collectively, the "Environmental Laws"), and there have been no spills or releases of hazardous substances on or from any Leased Property that, in any such case, is reasonably likely to subject the Borrower or LBC to liability. The Leased Property and all operations of the Borrower or LBC conducted on such Leased Property are in compliance in all material respects with all Environmental Laws.

The Borrower has not received any notice, nor is the Borrower aware of any administrative or judicial investigations, proceedings or actions with respect to violations, alleged or proven, of any Environmental Law by the Borrower or LBC, or otherwise involving the Leased Property or the operations conducted on the Leased Property. No asbestos-containing material is present in any of the improvements on any Leased Property or is otherwise located on any Leased Property. All operations conducted on Leased Property are in material compliance with all Laws relating to asbestos. To the Borrower's knowledge and belief, no underground storage tanks, whether in use or closed, are on or under any Leased Property.

**3.20 BROKERS, ETC.** The Borrower has not dealt with any broker, finder, commission agent or other similar person acting on behalf of the Borrower in connection with the transactions contemplated by this Agreement.

**3.21 LABOR RELATIONS; EMPLOYEES.** Except as described in Schedule 3.21, there are no collective bargaining agreements currently in effect between the Borrower or LBC and any labor unions or organizations representing any of the employees of the Borrower or LBC, and neither the Borrower nor LBC has made any material promises or commitments of any kind for: (i) any employment or labor agreement; (ii) any agreement, arrangement or policy that contains or involves any severance pay or supplemental employment liabilities or obligations, including any bonus, deferred compensation, pension, option, profit-sharing, incentive compensation, fringe benefit or retirement plan or other arrangement; or (iii) any personnel-related agreement, guarantee or indemnification which involves, singly or in the aggregate, a potential significant liability. There is neither pending nor, to the Borrower's knowledge, threatened any labor dispute, strike or work stoppage. There is not now pending or, to the Borrower's knowledge, threatened any charge or complaint, against either the Borrower or LBC by the National Labor Relations Board, Department of Labor or any other federal, state or local labor or employment agency or any representative thereof. There are no arrearages in the payment of any wages, withholding or Social Security taxes, unemployment insurance premiums, or other similar obligations of the Borrower or LBC.

**3.22 FULL DISCLOSURE.** All information set forth in this Agreement, and all other documents, certificates or schedules furnished to the Lender pursuant to this Agreement, taken as a whole, are complete and correct in all material respects, and there is no fact presently known to the Borrower concerning the Borrower or LBC which materially adversely affects or, as far as the Borrower can reasonably foresee, shall materially adversely affect the business, property, operations or condition (financial or otherwise) of Borrower or LBC that has not been disclosed to the Lender, other than: (A) conditions affecting the radio broadcast industry generally; and (b) economic conditions affecting the geographical areas in which the Borrower's business operates (although the Borrower is not aware of any

circumstances which are not generally known or available to the public that are likely to adversely affect the economy in such areas).

**3.23 EVENTS OF DEFAULT.** As of the date of this Agreement, no event or set of facts exists which, pursuant to the provisions of Section 7.1 of this Agreement, would constitute an Event of Default.

**3.24 PAYMENTS RELATING TO PROPERTY.** (a) All payments and accounts with respect to the ownership and operation of the Property which is leased or owned are current and not delinquent or in default, including, without limitation, taxes, utilities, and common charges or assessments.

(b) There are no mechanics or materialmens liens filed on or against all or any portion of the Property, and no other claims exist which constitute or which may constitute a lien on all or any portion of the Property for which lien waivers have not been obtained (and copies of which have been provided to the Lender).

**3.25 CONDITION OF THE PROPERTY.** To the best of Borrower's and Guarantor's knowledge, all of the existing improvements forming a part of the Leased Property are in good condition and in compliance with all Laws.

**3.26 SERVICES TO THE PROPERTY.** To the best of Borrower's and Guarantor's knowledge, public water supply, storm and sanitary sewers and electrical, gas and telephone facilities are available to each of the Leased Properties and are sufficient to meet the reasonable needs of each Leased Property as they are intended to be used.

**3.27 LEASES.** Except as set forth on **Schedule B** attached hereto, there are no other Leases, tenancies or occupants of any portions of the Property.

**3.28 MANAGEMENT OF PROPERTY.** Borrower has not entered into any management agreements relating to the Property other than the Time Management Agreement between LBC and Shared Visions, Inc., an Affiliate of Borrower and Guarantor.

**3.29 ENVIRONMENTAL MATTERS.** Neither Borrower nor, to the best knowledge of Borrower and Guarantor, any other party has been, is or will be engaged in any operation at any Leased Property which could lead to (i) the imposition of liability relating to any Hazardous Substance on Borrower or on LBC or any former or subsequent owner of the Property, or (ii) the creation of a lien on the Property under any Laws.

**3.30 RELIANCE ON REPRESENTATION UNDER P & S AGREEMENT.** In connection with certain of the representations and warranties of Buyer as set forth in Section 3.01 through 3.29, as applicable, Borrower and Guarantor are relying on the representations and warranties made by Lender, as Seller, and LBC under Article III of the P & S Agreement.

- 11 -

## SECTION 4.   CONDITIONS PRECEDENT

**4.1  CONDITIONS TO LOAN.**  The obligation of the Lender to advance the Loan Proceeds is subject to satisfaction of the following conditions precedent:

(a)  The representations and warranties set forth in Section 3 hereof and in the other Loan Documents shall be true and correct in all material respects on and as of the date hereof and shall be true and correct in all material respects as of the date the Loan is made.

(b)  No Event of Default shall have occurred and no event which upon notice or lapse of time or both, would constitute such an Event of Default, shall have occurred and be continuing.

(c)  The Lender shall have reviewed and approved the form and substance of the organizational documents of Borrower and such evidence of Borrower's power to execute and deliver this Agreement, the Note and the other Loan Documents as the Lender or its counsel shall reasonably request, and all legal matters incident to the transaction contemplated by this Agreement shall be reviewed and approved by counsel for the Lender.

(d)  Borrower, Guarantor and any necessary third party shall have executed and delivered to the Lender this Agreement, the Note, the Pledge Agreements, the Security Agreements, the Guaranty, the other Loan Documents and such other documents, certificates and other items as the Lender or its counsel may reasonably request.

(e)  The Lender shall have determined that all of the terms and conditions of this Agreement have been satisfied.

(f)  The Lender shall have received from counsel for Borrower and Guarantor a written opinion satisfactory in form and substance to the Lender and its counsel.

(g)  The Lender shall have received and approved the additional documents or information set forth on the preliminary closing checklist previously delivered to counsel for the Borrower, as said checklist may have been modified or supplemented, including, without limitation:

(i) Certified copies of the certificate of incorporation, by-laws and authorizing resolutions of Borrower;

(ii)  Evidence of insurance coverage in form, in amounts and issued by companies approved by the Lender, to cover such casualties, risks, perils, liabilities and other hazards as the Lender may reasonably require; and

(iii)  Such additional information or documentation as set forth on the attached preliminary closing checklist or as the Lender may reasonably require.

- 12 -

## SECTION 5.  AFFIRMATIVE COVENANTS AND AGREEMENTS

Borrower and Guarantor hereby agree that until payment in full of the Note and the complete performance and discharge of all other duties and obligations under this Agreement and the other Loan Documents, the Borrower and Guarantor, as the case may be, shall perform, satisfy and observe each of the following:

**5.1  MAINTENANCE OF PROPERTIES.**  Borrower shall do and cause to be done all things necessary to (a) preserve, renew and keep in full force and effect its legal existence, and all material rights, licenses, permits, and Licenses; (b) comply in all material respects with all material agreements to which it is a party, the violation of which is reasonably likely to have a material adverse effect upon the Borrower or LBC taken as a whole; (c) at all times maintain, preserve and protect its and LBC's Licenses, and any trade names, and preserve all the remainder of its or LBC's material properties used or useful in the conduct of its or LBC's business and keep the same in good repair, working order and condition; and (d) from time to time, make, or cause to be made, all needed and proper repairs, renewals, replacements, betterments and improvements thereto, so that the business carried on in connection therewith may be properly conducted at all times.

**5.2  FINANCIAL STATEMENTS; REPORTING; NOTICE OF DEFAULT.** Borrower and, as indicated, Guarantor, shall deliver the following to the Lender by the specified dates, each in form and content reasonably required by the Lender:

(a)  By April 30 of each year, financial statements of Borrower, Guarantor and LBC, prepared and certified by the submitting Person as true, accurate and complete;

(b)  Within 30 days after submittal to the appropriate Governmental Authority, copies of Borrower's, LBC's and Guarantor's executed federal and state income tax returns and all schedules thereto, including any request for extension of time to file;

(c)  Simultaneously with the delivery of the annual financial statements required by 5.1(a) above, a Certificate of Compliance certifying that, as at the end of the applicable period, the submitting Person is in full compliance with all representations and warranties set forth in this Agreement and all other Loan Documents;

(d)  Promptly upon the Lender's written request, such other information (not otherwise required to be delivered by this **Section 5.2**) concerning the financial condition, business and operations of Borrower, LBC, the Property including the Station and/or Guarantor as the Lender may, from time to time, reasonably request; and

(e)  Upon becoming aware of any Event of Default or of any occurrence which, but for the giving of notice or the passage of time would become an Event of Default, written notice thereof to the Lender.

- 13 -

**5.3  INSURANCE.**   (a) Borrower shall keep the Property insured against fire and other hazards (so called "All Risk" or "ISO Special Form" or its equivalent coverage) including hurricane, tornado and wind damage insurance with companies satisfactory to the Lender and in amounts no less than 100% of the full replacement value thereof at the time of issuance and at each renewal thereof.

(b) Borrower shall also maintain (i) comprehensive public liability coverage against claims for personal injuries, property damage or death in an amount no less than $1,000,000 for each claim, (ii) worker's compensation, employment or similar insurance as may be required by Law, (iii) flood hazard insurance if any portion of the Property is located in a flood hazard area as designated by the Federal Emergency Management Agency, and (iv) such other forms of insurance coverage as the Lender may reasonably require.

(c) All policies required by this **Section 5.2** shall include standard loss payable or additional insured clauses, as appropriate, shall be with reputable carriers and on such terms as shall be customarily carried by comparable companies. Borrower shall deliver originals or certified copies of all of the aforesaid insurance policies to the Lender on the Closing Date and immediately upon renewal thereof. All such insurance coverages shall be in amounts, where applicable, to prevent any Person from becoming a co-insurer of any loss and shall provide for a minimum of 30 days prior written cancellation notice to the Lender. In the event of any loss or damage to any portion of the Property, Borrower shall give immediate written notice to the Lender and to the insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

**5.4  COMPLIANCE WITH LAWS.**   Borrower shall comply with and cause the Property to comply with all Laws, including without limitation, those pertaining to or concerning public health, safety and the environment, whether now in effect or hereafter enacted, including, without limitation, the Communications Act of 1934, as amended, 47 C.F.R. 73, as amended, or any successor regulations, and any other rule or regulations, as may be promulgated by the FCC from time to time.

**5.5  PAYMENT OF TAXES; DEBTS.**   Borrower shall pay and discharge or cause to be paid and discharged as they become due all of its and LBC's indebtedness and all of its and LBC's trade obligations and all taxes, assessments and governmental charges or levies imposed upon it or LBC or upon its or LBC's income and profits or upon any of its or LBC's property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a lien or charge upon such Property or any part thereof, unless the Borrower or LBC is contesting such indebtedness, obligations, taxes, easements, levies, claims or charges in good faith and has set aside adequate reserves on its or LBC's books in respect thereof; provided, however, that in any event all such indebtedness, obligations, taxes, easements, claims, levies and charges shall be   paid before any

property of the Borrower or LBC is seized or attached in respect thereof.

**5.6  ACCESS TO PROPERTY; LOCATION OF RECORDS.**  (a) Borrower shall allow the Lender and its agents, consultants, attorneys or accountants to: (i) enter the Leased Property for the purpose of conducting inspections, and appraisals, (ii) enter Borrower's offices to examine or inspect any books and records relating to its duties and obligations under the Loan Documents, (iii) make extracts or copies of any such books and records, and (iv) discuss its affairs, finances and accounts with its Representatives and/or its accountants, all following reasonable advance notice (except in the case of an emergency), at such reasonable times and as often as the Lender may reasonably request.

(b)  Borrower shall keep all books and records relating to the Property or its duties and obligations under the Loan Documents at its Boston, Massachusetts office unless prior written consent of the Lender is obtained to a change of location, such consent not to be unreasonably withheld.

**5.7  LITIGATION; CHANGE IN ACCURACY OF REPRESENTATIONS.**  (a) Borrower and/or Guarantor shall promptly advise the Lender of (i) the commencement or threat of litigation, including condemnation, eminent domain or arbitration proceedings, or any other proceedings before any Governmental Authority which may have an adverse effect on assets, liabilities, financial condition or business of Borrower, LBC or Guarantor and which involves a dispute in excess of $25,000.00, and (ii) the commencement or threat of litigation, including condemnation, eminent domain or arbitration proceedings, revocation of the FCC License or any other proceedings before any Governmental Authority which might have an adverse effect on or upon the Property.

(b)  Borrower and/or Guarantor shall immediately notify the Lender in writing if any event occurs or facts become known which makes any of the other representations set forth in **Section 3** of this Agreement no longer true in all material respects.

**5.8  MAINTENANCE OF EXISTENCE**. Borrower shall continue to (i) conduct its business and LBC's business as presently conducted, (ii) maintain its existence and LBC's existence, and (iii) maintain the Leased Property and other Property in good repair, working order and operating condition.  Borrower agrees to timely complete construction, signal adjustment work and the like at the Ashland, Massachusetts Tower Site so as to cause the Station to operate on a 24 hour 7 days per week basis with 50,000 watts of power.

**5.9  ACCOUNTING.**  Borrower shall maintain a standard system of accounting in accordance with generally accepted accounting principles, and apply such principles on a consistent basis.

**5.10  ADDITIONAL ASSURANCES.**  From time to time hereafter, Borrower, LBC and Guarantor, as the case may be, shall execute and deliver such additional instruments, certificates and documents, and

- 15 -

take all such actions, as the Lender shall reasonably request for the purpose of implementing or effectuating the provisions of the Loan Documents, and upon the exercise by the Lender of any power, right, privilege or remedy pursuant to the Loan Documents which requires any consent, approval, registration, qualification or authorization of any governmental authority or instrumentality, exercise and deliver and cause to be exercised and deliver all applications, certifications, instruments and other documents and papers that the Lender may reasonably request.

    **5.11   LEASE OR PURCHASE OF REAL ESTATE.**   The Borrower will notify the Lender if it, any Affiliate or LBC enters into any lease of real estate, will supply the Lender with a copy of such lease and will enter into a specific assignment of such lease in favor of Lender in such form as the Lender shall specify; and will notify the Lender of the acquisition of any real estate by the Borrower or any Affiliate, which party shall enter into a lease of the real estate with LBC and both Borrower or Borrower's Affiliate, as owner and lessor and LBC, as Lessee, shall enter into an assignment of such lease in favor of Lender in such form as the Lender shall specify.   In no event shall LBC own any real estate.

    **5.12 COMPLIANCE WITH LEASES AND CONTRACTS.**   (a)   Borrower shall perform or cause LBC to perform all duties and obligations required to be performed by Borrower as "Tenant" under the Leases, use best efforts to compel performance by the applicable landlord of all of their duties and obligations under the Leases, and give the Lender written notice of any payment or other material default under any Lease promptly after obtaining knowledge thereof.

    (b)   Borrower has entered into or has caused LBC to enter into and shall maintain or shall cause LBC to maintain in full force and effect any and all contracts necessary for the customary use, maintenance and operation of the Property.

    (c)   In the event any Affiliate of Borrower acquires any Leased Property, then such Affiliate shall enter into a lease with Borrower as of the date of closing on the Leased Property which shall be satisfactory to Lender and Borrower and such Affiliate as owner of the Leased Property shall enter into for the benefit of Lender a Conditional Assignment of Lease and Rents in a form satisfactory to Lender as of the date of closing on the Leased Property.

    **5.13 ENVIRONMENTAL.** (a) Borrower shall comply with and shall cause LBC to comply with and conform to, all Laws relating specifically to health, safety, pollution control or the environment (collectively, "Environmental Laws"), including without limitation, those relating to (i) the transportation, storage, placement, handling, treatment, discharge, generation, manufacture, production or disposal (collectively, the "Treatment") of any Hazardous Substance at, under or upon the Leased Property, and (ii) the actual or threatened release, spilling, leaking, migrating, pumping, pouring, emitting, emptying, injecting, escaping, leaching, dumping, discharging or disposing any

Hazardous Substance into the environment upon, in, from or affecting any portion of the Leased Property (collectively, a "Release").

(b)  Within three Business Days of receipt of any Notice (as defined below), Borrower shall deliver to the Lender a complete copy of the written Notice or a written summary of the content of any oral Notice.  "Notice" means any note, notice or report of any of the following, received by Borrower or Guarantor from any Person:

(i)  Any suit, proceeding, investigation, order, consent order, injunction, writ, award or action relating to or indicating the Treatment of any Hazardous Substance upon, in, from and which affects any portion of the Property;

(ii) any Release;

(iii)  any dispute relating to any Release or to Borrower's or any other Person's Treatment of any Hazardous Substance upon, in, from or affecting any portion of the Property;

(iv) any recommendations or requirements of any Governmental Authority, insurer or board of underwriters relating to any Release or to any Treatment of any Hazardous Substance upon, in, from or affecting any portion of the Property;

(v)  any claims by or against any insurer related to or arising out of any Release or to any Treatment of any Hazardous Substance upon, in, from or affecting any portion of the Property; or

(vi) any legal requirement or breach thereof relating to any Release or to any Treatment of any Hazardous Substance upon, in, from or affecting any portion of the Property.

(c)  In the event that any Release has occurred or occurs at any time, Borrower shall immediately take all of the following actions: (i) notify all Governmental Authorities as required by Law; (ii) notify all insurance carriers; (iii) notify the Lender; (iv) devise a plan (the "Clean-up Plan") for the assessment, containment, clean-up, remediation and removal of the Hazardous Substances relating to the Release as required by any Environmental Law; (v) provide a copy of the Clean-up Plan and evidence of all required governmental and regulator approvals thereof to the Lender prior to the commencement of any remediation (other than emergency remediation); (vi) take all steps necessary or desirable (as determined by Borrower and approved by the Lender in its reasonable judgment) to fully remediate the Release so as to fully restore the affected portion of the Property to its condition and value prior to the Release; and (vii) keep the Lender fully apprised of the status of all assessment, containment, clean-up and remediation efforts, and allow the Lender, at Borrower's cost, to monitor and inspect all such assessment, containment, clean-up and remediation efforts.

**5.14  LIFE INSURANCE.**  Borrower shall cause Guarantor to maintain a life insurance policy on Guarantor's life, in the face amount of the outstanding principal balance of the Loan which policy shall be collaterally assigned to Lender, such policy to be obtained by Borrower and collaterally assigned to Lender within thirty (30) days after the date hereof.

**5.15  USE OF PROCEEDS.**  Borrower shall use the Loan proceeds to fund a portion of the purchase price of the LBC Stock.

**5.16  NOTIFICATION OF DEFAULT, LITIGATION, GOVERNMENTAL ACTION.** Borrower and/or Guarantor shall promptly notify Lender in writing of: (i) the occurrence of any event that would constitute a default under the terms hereof or under the terms of any other loan or financing agreement of either or both of them, (ii) any litigation that has been instituted or is pending or threatened, the outcome of which would have a material adverse effect on the continued operations or financial condition of Borrower, LBC and/or Guarantor, respectively, or (iii) any governmental investigation or proceeding that has been instituted or is pending or threatened, including without limitation, matters relating to any or all licenses necessary to operate the Borrower's or LBC's business including the FCC License, and the Federal or state tax returns of Borrower, LBC or Guarantor.

**5.17  COOPERATION.**  Upon the request of the Lender following the occurrence of an Event of Default hereunder, the Borrower shall cooperate with and use its best efforts to assist the Lender in obtaining any necessary consents from Federal, state and local governmental authorities and landlords, as the case maybe, for the assignment of the Borrower's Licenses, leases, easements and other material contracts to the Lender, its designee or assignee.

### SECTION 6.  NEGATIVE COVENANTS

The Borrower and Guarantor, jointly and severally, covenant and agree that, so long as any obligations are unpaid or outstanding under the Note or any of the Loan Documents, unless the Lender shall otherwise consent in writing, they will not directly or indirectly:

<u>Section 6.1.    Indebtedness</u>.  Without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any indebtedness (including capital leases), except:

(a)  Indebtedness to the Lender hereunder;

(b)  Indebtedness with respect to capital leases, purchase money security interests, and real estate mortgages incurred after the date hereof, in an amount not exceeding $200,000.00 in aggregate principal amount outstanding at any one time, <u>provided</u>, that the amount of each such indebtedness shall not exceed the value of the assets purchased or leased with the proceeds of such indebtedness; and

- 18 -

(c) Indebtedness in respect to endorsements of negotiable instruments for collection in the ordinary course of business.

<u>Section 6.2. Liens</u>. Without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to create, incur, assume or suffer to exist, any lien, mortgage, security interest, pledge, charge or other encumbrance ("Liens") on any of Borrower's or LBC's assets, now or hereafter owned, other than:

(a) Liens securing obligations to the Lender under this Agreement;

(b) Liens securing the payment of taxes, and other governmental charges, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which they shall have set aside on its books adequate reserves to the extent required by generally accepted accounting principles, <u>provided</u>, <u>however</u>, that all such Liens shall be paid and discharged before any property of the Borrower is seized, sold or attached in satisfaction thereof or as security for the payment thereof);

(c) Liens created by deposits (i) under worker's compensation, unemployment insurance and social security laws, or to secure the performance of bids, tenders, contracts (other than for borrowed money) or leases, or to secure statutory obligations and that do not exceed in the aggregate $20,000 outstanding at any time; or (ii) to secure surety or other similar bonds that the Borrower or LBC is required to obtain under the Licenses, and that do not exceed $20,000 in the aggregate outstanding at any time;

(d) Liens securing purchase money security interests, real estate mortgages, vehicle leases and loans, and leasehold interests under capital leases as permitted hereunder, provided that such Liens shall attach only to the assets so purchased, mortgaged or leased;

(e) Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering in any material respect with the Borrower's or LBC's business;

(f) Liens imposed by law, such as carriers, warehousemen's or mechanics' liens, incurred by the Borrower or LBC in good faith in the ordinary course of business; and

(g) Liens to secure construction, completion and performance bonds in the ordinary course of the Borrower's or LBC's business.

