**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

—————————————————————————
SECURITIES AND EXCHANGE COMMISSION,)
       Plaintiff,         )   Case No. 04-CV-12415-NG
                       )
       v.                 )
                       )
BRADFORD C. BLEIDT and       )
ALLOCATION PLUS ASSET MANAGEMENT  )
COMPANY, INC.,            )
       Defendants.       )
—————————————————————————
GERTNER, D.J.:

**ORDER RE: SEC FIRST INTERIM APPLICATION**
**FOR COUNSEL FEES AND EXPENSES**
**January 27, 2006**

I.   **OVERVIEW**

On November 12, 2004, the Securities and Exchange Commission (the "Commission") commenced an action against Bradford C. Bleidt ("Bleidt") and Allocation Plus Asset Management ("APAM"). APAM was an investment advisory and asset management firm and Financial Planning Perspective Services, Inc. ("FPPS") was an investment advisory firm specializing in financial planning. F.P. Insurance Agency, Financial Perspectives Management Company, Perspective Broadcasting Inc., and Shared Visions, Inc. (these six entities hereinafter referred to collectively as, the "Receivership Entities") were affiliates of APAM and FPPS. At the time this action was commenced, Bleidt was the Director, President, Treasurer and sole shareholder of APAM and the Chief Executive Officer and the majority shareholder of FPPS.

The allegations against Bleidt and APAM were serious, and indeed tragic.  In its Complaint, the Commission alleges that Bleidt defrauded his and APAM's investment advisory clients out of millions of dollars.  There were countless victims, many of whom presumably lost their life savings.  The SEC not only sought a judgment that the defendants had committed fraud, but also tried to recapture some of the victims' lost assets.

Accordingly, the SEC proceeded on two fronts almost immediately.  On the same day that the Complaint was filed, the Court, acting through Emergency Judge Richard G. Stearns, entered a Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief (the "TRO").  The TRO, among other things, froze Bleidt's assets and enjoined banks, brokerages, financial institutions and other persons from transferring funds or other assets held in the name of Bleidt and/or APAM.  A month later, the Court granted the Commission's Motion for a preliminary injunction, Order Freezing Assets, and Order for Other Equitable Relief.

After the case was brought, on November 18, 2004, the Court entered an order (the "Appointment Order") appointing David A. Vicinanzo as Receiver in this civil action.  Among other things, the Court's order directed the Receiver to:

> [t]ake and retain immediate possession, custody and control of the funds, assets and property of Bleidt, Allocation, its clients' accounts (the "Allocation Client Accounts"),

-2-

and of the funds, assets and property of all
other entities which Bleidt either owed,
controlled or benefitted from (including, but
not limited to, radio station WBIX, Financial
Perspectives Planning Services, Inc.,
Financial Perspectives Management Company,
F.P. Insurance Agency, Perspective
Broadcasting, Inc., Shared Visions, Inc. and
Langer Broadcasting Corporation), wherever
situated.[1]

With respect to compensation, the Appointment Order

provides, in relevant part:

The Receiver shall pay from the assets of
Bleidt, Allocation, radio station WBIX,
Financial Perspectives Planning Services,
Inc., Financial Perspectives Management
Company, FP Insurance Agency, Perspectives
Broadcasting, Inc., Shared Visions, Inc. and
Langer Broadcasting Corporation *all
reasonable costs, fees, taxes and other
expenses* (including fees relating to persons
employed by the Receiver in connection with
this receivership) incurred in the
performance of his duties, and shall be
compensated for services rendered by himself
and other Nixon Peabody partners at an hourly
rate not to exceed $420, for services
rendered by Nixon Peabody associates at an
hourly rate not to exceed $280, and for
services rendered by paralegals and legal
assistants at an hourly rate not to exceed
$130. (emphasis added).

Additionally, the Order provided for the payment of interim fees

to the Receiver:

---

[1] On November 19, 2004, the United States commenced a criminal action
against Bleidt: USA v. Bleidt, Criminal Action No. 04-0027-JLA-ALL (the
"Criminal Action"). On July 26, 2005, Bleidt pleaded guilty to 115 counts of
mail fraud and one count of money laundering. He was sentenced to 135 months
in prison and ordered to pay restitution in the amount of $31,734,192.75.

> The Receiver shall be compensated from the funds
> in his custody; provided, however, that before
> paying any such fees: (i) the Receiver must
> provide all fee applications . . . to counsel for
> the Commission for review and approval as to
> reasonableness ten days prior to submission for
> Court approval; and (ii) the Receiver must obtain
> approval of payment of the fees and expenses from
> this Court, which shall review such fees and
> expenses for reasonableness in determining
> whether, in its discretion, such payment will be
> approved. . . .
> . . . .
> Every ninety (90) days from the date of this
> Order, the Receiver shall file a Report with the
> Court summarizing his activities . . . The
> Receiver shall also include in the Report an
> application to the Court for an order approving
> the payment of all reasonable fees and expenses. .
> . .