**6.3 GUARANTEES.** Except as otherwise explicitly permitted by this Agreement or otherwise without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to guarantee, endorse or otherwise in any way become or be responsible for obligations of any other Person, whether by agreement to purchase the indebtedness of any other Person, or agreement for the furnishing

- 19 -

of funds to any other Person, through purchase of goods, supplies or services, or by way of stock purchase, capital contribution, advance or loan, for the purpose of paying or discharging any indebtedness or obligation of such other Person, or otherwise, except endorsements on negotiable instruments for collection in the ordinary course of business.

**6.4  SALE OF ASSETS; TRANSFERS.**    (a) Sell, lease, transfer or otherwise dispose of Borrower's or LBC's License or other assets to any Person, except (i) with respect to assets other than the FCC License, in the ordinary course of its business, including the replacement of equipment with other equipment of at least equal utility and value provided that the Lender's Liens upon such newly acquired equipment has the same priority as the Lender's Liens upon the replaced equipment, except as otherwise permitted by Section 6.2 hereof) and (ii) the disposition without replacement of assets not material, individually or in the aggregate, to the operation of its business.

(b)  Other than for the purpose of paying down the indebtedness to the Lender, sell, assign, convey, hypothecate or otherwise transfer any legal or beneficial title or ownership interest in or to (i) all or any portion of the Property, or (ii) Borrower, or (iii) LBC.

**6.5  SALE AND LEASEBACK; SALE OF ACCOUNTS RECEIVABLE.**  Cause Borrower or LBC to enter into any arrangement, directly or indirectly, with any Person whereby Borrower or LBC shall sell or transfer any property, real, personal or mixed, used or useful in Borrower's or LBC's business, whether now owned or hereafter acquired, and thereafter rent or lease such property; or sell, assign, discount or dispose in any way any accounts receivable, promissory notes or trade acceptances with or without recourse, except for collection (including endorsements) in the ordinary course of business.

**6.6  INVESTMENTS.**  Without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to make or possess any investment in any Person except investments by Borrower made to LBC and except investments in short-term obligations (one year or less) in obligations of or guaranteed by the United States, or certificates of deposit (6 months or less) of a commercial bank with unrestricted capital and surplus of at least $100,000,0000; or make loans or advances to, or enter into any arrangement for the purpose of providing funds or credit to, any other Person.

**6.7  REORGANIZATION.**  Without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to (a) form any subsidiary; (b) amend Borrower's or LBC's Articles of Incorporation in any way that could have a material adverse effect upon either party's business or upon the Lender's rights hereunder or under any Loan Document; (c) dissolve, liquidate, form any subsidiary, consolidate with or merge with, or otherwise acquire all or substantially all of the assets, properties of, or ownership interests in, any corporation, partnership, business, firm, or other Person; or (d) make any change in Borrower's or LBC's legal name or the name under

which Borrower or LBC conducts business (other than a change in the call letters of the Station upon notice to the Lender).

**6.8  TRANSACTIONS WITH AFFILIATES.** Cause Borrower or LBC to enter into any transaction, including, without limitation, the lease, purchase, sale or exchange of property or assets or the rendering of any service, with or to any Affiliate of the Borrower or LBC, except in the ordinary course of business and pursuant to the reasonable requirements of Borrower's or LBC's business and upon fair and reasonable terms not less favorable to the Borrower or LBC, as the case may be, than would be obtained in a comparable arms-length transaction with a non-Affiliate third party.

**6.9  OTHER BUSINESSES.** Cause Borrower or LBC to engage directly or indirectly in any business other than the ownership and operation of the Station, which business shall include the sale of advertising on the Station and ancillary activities directly benefiting the operation of the Station.

**6.10 MANAGEMENT AND CAPITAL STRUCTURE.** Cause Borrower or LBC to make, permit or consent to: (i) the withdrawal, resignation, termination or cessation of Guarantor as shareholder of Borrower or of Borrower as shareholder of LBC, (ii) without the Lender's prior written consent, which consent shall not be unreasonably withheld, a material change in the manner in which Borrower's or LBC's business is conducted or their methods of accounting, or (iii) without the Lender's prior written consent, which consent shall not be unreasonably withheld, cause Borrower or LBC to make, permit or consent to, a change in the capital structure of Borrower or LBC.

**6.11 PENSION PLANS.** Cause Borrower or LBC to enter into or otherwise adopt any pension, profit sharing or other similar plan covered by ERISA providing for a program of deferred compensation to any employee, other than a 401(k) Plan.

## SECTION 7.  EVENTS OF DEFAULT

**7.1  EVENTS OF DEFAULT.** The occurrence of any one or more of the following events, after the lapse of any specified grace or notice and cure periods, shall be deemed to constitute an "Event of Default:"

(a) If (i) payment of any monthly installment of interest under the Note, (ii) payment of any installment of principal under the Note (excluding the final payment on the Maturity Date which is due on such date without any grace period) or (ii) payment of any other amounts due under any of the other Loan Documents, is not received in any case by the Lender within thirty (30) days of the date upon which such payment became due and payable; or

(b) If payment in full of the indebtedness evidenced by the Note and the other Loan Documents is not received on the Maturity Date (as defined in the Note); or

(c)  If a default occurs in the due observance or performance of any covenant, condition or agreement to be observed or performed by the Borrower: (i) pursuant to the terms of this Agreement (excluding those specified in subparagraphs (a) and (b) above, or (ii) pursuant to the terms of any of the other Loan Documents; or

(d)  If a default occurs with respect to any other indebtedness of Borrower or Guarantor if the effect of such default is to accelerate the maturity of such indebtedness or to permit the holder thereof to cause such indebtedness to become due prior to the stated maturity thereof; or

(e)  If any representation or warranty made by Borrower or Guarantor in this Agreement or in any other Loan Document, or any statement, certificate or other data furnished in connection with the Loan, proves at any time to be incorrect or inaccurate in any material respect as of the date made; or

(f)  If all or any material part of the Leased Property is taken by eminent domain or other proceedings; or

(g)  If all or any material part of the Property is demolished, removed or substantially altered without the prior written consent of the Lender (except as otherwise permitted in the Loan Documents); or

(h)  If Borrower or LBC fails to keep the Property insured as required hereunder whether or not Borrower has had notice thereof or an opportunity to cure; or

(i)  If any material portion of the Property is abandoned, destroyed or damaged by fire or other casualty and restoration of the affected portion of the Property is not timely proceeding; or

(j)  If the Borrower or LBC, as the case may be, shall lose, fail to keep in force, suffer the termination, suspension or revocation of or terminate, forfeit or suffer a material adverse amendment to the License at any time held by it which circumstances shall continue for a period of ten (10) days; or

(k)  If a judgment or judgments for the payment of $100,000.00 or more is entered against Borrower, LBC or Guarantor, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or

(l)  If any levy, seizure, trustee process, attachment, execution or similar process is issued or levied on the Property, the FCC License or any of Borrower's, LBC's or Guarantor's property; provided, however, that the issuance of any levy, seizure, trustee process, attachment, execution or similar process shall not entitle the Lender to exercise its right to accelerate repayment of the Loan if any such levy, seizure, trustee process, attachment, execution or similar

process is released or bonded within thirty (30) calendar days of service thereof; or

(m) If Borrower, LBC or Guarantor (i) applies for or consents to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its/his assets; (ii) is unable, or admits in writing its/his inability, to pay its/his debts as they become payable; (iii) files or permits the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, (iv) seeks or permits an assignment for the benefit of creditors or other arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its/his properties; or (v) takes any action to initiate any of the foregoing; or

(n) If an order, judgment or decree shall be entered, or a case shall be commenced against Borrower, LBC or Guarantor, without the application, approval or consent of Borrower, LBC or the Guarantor by or in any court of competent jurisdiction permitting the commencement of a case seeking reorganization or liquidation, and such involuntary order, judgment, decree or case shall continue unstayed and in effect for any period of forty-five (45) consecutive days; or

(o) If Borrower or LBC shall dissolve or liquidate, or be dissolved or liquidated, or cease to legally exist, or merge or consolidate, or be merged or consolidated with or into any Person; or

(p) If the Guarantor dies or becomes incapacitated (as such term is defined under the Social Security disability laws); provided, however, that the death or incapacity of the Guarantor shall not constitute an Event of Default if within 180 days following death or incapacity, a substitute Guarantor is provided that is acceptable to the Lender (in the Lender's reasonable discretion); or

(q) If Borrower fails to pay when due any other indebtedness or obligation to the Lender, whether contingent or otherwise, which failure continues beyond any applicable grace or cure periods; or

(r) If the nature of Borrower's or LBC's business changes in any material way so that it is no longer principally in the radio broadcasting business, or if any shares of Borrower or LBC are purchased, redeemed or otherwise acquired for value by any person other than Bradford C. Bleidt other than for the purpose of paying down indebtedness to the Lender; or

(s) If Borrower, LBC or Guarantor incurs, creates, assumes or suffers to exist any mortgage, pledge, charge or other encumbrance of any nature whatsoever on any of the Property, other than any security interest or pledges granted to Lender, or if Borrower or LBC sells, leases, transfers, pledges, encumbers or otherwise disposes of its accounts receivable or all or a substantial portion of its assets and Property, except in the ordinary course of business, and except to the Lender as provided in this Agreement and in the Loan Documents; or

- 23 -

(t) If the Borrower or LBC fails to comply in any material respect with any applicable provisions of the Communications Act of 1934, 47 C.F.R. Part 73 or any successor regulations or any other material applicable FCC regulation, or if the License held by the Borrower or LBC shall be terminated, cancelled or not renewed, or if the Borrower or LBC shall otherwise lose the ability to conduct its business, or if the Borrower or LBC shall fail to operate the Station; or

(u) if the Station ceases to broadcast or fails to continuously broadcast in a such a manner as to jeopardize the continuing status of the FCC License; or

(v) if the Guarantor terminates or attempt to terminate the Guaranty; or

(w) if there occurs any lapse or cancellation of any policy, or failure to pay premiums thereof of insurance otherwise required of Borrower or LBC, unless Borrower immediately provides evidence, satisfactory to Lender, of either reinstatement of coverage or replacement of coverage, without loss of coverage for any time after the time of said cancellation or lapse; or

(x) If Borrower and/or Guarantor fail to perform any other affirmative covenant, violate any other negative covenant or breach any other warranty set forth in this Agreement or any other Loan Document and such failure or breach continues for thirty (30) calendar days after written notice of such failure from the Lender; _provided_, _however_, that in no event shall any additional grace or cure period apply to an event of default based upon:   (A) the sale, transfer, encumbrance or conveyance of any portion of the Property (other than by permitted Lease or as otherwise permitted herein); or (B) a lapse in any required insurance coverage.

**7.2 REMEDIES.** Upon the occurrence of an Event of Default, the Lender may, at its option, (i) declare the then outstanding principal balance, all accrued but unpaid interest under the Note and all applicable late charges, default interest and other liabilities and obligations of Borrower to the Lender to be immediately due and payable, (ii) implement the accrual of interest at the Default Rate, and (iii) promptly pursue any and all rights and remedies available pursuant to the Loan Documents, at law or in equity, all without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind. All remedies provided Lender under this Loan Agreement, the Note and the Loan Documents in connection with the Loan evidenced by the Note or otherwise granted to Lender by operation of law, shall be cumulative and may be exercised singly or concurrently.

## SECTION 8.  MISCELLANEOUS

**8.1  WAIVERS.**     (a)  Borrower  and  Guarantor  hereby  waive presentment, demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.

(b)  With respect to this Agreement, the Note, the other Loan Documents and any collateral, whether real or personal, now or hereafter securing the Loan, Borrower and Guarantor assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of any collateral now or hereafter securing the Loan, to the addition or release of any Person primarily or secondarily liable under the Loan Documents, to the acceptance of partial payments thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Lender may deem advisable.  The Lender shall have no duty as to the collection or protection of any collateral now or hereafter securing the Loan or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.   The Lender may exercise its rights with respect to any collateral without resorting or regard to other collateral now or hereafter securing the Loan or sources of reimbursement for liability.  The Lender shall not be deemed to have waived any of its rights upon or under any Loan Document or any collateral now or hereafter securing the Loan unless such waiver is in writing and signed by the Lender.  No delay or omission on the part of the Lender in exercising any right shall operate as a waiver of such right or any other right.   A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of the Lender with respect to this Agreement, the Note, the other Loan Documents or any collateral now or hereafter securing the Loan, whether evidenced hereby or by any other instrument or document, shall be cumulative and may be exercised singularly or concurrently.

**(c)  THE  LENDER,  BORROWER  AND  GUARANTOR  KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER, BORROWER OR GUARANTOR IN RESPECT OF THIS AGREEMENT, THE NOTE, OR ANY OTHER LOAN DOCUMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER WRITTEN OR ORAL) OR ACTIONS OF EITHER PARTY.**

**8.2  NOTICES.**  All notices, requests or demands to or upon a party to this Agreement shall be given or made in writing, in person or by deposit in the mail, postage prepaid, certified mail, return receipt requested or by nationally recognized overnight delivery, addressed to the addressee at the address set forth above or to such other addresses as such addressee may have designated in writing to the other party hereto, and shall be deemed given upon receipt.

**8.3  ADDITIONAL DOCUMENTS.**  Borrower and Guarantor shall, from time to time, at their expense, execute and deliver to the Lender all such other and further reasonable and necessary instruments and documents and take or cause to be taken all such other and future reasonable and necessary action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**8.4  INDEMNIFICATION.**  Borrower and Guarantor hereby jointly and severally agree to defend, indemnify and hold harmless the Lender and his heirs, successors and assigns and each of them from and against any and all losses, claims, liabilities, asserted liabilities, costs and expenses, including, without limitation, costs of litigation and attorneys' fees (whether in-house or outside counsel), incurred in connection with any and all claims or proceedings, whether brought by private party or related to an action, proceeding or investigation instituted by any federal, state or local governmental agency related to any suspected or actual violation of any federal, state or local laws or regulations concerning public health, safety or the environment with respect to the Property, and the improvements thereon, for bodily injury, property damage, abatement or remediation, environmental damage or impairment or any other injury or damage (including all foreseeable and unforeseeable consequential damage) or any diminution in value of the Property, and the improvements thereon, resulting from or relating, directly or indirectly, to (i) the Release, threatened Release, existence, treatment, or removal of any Hazardous Substance on, into, from, through or under any portion of the Property (whether or not such Release was caused by Borrower, a Guarantor, a tenant, subtenant, prior owner or tenant or any other Person and whether or not the alleged liability is attributable to the handling, storage, generation, transportation or disposal of Hazardous Substances or the mere presence of such Hazardous Substances), (ii) the breach or alleged breach of any such law or regulation by Borrower or Guarantor, (iii) the failure of Borrower to comply with its duties, obligations, covenants and agreements set forth in **Section 5 and 6** of this Agreement, or (iv) the discovery of any material misrepresentation by Borrower or Guarantor under **Section 3** of this Agreement.

**THE DUTIES, OBLIGATIONS, COVENANTS AND AGREEMENT OF BORROWER AND GUARANTOR UNDER THIS SECTION 8.4 SHALL SURVIVE THE PAYMENT IN FULL OF THE NOTE, THE TERMINATION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ASSIGNMENT OF THE NOTE AND LOAN DOCUMENTS BY THE LENDER.**

**8.5  APPLICABLE LAW.**  This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder shall be construed and interpreted in accordance with the laws of The Commonwealth of Massachusetts.  Borrower and Guarantor agree that the execution of this Agreement and the other Loan Documents and performance of their duties and obligations under this Agreement and the other Loan Documents shall be deemed to have a situs in Massachusetts, and Borrower and Guarantor shall be subject to the personal jurisdiction of the courts of The Commonwealth of Massachusetts with respect to any action the Lender or his successors or assigns may commence under this Agreement or under

the other Loan Documents.  Accordingly, Borrower and Guarantor hereby specifically and irrevocably consent to the jurisdiction of the courts of The Commonwealth of Massachusetts with respect to all matters concerning this Agreement, the Note, the other Loan Documents or the enforcement of any of the foregoing and to the service of process by U.S certified or registered mail, return receipt requested, addressed to the Borrower and Guarantor at the address set forth above.

**8.6  SEVERABILITY.**  If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected.

**8.7  INTEGRATION; CONFLICTS; MODIFICATIONS.**  (a) This Agreement and the other Loan Documents are intended by the parties as a final, complete and exclusive statement of the transaction contemplated and evidenced by this Agreement and the other Loan Documents.

(b)  In the event of a conflict in the provisions of this Agreement with those in any other Loan Documents (other than the Note), the provisions of this Agreement shall govern.  In the event of a conflict in the provisions of this Agreement with those in the Note, the provisions of the Note shall govern.

(c)  No modification or amendment of this Agreement, the Note or any other Loan Documents shall be effective unless the same shall be in writing and signed by the parties hereto.

**8.8  ASSIGNMENTS.**  Neither Borrower nor the Guarantor may assign any of its/his duties or obligations under this Agreement or under any other Loan Documents without the prior written consent of the Lender (which consent may be withheld by the Lender in his sole discretion). The Lender may, with thirty (30) days prior notice to Borrower, sell, assign, grant a participation in or otherwise dispose of all or any portion of the Note, this Agreement and the other Loan Documents.  In connection therewith, the Lender may disclose to a prospective purchaser, assignee, participant or transferee any information possessed by the Lender relating to the Loan and the collateral securing the Loan.

**8.9  SURVIVAL OF WARRANTIES.**  This Agreement and all covenants, agreements, representations and warranties made herein shall survive the making by the Lender of the Loan hereunder and the execution by Borrower and delivery to the Lender of the Note, and shall continue in full force and effect so long as the Note is outstanding and unpaid.

**8.10  REIMBURSEMENT OF LENDER'S EXPENSES.**  The Borrower will reimburse the Lender upon demand for all out-of-pocket costs, filing fees, recording fees, charges, liabilities, and any other out-of-pocket expenses of the Lender including reasonable fees and disbursements of counsel to the Lender in connection with (i) any enforcement of the provisions of the Note, this Agreement or any of the other Loan Documents, (ii) any proceedings with respect to the bankruptcy,

reorganization, insolvency, readjustment of indebtedness, dissolution or liquidation of the Borrower or LBC or any other party to any of the Loan Documents; and (iii) any claims by third parties relating to the foregoing.

**8.11 WAIVER AND AMENDMENTS.** No modification or waiver of any provisions of this Agreement, the Note, or the other Loan Documents, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. No notice to or demand of the Borrower, in any case, shall entitle the Borrower to any other or future notice or demand in the same, similar or other circumstances except to the extent provided herein.

**8.12 NO IMPLIED WAIVERS.** Neither any failure nor delay on the part of the Lender in exercising any right, power or privilege hereunder, or under the Note, this Agreement or under any other Loan Documents or any other instrument given as security for any obligations shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or future exercise, or the exercise of any other right, power or privilege.

**8.13 FCC MATTERS.** The Lender will not take any action under this Agreement or the Security Documents if such action would require the consent of the FCC, unless such consent is first obtained. The Borrower, LBC and Guarantor will cooperate with and assist the Lender in obtaining any such approvals of the FCC.

**8.14 HEADINGS.** Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**8.15 SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and shall inure to the benefit of Borrower, Guarantor, the Lender and their respective permitted successors, assigns, heirs and executors.

**8.16 TIME IS OF THE ESSENCE**. Time is of the essence in this Agreement and in each Loan Document.

**8.17 COUNTERPARTS; SEALED INSTRUMENT.** This Loan Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument. This Loan Agreement is intended to take effect as a sealed instrument.

**8.18 OTHER TERMS.** The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless expressly provided otherwise.

**8.19 SCHEDULES**.  **Schedule A** and **Schedule B** are attached hereto and shall constitute a part of this Agreement.

**8.20 WAIVER OF RIGHTS UNDER P&S AGREEMENT.**  Notwithstanding any provisions to the contrary contained in the P & S Agreement, in the Event of Default by Borrower and irrespective of Lender's exercise of its rights under either or both of the Pledge Agreements or the Security Agreements, the Guarantor shall only have a right to any excess proceeds upon any subsequent sale by Lender of the assets or stock of Borrower and/or LBC which exceed the Liabilities as such term is defined in the Promissory Note between Lender and Borrower.

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed as a sealed instrument as of the day and year first above written.

**LENDER**

_____     _____
Witness                     Alexander G. Langer

**BORROWER**

PERSPECTIVES BROADCASTING, INC.

_____     By: _____
Witness                     Bradford C. Bleidt, President

**GUARANTOR**

_____     _____
Witness                     Bradford C. Bleidt, individually

LL040110

- 29 -

## SCHEDULE A

## LIST OF FINANCIAL STATEMENTS

<u>Name</u>:                        <u>Financial Statement Date</u>:

Bradford C. Bleidt

LL040110

**SCHEDULE B**

**LEASE/TENANCY AT WILL ARRANGEMENTS**

1.  Tenancy at will arrangement with Tower Sites, Limited as Landlord for Ashland, MA site located off Pond Street, Ashland, MA

2.  Towers Lease Agreement with Clear Channel, successor-in-interest to Fairbanks Communications, Inc. located at 100 Mt. Wayte Avenue, Framingham, MA.

3.  Sub-Tenancy at will lease for broadcasting studio and office space at 164 Canal Street, Suite 400, Boston, MA 02114 with Shared Visions, Inc., as Sub-Landlord.