While Receiver had the right to petition for interim fees,
it did not do so until recently (docket entry # 49).  The problem
is that the fees requested by the Receiver in his First Interim
Application for Compensation nearly equal the amount currently
available.  While the receiver has recovered value for the
estate, his request for interim fees in the amount of
$966,207.02, if granted, would wipe out three quarters of that
value.  To address this dilemma, I held a hearing at which all
interested parties, including investors, were invited to
participate.

A few things must be said about this petition at the outset:
First, the Receiver was plainly significant to this case.  The
work that needed to be done to assemble the defendants' assets,

-4-

which included ongoing enterprises, was plainly more than the SEC
was capable of doing.  And it was also beyond the ken of
individual investors.  At the same time, it was work that was
essential to the task of recovering any of the money allegedly
swindled.

Second, it is also clear that the Receiver has done an
outstanding job.  The situation at the outset of the case was
dire from the perspective of the victims.  The defendants
appeared to be insolvent.  The efforts of the Receiver, virtually
all parties agree, enabled the estate to recover $1,354,299.73 in
cash to date, far less than the amount allegedly lost, but far
more than anyone expected.

Third, some objected to the award of a fee in excess of one
third of the total recovery to date, and even suggested that the
results were totally inadequate to justify the full fee, when
measured by the amount the investors lost.  But if the Court
agreed and either refused to award any fees at this time or
awarded dramatically reduced fees, it would be difficult -- if
not impossible -- to secure the services of competent counsel in
cases like this.

Fourth, the measure of the value created by the Receiver's
efforts is not whether he has recaptured the full amount that the
investors have lost.  As the SEC suggested, the proper measure is
state of the estate today as compared to what it was at the

-5-

outset of this case.  It noted that "no one could have predicted the sort of result that we have here today and they have done an outstanding job."

Fifth, the SEC, which is plainly interested in securing the most for the investors, has reviewed the Receiver's bills, as they were obliged to do under the Order, and has concluded that they were reasonable and should be paid.  The SEC agreed with an objector, the St. Demetrios Greek Orthodox Church, that the only question was when they should be received.  St. Demetrios Greek Orthodox church, argued that fees incurred in connection with third party claims against APAM's broker dealers and their respective insurance carriers should be deferred since those claims are pending.

After reviewing the application and the applicable law, as described below, I adopt this position.  Accordingly, I will withhold the payment of the $245,469.00 sought for work related to the broker-dealer settlement until that matter is resolved and the results assessed.  Thus, the total fee award is $720,738.02.

II.  **SUMMARY OF WORK PERFORMED BY THE RECEIVER**

Nixon Peabody, the law firm retained by the Receiver, has categorized their fee/expense requests into six categories.  The following serves as a rough summary of these activities:

A.  **Identifying, Preserving and Liquidating Receivership Assets**

**Hours:**    559.20

**Fees:**    $193,541.00

**1.    Nature of the work:**

- Preserving WBIX as a going concern.

- Marketing WBIX.

- Negotiating and document a rescission of WBIX sale.

- Locating, acquiring, and liquidating Bleidt's

personal property.

- Investigating the potential causes of action

available to APAM and FPPS (the financial institutions

owned by Bleidt).

**B.    <u>Review and Analysis of APAM and FPPS Customer Accounts
and Investigation into the Nature and Scope of Bleidt's
Fraud</u>**

**Hours:**    654.50

**Fees:**    $245,469.00

- Investigating Bleidt's alleged misappropriation and

embezzlement of more than $30 million in investor

funds.

- Mitigating the effect of the TRO and Preliminary

Injunction on bona fide APAM and FFPS customers (I

believe that APAM and FFPS funds were frozen after the

fraud was discovered).

- Attempting to negotiate a global settlement of client-victim claims against APAM's broker-dealers and their respective insurance carriers.

- Note: the fees requested in this category have been reduced by $21,504 to reflect the fact that the global settlement has not yet been reached; Nixon Peabody reserves the RIGHT TO SEEK THIS payment at a later date.

**C.    Wind up of APAM's and FPPS's Investment Businesses**

**Hours:**    384.60

**Fees:**    $140,794.00

- Termination of APAM's advisory agreements.

- Transfer of all of APAM and FPPS clients to WEC.

- Ensuring that all of these accounts were covered by appropriate investment representatives.

- Preparing final portfolio statements for each APAM account.

- Addressing myriad employee issues.

- Negotiating the termination and surrender of the businesses' fives leased facilities.

**D.    Investor Communications**

**Hours:**    273.70

**Fees:**    $64,375.00

- Preparation of interim reports to keep investors appraised of receiver's results in recovering proceeds of Bleidt's fraud.