LL040110

# EXHIBIT B

# FIRST AMENDMENT
## TO
## LOAN AGREEMENT

This First Amendment ("First Amendment") To Loan Agreement, dated as of January 1Ʒ, 2004, is entered into by and between **ALEXANDER G. LANGER** of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (the "Lender"), **PERSPECTIVES BROADCASTING, INC.**, a Massachusetts corporation having an office at 164 Canal Street, Suite 400, Boston, Massachusetts 02114 ("Borrower") and **BRADFORD C. BLEIDT** of 8 Norton's Point, Gloucester, Massachusetts 01944 (the "Guarantor"). Unless otherwise defined elsewhere in this First Amendment, defined terms have the respective meanings ascribed in **SECTION 1** of the Loan Agreement.

## PRELIMINARY STATEMENT

The parties hereto have entered into a Loan Agreement as of the date hereof in connection with the sale by Lender of all of the issued and outstanding shares of stock of LBC, as Borrower. In connection with the closing on such sale, Borrower will only tender an initial cash payment $1,300,000, rather than $2,000,000 as contemplated under the Loan Agreement, thereby increasing the amount of the Loan from $6,618,000 to $7,318,000.

Accordingly, the parties hereto agree that the Loan Agreement is hereby revised as follows:

1.    **Section 1**.    **DEFINITIONS**.    The defined term "Loan" means a loan by Lender to Borrower and guaranteed by Guarantor in the amount of $7,318,000, to be evidenced by the Note as modified by the First Amendment thereto.

2.    **Section 1**. **DEFINITIONS**.    The defined term "Note" means the Promissory Note, as amended by the First Amendment thereto, executed by Borrower and payable to the Lender or order, each dated the date of the Closing and in the amount of the Loan, as the Note, as amended by the First Amendment thereto, may be extended, renewed, further modified or replaced from time to time.

3.    In all other respects, the terms and provisions of the Loan Agreement, as modified by this First Amendment, are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to Loan Agreement to be duly executed as a sealed instrument as of the day and year first above written.

---
Witness

**LENDER**

---
Alexander C. Langer

**BORROWER**

PERSPECTIVES BROADCASTING, INC.

---
Witness

By: _____
Bradford C. Bleidt, President

- 2 -

_____
Witness

LL040430

GUARANTOR

_____
Bradford C. Bleidt, individually

# EXHIBIT C

PROMISSORY NOTE
OF
PERSPECTIVES BROADCASTING, INC.

1.    **DEFINED TERMS.**  As used in this Promissory Note (the "Note"), the following terms shall have the following meanings:

    1.1  **Borrower:**       Perspectives Broadcasting, Inc.
                            164 Canal Street, Suite 400
                            Boston, MA 02114

    1.2  **Lender:**         Alexander G. Langer
                            94 St. Rose Street
                            Jamaica Plain, MA 02130

    1.3  **Loan Amount:**    Six Million Six Hundred Eighteen Thousand ($6,618,000) Dollars

    1.4  **Interest Rate:** Seven (7%) percent per annum.

    1.6  **Maturity Date:** January 13, 2007

    1.7  **Loan Agreement:**  a certain Loan Agreement of even date herewith by and between Borrower, Guarantor and Lender. All capitalized terms used herein and not otherwise defined herein shall have the respective meanings as set forth in the Loan Agreement.

    1.8  **Loan, Loan Documents and Event of Default** shall have the same meanings as in the Loan Agreement.  The Loan Documents are incorporated herein by reference.

    1.09 **Guarantor:**  Bradford C. Bleidt, individually

2.    **DEBT:** For value received, Borrower hereby promises to pay to the order of Lender the Loan Amount, together with interest on all unpaid balances from the date of this Note at the rate of seven (7%) percent per annum, together with all other amounts due hereunder or under the Loan Documents.

3.    **PAYMENTS:** Interest on the unpaid principal balance shall be payable monthly in arrears commencing on February 13, 2004 at the rate of seven (7%) percent per annum.  The first principal payment in the amount of One Million Dollars ($1,000,000) shall be due on April 1, 2004, together with accrued interest thereon.  The second principal payment in the amount of One Million ($1,000,000) Dollars shall be due on January 13, 2005, together with accrued interest thereon.  The third principal payment in the amount of Two Million ($2,000,000) Dollars shall be payable on January 13, 2006, together with accrued interest thereon.  The final principal payment in the amount of Two Million Six Hundred Eighteen Thousand ($2,618,000)

Dollars shall be due on January 13, 2007, being the Maturity Date, together with all interest accrued thereon.

On the Maturity Date, as the same may be extended by Lender, or on such earlier date as may be required under the terms of this Note or any of the Loan Documents, Borrower shall pay to Lender the entire then unpaid balance of principal and accrued interest.

Any payments on this Note, whether such payment is of a regular installment or represents a prepayment, shall be made in currency of the United States of America which is legal tender for the payment of public and private debts, in immediately available funds, to Lender at Lender's address set forth in Section 1.2 above or at such other address as Lender may from time to time designate in writing.

4.  **DEFAULT INTEREST:** If any payment due hereunder or under any of the other Loan Documents is not paid within thirty (30) days when due, either at stated or accelerated maturity or pursuant to any of the terms hereof, then and in such event, Borrower shall, in addition to any other payment due hereunder, pay interest thereon from and after the date on which such payment first becomes due at an annual interest rate equal to the lesser of a) the Interest Rate plus four percent (4%), or b) the maximum rate permitted by law, and such interest shall be due and payable, on demand, at such rate until the entire amount past due is paid to Lender, whether or not any action shall have been taken or proceeding commenced to recover the same under the Loan Documents. Nothing in this Section 4 or in any other provision of this Note shall constitute an extension of the time of payment of the indebtedness hereunder. Any cure period provided for hereunder or under the other Loan Documents (without implying the existence of such cure period) shall not affect Lender's right to collect interest at the default rate specified above for the period prior to the cure of such default, as applicable.

5.  **DELINQUENCY CHARGES:** If Borrower fails to pay any amount of principal, interest or other charge due under this Note for thirty (30) days after such payment becomes due or fails to pay the principal amount due on this Note on the Maturity Date, whether by acceleration or otherwise, Lender may, at its option, within a reasonable time thereafter, impose a delinquency or "late" charge equal to five percent (5%) of the amount of such past due payment notwithstanding the date on which such payment is actually paid in full, and the amount thereof shall be secured by the collateral held by Lender to

- 2 -



secure such indebtedness.  Borrower agrees that any such delinquency charges shall not be deemed to be additional interest or penalty, but shall be deemed to be liquidated damages because of the difficulty in computing the actual amount of damages in advance.  Any cure period provided for hereunder or under the other Loan Documents (without implying the existence of such cure period) shall not affect Lender's right to impose the delinquency charges specified above for the period prior to the cure of such default, as applicable.

6.    **COSTS AND EXPENSES UPON DEFAULT:** After default, in addition to principal, interest and delinquency charges, Lender shall be entitled to collect all costs of collection, including, but not limited to, reasonable attorneys' fees and expenses, incurred in connection with the protection or realization of collateral or in connection with any of Lender's collection efforts, whether or not suit on this Note or any foreclosure proceeding is filed, and all such costs and expenses shall be payable on demand and until paid shall also be secured by the collateral held by Lender as security for Borrower's obligations to Lender.

7.    **APPLICATION OF PAYMENTS:** Unless an Event of Default has occurred, all payments hereunder shall be applied first to delinquency charges, costs of collection and enforcement and other similar amounts due, if any, under this Note and under the other Loan Documents, then to interest which is due and payable under this Note and the remainder, if any, to principal due and payable under this Note.  If an Event of Default has occurred, such payments may be applied to sums due under this Note or under the other Loan Documents in any order and combination that Lender may, in its sole and absolute discretion, determine.    Lender is authorized, but not required, to charge principal and interest due under this Note and all other amounts due hereunder to any account of Borrower when and as such interest and principal and such other amounts become due.

8.    **PERMITTED PREPAYMENT:** The Borrower shall have the right to prepay the Loan in whole or in part, at any time, and from time to time without premium or penalty, together with all delinquency charges and any other amounts which may be due hereunder or under any of the Loan Documents.

9.    **COSTS; ILLEGALITY OF LOAN:** In addition to principal, interest and delinquency charges, Borrower shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and all expenses and disbursements of counsel, in

- 3 -



connection with the protection, realization or enforcement of any of Lender's rights against Borrower and against any collateral given Lender to secure this Note or any other liabilities of Borrower to Lender (whether or not suit or foreclosure is instituted by or against Lender).

Borrower hereby agrees to pay to Lender on demand: (a) all costs and expenses of Lender in connection with, and any stamp or other taxes or charges (including filing fees) payable with respect to, this Note and the enforcement hereof; and (b) any amount necessary to compensate Lender for any losses or costs (including funding costs) sustained by Lender as a consequence of any default by Borrower hereunder.

10. **UNCONDITIONAL LIABILITY:**  Borrower and all endorsers and guarantors agree that the liability of each of them shall be unconditional without regard to the liability of any other party and shall not be in any manner affected by an indulgence, extension of time, renewal, waiver, or modification granted by Lender with respect to the payment or other provisions of this Note, and each agrees to the release of all or any part of the collateral with or without substitution and agrees that makers, endorsers, and guarantors may be released from their obligations or may become parties hereto without notice to them and without affecting their liability hereunder.

11. **WAIVERS:** Borrower irrevocably waives presentment for payment, demand, notice of nonpayment, notice of intention to accelerate the maturity of this Note, diligence in collection, commencement of suit against any obligor, notice of protest, and protest of this Note and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, before or after the maturity of this Note, with or without notice to Borrower, and agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Lender.  Borrower consents to any and all extensions of time, renewals, waivers or modifications that may be granted by Lender with respect to the payment or other provisions of this Note, and to any substitution, exchange or release of the collateral for this Note, or any part thereof, with or without substitution of said collateral, and agrees to the addition or release of any guarantor, all whether primarily or secondarily liable, before or after maturity of this Note, with or without notice to Borrower, and without affecting Borrower's liability under this Note.  Any delay on the part of Lender in exercising any

- 4 -



right under this Note shall not operate as a waiver of any such right, and any waiver granted or consented to on one occasion shall not operate as a waiver in the event of any subsequent default.

BORROWER HEREBY SEVERALLY AND IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDINGS HEREAFTER INSTITUTED BY OR AGAINST BORROWER OR ANY GUARANTOR IN RESPECT OF THIS NOTE OR ARISING OUT OF ANY DOCUMENT, INSTRUMENT OR AGREEMENT EVIDENCING, GOVERNING OR SECURING THIS NOTE, INCLUDING ALL LOAN DOCUMENTS.

12. **NO USURY:** Lender and Borrower intend to comply at all times with applicable usury laws. If at any time such laws would ever render usurious any amounts called for under this Note or the other Loan Documents, then it is Borrower's and Lender's express intention that Borrower shall not be required to pay interest on this Note at a rate in excess of the maximum lawful rate, that the provisions of this Section 12 shall control over all other provisions of this Note and the Loan Documents which may be in apparent conflict herewith, that such excess amount shall be credited to the principal balance of this Note (or, if this Note has been fully paid, refunded by Lender to Borrower), and the provisions hereof shall be reformed and the amounts thereafter collectible under this Note reduced, without the necessity of the execution of any further documents, so as to comply with the then applicable law, but so as to permit the recovery by Lender of the fullest amount otherwise called for under this Note. Any such crediting or refund shall not cure or waive any default by Borrower under this Note or the other Loan Documents. If at any time following any reduction in the interest rate payable by Borrower there remains unpaid any principal amount under this Note and the maximum interest rate allowed by applicable law is increased or eliminated, then the interest rate payable under this Note shall be readjusted, to the extent not prohibited by applicable law, so that the dollar amount of interest payable hereunder shall be equal to the dollar amount of interest which would have been paid by Borrower without giving effect to the reduction in interest resulting from compliance with applicable usury laws. Borrower agrees that in determining whether or not any interest payable under this Note or the other Loan Documents exceeds the highest rate allowed by law, any non-principal payment (except payments specifically stated in this Note or in the other Loan Documents to be "interest"), including, without limitation, prepayment fees and delinquency charges, shall, to the maximum extent allowed by law, be an expense, fee or premium rather

- 5 -



than interest. The term "applicable law" as used in this Note shall mean the laws of The Commonwealth of Massachusetts, the state in which the Premises is located (if other than The Commonwealth of Massachusetts) or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

13.    **ACCELERATION AND OTHER REMEDIES:** If:

(a)  Borrower fails to pay any monthly installment of interest due on this Note within thirty (30) days of the due date; or

(b)  Borrower fails to pay any installment of principal under the Note (other than the final payment due on the Maturity Date) within thirty (30) days of the due date; or

(c)  an "Event of Default", as said term is hereinafter defined or as defined in the Loan Agreement or any other Loan Document, subject to any applicable cure period, occurs;

then, and in any such event, Lender may, at its option, declare the entire unpaid balance of this Note together with interest accrued thereon, to be immediately due and payable and Lender may proceed to exercise any rights or remedies that it may have under this Note, the Loan Agreement, the Mortgages, the other Loan Documents or such other rights and remedies which Lender may have at law, equity or otherwise.

An Event of Default shall include in addition to (a) and (b) above relating to failure to pay any sum due on this Note within thirty (30) days of the due date and in addition to any Events of Default as set forth in the Loan Agreement, the following:  an occurrence of an Event of Default under the Loan Documents of even date including the Loan Agreement or any Event of Default under a Pledge Agreement or under a Security Agreement, each between Lender and Borrower or under a Pledge Agreement or under a Security Agreement, each between Lender and Borrower's wholly owned subsidiary, Langer Broadcasting Corp.; subject, however, to any applicable cure period.

14.    **JOINT AND SEVERAL LIABILITY:** The liabilities of Borrower and any guarantor of this Note are joint and several; <u>provided</u>, <u>however</u>, the release by Lender of Borrower shall not release any other person obligated on account of this Note. Each reference in the within Note to Borrower and any guarantor is

- 6 -



to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated unless and until all liabilities to Lender from the person from whom contribution is sought have been satisfied in full.

15. **SUCCESSORS AND ASSIGNS:** This Note shall be binding upon Borrower and every guarantor hereof and upon their respective heirs, successors, assigns and representatives, and shall inure to the benefit of Lender and its successors, endorsees, and assigns.

16. **SECURITY:** This Note is secured by (i) a pledge of stock of Langer Broadcasting Corp., a Florida corporation pursuant to a Pledge Agreement of even date, (ii) a pledge of stock of Perspectives Broadcasting, Inc., a Massachusetts corporation pursuant to a separate Pledge Agreement of even date, and (iii) a security interest in the assets of Perspectives Broadcasting, Inc. pursuant to a Security Agreement of even date, (iv) a security interest in the assets of Langer Broadcasting Corp. pursuant to a separate Security Agreement of even date and (iv) the other Loan Documents, and all amendments, modifications, supplements, substitutions, additions, renewals, replacements and extensions thereof. Any and all deposits or other sums at any time credited by or due from Lender to Borrower or to any guarantor of this Note, and any cash, securities, instruments, or other property of Borrower which now or hereafter are at any time in the possession or control of Lender, constitute additional security to Lender for the liabilities of Borrower to Lender including, without limitation, the liability evidenced hereby, and may be applied or set off by Lender against such liabilities at any time from and after an Event of Default hereunder whether or not other collateral is available to Lender.

17. **COLLECTION:** Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by Lender and handled by collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender and applied to this indebtedness in the manner elsewhere herein provided.

18. **AMENDMENTS:** This Note may be changed, waived or amended only by an agreement in writing signed by the party against whom enforcement of the change, waiver or termination is sought.

- 7 -



19. **GOVERNING LAW; SUBMISSION TO JURISDICTION:** This Note is given to evidence debt for business or commercial purposes, is being delivered to Lender at its principal place of business in The Commonwealth of Massachusetts and shall be governed by and construed under the laws of said Commonwealth. Borrower hereby submits to personal jurisdiction in said Commonwealth for the enforcement of Borrower's obligations hereunder, and under the other Loan Documents, and waives any and all personal rights under the law of any other state to object to jurisdiction within such Commonwealth for the purposes of litigation to enforce such obligations of Borrower. In the event such litigation is commenced, Borrower agrees that service of process may be made, and personal jurisdiction over Borrower obtained, by service of a copy of the summons, complaint and other pleadings required to commence such litigation upon Borrower, at Borrower's address set forth in Section 1.1 above.

20. **WAIVER OF TRIAL WITHOUT JURY:** Borrower hereby expressly WAIVES ANY RIGHT TO TRIAL BY JURY of any claim, demand, action or cause of action: (i) arising under this Note or any other instrument, document or agreement executed or delivered in connection herewith; or (ii) in any way connected with or incidental to the dealings of the Borrower, the Guarantor or the Lender or any of them with respect to this Note or any other instrument, document or agreement executed or delivered in connection herewith or the transactions related hereto or thereto, in each case regardless of whether the claim, demand, action or cause of action: (x) is now existing or hereafter arises; and (y) is brought in contract or tort or otherwise; AND THE GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT THE LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE GUARANTOR TO THE WAIVER OF HIS RIGHT TO A TRIAL BY JURY.

21. **CAPTIONS:** All paragraph and subparagraph captions are for convenience of reference only and shall not affect the construction of any provision herein.

22. **SEVERABILITY:** The invalidity of any provision of this Note shall in no way affect the validity of any other provision.

23. **NOTICES:** All notices given hereunder shall be in writing and shall be deemed received at the earlier of when delivered in

- 8 -



hand or seventy-two (72) hours after the same have been deposited in the United States mails, postage prepaid, certified or registered mail, return receipt requested, addressed to the Borrower and Lender at their addresses appearing on the first page hereof, or to such other address or addresses as the parties may from time to time specify by notice so given.

IN WITNESS WHEREOF, this Note has been executed and delivered under seal as of  this 13th day of January, 2004.

PERSPECTIVES BROADCASTING, INC.

By: _____
Bradford C. Bleidt, President

_____
Witness

LL040173

– 9 –

# EXHIBIT D

**FIRST AMENDMENT**
**TO**
**PROMISSORY NOTE**
**OF**
**PERSPECTIVES BROADCASTING, INC.**

Reference is made to a Promissory Note of Perspectives Broadcasting, Inc. dated the date hereof, as Borrower, in favor of Alexander G. Langer, as Lender (the "Promissory Note"). The terms and provisions of the Promissory Note are hereby modified as set forth below. Defined terms, not otherwise modified herein, shall have the respective meanings set forth in the Promissory Note.

1.    The Defined Term, Section 1.3 **Loan Amount,** shall mean Seven Million Three Hundred Eighteen Thousand ($7,318,000) Dollars.

2.    The Defined Term, Section 1.7 **Loan Agreement** shall mean a certain Loan Agreement, as modified by a First Amendment thereto, each of even date herewith, by and between Borrower, Guarantor and Lender.

3.    **PAYMENTS is modified as follows:** Interest on the unpaid principal balance shall be payable monthly in arrears commencing on February 13, 2004 at the rate of seven (7%) percent per annum. The first principal payment in the amount of Seven Hundred Thousand ($700,000) Dollars shall be due on February 13, 2004, together with accrued interest thereon. The second principal payment in the amount of One Million ($1,000,000) Dollars shall be due on April 1, 2004, together with accrued interest thereon. The third principal payment in the amount of One Million ($1,000,000) Dollars shall be due on January 13, 2005, together with accrued interest thereon. The fourth principal payment in the amount of Two Million ($2,000,000) Dollars shall be payable on January 13, 2006, together with accrued interest thereon. The final principal payment in the amount of Two Million Six Hundred Eighteen Thousand ($2,618,000) Dollars shall be due on January 13, 2007, being the Maturity Date, together with all interest accrued thereon.

On the Maturity Date, as the same may be extended by Lender, or on such earlier date as may be required under the terms of the Note as modified by this First Amendment thereto or any of the Loan Documents, Borrower shall pay to Lender the entire then unpaid balance of principal and accrued interest.

Any payments on the Note, as modified by this First Amendment thereto, whether such payment is of a regular installment or represents a prepayment, shall be made in currency of the United States of America which is legal tender for the payment of public and private debts, in immediately available funds,

to Lender at Lender's address set forth in Section 1.2 of the Promissory Note or at such other address as Lender may from time to time designate in writing.

4.   All other terms and provisions of the Promissory Note, as modified by this First Amendment, are hereby ratified and confirmed.

IN WITNESS WHEREOF, this First Amendment to Promissory Note has been executed and delivered under seal as of this 13ᵗʰ day of January, 2004.

PERSPECTIVES BROADCASTING, INC.

By: _____
Bradford C. Bleidt, President

_____
Witness

LL040432

- 2 -

# EXHIBIT E

**PBI SECURITY AGREEMENT**

---

DATE: December ⅟, 2003

    1.   To secure the prompt, punctual, and faithful performance of all and each of the Liabilities (as that term is defined herein) of the undersigned (hereinafter, the "Pledgor") to Alexander G. Langer of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (hereinafter, the "Lender"), the Pledgor hereby grants to the Lender a security interest in and to, and assigns, pledges, and delivers to the Lender the following property, and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits and distributions in kind or cash) in respect thereto, and all books, records, and papers relating to the foregoing (all of which is referred to hereinafter as the "Collateral"):

    All of the Pledgor's right, title, and interest in Pledgor's Accounts, Accounts Receivable, General Intangibles, Contract Rights, Chattel Paper, Instruments, Equipment, Fixtures and Licenses, including without limitation all licenses, permits, construction permits and contracts used by the Pledgor in connection with the operation of Radio Station, WBIX 1060 AM or its successor, excepting only the license issued by the FCC to the extent that a transfer or assignment hereof or a lien thereon would cause or permit the imposition of a sanction by the FCC including loss or revocation thereof, but including, to the maximum extend permitted by law, all rights, incident or appurtenant to such FCC License, including, without limitation any renewal expectation and further including without limitation, the right to receive all proceeds derived or arising from or in connection with sale, assignment, transfer, or other disposition of such license, authorization or permit, all of the foregoing now held or in which the Pledgor has an interest, or hereafter acquired or in which the Pledgor obtains an interest, and all books, records, electronically stored data and information relating to the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and electronically stored data are stored, recorded, and maintained.