- Preparation and circulation of two confidential memoranda to defrauded investors explaining how Bleidt committed the fraud.

- Held meetings with investors to discuss claims and case status.

- Created web page for receiver.

**E.    General Case Administration**

**Hours:**    985.90

**Fees:**    $314,272.30

- Nixon does not detail the work performed in this category but seems to suggest that some of it may be work that was performed before Nixon Peabody created the categories and which was not later re-categorized.

**F.    Expenses**

**Total:**    $21,599.96

**Requested Compensation:** $7,755.72

- Expenses include photocopying charges, postage charges, telephone charges, facsimile expenses, and travel expenses.

- Nixon Peabody states that they are not seeking reimbursement for 2/3 of the expenses incurred,

including expenses for legal research, internal copying, secretarial overtime and travel.

### G.    **The Law Regarding Compensation**

Nixon Peabody concedes that the determination of fees and expenses is largely within the discretion of the court.  See Monaghan v. Hill, 140 F.2d 31 (9th Cir. 1944); In re Lloyd, Carr & Co., 2. B.R. 714 (D. Mass. 1979).

To determine the size of the award, the Court must first determine the "lodestar" by multiplying the hours worked on the case by a fair hourly rate (typically, one charged by comparable attorneys in the area), see Coutin v. Young & Rubicon Puerto Rico Inc., 124 F.3d 331 (1st Cir. 1997); Morgan v. Gittens, 915 F. Supp. 457, 469-74 (D. Mass. 1996), "and then subtracting from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir. 1984).  "Once established, the lodestar represents a presumptively reasonable fee, although it is subject to upward or downward adjustment in certain circumstances." Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); see also Wilson v. McClure, 135 F. Supp. 2d 66, 69 (D. Mass. 2001).  Other "[r]elevant considerations include the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the results obtained,

the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." Arthur P. Little Int'l Inc. v. Dooyang Corp., 995 F. Supp. 217, 221 (D. Mass. 1998) (internal quotations and citations omitted).  I would like to discuss each of the respective factors here:

> 1.  Nature of the Case and the Issues Presented.
>     Nixon Peabody argues that they undertook a daunting task as counsel for the receiver and that untangling Bleidt's fraud, protecting investors from further fraud, maintaining the radio station as a going concern, selling the radio station required a broad range of expertise and ability. I agree.

> 2.  Time and Labor Required.  Nixon Peabody explains that individuals employed by their firm spent in excess of 2,857 hours working on the matter and that a detailed breakdown of this work is contained in Exhibits C1-C5.  I agree.

> 3.  The Amount at Issue and the Results Obtained.
>     Nixon Peabody argues that they have managed to confirm that Bleidt defrauded investors out of more than $30 million, collected more than a half million dollars and "mitigate[d] the impact of Bleidt's fraud on investors, employees, the creditors and parties-in-interest."  Additionally, NP adds that they were able to keep the radio station operating despite its almost complete lack of funds, negotiate a rescission agreement with Langer, and developed the facts necessary for individual investors to bring causes of action against third parties who may be civilly culpable for Bleidt's schemes.  I agree, though I note that Nixon Peabody has not yet fully resolved the issues relating to the broker-dealer settlement.

> 4.  Experience, Reputation and Ability of NP.  The attorneys in Nixon Peabody's employ clearly have substantial experience.

-11-

5.  <u>Usual Price Charged for Similar Services and
    Amount of Awards in Other Cases.</u>  Nixon Peabody
    alleges that the hourly rates charged in this case
    are substantially less than what they and other
    law firms in the area charge for similar work.  NP
    further alleges that this reduction from their
    typical rates has resulted in a savings of
    $132,426.50.  Additionally, NP has written off or
    deferred more than $38,000 in additional charges.
    These fees are also consistent with awards in
    other large receivership cases.

6.  <u>Risk of Nonpayment.</u>  NP asserts that they
    undertook a very substantial and complicated
    assignment, succeeded to very little cash and have
    financed all of the work performed thus far.
    Given the uncertainties surrounding the recovery
    of the vestiges of Bleidt's estate and the fact
    that payment is contingent, to some extent, on
    this Court's approval, there was real risk of
    nonpayment.

The SEC has reviewed the Receiver's First Interim
Application and adjudged it reasonable.  I agree.  Accordingly, I
award the Receiver the fees sought in its First Interim
Application for Compensation but I will withhold the payment of
the $245,469.00 sought for work related to the broker-dealer
settlement until that matter is resolved and the results
assessed.

Therefore, the total fee of Seven Hundred Twenty Thousand,
Seven Hundred Thirty-Eight And 02/100 **($720,738.02)** Dollars is
hereby **AWARDED TO THE RECEIVER.**


**SO ORDERED.**

**Date:  January 27, 2006**          /s/NANCY GERTNER, U.S.D.J.

-12-