Proceeds (and the Collateral) include, without limitation, any investment, instrument, security, certificate of deposit, or other asset purchased from time to time with the proceeds of any of the foregoing (or with the proceeds thereof) including: any into which any of the foregoing (or such proceeds) is "rolled" or "turned over"; any cash received on account of any of the foregoing; and any deposit or other account to the extent that any proceeds of any of the foregoing is deposited therein.

    2.   The Pledgor represents that the Collateral is held and owned by the Pledgor free and clear of all liens, encumbrances,

- 1 -

attachments, security interests, pledges, and charges, and if the Collateral is securities, is fully paid for and nonassessable.

3.    The Pledgor shall:

(a)  execute all such instruments, documents, and papers, and will do all such acts as the Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of stop transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notifications in connection with book entry securities or general intangibles, and the providing of instructions to the issuers of uncertificated securities, and will do all such other acts as the Lender may request with respect to the perfection and protection of the security interest granted herein and the assignment effected hereby;

(b)  keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges;

(c)  deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral, including, without limitation, all cash or in-kind dividends and/or distributions and all certificates, whether now existing or hereafter received as a result of any dividends, splits, or other transactions;

(d)  upon the request of the Lender, cause the issuer of any uncertificated securities comprising any of the Collateral to issue certificates with respect thereto;

(e)  upon the request of the Lender, cause certificated securities comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(f)  not cause or permit any of the Collateral presently evidenced by written certificates to be converted to uncertificated securities;

(g)  not exercise any right with respect to the Collateral which would dilute or adversely affect the Lender's rights in the Collateral;

(h)  not file any affidavit for replacement of lost stock certificates or bonds; and

(i)  not vote the Collateral in favor of or consent to any resolution which might:

(i)  impose any restrictions upon the sale, transfer, or disposition of the Collateral; or

(ii) result in the issuance of any additional shares of stock of any class; or

(iii) vest additional powers, privileges, or priorities

- 2 -

to any other class of stock.

4. Upon the occurrence of any one or more of the following events of default (herein, "Events of Default"), any and all Liabilities of the Pledgor to the Lender shall become immediately due and payable at the option of the Lender and without notice or demand, in addition to which the Lender may exercise the Lender's rights and remedies upon default:

(a) the failure by the Pledgor to pay upon demand (or when due, if not payable on demand) any of the Liabilities, subject to any applicable grace period;

(b) the failure by the Pledgor to promptly, punctually, and faithfully perform, discharge, or comply with any Liability, subject to any applicable grace period; or

(c) the occurrence of any event of default under any agreement between the Lender and the Pledgor, or between the Lender and Pledgor's wholly owned subsidiary, Langer Broadcasting Corp. ("LBC") or between the Lender and Bradford C. Bleidt, including a Loan Agreement of even date among Lender, Pledgor, LBC and Bradford C. Bleidt, a Pledge Agreement of even date between Lender and LBC, a Security Agreement of even date between Lender and Pledgor and a Security Agreement of even date between Lender and LBC (notwithstanding that the Lender may not have exercised its rights upon default under any such other agreement);

The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between the Lender and the Pledgor and instruments and papers given the Lender by the Pledgor, whether now existing or hereafter arising.

5. Upon the occurrence of any Event of Default, and at any time thereafter the Lender shall have all of the rights and remedies of a secured party upon default under the Uniform Commercial Code as adopted in Massachusetts, in addition to which the Lender may sell or otherwise dispose of the Collateral and/or enforce and collect the Collateral (including, without limitation, the liquidation of debt instruments or securities and the exercise of conversion rights with respect to convertible securities, whether or not such instruments or securities have matured and whether or not any penalties or other charges are imposed on account of such action), for application toward (but not necessarily in complete satisfaction of) the Liabilities. The Pledgor shall remain liable to the Lender for any deficiency remaining following such application. Unless the Collateral is perishable, threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall give the Pledgor such notice as may be practicable under the circumstances), the Lender shall give the Pledgor at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time and place of any public sale thereof or of the time after which any private sale or any other intended disposition is to be made. The Pledgor acknowledges that

any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive, or order of any federal, state, municipal, or other governmental authority, including, without limitation, any of the foregoing restricting the sale of securities. The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to this Agreement shall be applied toward the Liabilities in such order and manner as the Lender determines in its sole discretion, any statute, custom, or usage to the contrary notwithstanding.

6.    The Pledgor hereby designates the Lender as and for the attorney-in-fact of the Pledgor to: endorse in favor of the Lender any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender may, from time to time, determine; cause the issuance of certificates for book entry and/or uncertificated securities; renew, extend, or roll over any Collateral; and following the occurrence of an Event of Default make demand and initiate actions to enforce any of the Collateral. The Lender may take such action with respect to the Collateral as the Lender may reasonably determine to be necessary to protect and preserve its interest in the Collateral. The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges, and discretions of the Pledgor with respect to and under the Collateral; provided, however, the Lender shall have no right to exercise any voting rights available to holders of the Collateral at any time the Collateral is held by the Lender solely as pledgee hereunder, and whether or not an Event of Default has occurred. Except as otherwise expressly provided herein, all of the rights, remedies, powers, privileges and discretions included in this Paragraph 6, may be exercised by the Lender whether or not any of the Liabilities are then due and whether or not an Event of Default has occurred. The within designation, being coupled with an interest, is irrevocable until the within instrument is terminated by a written instrument executed by a duly authorized officer of the Lender. The within power of attorney shall not be affected by subsequent disability or incapacity of the Pledgor. The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act of omission to act which is in actual bad faith.

7.    The rights, remedies, powers, privileges, and discretions of the Lender hereunder (hereinafter, the "Lender's Rights and Remedies") shall be cumulative and not exclusive of any rights, remedies, powers, privileges or discretions which it otherwise may have. No delay or omission by the Lender in exercising or enforcing any of the Lender's Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Lender of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Lender's Rights and Remedies and no other agreement or transaction of whatever nature entered into between the Lender and the Pledgor at any time shall preclude any other exercise of the Lender's Rights and Remedies. No waiver by the Lender of any of the Lender's Rights and Remedies on any one occasion shall be deemed a waiver on any

- 4 -

subsequent occasion, nor shall it be deemed a continuing waiver. All of the Lender's Rights and Remedies and all of the Lender's rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative and not alternative or exclusive and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

    8.    As used herein, the following terms have the following meanings:

    (a)  "Liability" and "Liabilities" include, without limitation, any and all liabilities, debts, and obligations of the Pledgor to the Lender and any and all liabilities, debts, all obligations of every endorser, guarantor, and surety of the Pledgor to the Lender, each of every kind, nature and description now existing or hereafter arising, whether under this Agreement or otherwise. "Liabilities" also includes, without limitation, each obligation to repay all loans, advances, indebtedness, notes, obligations, overdrafts, and amounts now or hereafter at any time owing by the Pledgor to the Lender (including all future advances or the like whether or not given pursuant to a commitment by the Lender), whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against the Pledgor. "Liabilities" also includes, without limitation, all notes and other obligations of the Pledgor now or hereafter assigned to or held by the Lender, each of every kind, nature, and description. "Liabilities" also includes, without limitation, all interest and other amounts which may be charged to the Pledgor and/or which may be due from the Pledgor to the Lender from time to time; and all costs and expenses incurred or paid by the Lender in respect of this and any other agreement between the Pledgor and the Lender or instrument furnished by the Pledgor to the Lender (including, without limitation, Costs of Collection, attorneys' reasonable fees, and all court and litigation costs and expenses). "Liabilities" also includes, without limitation, any and all obligations of the Pledgor to act or refrain from acting in accordance with the terms, provisions, and covenants of this Agreement and of any other agreement between the Pledgor and the Lender or instrument furnished by the Pledgor to the Lender. As used herein the term "indirect" includes, without limitation, all obligations and liabilities which the Lender may incur or become liable for, on account of, or as a result of any transactions between the Lender and the Pledgor; any which may arise out of any action brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities of the Pledgor, or by any other person in connection with the Liabilities; and any obligation of the Pledgor which may arise as endorser or guarantor of any third party, or as obligor to any third party which obligation has been endorsed, participated, or assigned to the Lender. The term "indirect" also refers to any direct or contingent liability of the Pledgor to make payment towards any obligation held by the Lender to the extent so held by the Lender. The Lender's books and records shall be prima facie evidence of the Pledgor's indebtedness to the Lender.

(b) "Costs of Collection" includes, without limitation, all attorneys' reasonable fees, and out-of-pocket expenses incurred by the Lender's attorneys, and all costs incurred by the Lender in the administration of the Liabilities, this Agreement, and all other instruments and agreements executed in connection with or relating to the Liabilities. Costs of Collection also includes, without limitation, all attorneys' fees, out-of-pocket expenses incurred by the Lender's attorneys, and all costs and expenses incurred by the Lender, which costs and expenses are directly or indirectly related to or in respect of the Lender's efforts to preserve, protect, collect, or enforce the Collateral, the Liabilities and/or the Lender's Rights and Remedies or any of the Lender's rights and remedies against or in respect of any guarantor or other person liable in respect of the Liabilities (whether or not suit is instituted in connection with such efforts). The Costs of Collection shall be added to the Liabilities of the Pledgor to the Lender, as if such had been lent, advanced, and credited by the Lender to, or for the benefit of, the Pledgor.

(c) "Accounts" and "Accounts Receivable" include, without limitation, "accounts" as defined in the Uniform Commercial Code as adopted by the Commonwealth of Massachusetts (the "UCC") and also all: accounts, accounts receivable, notes, drafts, acceptances, and other forms of obligations and receivables and rights to payment for credit extended and for goods sold or leased, or services rendered, whether or not yet earned by performance arising out of or relating to the Partnership.

(d) "Contract Rights" includes, without limitation, "contract rights" as now or formerly defined in the UCC and also any right to payment under a contract not yet earned by performance and not evidenced by an instrument or Chattel Paper.

(e) "General Intangibles" includes, without limitation, "general intangibles" as defined in the UCC; and also all: rights to payment for credit extended; deposits; amounts due to the Pledgor; credit memoranda in favor of the Pledgor; warranty claims; all means and vehicles of investment or hedging, including, without limitation, options, warrants, and futures contracts; records; customer lists; goodwill; causes of action; judgments; payments under any settlement or other agreement; literary rights; rights to performance; royalties, license fees; franchise fees; rights of admission; licenses; franchises; permits, certificates of convenience and necessity, and similar rights granted by any governmental authority; copyrights; trademarks, tradenames, service marks, patents, patent applications, patents pending, and other intellectual property; developmental ideas and concepts; proprietary processes; blueprints; drawings; designs; diagrams, plans, reports, charts; catalogs; manuals; technical data; computer programs, computer records, computer software, rights of access to computer record service bureaus, service bureau computer contracts, and computer data; proposals; costs estimates, and other reproductions on paper, or otherwise, of any and all concepts or ideas, and any matter related to, or connected with the Partnership.

- 6 -

(f) "Chattel Paper" and "Instruments" have the meanings given such terms in the UCC.

9. The Pledgor

(a) waives presentment, demand, notice, and protest with respect to the Liabilities and the Collateral;

(b) waives any delay on the part of the Lender without notice to or consent from the Pledgor;

(c) assents to any indulgence or waiver which the Lender may grant or give any other person liable or obliged to the Lender for or on the Liabilities without notice to or consent from the Pledgor;

(d) authorizes the Lender to alter, amend, cancel, waive, or modify any term or condition of the obligations of any other person liable or obligated to the Lender for or on the Liabilities, without notice to or consent from the Pledgor;

(e) agrees that no release of any property securing the Liabilities, without notice to or consent from the Pledgor, shall affect the rights of the Lender with respect to the Collateral hereunder; and, if entitled thereto,

(f) waives the right to notice and/or hearing prior to the Lender's exercising of the Lender's rights and remedies hereunder upon default.

10. The Lender shall have no duty as to the collection or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

11. This Agreement shall be binding upon the Pledgor and upon the Pledgor's heirs, executors, administrators, representatives, successors, and assigns, and shall inure to the benefit of the Lender and the Lender's successors and assigns.

12. This Agreement and all other instruments executed in connection with the Liabilities incorporate all discussions and negotiations between the Pledgor and the Lender concerning the matters included herein and in such other instruments. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of the within Agreement or of any provision of any other agreement between the Pledgor and the Lender shall be effective unless executed in writing by the party to be charged with such modification or amendment or waiver, and if such party be the Lender, then by a duly authorized officer thereof.

- 7 -

13.   This Agreement and all other documents in the Lender's possession which relate to the Liabilities may be reproduced by the Lender by any photographic, photostatic, microfilm, micro-card, miniature photographic, xerographic, or similar process, and, with the exception of instruments constituting the Collateral, the Lender may destroy the original from which any document was so reproduced. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) and any enlargement, facsimile, or further reproduction shall likewise be admissible in evidence.

14.   This Agreement, and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The Commonwealth of Massachusetts.  The Pledgor submits to the jurisdiction of the courts of said Commonwealth for all purposes with respect to the within Agreement and the Pledgor's relationships with the Lender.

15.   The Pledgor shall indemnify, defend, and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Pledgor or any other guarantor or endorser of the Liabilities, except as the result of the willful misconduct or gross negligence of the Lender (each of which may be defended, compromised, settled, or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Pledgor).  The within indemnification shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Lender in favor of the Pledgor.

16.   It is intended that this Agreement take effect as a sealed instrument and shall be effective as of January 13, 2004.

Perspectives Broadcasting, Inc.

By: _____
     Bradford C. Bleidt
Title:  President and Treasurer

[CONTINUED ON PAGE 9]

- 8 -

**COMMONWEALTH OF MASSACHUSETTS**

Suffolk, ss.                                December 11, 2003

     Then personally appeared the above-named Bradford C. Bleidt, the President and Treasurer of Perspectives Broadcasting Inc., and acknowledged the foregoing to be the free act and deed of Perspectives Broadcasting, Inc., before me.

_____
Lawrence Litwak, Notary Public
My Commission Expires: Sept. 12, 2008

LL040161

- 9 -

# EXHIBIT F

**LBC SECURITY AGREEMENT**

DATE: December 1, 2003

1.    To secure the prompt, punctual, and faithful performance of all and each of the Liabilities (as that term is defined herein) of Perspectives Broadcasting, Inc., a Massachusetts corporation ("PBI") to Alexander G. Langer of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (hereinafter, the "Lender"), the undersigned, being a wholly owned subsidiary of PBI (hereafter the "Pledgor") hereby grants to the Lender a security interest in and to, and assigns, pledges, and delivers to the Lender the following property, and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits and distributions in kind or cash) in respect thereto, and all books, records, and papers relating to the foregoing (all of which is referred to hereinafter as the "Collateral"):

> All of the Pledgor's right, title, and interest in Pledgor's Accounts, Accounts Receivable, General Intangibles, Contract Rights, Chattel Paper, Instruments, Equipment, Fixtures and Licenses, including without limitation all licenses, permits, construction permits and contracts used by the Pledgor in connection with the operation of Radio Station, WBIX 1060 AM or its successor, excepting only the license issued by the FCC to the extent that a transfer or assignment hereof or a lien thereon would cause or permit the imposition of a sanction by the FCC including loss or revocation thereof, but including, to the maximum extend permitted by law, all rights, incident or appurtenant to such FCC License, including, without limitation any renewal expectation and further including without limitation, the right to receive all proceeds derived or arising from or in connection with sale, assignment, transfer, or other disposition of such license, authorization or permit, all of the foregoing now held or in which the Pledgor has an interest, or hereafter acquired or in which the Pledgor obtains an interest, and all books, records, electronically stored data and information relating to the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and electronically stored data are stored, recorded, and maintained.

Proceeds (and the Collateral) include, without limitation, any investment, instrument, security, certificate of deposit, or other asset purchased from time to time with the proceeds of any of the foregoing (or with the proceeds thereof) including: any into which any of the foregoing (or such proceeds) is "rolled" or "turned over"; any cash received on account of any of the foregoing; and any deposit or other account to the extent that any proceeds of any of the foregoing is deposited therein.

2.    The Pledgor represents that the Collateral is held and

- 1 -

owned by the Pledgor free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges, and if the Collateral is securities, is fully paid for and nonassessable.

3. The Pledgor shall:

(a) execute all such instruments, documents, and papers, and will do all such acts as the Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of stop transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notifications in connection with book entry securities or general intangibles, and the providing of instructions to the issuers of uncertificated securities, and will do all such other acts as the Lender may request with respect to the perfection and protection of the security interest granted herein and the assignment effected hereby;

(b) keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges;

(c) deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral, including, without limitation, all cash or in-kind dividends and/or distributions and all certificates, whether now existing or hereafter received as a result of any dividends, splits, or other transactions;

(d) upon the request of the Lender, cause the issuer of any uncertificated securities comprising any of the Collateral to issue certificates with respect thereto;

(e) upon the request of the Lender, cause certificated securities comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(f) not cause or permit any of the Collateral presently evidenced by written certificates to be converted to uncertificated securities;

(g) not exercise any right with respect to the Collateral which would dilute or adversely affect the Lender's rights in the Collateral;

(h) not file any affidavit for replacement of lost stock certificates or bonds; and

(i) not vote the Collateral in favor of or consent to any resolution which might:

(i) impose any restrictions upon the sale, transfer, or disposition of the Collateral; or

(ii) result in the issuance of any additional shares of stock of any class; or

- 2 -

(iii) vest additional powers, privileges, or priorities to any other class of stock.

4.    Upon the occurrence of any one or more of the following events of default (herein, "Events of Default"), any and all Liabilities of the Pledgor to the Lender shall become immediately due and payable at the option of the Lender and without notice or demand, in addition to which the Lender may exercise the Lender's rights and remedies upon default:

(a)   the failure by PBI to pay upon demand (or when due, if not payable on demand) any of the Liabilities, subject to any applicable grace period;

(b)   the failure by PBI to promptly, punctually, and faithfully perform, discharge, or comply with any Liability, subject to any applicable grace period; or

(c)   (c) the occurrence of any event of default under any agreement between the Lender and the Pledgor or between the Lender and PBI or between the Lender and Bradford C. Bleidt, including a Loan Agreement of even date among Lender, Pledgor, Alexander G. Langer and Bradford C. Bleidt, a Security Agreement of even date between Lender and PBI, Security Agreement of even date between Lender and Pledgor, and a Pledge Agreement of even date between Lender and PBI (notwithstanding that the Lender may not have exercised its rights upon default under any such other agreement, instrument or paper).

The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between the Lender and the Pledgor and instruments and papers given the Lender by the Pledgor, whether now existing or hereafter arising.

5.    Upon the occurrence of any Event of Default, and at any time thereafter the Lender shall have all of the rights and remedies of a secured party upon default under the Uniform Commercial Code as adopted in Massachusetts, in addition to which the Lender may sell or otherwise dispose of the Collateral and/or enforce and collect the Collateral (including, without limitation, the liquidation of debt instruments or securities and the exercise of conversion rights with respect to convertible securities, whether or not such instruments or securities have matured and whether or not any penalties or other charges are imposed on account of such action), for application toward (but not necessarily in complete satisfaction of) the Liabilities.   The Pledgor shall remain liable to the Lender for any deficiency remaining following such application.   Unless the Collateral is perishable, threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall give the Pledgor such notice as may be practicable under the circumstances), the Lender shall give the Pledgor at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time and place of any public sale thereof or of the time after which any private sale or any other

- 3 -

intended disposition is to be made. The Pledgor acknowledges that any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive, or order of any federal, state, municipal, or other governmental authority, including, without limitation, any of the foregoing restricting the sale of securities. The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to this Agreement shall be applied toward the Liabilities in such order and manner as the Lender determines in its sole discretion, any statute, custom, or usage to the contrary notwithstanding.

6. The Pledgor hereby designates the Lender as and for the attorney-in-fact of the Pledgor to: endorse in favor of the Lender any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender may, from time to time, determine; cause the issuance of certificates for book entry and/or uncertificated securities; renew, extend, or roll over any Collateral; and following the occurrence of an Event of Default make demand and initiate actions to enforce any of the Collateral. The Lender may take such action with respect to the Collateral as the Lender may reasonably determine to be necessary to protect and preserve its interest in the Collateral. The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges, and discretions of the Pledgor with respect to and under the Collateral; provided, however, the Lender shall have no right to exercise any voting rights available to holders of the Collateral at any time the Collateral is held by the Lender solely as pledgee hereunder, and whether or not an Event of Default has occurred. Except as otherwise expressly provided herein, all of the rights, remedies, powers, privileges and discretions included in this Paragraph 6, may be exercised by the Lender whether or not any of the Liabilities are then due and whether or not an Event of Default has occurred. The within designation, being coupled with an interest, is irrevocable until the within instrument is terminated by a written instrument executed by a duly authorized officer of the Lender. The within power of attorney shall not be affected by subsequent disability or incapacity of the Pledgor. The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act of omission to act which is in actual bad faith.

7. The rights, remedies, powers, privileges, and discretions of the Lender hereunder (hereinafter, the "Lender's Rights and Remedies") shall be cumulative and not exclusive of any rights, remedies, powers, privileges or discretions which it otherwise may have. No delay or omission by the Lender in exercising or enforcing any of the Lender's Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Lender of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Lender's Rights and Remedies and no other agreement or transaction of whatever nature entered into between the Lender and the Pledgor at any time shall preclude any other exercise of the Lender's Rights and Remedies. No waiver by the Lender of any of the Lender's Rights and

- 4 -

Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. All of the Lender's Rights and Remedies and all of the Lender's rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative and not alternative or exclusive and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

8.   As used herein, the following terms have the following meanings:

(a) "Liability" and "Liabilities" include, without limitation, any and all liabilities, debts, and obligations of PBI to the Lender and any and all liabilities, debts, all obligations of every endorser, guarantor, and surety of PBI to the Lender, each of every kind, nature and description now existing or hereafter arising, whether under this Agreement or otherwise. "Liabilities" also includes, without limitation, each obligation to repay all loans, advances, indebtedness, notes, obligations, overdrafts, and amounts now or hereafter at any time owing by PBI to the Lender (including all future advances or the like whether or not given pursuant to a commitment by the Lender), whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against PBI. "Liabilities" also includes, without limitation, all notes and other obligations of the Pledgor now or hereafter assigned to or held by the Lender, each of every kind, nature, and description. "Liabilities" also includes, without limitation, all interest and other amounts which may be charged to PBI and/or which may be due from PBI to the Lender from time to time; and all costs and expenses incurred or paid by the Lender in respect of this and any other agreement between the Pledgor and the Lender or instrument furnished by the Pledgor to the Lender (including, without limitation, Costs of Collection, attorneys' reasonable fees, and all court and litigation costs and expenses). "Liabilities" also includes, without limitation, any and all obligations of the Pledgor to act or refrain from acting in accordance with the terms, provisions, and covenants of this Agreement and of any other agreement between the Pledgor and the Lender or instrument furnished by the Pledgor to the Lender. As used herein the term "indirect" includes, without limitation, all obligations and liabilities which the Lender may incur or become liable for, on account of, or as a result of any transactions between the Lender and PBI and/or the Pledgor; any which may arise out of any action brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities of the Pledgor, or by any other person in connection with the Liabilities; and any obligation of the Pledgor which may arise as endorser or guarantor of any third party, or as obligor to any third party which obligation has been endorsed, participated, or assigned to the Lender. The term "indirect" also refers to any direct or contingent liability of the Pledgor to make payment towards any obligation held by the Lender to the extent so held by the Lender. The Lender's books and records shall be prima facie evidence of the Pledgor's indebtedness to the Lender.

(b)  "Costs of Collection" includes, without limitation, all attorneys' reasonable fees, and out-of-pocket expenses incurred by the Lender's attorneys, and all costs incurred by the Lender in the administration of the Liabilities, this Agreement, and all other instruments and agreements executed in connection with or relating to the Liabilities.  Costs of Collection also includes, without limitation, all attorneys' fees, out-of-pocket expenses incurred by the Lender's attorneys, and all costs and expenses incurred by the Lender, which costs and expenses are directly or indirectly related to or in respect of the Lender's efforts to preserve, protect, collect, or enforce the Collateral, the Liabilities and/or the Lender's Rights and Remedies or any of the Lender's rights and remedies against or in respect of any guarantor or other person liable in respect of the Liabilities (whether or not suit is instituted in connection with such efforts).  The Costs of Collection shall be added to the Liabilities of the Pledgor to the Lender, as if such had been lent, advanced, and credited by the Lender to, or for the benefit of, the Pledgor.

(c)  "Accounts" and "Accounts Receivable" include, without limitation, "accounts" as defined in the Uniform Commercial Code as adopted by the Commonwealth of Massachusetts (the "UCC") and also all: accounts, accounts receivable, notes, drafts, acceptances, and other forms of obligations and receivables and rights to payment for credit extended and for goods sold or leased, or services rendered, whether or not yet earned by performance arising out of or relating to the Partnership.

(d)  "Contract Rights" includes, without limitation, "contract rights" as now or formerly defined in the UCC and also any right to payment under a contract not yet earned by performance and not evidenced by an instrument or Chattel Paper.

(e)  "General Intangibles" includes, without limitation, "general intangibles" as defined in the UCC; and also all:  rights to payment for credit extended; deposits; amounts due to the Pledgor; credit memoranda in favor of the Pledgor; warranty claims; all means and vehicles of investment or hedging, including, without limitation, options, warrants, and futures contracts; records; customer lists; goodwill; causes of action; judgments; payments under any settlement or other agreement; literary rights; rights to performance; royalties, license fees; franchise fees; rights of admission; licenses; franchises; permits, certificates of convenience and necessity, and similar rights granted by any governmental authority; copyrights; trademarks, tradenames, service marks, patents, patent applications, patents pending, and other intellectual property; developmental ideas and concepts; proprietary processes; blueprints; drawings; designs; diagrams, plans, reports, charts; catalogs; manuals; technical data; computer programs, computer records, computer software, rights of access to computer record service bureaus, service bureau computer contracts, and computer data; proposals; costs estimates, and other reproductions on paper, or otherwise, of any and all concepts or ideas, and any matter related to, or connected with the Partnership.

- 6 -

(f) "Chattel Paper" and "Instruments" have the meanings given such terms in the UCC.

9. The Pledgor

(a) waives presentment, demand, notice, and protest with respect to the Liabilities and the Collateral;

(b) waives any delay on the part of the Lender without notice to or consent from the Pledgor;

(c) assents to any indulgence or waiver which the Lender may grant or give any other person liable or obliged to the Lender for or on the Liabilities without notice to or consent from the Pledgor;

(d) authorizes the Lender to alter, amend, cancel, waive, or modify any term or condition of the obligations of any other person liable or obligated to the Lender for or on the Liabilities, without notice to or consent from the Pledgor;

(e) agrees that no release of any property securing the Liabilities, without notice to or consent from the Pledgor, shall affect the rights of the Lender with respect to the Collateral hereunder; and, if entitled thereto,

(f) waives the right to notice and/or hearing prior to the Lender's exercising of the Lender's rights and remedies hereunder upon default.

10. The Lender shall have no duty as to the collection or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

11. This Agreement shall be binding upon the Pledgor and upon the Pledgor's heirs, executors, administrators, representatives, successors, and assigns, and shall inure to the benefit of the Lender and the Lender's successors and assigns.

12. This Agreement and all other instruments executed in connection with the Liabilities incorporate all discussions and negotiations between the Pledgor and the Lender concerning the matters included herein and in such other instruments. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of the within Agreement or of any provision of any other agreement between the Pledgor and the Lender shall be effective unless executed in writing by the party to be charged with such modification or amendment or waiver, and if such party be the Lender, then by a duly authorized officer thereof.

- 7 -

13. This Agreement and all other documents in the Lender's possession which relate to the Liabilities may be reproduced by the Lender by any photographic, photostatic, microfilm, micro-card, miniature photographic, xerographic, or similar process, and, with the exception of instruments constituting the Collateral, the Lender may destroy the original from which any document was so reproduced. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) and any enlargement, facsimile, or further reproduction shall likewise be admissible in evidence.

14. This Agreement, and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The Commonwealth of Massachusetts. The Pledgor submits to the jurisdiction of the courts of said Commonwealth for all purposes with respect to the within Agreement and the Pledgor's relationships with the Lender.

15. The Pledgor shall indemnify, defend, and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with PBI or the Pledgor or any other guarantor or endorser of the Liabilities, except as the result of the willful misconduct or gross negligence of the Lender (each of which may be defended, compromised, settled, or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Pledgor). The within indemnification shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Lender in favor of the Pledgor.

16. It is intended that this Agreement take effect as a sealed instrument and shall be effective as of January 12, 2004.

Langer Broadcasting Corp.

By: _____
Bradford C. Bleidt
Title: President and Treasurer

[CONTINUED ON PAGE 9]

- 8 -

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                December 11, 2003

    Then personally appeared the above-named Bradford C. Bleidt, the President and Treasurer of Langer Broadcasting Corp, and acknowledged the foregoing to be the free act and deed of Langer Broadcasting Corp., before me.

_____
Lawrence Litwak, Notary Public
My Commission Expires: Sept. 12, 2008

LL040238

# EXHIBIT G

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty") is given as of January 12, 2004, by Bradford C. Bleidt, having an address of 8 Norton's Point, Manchester, Massachusetts 01944 (the "Guarantor") to and for the benefit of Alexander G. Langer of 94 Saint Rose Street, Jamaica Plain, Massachusetts 02130 (the "Lender").

### BACKGROUND

A.    The Lender has agreed to extend a loan in the amount of up to Six Million Six Hundred Eighteen Thousand ($6,618,000) Dollars (the "Loan") to Perspectives Broadcasting, Inc., a Massachusetts corporation ("Borrower"), to be evidenced by a Promissory Note in the amount of Six Million Six Hundred Eighteen Thousand ($6,618,000) Dollars of even date herewith (the "Note").

B.    Certain duties and obligations of Borrower and Guarantor to the Lender are set forth in a Loan Agreement of even date herewith (the "Loan Agreement") by and among Borrower, Guarantor and the Lender.  Capitalized terms not otherwise defined in his Guaranty shall have the respective meanings ascribed in the Loan Agreement, which by this reference is hereby incorporated herein.

C.    Bradford C. Bleidt is the sole shareholder of Borrower, and as such shall receive and realize a material benefit from the transactions contemplated by the Loan Documents.

D.    It is a condition precedent to the Lender's obligation to make the Loan that Guarantor executes and delivers this Guaranty.

NOW, THEREFORE, in order to induce the Lender to make the Loan, and in connection therefor, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby covenants and agrees as follows:

1.    Guarantor hereby unconditionally and irrevocably guarantees to the Lender without any prior written notice the full and punctual payment and performance of any and all Liabilities.

As used herein, "Liability" and "Liabilities" include, without limitation, any and all indebtedness, liabilities, debts, duties and obligations of the Borrower to the Lender of every kind and description related to or incurred in connection with the Loan, whether or not contemplated on the date of this Guaranty, direct or indirect, primary or secondary, absolute or contingent, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced and shall include any and all liabilities, debts, and obligations of every endorser, guarantor, and surety of the Borrower to the Lender.  "Liabilities" also includes, without

limitation, each obligation to repay all loans, advances, indebtedness, notes, obligations, overdrafts, and amounts now or hereafter at any time owing by the Borrower to the Lender (including all future advances or the like whether or not given pursuant to a commitment by the Lender) whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against the Borrower. "Liabilities" also includes, without limitation, all notes and other obligations of the Borrower now or hereafter assigned to or held by the Lender, each of every kind, nature, and description. "Liabilities" also includes, without limitation, all interest and other amounts which may be charged to the Borrower and/or which may be due from the Borrower to the Lender from time to time; all fees and charges in connection with any account maintained by the Borrower with the Lender or any service rendered by the Lender; and all costs and expenses incurred or paid by the Lender in respect of any agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender (including, without limitation, Costs of Collection, attorneys' fees, and all court and litigation costs and expenses). "Liabilities" also includes, without limitation, any and all obligations of the Borrower to act or to refrain from acting in accordance with the terms, provisions, and covenants of any agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender. As used herein, the term "indirect" includes, without limitation, all obligations and liabilities which the Lender may incur or become liable for, on account of, or as a result of any transactions between the Lender and the Borrower including, without limitation, any which may arise out of any Letter of Credit or acceptance, or similar instrument issued or obligation incurred by the Lender for the account of the Borrower; any which may arise out of any action bought or threatened against the Lender by the Borrower, any guarantor or endorser of the Liabilities of the Borrower, or by any other person in connection with the Liabilities; and any obligation of the Borrower which may arise as endorser or guarantor of any third party, or as obligor to any third party which obligation has been endorsed, participated, or assigned to the Lender. The term "indirect" also refers to any direct or contingent liability of the Borrower to make payment towards any obligation held by the Lender to the extent so held by the Lender. The Lender's books and records shall prima facie evidence the Borrower's indebtedness to the Lender.

"Costs of Collection" includes, without limitation, all reasonable attorneys' fees, and out-of-pocket expenses, incurred by the Lender's attorneys, and all costs incurred by the Lender in the administration of the Liabilities, this Guaranty, and all other instruments and agreements executed in connection with or relating to the Liabilities including, without limit costs and expenses

associated with travel on behalf of the Lender. Costs of Collection also includes, without limitation, all attorneys' fees, out-of-pocket expenses incurred by the Lender's attorneys, and all costs and expenses incurred by the Lender on account of the Lender's relationship with the Borrower, the undersigned, or any other guarantor or endorser of the Liabilities (each of which may be defended, compromised, settled, or pursued by the Lender with counsel of the Lender's selection, but at the expense of the undersigned).

The undersigned will pay on demand interest on all amounts due to the Lender under this Guaranty, or arising under any documents, instruments or agreements relating to any collateral securing this Guaranty, from the time the Lender first demands payment of this Guaranty at a rate equal to the highest rate chargeable to the Borrower after the earlier of: (i) demand or (ii) the occurrence of any event of default.

Any and all deposits or other sums at any time credited by or due to the undersigned from the Lender, and any cash, securities, instruments or other property of the undersigned in the possession of the Lender, or in the possession of any third party acting on the Lender's behalf (regardless of the reason the Lender or such affiliate or participant had received same or whether the Lender or such affiliate or participant has conditionally released the same) shall at all times constitute security for all Liabilities and for any and all obligations of the undersigned to the Lender, now existing or hereafter arising, and may be applied or set off against such Liabilities and against the obligations of the undersigned to the Lender including, without limitation, those arising hereunder, at any time, whether or not such are then due and whether or not other collateral is then available to the Lender.

The obligations of the undersigned hereunder shall not be affected by any fraudulent, illegal, or improper act by the Borrower, nor by any release, discharge, or invalidation, by operation of law or otherwise, of the Liabilities, or by the legal incapacity of the Borrower, the undersigned, or any other, person liable or obligated to the Lender for or on the Liabilities. Interest and Costs of Collection shall continue to accrue and shall continue to be deemed Liabilities guaranteed hereby notwithstanding any stay to the enforcement thereof against the Borrower or disallowance of any claim therefor against the Borrower.

Guarantor hereby warrants and represents to Lender that:

(i) any and all financial statements and other financial data which have previously been furnished to Lender with respect to Guarantor are true and correct in all material respects, fairly, completely and accurately represent the financial condition of Guarantor as of the date thereof and, since

-3-

the date thereof, there has been no material adverse change in the financial condition of Guarantor, there are no legal proceedings, material claims or demands pending against, or to the best of Guarantor's knowledge, threatened against Guarantor or any of Guarantor's assets; there are no federal or state liens filed or threatened against Guarantor or any of Guarantor's assets; and Guarantor is not in default or claimed default under any agreement for borrowed money.

(ii)    Each and every warranty and representation made by Borrower in the Note and other Loan Documents evidencing the Loan is, to the best of Guarantor's knowledge, true and correct.

(iii)    This Guaranty constitutes a legal, valid and binding obligation of Guarantor, and is fully enforceable in accordance with its terms.

(iv)    Neither the execution nor delivery of this Guaranty nor fulfillment of, nor compliance with the terms and provisions hereof, will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default or result in the creation of any lien, charge or encumbrance upon any property or assets of Guarantor under, any agreement or instrument to which Guarantor is now a party or by which Guarantor may be bound.

(v)    Guarantor has reviewed and approved the Loan Documents to be signed by Borrower in connection with the Loan.

(vi)    Guarantor shall, as to notices of default served on such Guarantor only, within five (5) business days after receipt thereof, deliver to Lender copies of any notices of default served on such Guarantor pursuant to the terms of any other material agreement to which such Guarantor is a party.

The within instrument incorporates all discussions and negotiations between the undersigned and the Lender concerning the guaranty and indemnification provided by the undersigned hereby. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No provision hereof may be altered, amended, waived, cancelled or modified, except by a written instrument executed, sealed, and acknowledged by a duly authorized officer of the Lender.

The undersigned waives diligence, presentment, demand, extension of time of payment, notice of acceptance of the Guaranty, notice, and protest with respect to the Liabilities and this Guaranty, further waives any delay on the part of the Lender, further waives any right to require the Lender to pursue or to proceed against the Borrower or any collateral which the Lender might have been granted to secure the Liabilities or to secure the obligations of the undersigned hereunder, and further waives notice of acceptance

-4-

of this Guaranty.

The books and records of the Lender showing the account between the Lender and the Borrower shall be admissible in any action or proceeding and constitute prima facie evidence and proof of the items contained therein.

The obligations of the undersigned hereunder are primary, with no recourse necessary by the Lender against the Borrower or any collateral given to secure the Liabilities or against any other person liable for or on the Liabilities prior to proceeding against the undersigned hereunder. The undersigned assents to any indulgence or waiver or forbearance or extension of the time of payment of the Liabilities which the Lender may grant or give the Borrower and/or any other person liable or obligated to the Lender for or on the Liabilities. The undersigned authorizes the Lender to alter, amend, cancel, waive, or modify any term or condition of the Liabilities and of the obligations of any other person liable or obligated to the Lender for or on the Liabilities, without notice to, or consent from, the undersigned. No compromise, settlement, or release by the Lender of the Liabilities or of the obligations of any such other person (whether or not jointly liable with the undersigned) and no release of any collateral securing the Liabilities or securing the obligations of any such other person shall affect the obligations of the undersigned hereunder. No action by the Lender which has been assented to herein shall affect the obligations of the undersigned to the Lender hereunder.

Guarantor hereby agrees that this Guaranty is an irrevocable and continuous guaranty of payment and performance (and not merely collection), notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of Guarantor, and further agrees that Guarantor shall remain liable, without deduction by reason of setoff, defense or counterclaim, until the full amount of the Liabilities, with interest and any other sums due or to become due under the Loan Documents (including, without limitation, all Costs of Collection) shall have been fully paid and the other terms, covenants and conditions of the Liabilities shall have been fully performed and observed.

The undersigned shall not exercise any right of subrogation, reimbursement, indemnity, contribution, or the like (including any right to proceed upon any collateral granted by the Borrower to the undersigned) against the Borrower or any person liable or obligated for or on the Liabilities unless and until all of the Liabilities have been satisfied in full.

The undersigned will pay on demand all attorneys' fees, out-of-pocket expense incurred by the Lender's attorneys, and all costs incurred by the Lender, in the administration of the Liabilities, this Guaranty and all other instruments, documents, and agreements

-5-

executed in connection with or relating to the Liabilities, including, without limitation, costs and expenses associated with travel on behalf of the Lender. The undersigned will also pay on demand, without limitation, all attorneys' fees, out-of-pocket expenses incurred by the Lender's attorneys and all costs incurred by the Lender, including, without limitation, costs and expenses associated with travel on behalf of the Lender, which costs and expenses are directly or indirectly related to or in respect of the Lender's efforts to collect and/or to enforce any of the obligations of the undersigned hereunder and/or to enforce any of the Lender's rights, remedies, or powers against or in respect of the undersigned (whether or not suit is instituted by or against the Lender).

This instrument shall inure to the benefit of the Lender, its successors and assigns, shall be binding upon the heirs, successors, representatives, and assigns of the undersigned, and shall apply to all Liabilities of the Borrower and any successor to the Borrower, including any successor by operation of law.

The rights, remedies, powers, privileges and discretion of the Lender hereunder (hereinafter, the Lender's Rights and Remedies") shall be cumulative and not exclusive of any rights or remedies which it would otherwise have. No delay or omission by the Lender in exercising or enforcing any of the Lender's Rights and Remedies shall operate as, or constitute a waiver thereof. No waiver by the Lender of any of the Lender's Rights and Remedies or of any default or remedies under any other agreement with the undersigned, or of any default under any agreement with the Borrower, or any other person liable or obligated for or on the Liabilities, shall operate as a waiver of any other of the Lender's Rights and Remedies or of any default or remedy hereunder or thereunder. No exercise of any of the Lender's Rights and Remedies and no other agreement or transaction of whatever nature entered into between the Lender and the undersigned, between the Lender and the Borrower, and/or between the Lender and any such other person at any time shall preclude any other exercise of the Lender's Rights and Remedies. No waiver by the Lender of any of the Lender's Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. All of the Lender's Rights and Remedies and all of the Lender's rights, remedies, powers, privileges, and discretion under any other agreement or transaction with the undersigned, the Borrower, or any such other person shall be cumulative and not alternative or exclusive, and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

This instrument and all documents which have been or may be hereinafter furnished by the undersigned to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, microcard, miniature photographic, xerographic, or

similar process, and the Lender may destroy the original from which such document was so reproduced. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

This instrument shall be governed, construed, and interpreted in accordance with the laws of The Commonwealth of Massachusetts. The undersigned submits to the jurisdiction of the courts of The Commonwealth of Massachusetts for all matters in connection herewith as well as for all purposes in connection with any other relationship between the undersigned and the Lender. It is the intention of the undersigned that the provisions of the within Guaranty and indemnification be liberally construed to the end that the Lender may be put in as good a position as if the Borrower had promptly, punctually, and faithfully performed all Liabilities and the undersigned had promptly, punctually, and faithfully performed hereunder.

Any determination that any provision herein is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance and shall not affect the validity, legality, or enforceability of any other provision contained herein.

Guarantor hereby irrevocably waives all right to a jury in any proceedings hereafter instituted by or against Guarantor in respect of this Guaranty or arising out of any document, instrument or agreement evidencing, governing or securing this Note or Guaranty, including all Loan Documents.

This Guaranty shall not be discharged or in any way affected by the death of the Guarantor. This Guaranty shall be binding upon Guarantor and the heirs, successors and legal representatives of Guarantor, and shall inure to the benefit of Lender and the heirs, successors, assigns and legal representatives of Lender. Guarantor may not assign his rights nor delegate his duties under this Guaranty. The transfer or assignment by Lender of the Note shall operate as a transfer or assignment to the transferee or assignee of this Guaranty and all rights and privileges hereunder.

All of Lender's rights, remedies and recourse under the Note or this Guaranty, are separate and cumulative and may be pursued separately, successively or concurrently, are non-exclusive and the exercise of any one or more of them shall in no way limit or prejudice any other legal or equitable right, remedy or recourse to which Lender may be entitled.

No provision hereof shall be modified or limited except by a written agreement expressly referring to this Guaranty and to the provision so modified or limited and signed by Guarantor and

-7-

Lender.

The obligations of the undersigned hereunder shall remain in full force and effect as to all Liabilities until the delivery of written notice of termination dated and signed by Lender, which notice of termination includes specific reference to this provision.

The undersigned certifies that the undersigned has read this Guaranty prior to its execution.

Guarantor agrees that this Guaranty take effect as a sealed instrument and its validity and construction shall be determined by the laws of The Commonwealth of Massachusetts and is executed and delivered this ___11___ day of December, 2003 effective as of January 12, 2004.

_____
Bradford C. Bleidt, individually

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                    December 11, 2003

    Then personally appeared, before me, the above named Bradford C. Bleidt, known to me, who acknowledged the foregoing instrument to be his free act and deed.

_____
Lawrence Litwak, Notary Public
My Commission Expires: Sept. 12, 2008

LL040187

-8-

# EXHIBIT H

# FIRST AMENDMENT

## TO

## GUARANTY AGREEMENT

THIS FIRST AMENDMENT ("First Amendment") TO GUARANTY AGREEMENT is given as of January 13, 2004, by Bradford C. Bleidt, having an address of 8 Norton's Point, Manchester, Massachusetts 01944 (the "Guarantor") to and for the benefit of Alexander G. Langer of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (the "Lender").

### BACKGROUND

Reference is made to a Guaranty Agreement of even date given by the Guarantor to and for the benefit of the Lender in connection with the guaranty by Guarantor of a loan in the amount of Six Million Six Hundred Eighteen Thousand ($6,618,000) Dollars (the "Loan") to Perspectives Broadcasting, Inc. ("Borrower") as evidenced by a Promissory Note of even date in the amount of the Loan and pursuant to which certain duties and obligations of Borrower and Guarantor to the Lender are set forth in a Loan Agreement of even date. The amount of the Loan has been increased to Seven Million Three Hundred Eighteen Thousand ($7,318,000) Dollars and the Promissory Note and Loan Agreement have each been amended to reflect the new amount of the Loan (the "New Loan Amount").

1.    Guarantor hereby unconditionally and irrevocable guarantees to the Lender without any prior written notice the full and punctual payment of the New Loan Amount and performance of any and all Liabilities, as such term is defined in the Guaranty Agreement.

2.    Except as modified herein, the Guarantor hereby ratifies and confirms all of the terms and provisions of the Guaranty Agreement.

The undersigned certifies that the undersigned has read this First Amendment to Guaranty Agreement prior to its execution.

Guarantor agrees that this First Amendment to Guaranty Agreement take effect as a sealed instrument and its validity and

[CONTINUED ON PAGE 2]

construction shall be determined by the laws of The Commonwealth of Massachusetts and is executed and delivered this 9th day of January, 2004, effective as of January 13, 2004.

_____
Bradford C. Bleidt, individually

### COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                    January 9, 2004

Then personally appeared, before me, the above named Bradford C. Bleidt, known to me, who acknowledged the foregoing instrument to be his free act and deed.

Victoria S. Bonarrigo
Notary Public
My Commission Expires
September 1, 2005

Name:_____  Notary Public Print

Expires:_____  My                    Commission

LL040434

- 3 -

# EXHIBIT I

**PLEDGE AGREEMENT**
**WITH RESPECT TO STOCK**
**OF**
**LANGER BROADCASTING CORP.**

January 13, 2004

1.    To secure the prompt, punctual, and faithful performance of all and each of the Liabilities (as that term is defined herein) of Perspectives Broadcasting, Inc. (herewith the "Borrower"), a Massachusetts corporation with a principal address at 164 Canal Street, Suite 400, Boston, Massachusetts 02114, to Alexander G. Langer, of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (hereinafter, the "Lender"), the undersigned (herein, the "Pledgor") hereby grants to the Lender a security interest in and to, and assigns, pledges, and delivers to the Lender the following property, and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits) in respect thereto and all books, records, and papers relating to the foregoing (all of which is referred to hereinafter as the "Collateral"):

All of the Pledgor's issued and outstanding shares of stock in Langer Broadcasting Corp., a Florida corporation ("LBC") consisting of 1000 shares of the no par value common stock of LBC.

2.    The Pledgor represents that the Collateral is held and owned by the Pledgor, free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges, except for the within Pledge, and if the Collateral is securities, is paid for (except for the amount set forth on a Promissory Note of Borrower of even date in favor of Lender) and represents one hundred (100%) percent of the issued and outstanding shares of stock of LBC.

3.    The Pledgor shall:

(a)    execute all such instruments, documents, and papers, and will do all such acts as the Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of stop transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notifications in connection with book entry securities or general intangibles, and the providing of instructions to the issuers of uncertificated securities and will do all such other acts as the Lender may request with respect to perfection and protection of the security interest granted herein and the assignment effected hereby;

(b)    keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges;

(c)    deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral or proceeds of the Collateral, including, without limitation, all

cash dividends and all stock certificates, whether now existing or hereafter received, as a result of any dividends, stock splits, or other transaction;

(d) upon the request of the Lender, cause the issuer of any uncertified securities comprising any of the Collateral to issue certificates with respect thereto;

(e) upon the request of the Lender, cause certificated securities comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(f) not cause or permit any of the Collateral presently evidenced by a written certificate to be converted to uncertificated securities;

(g) not exercise any right with respect to the Collateral which would dilute or otherwise adversely affect the Lender's rights in the Collateral;

(h) not, without the prior consent of the Lender, file any affidavit for replacement of lost stock certificates or bonds; and

(i) not, without the prior consent of the Lender, vote the Collateral in favor of or consent to any resolution which might:

(A) impose any restrictions upon the sale, transfer, or disposition of the Collateral; or

(B) result in the issuance of any additional shares of stock of any class; or

(C) vest additional powers, privileges, preferences, or priorities to any other class of stock.

4. Upon the occurrence of any one or more of the following events of default (herein, "Events of Default"), any and all Liabilities of the Borrower to the Lender shall become immediately due and payable at the option of the Lender and without notice or demand, in addition to which the Lender may exercise the Lender's rights and remedies upon default. The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between the Lender and the Borrower and instruments and papers given the Lender by the Borrower, whether now existing or hereafter arising.

(a) The failure by the Borrower to pay upon demand (or when due, if not payable on demand) any of the Liabilities, subject to any applicable grace period;

(b) The failure by the Borrower to promptly, punctually, and faithfully perform, discharge, or comply with any

-2-

Liability, subject to any applicable grace period; or

(c)     The occurrence of any event of default under any agreement between the Lender and the Borrower or between the Lender and LBC or between the Lender and Bradford C. Bleidt, including a Loan Agreement of even date among Lender, Borrower, LBC and Bradford C. Bleidt, a Security Agreement of even date between Lender and Borrower, a Security Agreement of even date between Lender and LBC, and a Pledge Agreement between Lender and LBC, (notwithstanding that the Lender may not have exercised its rights upon default under any such other agreement).

5.     Upon the occurrence of any Event of Default, and at any time thereafter, the Lender shall have all of the rights and remedies of a secured party upon default under the Uniform Commercial Code as adopted in Massachusetts, in addition to which the Lender may sell or otherwise dispose of the Collateral and/or enforce and collect the Collateral (including, without limitations the liquidation of debt instruments or securities and the exercise of conversion rights with respect to convertible securities, whether or not such instruments or securities have matured and whether or not any penalties or other charges are imposed on account of such action), for application towards (but not necessarily in complete satisfaction of) the Liabilities.  The Borrower shall remain liable to the Lender for any deficiency remaining following such application.  Unless the Collateral is perishable, threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall give Pledgor such notice as may be practicable under the circumstances), the Lender shall give Pledgor at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any public sale thereof or of the time after which any private sale or any other intended disposition is to be made.  The Borrower acknowledges that any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive, or order of any federal, state, municipal, or other governmental authority, including without limitation, any of the foregoing restricting the sale of securities.  The Lender, in its sole discretion at any such sale, may restrict the prospective bidders or purchasers as to their number, nature of business and investment intention, and impose without limitation, a requirement that the persons making such purchases represent and agree, to the satisfaction of the Lender, that they are purchasing the Collateral for their own account, for investment, and not with a view to the distribution or resale thereof.  The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to the within Agreement shall be applied toward the Liabilities of the Borrower and/or LBC in such order and manner as the Lender determines in its sole discretion, any statute, custom, or usage to the contrary notwithstanding.

-3-

6.    Pledgor hereby designates the Lender as and for the attorney-in-fact of Pledgor to: endorse in favor of the Lender any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender, may from time to time, determine; cause the issuance of certificates for book entry and/or uncertificated securities; renew, extend, or roll over any Collateral; and, following the occurrence of an Event of Default, make demand and initiate actions to enforce any of the Collateral.  The Lender may take such action with respect to the Collateral following an Event of Default as the Lender may reasonably determine to be necessary to protect and preserve its interest in the Collateral.   The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges, and discretions of Pledgor with respect to and under the Collateral; provided, however, the Lender shall have no right to exercise any voting rights available to holders of the Collateral at any time the Collateral is held by the Lender solely as pledgee hereunder, prior to the occurrence of an Event of Default.  Except as otherwise provided herein, all of the rights, remedies, powers, privileges and discretions included in this Paragraph 6, may be exercised by the Lender whether or not any of the Liabilities are then due and whether or not an Event of Default has occurred.  The within designation, being coupled with an interest, is irrevocable until the within agreement is terminated by a written instrument executed by a duly authorized officer of the Lender.  The within power of attorney shall not be affected by subsequent disability or incapacity of Pledgor.  The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act or omission to act which is in actual bad faith.

7.    The rights, remedies, powers, privileges, and discretions of the Lender hereunder (herein, the "Lender's Rights and Remedies") shall be cumulative and not exclusive of any rights, remedies, powers, privileges, or discretions which it otherwise may have.  No delay or omission by the Lender in exercising or enforcing any of the Lender's Rights and Remedies shall operate as, or constitute, a waiver thereof.  No waiver by the Lender of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement.  No single or partial exercise of any of the Lender's Rights and Remedies and no other agreement or transaction of whatever nature entered into between the Lender and the Pledgor at any time, either express or implied, shall preclude any other exercise of the Lender's Rights and Remedies.  No waiver by the Lender of any of the Lender's Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. All of the Lender's Rights and Remedies and all of the Lender's rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative and not alternative or exclusive and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

-4-

8. As used herein, the following terms have the following meanings:

(a) "Liability" and "Liabilities" include, without limitation, any and all liabilities, debts, and obligations of the Borrower to the Lender and any and all liabilities, debts, and obligations of every endorser, guarantor, and surety of the Borrower to the Lender, each of every kind, nature, and description, now existing or hereafter arising. "Liabilities" also includes, without limitation, each obligation to repay all loans, advances, indebtedness, notes, obligations, overdrafts, and amounts now or hereafter at any time owing by the Borrower to the Lender (including all future advances or the like whether or not given pursuant to a commitment by the Lender), whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against the Borrower. "Liabilities" also includes, without limitation, all notes and other obligations of the Borrower now or hereafter assigned to or held by the Lender, each of every kind, nature, and description. "Liabilities" also includes, without limitation, all interest and other amounts which may be charged to the Borrower and/or which may be due from the Borrower to the Lender from time to time; all fees and charges in connection with any account maintained by the Borrower with the Lender or any service rendered by the Lender; and all costs and expenses incurred or paid by the Lender in respect of this and any other agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender (including, without limitation, Costs of Collection, attorneys' reasonable fees, and all court and litigation costs and expenses). "Liabilities" also includes, without limitation, any and all obligations of the Borrower to act or to refrain from acting in accordance with the terms, provisions, and covenants of this Agreement and of any other agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender. As used herein, the term "indirect" includes, without limitation, all obligations and liabilities which the Lender may incur or become liable for, on account of, or as a result of any transactions between the Lender and the Borrower including, without limitation, any which may arise out of any Letter of Credit or acceptance, or similar instrument issued or obligation incurred by the Lender for the account of the Borrower; any which may arise out of any action brought or threatened against the Lender by the Borrower, any guarantor or endorser of the Liabilities of the Borrower, or by any other person in connection with the Liabilities; and any obligation of the Borrower which may arise as endorser or guarantor of any third party, or as obligor to any third party which obligation has been endorsed, participated, or assigned to the Lender. The term "indirect" also refers to any direct or contingent liability of the Borrower to make payment towards any obligation held by the Lender to the extent so held by the Lender.

-5-

The Lender's books and records shall be prima facie evidence of the Borrower's indebtedness to the Lender.

(b) "Costs of Collection" includes, without limitation, all attorneys' reasonable fees, and out-of-pocket expenses incurred by the Lender's attorneys, and all costs incurred by the Lender in the administration of the Liabilities, this Agreement, and all other instruments and agreements executed in connection with or relating to the Liabilities including, without limitation, costs and expenses associated with travel on behalf of the Lender. Costs of Collection also includes, without limitation, all attorneys' reasonable fees, out-of-pocket expenses incurred by the Lender's attorneys, and all costs and expenses incurred by the Lender, including, without limitation, costs and expenses associated with travel on behalf of the Lender, which costs and expenses are directly or indirectly related to or in respect of the Lender's efforts to preserve, protect, collect, or enforce the Collateral, the Liabilities and/or the Lender's Rights and Remedies and any of the Lender's rights and remedies against or in respect of any guarantor or other person liable in respect of the Liabilities (whether or not suit is instituted in connection with such efforts). The Costs of Collection shall be added to the Liabilities of the Borrower to the Lender, as if such had been lent, advanced, and credited by the Lender to, or for the benefit of, the Borrower.

9. The Pledgor (a) waives presentment, demand, notice, and protest with respect to the Liabilities and the Collateral; (b) waives any delay on the part of the Lender without notice to or consent from the Pledgor; (c) assents to any indulgence or waiver which the Lender may grant or give any other person liable or obliged to the Lender for or on the Liabilities without notice to or consent from the Pledgor; (d) authorizes the Lender to alter, amend, cancel, waive, or modify any term or condition of the obligations of any other person liable or obligated to the Lender for or on the Liabilities, without notice to or consent from the Pledgor; (e) agrees that no release of any property securing the Liabilities without notice to or consent from the Pledgor shall affect the rights of the Lender with respect to the Collateral hereunder; and (f) if entitled thereto, waives the right to notice and/or hearing prior to the Lender's exercising of the Lender's rights and remedies hereunder upon default.

10. The Lender shall have no duty as to the collection or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

11. This Agreement shall be binding upon the Pledgor and

-6-

upon the Pledgor's respective heirs, executors, administrators, representatives, successors, and assigns, and shall inure to the benefit of the Lender and the Lender's successors and assigns.

12. This Agreement and all other instruments executed in connection herewith incorporate all discussions and negotiations amongst the Lender, the Borrower and/or the Pledgor concerning the matters included herein and in such other instruments. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of the within Agreement or of any provision of any other agreement between the Borrower and the Lender and/or the Pledgor and the Lender shall be effective unless executed in writing by the party to be charged with such modification, amendment or waiver, and if such party be the Lender, then by a duly authorized officer thereof.

13. This Agreement and all other documents in the Lender's possession which relate to the Liabilities may be reproduced by the Lender by any photographic, photostatic, microfilm, microcard, miniature photographic, xerographic, or similar process and, with the exception of instruments constituting the Collateral, the Lender may destroy the original from which any document was so reproduced. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) and any enlargement, facsimile, or further reproduction shall likewise be admissible in evidence.

14. This Agreement, and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The Commonwealth of Massachusetts. The Pledgor submits to the jurisdiction of the courts of said Commonwealth for all purposes with respect to the within Agreement and the Pledgor's relationships with the Lender.

15. The Pledgor and the Borrower respectively shall indemnify, defend, and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Pledgor, or any other guarantor or endorser of the Liabilities (each of which may be defended, compromised, settled, or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower and/or the Pledgor). The within indemnification shall survive payment of the Liabilities, and/or any termination, release, or discharge executed by the Lender in favor of the Borrower and/or the Pledgor.

16.   It is intended that the within Agreement take effect as sealed instrument.

_____
              Witness
LL040215

**PLEDGOR**
PERSPECTIVES BROADCASTING, INC.

By:_____
      Bradford C. Bleidt, President

# EXHIBIT J

**PLEDGE AGREEMENT**
**WITH RESPECT TO STOCK**
**OF**
**PERSPECTIVES BROADCASTING, INC.**

January 12, 2004

1.   To secure the prompt, punctual, and faithful performance of all and each of the Liabilities (as that term is defined herein) of Perspectives Broadcasting, Inc. (herewith the "Borrower"), a Massachusetts corporation with a principal address at 164 Canal Street, Suite 400, Boston, Massachusetts 02114, to Alexander G. Langer, of 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 (hereinafter, the "Lender"), the undersigned (herein, the "Pledgor") hereby grants to the Lender a security interest in and to, and assigns, pledges, and delivers to the Lender the following property, and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits) in respect thereto and all books, records, and papers relating to the foregoing (all of which is referred to hereinafter as the "Collateral"):

All of the Pledgor's issued and outstanding shares of stock in Borrower consisting of 1000 shares of the no par value common stock of Borrower.

2.   The Pledgor represents that the Collateral is held and owned by the Pledgor, free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges, and if the Collateral is securities, is fully paid for and non-assessable and represents one hundred (100%) percent of the issued and outstanding shares of stock of Borrower.

3.   The Pledgor shall:

(a)   execute all such instruments, documents, and papers, and will do all such acts as the Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of stop transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notifications in connection with book entry securities or general intangibles, and the providing of instructions to the issuers of uncertificated securities and will do all such other acts as the Lender may request with respect to perfection and protection of the security interest granted herein and the assignment effected hereby;

(b)   keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges, and charges;

(c)   deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral or proceeds of the Collateral, including, without limitation, all cash dividends and all stock certificates, whether now existing or

hereafter received, as a result of any dividends, stock splits, or other transaction;

(d)  upon the request of the Lender, cause the issuer of any uncertificated securities comprising any of the Collateral to issue certificates with respect thereto;

(e)  upon the request of the Lender, cause certificated securities comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(f)  not cause or permit any of the Collateral presently evidenced by a written certificate to be converted to uncertificated securities;

(g)  not exercise any right with respect to the Collateral which would dilute or otherwise adversely affect the Lender's rights in the Collateral;

(h)  not, without the prior consent of the Lender, file any affidavit for replacement of lost stock certificates or bonds; and

(i) not, without the prior consent of the Lender, vote the Collateral in favor of or consent to any resolution which might:

(A) impose any restrictions upon the sale, transfer, or disposition of the Collateral; or

(B) result in the issuance of any additional shares of stock of any class; or

(C) vest additional powers, privileges, preferences, or priorities to any other class of stock.

4.  Upon the occurrence of any one or more of the following events of default (herein, "Events of Default"), any and all Liabilities of the Borrower and/or Pledgor to the Lender shall become immediately due and payable at the option of the Lender and without notice or demand, in addition to which the Lender may exercise the Lender's rights and remedies upon default.  The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between the Lender and the Borrower and instruments and papers given the Lender by the Borrower, whether now existing or hereafter arising.

(a)  The failure by the Borrower to pay upon demand (or when due, if not payable on demand) any of the Liabilities, subject to any applicable grace period;

(b)  The failure by the Borrower to promptly, punctually, and faithfully perform, discharge, or comply with any

-2-

Liability, subject to any applicable grace period; or

(c)     The occurrence of any event of default under any agreement between the Lender and the Borrower or between the Lender and Borrower's wholly owned subsidiary, Langer Broadcasting Corp. ("LBC") or between the Lender and Pledgor, including a Loan Agreement of even date among Lender, Borrower and Pledgor as Guarantor et. al., a Security Agreement of even date between Lender and Borrower, a Security Agreement of even date between Lender and LBC, and separate Pledge Agreements between Lender and Borrower and between Lender and LBC (notwithstanding that the Lender may not have exercised its rights upon default under any such other agreement).

5.     Upon the occurrence of any Event of Default, and at any time thereafter, the Lender shall have all of the rights and remedies of a secured party upon default under the Uniform Commercial Code as adopted in Massachusetts, in addition to which the Lender may sell or otherwise dispose of the Collateral and/or enforce and collect the Collateral (including, without limitations the liquidation of debt instruments or securities and the exercise of conversion rights with respect to convertible securities, whether or not such instruments or securities have matured and whether or not any penalties or other charges are imposed on account of such action), for application towards (but not necessarily in complete satisfaction of) the Liabilities. The Borrower shall remain liable to the Lender for any deficiency remaining following such application. Unless the Collateral is perishable, threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall give Pledgor such notice as may be practicable under the circumstances), the Lender shall give Pledgor at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any public sale thereof or of the time after which any private sale or any other intended disposition is to be made. The Borrower and Pledgor respectively acknowledge that any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive, or order of any federal, state, municipal, or other governmental authority, including without limitation, any of the foregoing restricting the sale of securities. The Lender, in its sole discretion at any such sale, may restrict the prospective bidders or purchasers as to their number, nature of business and investment intention, and impose without limitation, a requirement that the persons making such purchases represent and agree, to the satisfaction of the Lender, that they are purchasing the Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to the within Agreement shall be applied toward the Liabilities of the Borrower in such order and manner as the Lender determines in its sole discretion, any statute, custom, or usage

-3-

to the contrary notwithstanding.

6. Pledgor hereby designates the Lender as and for the attorney-in-fact of Pledgor to: endorse in favor of the Lender any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender, may from time to time, determine; cause the issuance of certificates for book entry and/or uncertificated securities; renew, extend, or roll over any Collateral; and following the occurrence of an Event of Default make demand and initiate actions to enforce any of the Collateral. The Lender may take such action with respect to the Collateral following an Event of Default as the Lender may reasonably determine to be necessary to protect and preserve its interest in the Collateral. The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges, and discretions of Pledgor with respect to and under the Collateral; provided, however, the Lender shall have no right to exercise any voting rights available to holders of the Collateral at any time the Collateral is held by the Lender solely as pledgee hereunder, and prior to the occurrence of an Event of Default. Except as otherwise provided herein, all of the rights, remedies, powers, privileges and discretions included in this Paragraph 6, may be exercised by the Lender whether or not any of the Liabilities are then due and whether or not an Event of Default has occurred. The within designation, being coupled with an interest, is irrevocable until the within agreement is terminated by a written instrument executed by a duly authorized officer of the Lender. The within power of attorney shall not be affected by subsequent disability or incapacity of Pledgor. The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act or omission to act which is in actual bad faith.

7. The rights, remedies, powers, privileges, and discretions of the Lender hereunder (herein, the "Lender's Rights and Remedies") shall be cumulative and not exclusive of any rights, remedies, powers, privileges, or discretions which it otherwise may have. No delay or omission by the Lender in exercising or enforcing any of the Lender's Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Lender of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Lender's Rights and Remedies and no other agreement or transaction of whatever nature entered into between the Lender and the Pledgor at any time, either express or implied, shall preclude any other exercise of the Lender's Rights and Remedies. No waiver by the Lender of any of the Lender's Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. All of the Lender's Rights and Remedies and all of the Lender's rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative and not alternative or exclusive and may be exercised by the Lender at such time or

-4-

times and in such order of preference as the Lender in its sole discretion may determine.

8. As used herein, the following terms have the following meanings:

(a) "Liability" and "Liabilities" include, without limitation, any and all liabilities, debts, and obligations of the Borrower to the Lender and any and all liabilities, debts, and obligations of every endorser, guarantor, and surety of the Borrower to the Lender, each of every kind, nature, and description, now existing or hereafter arising. "Liabilities" also includes, without limitation, each obligation to repay all loans, advances, indebtedness, notes, obligations, overdrafts, and amounts now or hereafter at any time owing by the Borrower to the Lender (including all future advances or the like whether or not given pursuant to a commitment by the Lender), whether or not any of such are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against the Borrower. "Liabilities" also includes, without limitation, all notes and other obligations of the Borrower now or hereafter assigned to or held by the Lender, each of every kind, nature, and description. "Liabilities" also includes, without limitation, all interest and other amounts which may be charged to the Borrower and/or which may be due from the Borrower to the Lender from time to time; all fees and charges in connection with any account maintained by the Borrower with the Lender or any service rendered by the Lender; and all costs and expenses incurred or paid by the Lender in respect of this and any other agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender (including, without limitation, Costs of Collection, attorneys' reasonable fees, and all court and litigation costs and expenses). "Liabilities" also includes, without limitation, any and all obligations of the Borrower to act or to refrain from acting in accordance with the terms, provisions, and covenants of this Agreement and of any other agreement between the Borrower and the Lender or instrument furnished by the Borrower to the Lender. As used herein, the term "indirect" includes, without limitation, all obligations and liabilities which the Lender may incur or become liable for, on account of, or as a result of any transactions between the Lender and the Borrower including, without limitation, any which may arise out of any Letter of Credit or acceptance, or similar instrument issued or obligation incurred by the Lender for the account of the Borrower; any which may arise out of any action brought or threatened against the Lender by the Borrower, any guarantor or endorser of the Liabilities of the Borrower, or by any other person in connection with the Liabilities; and any obligation of the Borrower which may arise as endorser or guarantor of any third party, or as obligor to any third party which obligation has been endorsed, participated, or assigned to the Lender. The term "indirect" also refers to any direct or

-5-

contingent liability of the Borrower to make payment towards any obligation held by the Lender to the extent so held by the Lender. The Lender's books and records shall be prima facie evidence of the Borrower's indebtedness to the Lender.

(b) "Costs of Collection" includes, without limitation, all attorneys' reasonable fees, and out-of-pocket expenses incurred by the Lender's attorneys, and all costs incurred by the Lender in the administration of the Liabilities, this Agreement, and all other instruments and agreements executed in connection with or relating to the Liabilities including, without limitation, costs and expenses associated with travel on behalf of the Lender. Costs of Collection also includes, without limitation, all attorneys' reasonable fees, out-of-pocket expenses incurred by the Lender's attorneys, and all costs and expenses incurred by the Lender, including, without limitation, costs and expenses associated with travel on behalf of the Lender, which costs and expenses are directly or indirectly related to or in respect of the Lender's efforts to preserve, protect, collect, or enforce the Collateral, the Liabilities and/or the Lender's Rights and Remedies and any of the Lender's rights and remedies against or in respect of any guarantor or other person liable in respect of the Liabilities (whether or not suit is instituted in connection with such efforts). The Costs of Collection shall be added to the Liabilities of the Borrower to the Lender, as if such had been lent, advanced, and credited by the Lender to, or for the benefit of, the Borrower.

9. The Pledgor (a) waives presentment, demand, notice, and protest with respect to the Liabilities and the Collateral; (b) waives any delay on the part of the Lender without notice to or consent from the Pledgor; (c) assents to any indulgence or waiver which the Lender may grant or give any other person liable or obliged to the Lender for or on the Liabilities without notice to or consent from the Pledgor; (d) authorizes the Lender to alter, amend, cancel, waive, or modify any term or condition of the obligations of any other person liable or obligated to the Lender for or on the Liabilities, without notice to or consent from the Pledgor; (e) agrees that no release of any property securing the Liabilities without notice to or consent from the Pledgor shall affect the rights of the Lender with respect to the Collateral hereunder, and (f) if entitled thereto, waives the right to notice and/or hearing prior to the Lender's exercising of the Lender's rights and remedies hereunder upon default.

10. The Lender shall have no duty as to the collection or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

-6-

11. This Agreement shall be binding upon the Pledgor and upon the Pledgor's respective heirs, executors, administrators, representatives, successors, and assigns, and shall inure to the benefit of the Lender and the Lender's successors and assigns.

12. This Agreement and all other instruments executed in connection herewith incorporate all discussions and negotiations amongst the Lender, the Borrower and/or the Pledgor concerning the matters included herein and in such other instruments. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of the within Agreement or of any provision of any other agreement between the Borrower and the Lender and/or the Pledgor and the Lender shall be effective unless executed in writing by the party to be charged with such modification, amendment or waiver, and if such party be the Lender, then by a duly authorized officer thereof.

13. This Agreement and all other documents in the Lender's possession which relate to the Liabilities may be reproduced by the Lender by any photographic, photostatic, microfilm, microcard, miniature photographic, xerographic, or similar process and, with the exception of instruments constituting the Collateral, the Lender may destroy the original from which any document was so reproduced. Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) and any enlargement, facsimile, or further reproduction shall likewise be admissible in evidence.

14. This Agreement, and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The Commonwealth of Massachusetts. The Pledgor submits to the jurisdiction of the courts of said Commonwealth for all purposes with respect to the within Agreement and the Pledgor's relationships with the Lender.

15. The Pledgor and the Borrower respectively shall indemnify, defend, and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Liabilities, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Pledgor, or any other guarantor or endorser of the Liabilities (each of which may be defended, compromised, settled, or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower and/or the Pledgor). The within indemnification shall survive payment of the Liabilities, and/or any termination, release, or discharge executed by the Lender in favor of the Borrower and/or the Pledgor.

-7-

16. It is intended that the within Agreement take effect as sealed instrument.

_____
Witness

LL040214

**PLEDGOR**

_____
Bradford C. Bleidt

# EXHIBIT K

[Stock Assignment Separate from Certificate]

**FOR VALUE RECEIVED** the undersigned hereby assigns and transfers unto

One Thousand (1,000) shares of the No Par Value

Capital Stock of Langer Broadcasting Corp. standing in its name on the books

of said Langer Broadcasting Corp. represented by Certificate No. 2 herewith,

and do hereby irrevocably constitute and appoint

_____ as attorney to transfer the said Stock on

the books of the within named Company with full power of substitution in the

premises.

Dated: _____

In Presence of

PERSPECTIVES BROADCASTING, INC.

By: _____
    Bradford C. Bleidt, President

LL040208



The shares represented by the within certificate are subject to the provisions of the Articles of Organization and/or the By-Laws of the Corporation which restrict transfer and may provide for the repurchase of the within shares upon the terms set forth therein. A copy of the pertinent provisions of the Articles of Organization and the By-Laws will be furnished to the record holder of this certificate upon written request and without charge.

The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"). These shares have not been acquired with a view to distribution or resale, and may not be sold, mortgaged, pledged, hypothecated, or otherwise transferred in the absence of evidence reasonable satisfactory to the Corporation, or its counsel, that such sale, mortgage, pledge, hypothecation or other transfer shall not violate the provisions of the Act.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations.

| TEN COM | — as tenants in common |
| TEN ENT | — as tenants by the entireties |
| JT TEN | — as joint tenants with right of survivorship and not as tenants in common |

UNIF GIFT MIN ACT—............Custodian............
                        (Cust)              (Minor)
under Uniform Gifts to Minors

Act.............................
            (State)

Additional abbreviations may also be used though not in the above list.

*For value received,*_____*hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____*Shares*

*represented by the within Certificate, and do hereby irrevocably constitute and appoint*_____

*Attorney to transfer the said shares on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated,*_____

*In presence of*

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

# EXHIBIT L

[Stock Assignment Separate from Certificate]

**FOR VALUE RECEIVED** the undersigned hereby assigns and transfers unto

_____ One Thousand (1,000) shares of the No Par Value

Capital Stock of Perspectives Broadcasting, Inc. standing in my name on the

books of said Perspectives Broadcasting, Inc. represented by Certificate No.

2, herewith, and do hereby irrevocably constitute and appoint

_____ as attorney to transfer the said Stock on the books

of the within named Company with full power of substitution in the premises.

Dated: _____

In Presence of

_____                    _____
                                   Bradford C. Bleidt

LL040208



Incorporated Under the Laws of
the Commonwealth of Massachusetts

NUMBER
2

SHARES
1,000

# Perspectives Broadcasting, Inc.

COMMON STOCK NO PAR VALUE

## This Certifies that

Registered Holder of

Bradford C. Bleidt

_____ is the

One Thousand (1,000) _____ Shares of the

Capital Stock of **Perspectives Broadcasting, Inc.** Fully Paid and Non-Assessable

*Transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.*

*In Witness Whereof,* the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this ____ 21st ____ day ____ of ____ July ____ A.D. 2003

PRESIDENT

TREASURER

TCC-11

The shares evidenced by this certificate have not been registered under the federal or state securities laws. No transfer, sale or other disposition of these shares may be made until applicable securities laws have been satisfied and until the transfer restriction procedures set forth in the By-Laws and any Shareholders Agreement and/or Stock Restriction Agreement, if any, have been satisfied and completed and unless registered, or the Corporation has been furnished with an opinion of counsel satisfactory to the Corporation that the foregoing have been satisfied.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations.

| | | |
|---|---|---|
| TEN COM | -as tenants in common | UNIF GIFT MIN ACT - ...............Custodian.................. |
| TEN ENT | -as tenants by the entireties | (Cust)              (Minor) |
| | | under the Uniform Gifts to Minors |
| JT TEN | -as joint tenants with right of survivorship and not as tenants in common | Act................................. (State) |

Additional abbreviations may also be used though not in the above list.

*For value received,* _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER INDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____ *Shares*

*Represented by the within Certificate, and do hereby irrevocably constitute and appoint* _____

*Attorney to transfer the said shares on the books of the within named Corporation with full power of substitution in the premises.*

*Dated,* _____

*In presence of* _____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

# EXHIBIT M

MA SOC    Filing Number: 200426872470    Date: 01/20/2004 4:51:00 PM

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Greif & Litwak, P.C.
> 77 North Washington Street
> Boston, MA 02114
>
> Attn: Lawrence Litwak, Esq.
> gltaxlaw@gis.net

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Langer Broadcasting Corp. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 164 Canal Street, Suite 400 | Boston | MA | 02114 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | FL | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Langer | Alexander | G. | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 94 St. Rose Street | Jamaica Plain, | MA | 02130 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Rider attached hereto and made a part hereof.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

60008-1-707903

### RIDER TO FINANCING STATEMENT

**Debtor:**

Langer Broadcasting Corp.
164 Canal Street # 400
Boston, MA 02114

**Secured Party:**

Alexander G. Langer
94 St. Rose Street
Jamaica Plain, MA 02130

The Financing Statement covers the following types or items of property:

All of the Debtor's right, title, and interest in Debtor's Accounts, Accounts Receivable, General Intangibles, Contract Rights, Chattel Paper, Instruments, Equipment, Fixtures and Licenses, including without limitation all licenses, permits, construction permits and contracts used by the Debtor in connection with the operation of Radio Station WBIX 1060 AM or its successor, excepting only the license issued by the FCC to the extent that a transfer or assignment thereof or a lien thereon would cause or permit the imposition of a sanction by the FCC including loss or revocation thereof, but including to the maximum extent permitted by law, all rights incident or appurtenant to such FCC License, including without limitation the right to receive all proceeds derived or arising from or in connection with the sale, assignment, transfer or other disposition of such license, authorizations and permits, all of the foregoing now held or in which the Debtor has an interest, or hereafter acquired, or in which the Debtor obtains an interest, and all books, records, electronically stored data and information relating to the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and electronically stored data are stored, recorded, and maintained; and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits and distributions in kind or cash) in respect thereto, and all books, records, and papers relating to the foregoing.    Proceeds (and the Collateral) include, without limitation, any investment, instrument, security, certificate of deposit, or other asset purchased from time to time with the proceeds of any of the foregoing (or with the proceeds thereof) including: any into which any of the foregoing (or such proceeds) is "rolled" or "turned over"; any cash received on account of any of the foregoing and any deposit or other account to the extent that any proceeds of any of the foregoing is deposited therein.

**Debtor:**

Langer Broadcasting Corp.

By: _____
    Bradford C. Bleidt, President

LL040235.a

# EXHIBIT N

MA SOC   Filing Number: 200426872560   Date: 01/20/2004 4:51:00 PM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|

| B. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|

Greif & Litwak, P.C.
77 North Washington Street
Boston, MA 02114

Attn: Lawrence Litwak, Esq.
gltaxlaw@gis.net

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Perspectives Broadcasting, Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 164 Canal Street, Suite 400 | Boston | MA | 02114 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | MA | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Langer | Alexander | G. | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 94 St. Rose Street | Jamaica Plain, | MA | 02130 | USA |

4. This FINANCING STATEMENT covers the following collateral:


See Rider attached hereto and made a part hereof


| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

60008-2-707902
FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

## RIDER TO FINANCING STATEMENT

**Debtor:**                                    **Secured Party:**

Perspectives Broadcasting, Inc.        Alexander G. Langer
164 Canal Street # 400                 94 St. Rose Street
Boston, MA 02114                       Jamaica Plain, MA 02130

The Financing Statement covers the following types or items of property:

All of the Debtor's right, title, and interest in Debtor's Accounts, Accounts Receivable, General Intangibles, Contract Rights, Chattel Paper, Instruments, Equipment, Fixtures and Licenses, including without limitation all licenses, permits, construction permits and contracts used by the Debtor in connection with the operation of Radio Station WBIX 1060 AM or its successor, excepting only the license issued by the FCC to the extent that a transfer or assignment thereof or a lien thereon would cause or permit the imposition of a sanction by the FCC including loss or revocation thereof, but including to the maximum extent permitted by law, all rights incident or appurtenant to such FCC License, including without limitation the right to receive all proceeds derived or arising from or in connection with the sale, assignment, transfer or other disposition of such license, authorizations and permits, all of the foregoing now held or in which the Debtor has an interest, or hereafter acquired, or in which the Debtor obtains an interest, and all books, records, electronically stored data and information relating to the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and electronically stored data are stored, recorded, and maintained; and all products, proceeds, substitutions, additions, interest, dividends, and other distributions (including, without limitation, stock splits and distributions in kind or cash) in respect thereto, and all books, records, and papers relating to the foregoing.     Proceeds (and the Collateral) include, without limitation, any investment, instrument, security, certificate of deposit, or other asset purchased from time to time with the proceeds of any of the foregoing (or with the proceeds thereof) including: any into which any of the foregoing (or such proceeds) is "rolled" or "turned over"; any cash received on account of any of the foregoing and any deposit or other account to the extent that any proceeds of any of the foregoing is deposited therein.

**Debtor:**

Perspectives Broadcasting, Inc.

By: _____
      Bradford C. Bleidt, President

LL040235

# EXHIBIT O

**LOCAL MARKETING AGREEMENT**

This Local Marketing Agreement ("Agreement" or "LMA") is made as of November 30, 2004, among (i) 1060 Communications Corp., a Massachusetts corporation with a principal place of business at 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 ("Programmer"), (ii) Alexander G. Langer, a resident of Massachusetts with a principal place of business at 94 St. Rose Street, Jamaica Plain, Massachusetts 02130 ("Langer") and (iii) David A. Vicinanzo, as court appointed receiver ("Receiver") for Bradford C. Bleidt ("Bleidt"), WBIX Corp. (formerly known as Langer Broadcasting Corp. ("LBC")), a Florida corporation, with a principal place of business at 164 Canal Street, Boston, Massachusetts 02114, and Perspective Broadcasting, Inc., a Massachusetts corporation with a principal address at 164 Canal Street, Boston, Massachusetts 02114 (the Receiver and collectively with WBIX Corp., Bleidt and PBI, the "Licensee").

**RECITALS**

WHEREAS, Langer is sole owner, director and officer of 1060 Communications Corp.; and

WHEREAS, LBC (now WBIX Corp.) was and is engaged in the operation of an AM Radio Broadcasting station ("Station") under the call letters WBIX 1060 AM; and

WHEREAS, on or about July 16, 2002, Bleidt entered into a Stock Purchase and Sale Agreement with LBC and its then sole shareholder, Langer, in connection with the sale of the LBC Stock to Bleidt or his nominee for a purchase price of Ten Million ($10,000,000) Dollars (the "Purchase Price"); and

- 1 -

WHEREAS, on or about July 16, 2002, LBC and Shared Visions, Inc. ("SVI"), a Massachusetts corporation wholly owned by Bleidt, entered into a Time Brokerage Agreement whereby SVI undertook to manage the Station in anticipation of the eventual closing on the sale of the LBC Stock to Bleidt or his nominee; and

WHEREAS, Bleidt formed PBI for the express purpose of acquiring the LBC Stock and the FCC license for the Station (the "License"); and

WHEREAS, Bleidt is sole owner of PBI; and

WHEREAS, on or about January 13, 2004 (the "Closing Date"), PBI acquired from Langer all of the stock of LBC and thereafter changed the corporate name of Langer Broadcasting Corp. to WBIX Corp. (the "Sale Transaction"); and

WHEREAS, in order to finance the acquisition of the purchase of the LBC Stock, Bleidt or his affiliates tendered deposits to Langer prior to the Closing Date in the amount of $750,000 and expended monies for both improvements to the Station and to cover operating deficits for the Station's operation, for which Langer credited Bleidt or his nominee with a $1,000,000 offset and reduction against the Purchase Price; and

WHEREAS, on or shortly after the Closing Date, Bleidt or his nominee tendered to Langer $1,300,000 as an additional cash payment against the Purchase Price and PBI and/or Bleidt entered into an interest bearing Promissory Note and a First Amendment thereto in favor of Langer (the "Langer Note") reflecting a balance of the Purchase Price due for the purchase of the LBC Stock and the License in the amount of $7,318,000, along with a Loan Agreement, Pledge Agreements of the LBC Stock and the PBI stock in favor of Langer, and Security Agreements in favor of Langer with LBC and PBI covering all of the

- 2 -

assets of both LBC and PBI, along with a Guaranty of the Langer Note and First Amendment thereto made by Bleidt in favor of Langer (collectively the "Security Agreements"); and

WHEREAS, Bleidt and his affiliates entered into an Asset Purchase Agreement (the "Egan Purchase Agreement") in 2004 with Egan Communications, LLC, a Massachusetts limited liability company ("ECLLC") in connection with ECLLC's proposed purchase of the assets of the Station including its FCC License; and

WHEREAS, on or about November 18, 2004, ECLLC's counsel notified Bleidt and his affiliates of ECLLC's intention to terminate the Egan Purchase Agreement; and

WHEREAS, Langer has failed to receive payments from Bleidt or his affiliates under the Langer Note; and

WHEREAS, the Receiver was appointed as such for Bleidt and his affiliates by Order of the U.S. District Court, District of Massachusetts (the "Court"), Case No. 04CV12415NG, on November 18, 2004, which Order was (or will be) modified to include WBIX Corp. and other Bleidt affiliates; and

WHEREAS, the parties hereto recognize the importance of continuing the broadcast of the Station's signal in order to preserve the value of the Station and the License for a subsequent sale to a third party purchaser and Programmer has been providing management services to Receiver to preserve the value of the Station; and

WHEREAS, the parties hereto intend to enter into this Local Marketing Agreement in connection with the continued management of the Station and the WBIX Corp. assets by the Programmer pending sale of the Station and its License to a third party purchaser; and

- 3 -

WHEREAS, it is in the mutual best interests of the parties hereto to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing promises and of the mutual covenants, representations, warranties and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

1.  Effective Date and Time.

1.1  Effective Date. This Agreement shall be deemed to be effective for all purposes as of November 30, 2004.

1.2  Term. The term of this Agreement (the "Term") will begin on the Effective Date and will continue until the earlier to occur of (i) Programmer's voluntary election to cancel the LMA upon giving of thirty (30) days prior written notice to the Receiver; or (ii) the closing of the sale of the Station to a third party; or (iii) the parties hereto mutually agree in writing; or (iv) the rescission of the Sale Transaction, as authorized by the Court and the approval of the FCC of the assignment of the License to Langer, or his nominee becoming final; or (v) the Receiver's election to cancel the LMA upon the giving of ninety (90) days prior written notice to the Programmer.

2.  Agreement of Licensee. In consideration of the Programmer's payment of Licensee's operating costs incurred on and after the date hereof as described in Section 5 below, Licensee hereby agrees to make available for the use of Programmer all airtime on the Station during the Term, on the terms specified herein (the airtime period to be utilized by Programmer shall be referred to herein as the "Broadcasting Period"). During the Broadcasting Period, Licensee shall cause the programming supplied by Programmer (collectively, the "Program" or

- 4 -

"Programs") to be broadcast on the Station in a manner consistent with the terms of the FCC License and the FCC Requirements.

Programmer will ensure that the Programs meet technical and quality standards equal to those of programming broadcast by commercial radio stations generally in the United States. Any material change from the current programming shall be mutually agreed upon by Licensee and Programmer, such agreement by Licensee not to be unreasonably withheld or delayed. If Licensee, in the reasonable exercise of its discretion, finds that any Program(s) does not meet these standards, then it shall advise Programmer in writing of the specific technical deficiencies. If such technical deficiencies have not been corrected within ten (10) days after receipt of notice, then Licensee shall have no obligation to cause such Program(s) to be broadcast until such time as the technical deficiencies are corrected.

3. Maintenance of Station. Throughout the Term, unless otherwise mutually agreed by the parties, Licensee shall maintain the operating power of the Station at its maximum licensed level and shall operate and maintain in good working condition the Station's transmission facilities and broadcasting equipment in accordance with the terms of the FCC License and the FCC Requirements.

4. Compliance with the FCC License and FCC Requirements. Licensee will bear the responsibility for the Station's compliance with, and shall cause the Station to comply with, all applicable laws, including the FCC Requirements. In this regard, Receiver agrees, as expeditiously as possible, to file with the FCC Form 316, Involuntary Assignment of License, in order to effect a transfer of the Station's License to the Receiver. Throughout the Term, in order to ensure compliance with all

- 5 -

of its obligations under the FCC License and the FCC requirements, Licensee shall:

(a) engage Alexander G. Langer as a Station Manager who will report to Licensee and cause Programmer to maintain the Station's transmission facilities;

(b) retain ultimate control over the Station in accordance with the FCC License and the FCC Requirements;

(c) maintain a studio in Framingham, Massachusetts consistent with the FCC Requirements at which the Station Manager and the other full time employee(s) of the Station will be available during normal business hours;

(d) comply with the FCC Requirements with respect to the ascertainment of community problems, needs and interests; broadcast programming responsive thereto; and timely prepare and place in the Station's public inspection files appropriate documentation thereof; and

(e) comply with all other FCC Requirements which may be applicable to the operation of the Station.

Nothing contained herein shall prevent or hinder Licensee from: (a) preempting any Program in the event of a local, territorial or national emergency; (b) refusing to broadcast any Program that does not meet the FCC Requirements; or (c) deleting any commercial announcements that do not comply with the FCC Requirements or the requirements of the Federal Trade Commission, or any state, local or federal law.

Nothing in this Paragraph 4 or Agreement shall obligate or call upon Licensee to actively endorse, promote, sponsor, market or advertise Programmer or its programs, provide any services to Programmer in connection with its use of the airtime on the Station during the Broadcast Period or participate in any way in the management of Programmer or the formulation of its programming.

5. Consideration. In consideration of the airtime made available to Programmer pursuant to this Agreement, during the Term of this Agreement, Programmer shall pay the Station's expenses incurred on and

- 6 -

after December 1, 2004, which are expected to be limited to expenses for the following: (i) Tower site and antenna rental expenses, along with utility charges at the Tower sites in Ashland, Massachusetts and Framingham, Massachusetts; (ii) salary and fees of all personnel employed or engaged by Programmer in connection with Station operations, and (iii) any maintenance and repair of Station equipment as deemed necessary by Programmer. Programmer shall not be required to pay directly or other reimburse Licensee for any other expenses, including lease (or sublease) payments at the Station's studio at 164 Canal Street, Boston, Massachusetts. Programmer shall be entitled to retain all income from programs and advertising derived from Station operations during the Term of this Agreement to offset Programmer's expenses.

6. Operation; Ownership and Control of the Station.

6.1 Ownership of the Station. Notwithstanding anything to the contrary contained in this Agreement, as long as Licensee retains the FCC License, Licensee will have full authority, power and control over the operation of the Station in a manner consistent with the FCC License and the FCC Requirements.

6.2 Notice of Complaints. Programmer will immediately serve Licensee with notice and a copy of any letters of complaint that Programmer receives concerning any Program for Licensee's review and inclusion in its public inspection files. Licensee will immediately serve Programmer with notice and a copy of any letters of complaint that it receives concerning any Program.

6.3 Programmer Access to the Station's Studios. During the Term, Licensee shall make available to Programmer for no additional consideration, the areas in the Station's studio located at the leased

- 7 -

Tower Site in Framingham, Massachusetts as may be reasonably necessary or appropriate for Programmer to exercise its rights and perform its obligations under this Agreement.

6.4 <u>Mutual Cooperation</u>.  Programmer and Licensee agree to cooperate reasonably with each other as necessary to fulfill their rights and obligations hereunder.

7.  <u>Program Rights and Music Licenses</u>.  During the Term, Licensee shall make available to Programmer for its use, on the dates and at the times specified by Programmer, all of Licensee's rights to programs under any program rights agreements of the Station (together with the music licenses described below, the "Program Rights Agreements"). Licensee shall use its best efforts to secure all consents, if any, from third parties that are necessary to permit Programmer to use the programs under Program Rights Agreements.  Licensee shall maintain all necessary performing rights licenses to musical compositions included in any Program, subject to reimbursement by Programmer for the cost thereof.

8.  <u>Programs to Serve the Public Interest</u>.  Licensee acknowledges that it is familiar with the type of programming Programmer intends to provide and has determined that the broadcast of such programming on the Station would serve the public interest and is otherwise suitable. Programmer shall cooperate with Licensee to ensure that the Programs include material that is responsive to community problems, needs, and interests.

9.  <u>Programming Standards</u>.  Programmer shall use its best efforts to ensure that the Programs conform to all FCC Requirements applicable to broadcast radio stations.

10. <u>Expenses, Revenues and Accounts Receivables</u>.

10.1 <u>Expenses</u>. The Station's cash expenses arising or relating to the period before the Effective Date shall be the responsibility of Licensee, and Programmer shall not be obligated to reimburse Licensee or pay creditors of the Station for any expenses allocable to such period. Programmer shall be solely responsible for all expenses incurred on or after the Effective Date attributable to the Station operations.

10.2 <u>Advertising and Programming Revenues, Accounts Receivable</u>. Programmer shall set all commercial advertising rates during the Broadcasting Period for its own account and shall be entitled to collect all Accounts Receivable arising thereunder. Prior to the Effective Date of this Agreement, Licensee shall provide Programmer with a list of all commercial advertising scheduled to be broadcast on or after the Effective Date. All Accounts Receivable of the Licensee prior to the Effective Date shall be collected by Programmer and shall be applied toward unpaid Tower Sites rental fees for periods prior to December 1, 2004. Promptly after the Effective Date, Licensee shall, to the extent same is available to Licensee, furnish to Programmer a list of the Accounts Receivable (the "AR List"), which shall include the commissions due, if any, on those Accounts Receivable and to whom commissions are owed, that arose out of the operations of the Station as of the close of business on the day preceding the Effective Date but are due and payable thereafter. Programmer shall use such efforts as are reasonable and in the ordinary course of business to collect the Accounts Receivable for a period of one hundred twenty (120) days following the Effective Date (the "Collection Period"). This obligation, however, shall not extend to the institution of litigation, employment of counsel, or any other extraordinary means of collection.

- 9 -

So long as the Accounts Receivable are in Programmer's possession, neither Licensee nor its agents shall make any solicitation of them for collection purposes, nor institute litigation for the collection of any amounts due thereunder. All payments received by Programmer during the Collection Period from any person obligated with respect to any of the Accounts Receivable shall be applied against the invoice for which payment is made. If during the Collection Period any account debtor contests in writing the validity of its obligation with respect to any Account Receivable, then Programmer may return that Account Receivable to Licensee after which Licensee shall be solely responsible for the collection thereof. Programmer shall not incur or cause to be incurred any collateral or outside fees, costs or charges in connection with its efforts at collection of the Accounts Receivable without first having obtained the authorization in writing of Licensee. Any of the Accounts Receivable that are not collected during the Collection Period shall be reassigned to Licensee after which Programmer shall have no further obligation to Licensee with respect to the Accounts Receivable; provided, however, that all funds subsequently received by Programmer (without time limitation) that can be specifically identified, whether by accompanying invoice or otherwise, as a payment on any Account Receivable, shall be applied to payment of unpaid Tower sites rental fees for periods prior to December 1, 2004.

Political Time. Licensee shall, with respect to the Station, oversee and take ultimate responsibility with respect to the provision of equal opportunities, lowest unit charge, and reasonable access to political candidates, and compliance with the political broadcasting provisions of the FCC Requirements. Programmer shall cooperate with Licensee in complying with such provisions, and shall supply promptly

- 10 -

to Licensee such information reasonably requested by Licensee for such purposes. Licensee, in consultation with Programmer, will develop a statement which discloses its political broadcasting rates and policies to political candidates, and Programmer will follow those respective policies in the sale of political programming an advertising for the Station. Programmer shall provide any rebates due to political advertisers and release advertising availabilities to Licensee during the Broadcasting Period sufficient to permit Licensee to comply with political broadcasting provisions of the FCC Requirements. Revenues received by Licensee as a result of any such release of advertising time shall be for the account of Programmer.

12. <u>Call Letters and Frequency</u>. During the Term, Licensee (i) shall retain all rights (except as provided in the following sentence) to the Station's call letters and trade names, and (ii) shall not seek FCC consent to a modification of facilities which would specify a frequency change or have a material adverse effect upon the presently authorized coverage of the Station. Programmer shall include in the Programs for the Station an announcement in a form reasonably satisfactory to the Licensee in accordance with the FCC Requirements to identify such Station as well as any other announcements required by the FCC Requirements. Upon request of Programmer, Licensee based on its reasonable discretion, may agree to change the call letters of the Station if the parties agree such change may facilitate a sale of the Station to a third party purchaser.

13. <u>Events of Default and Termination</u>.

13.1 <u>Programmer's Events of Default</u>. The occurrence and continuation of any of the following will be deemed an Event of Default by Programmer under this Agreement:

- 11 -

(a)  Programmer fails to pay costs described in Section 5;

(b)  Programmer fails to observe or perform any other material covenants, condition or agreement contained in this Agreement; or

(c)  Programmer breaches or violates any material representation or warranty made by it under this Agreement.

13.2 Licensee's Events of Default.  The occurrence and continuation of any of the following will be deemed an Event of Default by Licensee under this Agreement:

(a)  Licensee fails to observe or perform any material covenant, condition or agreement contained in this Agreement; or

(b)  Licensee breaches or violates any material representation or warranty made by it under this Agreement.

13.3 Cure Period.  The defaulting party shall have thirty (30) days from the date on which Programmer has provided Licensee or Licensee has provided Programmer, as the case may be, with written notice specifying the Event(s) of Default, to cure any such Event(s) of Default.  If the Event of Default cannot be cured by the defaulting party within such time period (except in the case of a monetary default) but commercially reasonably efforts are being made to effect a cure or otherwise secure or protect the interests of the non-defaulting party (in which case, if successful, the Event of Default shall be deemed cured), then the defaulting party shall have an additional period not to exceed thirty (30) days to effect a cure or a deemed cure.

13.4 Termination for Uncured Event of Default. If an Event of Default by Programmer has not been cured or deemed cured within the period set forth in Section 13.3 above, then Licensee may terminate

- 12 -

this Agreement, effective immediately upon written notice to Programmer. If an Event of Default by Licensee has not been cured or deemed cured within the periods set forth in Section 13.3 above, then Programmer may terminate this Agreement, effective immediately upon written notice to Licensee.

13.5 <u>Termination By Licensee To Satisfy the FCC Requirements</u>. If Licensee is required by the FCC to terminate this Agreement by an FCC order, Licensee shall, or, if the FCC orders that this Agreement be terminated before its order becomes a Final Order and this Agreement cannot be revised to comply with applicable FCC Requirements as contemplated by Section 23 hereof, Licensee may, upon at least thirty (30) days' written notice to Programmer (or such shorter period as may be required by the FCC) terminate this Agreement.

14. <u>Certain Representations, Warranties and Covenants</u>.

14.1 <u>Mutual Representations Concerning This Agreement</u>. Licensee represents and warrants as follows: (a) Licensee has the requisite corporate power and authority to enter into and perform this Agreement; (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Licensee; and (c) the execution, delivery and performance of this Agreement by Licensee does not conflict with any other agreement to which Licensee is a party.

Programmer represents and warrants as follows: (a) Programmer is a Massachusetts corporation duly organized, validly existing and in good standing under the laws of The Commonwealth of Massachusetts; (b) Programmer has the requisite power and authority to enter into and perform this Agreement; (c) the execution, delivery and performance of this Agreement have been duly authorized by all necessary actions of Programmer; and (d) the execution, delivery and performance of this

- 13 -

Agreement by Programmer does not conflict with any other agreement to which Programmer is a party.

14.2 <u>Reduction of Station Payables</u>. Licensee delegates to Programmer the authority to negotiate with any parties to whom the Station owed money prior to December 1, 2004 for the purpose of attempting to reduce the Station's accounts payable arising from Station operations prior to December 1, 2004.

14.3 <u>Compliance with FCC Requirements</u>. Programmer represents, warrants and covenants that its execution and performance of this Agreement is, and will remain, in compliance with the FCC Requirements, including without limitation, 47 C.F.R. § 73.3555.

15. <u>Station Operations</u>.

(i) Programmer shall use best efforts to broadcast programs from the Station on a 24 hour per day, seven days per week basis from the Station, which may include automated satellite programming.

(ii) Licensee acknowledges that past due rents are due to the Landlords of the Tower Sites leased by Licensee in Framingham, Massachusetts and Ashland, Massachusetts. Licensee authorizes Programmer to negotiate with such Landlords for an extended payment schedule of past due rents in order to attempt to avoid either landlord from terminating the Tower Sites leases with the Licensee. Moreover, Licensee authorizes Programmer to reduce the overhead costs of running the Station to the extent possible, including elimination of Station personnel and staff layoffs, and terminating the 164 Canal Street, Boston lease, between Licensee and the landlord of these premises. Licensee also authorizes Programmer to enter into Time Brokerage Agreements with third parties for broadcast programs on the Station, all in accordance with applicable FCC requirements. Licensee agrees to

- 14 -

assist Programmer, to the extent possible in this regard, and to attempt to exert pressure on Egan Communications, LLC, the Station's prior Programmer, to pay any amounts due to third party creditors of the Station under the provisions of the Local Marketing Agreement and/or the Shared Services Agreement entered into in each case between Egan Communications, LLC, Bleidt and his affiliates.

16. <u>Modification and Waiver; Remedies Cumulative</u>. No modification or waiver of any provision of this Agreement will be effective unless in writing and signed by all parties. No failure or delay on the part of Programmer or Licensee in exercising any right or power under this Agreement will operate as a waiver of such right or power, nor will any single or partial exercise of any such rights or power or the exercise of any other right or power operate as a waiver. Except as otherwise provided in this Agreement, the rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies which a party may otherwise have.

17. <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

18. <u>Governing Law</u>. This Agreement shall be construed and interpreted under the laws of The Commonwealth of Massachusetts. The parties hereto agree that any disputes arising out of this Agreement shall be heard before the Federal District Court for the  District of Massachusetts and agree to that venue and jurisdiction of that court.

19. <u>Notices</u>. Notices required to be provided by this Agreement shall be given as follows:

      TO LICENSEE:    David Vicinanzo, Receiver
                      c/o Nixon Peabody LLP
                      100 Summer Street

- 15 -

```
                          Boston, MA 02110

      COPY TO:            Kevin M. Fitzgerald, Esq.
                          Nixon Peabody, LLP
                          889 Elm Street
                          Manchester, NH 03101

      TO PROGRAMMER:      Alexander G. Langer, President
                          Langer Communications Corp.
                          94 St. Rose Street
                          Jamaica Plain, MA 02130

      COPY TO:            Lawrence Litwak, Esq.
                          Greif & Litwak, P.C.
                          77 North Washington Street
                          Boston, MA 02114

      AND TO:             Frank A. Libby, Jr., Esq.
                          Kelly Libby & Hoopes
                          175 Federal Street
                          Boston, MA 02110
```

20. Entire Agreement. This Agreement embodies the entire understanding among the parties with respect to the subject matter hereof, and except for e-mail correspondence dated November 29, 2004 and November 30, 2004 between the parties relating to Actions Items and Equipment List for Receiver (attached hereto), supersedes any prior or contemporaneous written or oral agreement between the parties regarding such subject matter.

21. Relationship of Parties. This Agreement is between independent parties and will not be construed as creating a partnership, joint venture, or agency of any kind. No party shall have the right to bind the other party.

22. Force Majeure. Except for a failure on the part of Programmer to pay Station expenses as set forth in paragraph 5 hereof, the failure of a party hereto to comply with its obligations under this Agreement due to acts of God, strikes or threats thereof or force majeure or due to causes beyond such party's control will not constitute an Event of

- 16 -

Default under Section 13 of this Agreement and no party will be liable to the others therefor.

23. Subject to Laws; Invalidity. The obligations of the parties under this Agreement are subject to the FCC Requirements and all other applicable laws. The parties acknowledge that this Agreement is intended to comply with FCC Requirements. However, in the event that the FCC determines that the continued performance of this Agreement is in violation of the FCC Requirements, each party will use commercially reasonable efforts to comply with the FCC Requirements or will in good faith contest or seek to reverse any such action or agree on the terms of a provision to this Agreement, in each case, on a time schedule sufficient to meet the FCC Requirements and so long as the fundamental nature of the business arrangement between the parties evidenced by this Agreement is maintained. If any provision of this Agreement is otherwise held to be illegal, invalid, or unenforceable under present or future laws, then such provision shall be fully severable, this Agreement shall be construed and enforced as if such provision had never comprised a part thereof, and the remaining provisions shall remain in full force and effect, in each case so long as the fundamental nature of the business arrangement between Programmer and Licensee has been maintained.

24. Reciprocal Indemnity.

24.1 Indemnification By Programmer. Programmer shall indemnify, defend, and hold harmless Licensee from and against any and all claims, losses, costs, liabilities, damages, and expenses (including reasonable attorneys' fees and other expenses incidental thereto) of every kind, nature and description, including but not limited to those relating to copyright infringement (except as may result from a breach of the

- 17 -

warranty in Section 14.1 hereof by Licensee), libel, slander, defamation or invasion of privacy, arising out of: (a) Programmer's broadcasts of the Programs; (b) any misrepresentation or breach of any warranty of Programmer, or (c) any breach of any covenant, agreement, or obligation of Programmer. If Programmer is required to indemnify Licensee as a result of programs broadcast hereunder which are supplied by a third party pursuant to a contract with Licensee, it is agreed that Programmer shall be subrogated to any rights which Licensee may have against such third party, including the right to indemnification by such third party.

24.2 <u>Indemnification by Licensee</u>. Licensee shall indemnify, defend, and hold harmless Programmer from and against any and all claims, losses, costs, liabilities, damages, and expenses (including reasonable attorneys' fees and other expenses incidental thereto) of every kind, nature and description, including but not limited to those relating to copyright infringement (except as may result from a breach of the warranty in Section 14.1 hereof by Programmer), libel, slander, defamation or invasion of privacy, arising out of: (a) Licensee's broadcast of programs on its own behalf, other than the Programs; (b) any misrepresentation or breach of any warranty of Licensee; or (c) any breach of any covenant, agreement, or obligation of Licensee.

25. <u>Headings</u>. The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

26. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were upon the same instrument.

- 18 -

09/21/05  WED 09:24 FAX 6284022        NIXON PEABODY LLP                          002
2002 (2) (TX/RX NO 7952) 09/20/2005 TUE 17:06

From :                              PHONE No. : 6175224889            Sep. 20 2005  5:21PM  P01

27. _Survival_. All representations, warranties, covenants and agreements made by any party in this Agreement or pursuant hereto shall survive execution and delivery of this Agreement.

28. _Counsel_. Each party has been represented by its own counsel in connection with the negotiation and preparation of this Agreement and, consequently, each party hereby waives the application of any rule of law to the effect that any provision of this Agreement shall be interpreted or construed against the party whose counsel drafted that provision.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective duly authorized officers as of the date first written above.

1060 COMMUNICATIONS CORP.

By: _____
    Alexander G. Langer, Pres/Pres

ASSENT:
FOR PURPOSES OF SECTION 4(a)
OF THE WITHIN AGREEMENT

_____
Alexander G. Langer

WDIX CORP.
(Formerly Langer Broadcasting
 Corporation)

By: _____ 9/21/05
    David A. Vicinanzo, Receiver

PERSPECTIVE BROADCASTING, INC.

By: _____ 9/21/05
    David A. Vicinanzo, Receiver

BRADFORD C. BLEIDT

By: _____ 9/21/05
    David A. Vicinanzo, Receiver

110401623

- 18 -

002
010 010 (2)              GREIF & LITVAK            617 723 9490 17:00 2005/20/09
                         GREIF & LITVAK            617 723 9490 FAX 17:00 2005/24/10

# EXHIBIT P

# David L. Sutherland

*Certified Public Accountant*

4 Brownfield Lane, Georgetown, MA  01833
Tel  978/ 352-9170    Fax  978/ 352-9171
Email  DLSCPA@comcast.net

October 21, 2005

Alexander G. Langer, President
1060 Communications Corp.
94 St. Rose Street
Jamaica Plain, MA  02130

Dear Alex:

Pursuant to your request, please find below a summary of the monthly income and expense activity associated with the operation of WBIX by 1060 Communications Corp. from inception to August 31, 2005:

|          | Income  | Expenses  | Profit (Loss) |
|----------|---------|-----------|---------------|
| Dec 2004 | 19,700  | (45,004)  | (25,304)      |
| Jan 2005 | 26,000  | (24,254)  | 1,746         |
| Feb 2005 | 33,915  | (35,466)  | (1,551)       |
| Mar 2005 | 56,951  | (24,475)  | 32,476        |
| Apr 2005 | 40,579  | (32,830)  | 7,749         |
| May 2005 | 45,418  | (35,332)  | 10,086        |
| Jun 2005 | 41,555  | (40,071)  | 1,484         |
| Jul 2005 | 57,975  | (34,691)  | 23,284        |
| Aug 2005 | 48,850  | (36,888)  | 11,962        |
| Totals   | 370,943 | (309,011) | 61,932        |

As you are aware, you loaned $42,000 in personal funds to 1060 Communications Corp. and the loan has not yet been repaid. The dates and amounts of the loans are as follows:

| December 7, 2004  | $30,000 |
| February 28, 2005 | $12,000 |

Also, I understand from our last conversation that the expenses above do not include payroll for yourself, and also do not yet reflect the payroll cost of several other operating personnel who are providing direct services in the operation of WBIX but are being paid through your other company.

Should you have any questions, please feel free to give me a call.

Oct 21 05  11:58a       David L. Sutherland, CPA    (978)352-9171        p.2

Alexander G. Langer
October 21, 2005
Page 2 of 2

Very truly yours,

David L. Sutherland, CPA

Cc:    Lawrence Litwak, Esq.